# EXHIBIT A

**afterpay**

For personal use only

*Afterpay Limited ASX: APT*

# ASX Announcement

**5 November 2021**

## Scheme Booklet registered with ASIC

Afterpay Limited (**Afterpay**) refers to the announcement made yesterday in relation to the proposed acquisition by Lanai (AU) 2 Pty Ltd, a wholly owned indirect subsidiary of Square, Inc. (NYSE: SQ) (**Square**) of Afterpay by way of scheme of arrangement (**Scheme**), and the orders made by the Supreme Court of New South Wales that Afterpay convene and hold a meeting of Afterpay shareholders to consider and vote on the Scheme (**Scheme Meeting**) and approving the distribution of an explanatory statement providing information about the Scheme and notice of Scheme Meeting (**Scheme Booklet**) to Afterpay shareholders.

**Scheme Booklet**

Afterpay confirms that the Scheme Booklet has today been registered with the Australian Securities and Investments Commission (**ASIC**). A copy of the Scheme Booklet is attached and will be made available online at https://corporate.afterpay.com/investors/egm-2021.

Further details on where the Scheme Booklet can be viewed and downloaded will be dispatched to Afterpay shareholders today, as described in the announcement dated 4 November 2021.

The Scheme Booklet should be read in its entirety before making a decision on whether or not to vote in favour of the Scheme.

**Independent Experts Report**

The Scheme Booklet includes a copy of the independent expert's report prepared by Lonergan Edwards & Associates Limited (**Independent Expert**).

The Independent Expert has concluded that the Scheme is fair and reasonable and in the best interests of Afterpay shareholders, in the absence of a Superior Proposal.

The Independent Expert's conclusion should be read in context with the full Independent Expert's Report and the Scheme Booklet.

**afterpay.com**       Afterpay Limited    |    ACN 618 280 649    |    ASX:APT
Level 5, 406 Collins Street, Melbourne VIC 3000, Australia                1

**1**

**Afterpay Directors' Recommendation**

The Afterpay Directors unanimously recommend that Afterpay shareholders vote in favour of the Scheme, in the absence of a Superior Proposal and subject to the Independent Expert continuing to conclude that the Scheme is in the best interests of Afterpay shareholders. Each Afterpay Director intends to vote all of the Afterpay Shares held or controlled by them in favour of the Scheme subject to the same qualifications.[1]

**Scheme Meeting**

The Scheme Meeting will be conducted as a virtual meeting at 10.00am (AEDT) on Monday, 6 December 2021. As previously announced, having regard to the uncertainty and potential health risks associated with large gatherings during the COVID-19 pandemic, Afterpay shareholders will not be able to attend the Scheme Meeting in person. Afterpay shareholders and their authorised proxies, attorneys and corporate representatives may participate in the Scheme Meeting through an online platform available at http://web.lumiagm.com/354553219  (meeting ID 354553219). Afterpay shareholders who participate in the Scheme Meeting via the online platform will be able to listen to the Scheme Meeting, cast a vote online and ask questions.

All registered Afterpay shareholders as at 7.00pm (AEDT) on Saturday, 4 December 2021 will be eligible to vote at the Scheme Meeting.

You should carefully read the Scheme Booklet in its entirety before making any decision in relation to the Scheme. You are encouraged to seek independent financial, legal, accounting, taxation and/or other professional advice before making any voting or investment decision in relation to your Afterpay shares.

**Further Information**

If you have any questions in relation to the Scheme or the Scheme Booklet, please contact the Afterpay Shareholder Information Line on 1300 229 418 (within Australia), or +61 2 9066 4051 (outside Australia) between Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT).

**Authorised by**

Anthony Eisen
Co-CEO & Managing Director

---

[1] In relation to the recommendation of Co-CEOs Anthony Eisen and Nick Molnar, Afterpay shareholders should have regard to the fact that, if the Scheme is implemented, each of Anthony Eisen and Nick Molnar will receive those entitlements as described in section 10.1 of the Scheme Booklet.

**afterpay.com**                 Afterpay Limited    |    ACN 618 280 649    |    ASX:APT
                                 Level 5, 406 Collins Street, Melbourne VIC 3000, Australia              2

For personal use only

**afterpay**

**ENDS**

For further information please contact

| Investors | Media | Company |
|---|---|---|
| Investors<br>Rhianna Fursdon<br>Senior Director Investor Relations<br>rhianna.fursdon@afterpay.com<br>+61 477 020 337 | ANZ<br>Amanda Shannahan Moore<br>Global Director, Comms & PR<br>amanda.shannahan@afterpay.com<br>+61 429 374 631<br><br>North America<br>Amanda Pires<br>VP, Communications<br>amandap@afterpay.com<br>+1 650-208-372 | Amanda Street<br>Company Secretary<br>amanda.street@afterpay.com |

For personal use only

**afterpay.com**     Afterpay Limited   |   ACN 618 280 649   |   ASX:APT
Level 5, 406 Collins Street, Melbourne VIC 3000, Australia                 3



For personal use only

# Scheme Booklet

For a scheme of arrangement in relation to the proposed acquisition of Afterpay Limited by Lanai (AU) 2 Pty Ltd, a wholly owned indirect subsidiary of Square, Inc.

# Vote In Favour

YOUR DIRECTORS UNANIMOUSLY RECOMMEND THAT YOU APPROVE THE SCHEME BY VOTING IN FAVOUR OF THE SCHEME RESOLUTION, IN THE ABSENCE OF A SUPERIOR PROPOSAL AND SUBJECT TO THE INDEPENDENT EXPERT CONTINUING TO CONSIDER THE SCHEME TO BE IN THE BEST INTERESTS OF AFTERPAY SHAREHOLDERS

This is an important document and requires your immediate attention. You should read this document carefully and in its entirety before deciding whether or not to vote in favour of the resolution to approve the Scheme. If you are in doubt as to what you should do, you should consult your legal, financial or other professional adviser.

If, after reading this Scheme Booklet, you have any questions about the Scheme or the number of Afterpay Shares you hold or how to vote, please call the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT).

If you have recently sold all of your Afterpay Shares, please disregard this document.

| Financial Advisers | Financial Adviser to the Board | Legal Adviser |
|---|---|---|
|   |  |  |

**4**

# Important Notices

For personal use only

## Defined Terms and Interpretation

Capitalised terms used in this Scheme Booklet are defined in the Glossary in section 11 of this Scheme Booklet. If a word or phrase is defined, its other grammatical forms have a corresponding meaning. The documents reproduced in the attachments to this Scheme Booklet may have their own defined terms, which sometimes differ from those in the Glossary.

## This Scheme Booklet

This Scheme Booklet will explain the terms of the Scheme, the manner in which the Scheme will be considered and implemented (if approved), and sets out information as prescribed by law or that may be material to Afterpay Shareholders' decision as to whether to vote in favour of the Scheme. This Scheme Booklet includes the explanatory statement required to be sent to Afterpay Shareholders in relation to the Scheme under Part 5.1 of the Corporations Act. A copy of the proposed Scheme is set out in Attachment A to this Scheme Booklet.

This Scheme Booklet is not a prospectus lodged under chapter 6D of the Corporations Act in respect of New Square Shares. An offer of shares does not require disclosure under chapter 6D of the Corporations Act if such an offer is made under a compromise or arrangement under Part 5.1 of the Corporations Act and is approved at a scheme meeting held pursuant to a court order made under section 411(1) or (1A) of the Corporations Act.

## Responsibility for Information

Except as provided below, the information in this Scheme Booklet has been provided by Afterpay and is the responsibility of Afterpay. Neither Square nor Square Acquirer or their directors, officers and advisers assume any responsibility for the accuracy or completeness of any such Afterpay Information.

Square has provided and is responsible for the Square Information. Afterpay and its directors, officers and advisers do not assume any responsibility for the accuracy or completeness of the Square Information.

The Independent Expert, Lonergan Edwards & Associates Limited, has provided and is responsible for the information contained in Attachment C to this Scheme Booklet. Afterpay does not assume any responsibility for the accuracy or completeness of the information contained in Attachment C to this Scheme Booklet except in relation to information given by it to the Independent Expert. Square does not assume any responsibility for the accuracy or completeness of the information contained in Attachment C to this Scheme Booklet. The Independent Expert does not assume any responsibility for the accuracy or completeness of the information contained in this Scheme Booklet other than that contained in Attachment C.

Ernst & Young Strategy and Transactions Limited (**Ernst & Young Strategy and Transactions**) has prepared the Independent Limited Assurance Report set out in Attachment D and takes responsibility for that report. Computershare has had no involvement in the preparation of any part of this Scheme Booklet other than being named as the Afterpay Share Registry. Computershare has not authorised or caused the issue of, and expressly disclaims and takes no responsibility for, any part of this Scheme Booklet.

## Investment Decisions

The information in this Scheme Booklet does not constitute financial product advice. This Scheme Booklet has been prepared without reference to the investment objectives, financial situation or particular needs of any Afterpay Shareholder or any other person. This Scheme Booklet should not be relied on as the sole basis for any investment decision. Independent legal, financial and taxation advice should be sought before making any investment decision in relation to your Afterpay Shares.

## ASIC and ASX Involvement

This document is the explanatory statement for the scheme of arrangement between Afterpay and the holders of Afterpay Shares as at the Record Date for the purposes of section 412(1) of the Corporations Act. A copy of the proposed Scheme is included in this Scheme Booklet as Attachment A.

A copy of this Scheme Booklet (including the Independent Expert's Report) has been lodged and registered with ASIC for the purposes of section 412(6) of the Corporations Act. ASIC has been given the opportunity to comment on this Scheme Booklet and has been requested to provide a statement in accordance with section 411(17)(b) of the Corporations Act that ASIC has no objection to the Scheme. If ASIC provides that statement, then it will be produced to the Court on the Court Approval Date.

Neither ASIC nor any of its officers take any responsibility for the contents of this Scheme Booklet.

A copy of this Scheme Booklet will be lodged with ASX. Neither ASX nor any of its officers take any responsibility for the contents of this Scheme Booklet.

For personal use only

## Important Notice Associated with Court Order under Subsection 411(1) of the Corporations Act

The fact that under subsection 411(1) of the Corporations Act the Court has ordered that a meeting be convened and has approved the explanatory statement required to accompany the notice of the meeting does not mean that the Court:

- has formed any view as to the merits of the proposed Scheme or as to how members should vote (on this matter members must reach their own decision); or
- has or will approve the terms of the Scheme; or
- has prepared, or is responsible for the content of, the explanatory statement.

The order of the Court that the Scheme Meeting be convened is not, and should not be treated as, an endorsement by the Court of, or any other expression of opinion by the Court on, the Scheme.

## Notice Regarding Second Court Hearing and Afterpay Shareholders' Rights to Oppose the Scheme

The date of the Second Court Hearing to approve the Scheme is Friday, 10 December 2021. The hearing will be at 9.15am (AEDT) at the Supreme Court of New South Wales at Law Courts Building, 184 Phillip Street, Sydney NSW 2000.

Each Afterpay Shareholder has the right to appear and be heard at the Second Court Hearing and if so advised, oppose the approval of the Scheme at the Second Court Hearing. If you wish to oppose in this manner, you must file and serve on Afterpay a notice of appearance, in the prescribed form, together with any affidavit on which you wish to rely at the hearing. The notice of appearance and affidavit must be served on Afterpay at its address for service at least one day before Friday, 10 December 2021.

The address for service for Afterpay is:
126 Buckingham Street,
Surry Hills NSW 2010

with a copy to

Gilbert + Tobin,
L35, Tower Two,
International Towers Sydney
200 Barangaroo Avenue,
Barangaroo NSW 2000.

(Attention: Andrew Cameron)
Email: andrew.cameron@afterpay.com.

## Disclosure Regarding Forward-Looking Statements

This Scheme Booklet contains both historical and forward-looking statements.

The forward-looking statements reflect the views of Afterpay or, in relation to the Square Information, Square, held only as at the date of this Scheme Booklet concerning future results and events and generally may be identified by the use of forward-looking words or phrases such as "believe", "aim", "expect", "anticipated", "intending", "foreseeing", "likely", "should", "planned", "may", "estimated", "potential", or other similar words and phrases. Similarly, statements that describe Afterpay's and Square's objectives, plans, goals or expectations are or may be forward-looking statements.

The statements in this Scheme Booklet about the impact that the Scheme may have on the results of Afterpay's operations, and the advantages and disadvantages anticipated to result from the Scheme, are also forward-looking statements.

Examples of forward-looking statements in this Scheme Booklet include, among others, statements regarding the future performance of Square and Afterpay, the perceived synergies and other benefits of the pending transaction between Square and Afterpay; the ability of the transaction to accelerate growth and to strengthen the integration between Square's Seller and Cash App ecosystems; and expectations around the financial impact of the transaction on Square's financials. Although Square believes that the views reflected in any forward-looking statements contained in the Square Information in this Scheme Booklet have been made on a reasonable basis, no assurance can be given that such views will prove to have been correct.

Although Afterpay believes that the views reflected in any forward-looking statements contained in the Afterpay Information in this Scheme Booklet have been made on a reasonable basis, no assurance can be given that such views will prove to have been correct.

These forward-looking statements involve known and unknown risks, uncertainties, assumptions and other factors that may cause either Afterpay's or Square's actual results, performance or achievements to differ materially from the anticipated results, performance or achievements expressed, projected or implied by these forward-looking statements. In addition, factors related to the Scheme that contribute to the uncertain nature of the forward-looking statements include, but are not limited to: the expected timing to complete the Scheme; filings and approvals relating to the Scheme; the ability to complete the Scheme considering the various closing conditions, including shareholder approvals; and the possibility that a governmental entity may prohibit, delay or refuse to grant approval for the consummation of the Scheme. Deviations

**6**

as to future results, performance and achievements are both normal and to be expected. Afterpay Shareholders should note that the historical financial performance of Afterpay or Square is no assurance of future financial performance of Afterpay or Square (whether the Scheme is implemented or not). Afterpay Shareholders should review carefully all of the information included in this Scheme Booklet, including the risks described in section 7. The forward-looking statements included in this Scheme Booklet are made only as of the date of this Scheme Booklet. Neither Afterpay, nor Square nor their directors give any representation, assurance or guarantee to Afterpay Shareholders that any forward-looking statements will actually occur or be achieved. Afterpay Shareholders are cautioned not to place undue reliance on such forward-looking statements.

Subject to any continuing obligations under law or the ASX Listing Rules, Afterpay and Square do not give any undertaking to update or revise any forward-looking statements after the date of this Scheme Booklet to reflect any change in expectations in relation to those statements or any change in events, conditions or circumstances on which any such statement is based.

All subsequent written and oral forward-looking statements attributable to Afterpay or Square or any person acting on their behalf are qualified by this cautionary statement.

## Privacy and Personal Information

Afterpay, Square and their respective registries may collect personal information to implement the Scheme. The personal information may include the names, contact details and details of holdings of Afterpay Shareholders, plus contact details of individuals appointed by Afterpay Shareholders as proxies, corporate representatives or attorneys at the Scheme Meeting. The collection of some of this information is required or authorised by the Corporations Act.

Computershare advises that personal information it holds about you (including your name, address, date of birth and details of the financial assets) is collected by Computershare to administer your investment. Personal information is held on the public register in accordance with Chapter 2C of the Corporations Act. Some or all of your personal information may be disclosed to the Afterpay Share Registry, print and mail service providers, authorised securities brokers, any member of Square, Afterpay and its Related Bodies Corporate, and Afterpay and Square's advisers and service providers in Australia and overseas. Your information may also be disclosed to Australian government agencies, law enforcement agencies and regulators, or as required under other Australian law, contract, and court or tribunal order. For further details about our personal information handling practices, including how you may access and correct your personal information and raise privacy concerns,

visit our website at www.computershare.com for a copy of the Computershare condensed privacy statement, or contact Computershare by phone on 1300 850 505 (within Australia) and +61 3 9415 5000 (outside Australia) from 8.30am to 8.00pm (AEDT) Monday to Friday (excluding public holidays) to request a copy of the complete privacy policy.

The information may be disclosed to print and mail service providers, and to Afterpay and Square and their respective Related Bodies Corporate and advisers to the extent necessary to effect the Scheme. If the information outlined above is not collected, Afterpay may be hindered in, or prevented from, conducting the Scheme Meeting or implementing the Scheme effectively or at all. Afterpay Shareholders who appoint an individual as their proxy, corporate representative or attorney to vote at the Scheme Meeting should inform that individual of the matters outlined above.

## Implied Value

The Scheme Consideration comprises New Square Securities. The value of your Scheme Consideration will therefore vary based on changes in the Square Share Price and the AUD/USD exchange rate. Any reference to the implied value of the Scheme Consideration should not be taken as an indication that the implied value is fixed.

If you are an Ineligible Foreign Shareholder, this also applies to the New Square Shares which will be remitted to the Sale Agent to sell on your behalf. Any cash remitted to you under the Sale Facility will depend on the market price of Square Shares and the AUS/USD exchange rate after the sale by the Sale Agent has been completed.

## Disclaimer

No person is authorised to give any information or make any representation in connection with the Scheme that is not otherwise contained in this Scheme Booklet.

You should not rely on any information or representation not contained in this Scheme Booklet as having been authorised by Afterpay, Square or either of their directors and officers regarding the Scheme.

## Notice of Scheme Meeting

The Notice of Scheme Meeting is at Attachment E of this Scheme Booklet.

## Notice to Persons Outside Australia

The release, publication or distribution of this Scheme Booklet (electronically or otherwise) outside of Australia may be restricted by law. If you come into possession of this Scheme Booklet

For personal use only

**7**

outside of Australia, you should observe and seek your own advice on such restrictions. Any failure to comply with such restrictions may contravene applicable laws or regulations.

This Scheme Booklet has been prepared in accordance with the laws and regulations of Australia and the information contained in this Scheme Booklet may not be the same as that which would have been disclosed if this Scheme Booklet had been prepared in accordance with the laws and regulations outside Australia.

This Scheme Booklet and the Scheme do not in any way constitute an offer of securities in any place in which, or to any person to whom, it would not be lawful to make such an offer.

You will not be able to receive New Square Shares if you are an Ineligible Foreign Shareholder. Any New Square Shares will be issued to the Sale Agent and sold through the Sale Facility.

For further details about Ineligible Foreign Shareholders and foreign selling restrictions regarding the Scheme, you should refer to Frequently asked questions and section 3.10.

## Internet Websites

Any reference in this Scheme Booklet to any website is only for informational purposes and any information on such websites does not form part of this Scheme Booklet.

Afterpay and Square maintain websites. The information contained in Afterpay and Square's respective websites do not form part of this Scheme Booklet and should not be relied on by Afterpay Shareholders.

## Effect of Rounding

A number of figures, amounts, percentages, estimates, calculations of value and fractions in this Scheme Booklet are subject to the effect of rounding. Accordingly, the actual calculation of these figures may differ from the figures set out in this Scheme Booklet and any discrepancies between totals in tables or financial information, or in calculations, graphs or charts are due to rounding.

## Times and Dates

Unless otherwise stated, all times referred to in this Scheme Booklet are times in Sydney, Australia (AEDT), unless otherwise defined. All dates following the date of the Scheme Meeting are indicative only and are subject to the Court approval process and the satisfaction or, where applicable, waiver of the conditions precedent to the implementation of the Scheme (see Key dates section of this Scheme Booklet and clause 3 of the Scheme Implementation Deed).

## Currency

Unless otherwise specified, all references to A$ or AUD and Australian cents are references to the currency of Australia.

Unless otherwise specified, all references to US$ or USD are references to the currency of the US.

## Supplementary Information

For information about the steps that Afterpay will take if information about the Scheme needs to be updated, you should refer to section 10.16.

Please contact the Afterpay Shareholder Information Line on 1300 229 418 (within Australia), or +61 2 9066 4051 (outside of Australia) between Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT) if you have any questions or require further information.

## Date

This Scheme Booklet is dated 5 November 2021.



**8**

# Contents

| | |
|---|---|
| Important Notices | ii |
| Chair's Letter – Afterpay | 5 |
| Letter from Square's CEO and Chairman | 8 |
| Key Dates | 9 |
| Afterpay Directors' Recommendation and Matters Relevant to your Vote on the Scheme | 11 |
| Next Steps | 18 |
| How to Vote | 19 |
| 1.  Frequently Asked Questions | 22 |
| 2.  Summary of the Scheme | 35 |
| 3.  Overview of the Scheme | 37 |
| 4.  Information on Afterpay | 55 |
| 5.  Information on Square | 77 |
| 6.  Overview of the Combined Group | 119 |
| 7.  Key Risks | 167 |
| 8.  Taxation Considerations for Scheme Shareholders | 181 |
| 9.  Comparison of Relevant Australian and US Laws | 190 |
| 10. Additional Information | 206 |
| 11. Glossary | 213 |
| Attachment A.   Scheme of Arrangement made under Section 411 of the Corporations Act | 228 |
| Attachment B.   Deed Poll | 252 |
| Attachment C.   Independent Expert's Report | 264 |
| Attachment D.   Independent Limited Assurance Report | 406 |
| Attachment E.   Notice of Scheme Meeting | 417 |
| Attachment F.   Sample Proxy Form | 422 |
| Corporate Directory | 425 |

For personal use only

**9**

# Chair's Letter – Afterpay

Friday, 5 November 2021

For personal use only

Dear Afterpay Shareholders,

On behalf of the Afterpay Board, I am pleased to present this Scheme Booklet containing information about the proposed acquisition of Afterpay by Square, a leading global fintech company that builds tools to empower businesses and individuals to participate in the economy. The combination of Afterpay and Square will bring together two of the fastest growing global payments companies to advance a shared mission of economic empowerment and financial inclusion and provide Afterpay Shareholders with the opportunity to be a part of the future growth of an innovative company aligned with Afterpay's vision.

On 2 August 2021, Afterpay announced that it had entered into a Scheme Implementation Deed with Square and Square Acquirer, by which Square Acquirer would acquire all of the issued shares in Afterpay by way of a scheme of arrangement.

## Recommendation of the Afterpay Board

The Afterpay Board believes the complementarity of the Afterpay and Square businesses will deliver strategic and commercial outcomes and represents a compelling opportunity. The combination will enable the companies to better deliver compelling financial products and services that expand access to more customers and drive incremental revenue for merchants of all sizes.

For Afterpay, the combination will enable Afterpay to further accelerate its growth in the US and globally, offer access to a new category of in-person merchants, and provide a broader platform of new and valuable capabilities and services to its merchants and customers. For Square, Afterpay will help accelerate the strategic priorities for its Seller and Cash App ecosystems supported by shifting customer preferences away from traditional credit, especially among younger customers. It will also help Square meet the consistent demand from merchants for new ways to grow their sales, and further support the global growth in omnichannel commerce.

The all scrip[1] Scheme Consideration provides Afterpay Shareholders with the opportunity to realise greater long-term value for their shares from the potential expected synergies through the combination of Afterpay and Square. This Scheme Booklet is intended to enable you to assess the transaction, which is to be implemented by way of a Court approved scheme of arrangement, and to determine whether to vote in favour of the Scheme.

*The Afterpay Board unanimously recommends that you vote in favour of the Scheme in the absence of a Superior Proposal and subject to the Independent Expert continuing to conclude that the Scheme is in the best interests of Afterpay Shareholders and each Afterpay Director intends to vote all of the Afterpay Shares held or controlled by them in favour of the Scheme.[2]*

## Summary of the Offer Value for Afterpay Shareholders

If the Scheme is approved and implemented, you will be entitled to receive the Scheme Consideration for each Afterpay Share you hold on the Record Date.[3] The Scheme Consideration will comprise 0.375 New Square Securities per Afterpay Share, representing an ownership interest in Square Class A Shares.

As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the implied value of the Scheme Consideration was A$126.39 per Afterpay Share[4] and represents:

- a 30.8% premium over the undisturbed Afterpay Share Price on 30 July 2021 (being the last trading day prior to the announcement of the Scheme) of A$96.66;
- a 22.1% premium over the undisturbed 10-day VWAP of an Afterpay Share Price to 30 July 2021; and
- a 10.7% premium over the undisturbed 30-day VWAP of an Afterpay Share Price to 30 July 2021.

Please refer to section 3.1 for further information on the Scheme Consideration.

---

1. Ineligible Foreign Shareholders will have their New Square Shares issued instead to a Sale Agent. These shares will then be sold by the Sale Agent in the ordinary course of trading on NYSE and the net proceeds of the sale will be paid to the Ineligible Foreign Shareholders promptly afterwards. Refer to Section 3.5 for more details on this process.

2. You should note that when considering this recommendation that two of the Afterpay Directors (being Co-CEOs and Managing Directors, Anthony Eisen and Nick Molnar) have previously been issued options under the Afterpay equity incentive plan. As contemplated by the terms of the Scheme Implementation Deed, Mr Eisen and Mr Molnar will each be receiving a benefit if the Scheme proceeds. A pro rata portion of the unvested options they hold will be accelerated and the balance will be forfeited and converted into a Square award as contemplated in Section 4.11 of this Scheme Booklet. These arrangements are described in more detail in Sections 4.10, 4.11 and 10.1. The benefit to each of Anthony Eisen and Nick Molnar in respect of their Co-CEO Options is estimated to be approximately $9,612,242. See footnote 1 in section 10.1 for further information.

   Despite this interest in the outcome of the Scheme, each of Anthony Eisen and Nick Molnar, considers that, given the importance of the Scheme, and their role as directors of Afterpay, it is important and appropriate for them to provide a recommendation to shareholders in relation to voting on the Scheme. The Afterpay Board (excluding Anthony Eisen and Nick Molnar) also considers that it is appropriate for them to make a recommendation on the Scheme given their role in the management and operation of Afterpay.

3. Ineligible Foreign Shareholders will have their New Square Shares issued instead to a Sale Agent. These shares will then be sold by the Sale Agent in the ordinary course of trading on NYSE and the net proceeds of the sale will be paid to the Ineligible Foreign Shareholders promptly afterwards. Refer to Section 3.5 for more details on this process.

4. Based on the Square share price of US$254.50 and the AUD/USD exchange rate of 0.7551 as at the close of trading on NYSE on 29 October 2021, being the last practicable date before the date of this Scheme Booklet.

**10**

## Benefits of the Scheme

Reasons to vote for the Scheme include:

1.  The implied value of the Scheme Consideration offered to Afterpay Shareholders represents a significant premium to the trading prices of Afterpay Shares on ASX prior to the announcement of the Scheme

2.  The Independent Expert has concluded that the Scheme is fair and reasonable, and in the best interests of Afterpay Shareholders in the absence of a Superior Proposal

3.  Square brings added value, differentiation and scale to Afterpay's growth strategy

4.  The combination brings together two shared visions and cultures to drive a common purpose

5.  Afterpay Shareholders will benefit from any expected synergies generated by the transaction

6.  No Superior Proposal has emerged as at the date of this Scheme Booklet

7.  The Afterpay Share Price will continue to be subject to market volatility and may fall if the Scheme is not implemented and in the absence of a Superior Proposal

8.  Afterpay Shareholders may be eligible to receive the Scheme Consideration in the form of New Square CDIs listed on ASX

9.  Scheme Shareholders that are residents of Australia for tax purposes may be eligible for CGT roll-over relief for any gain made from the disposal of their Scheme Shares

10. Afterpay Shareholders will not incur any brokerage charges on the transfer of your Afterpay Shares if the Scheme proceeds

Further information in relation to these benefits is set out in **Reasons for recommendation and advantages of the Scheme**.

## Other Considerations

You should consider the reasons why you may not want to vote in favour of the Scheme. These reasons may include:

1.  You may wish to maintain your direct investment in Afterpay as an ASX-listed company and prefer Afterpay to continue to operate as a standalone entity

2.  There are risks associated with holding shares in the Combined Group which are different from those associated with your shareholding in Afterpay

3.  You may believe that the Scheme is not in your individual best interests and disagree with Afterpay Board's recommendation and the Independent Expert's conclusion

4.  The value of the New Square Securities which form the consideration is not certain until the Implementation Date

5.  There are risks associated with implementing the Scheme which you may consider outweigh the benefits of the Scheme

6.  You may consider that there is a possibility that a Superior Proposal could emerge in relation to Afterpay in the foreseeable future

Further information on these reasons is set out in **Reasons why Afterpay Shareholders may consider voting against the Scheme and disadvantages of the Scheme**.

## Independent Expert

The Afterpay Board appointed Lonergan Edwards & Associates to prepare an Independent Expert's Report opining on whether the Scheme is fair and reasonable and in the best interests of Afterpay Shareholders.

The Independent Expert has concluded that the Scheme Consideration is fair and reasonable and, therefore, the Scheme is in the best interests of Afterpay Shareholders, in the absence of a Superior Proposal.

The Independent Expert has assessed the value of an Afterpay Share to be in the range of A$115-135 per Afterpay Share. As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the implied value of the Scheme Consideration was A$126.39 per Afterpay Share[5] which falls within the Independent Expert's range.

The reasons why the Independent Expert reached these conclusions are set out in the Independent Expert's Report, a copy of which is included in Attachment C. The Afterpay Board encourages you to read this report in its entirety.

---

5.  Based on the Square share price of US$254.50 and the AUD/USD exchange rate of 0.7551 as at the close of trading on NYSE on 29 October 2021, being the last practicable date before the date of this Scheme Booklet.

**11**

For personal use only

## Your Vote is Important

Your vote is important regardless of how many shares you own in Afterpay and I encourage you to vote on the Scheme.

Voting will take place at the online Scheme Meeting to be held at 10.00am on Monday, 6 December 2021 through an online platform by using a **web browser** at http://web.lumiagm.com/354553219 on your smartphone, tablet or computer. Having regard to the uncertainty, legal restrictions and potential health risks associated with large gatherings during the COVID-19 pandemic, Afterpay Shareholders will not be able to attend the Scheme Meeting in person. Afterpay Shareholders who participate in the Scheme Meeting via the online platform will be able to listen to the Scheme Meeting, cast an online vote and ask questions online.

If you wish the Scheme to proceed, it is important that you vote in favour of the Scheme Resolution. Information on how to vote in the Scheme is set out in the "How to vote" section of this Scheme Booklet. The Scheme can only be implemented if approved by Afterpay Shareholders by the Requisite Majorities at the Scheme Meeting and by the Court.

### Conditions Precedent

The Scheme is subject to the approval of Afterpay Shareholders and the Court. It also remains subject to a number of other Conditions Precedent, including regulatory approvals as set out in section 3.11(a).

### Further Information

If you have any questions in relation to the Scheme or this Scheme Booklet, please contact the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT).

On behalf of the Afterpay Board, I would like to reiterate our support for the Scheme. We believe that it represents a compelling opportunity and attractive value to Afterpay Shareholders, and we encourage you to vote in favour of the Scheme, in the absence of a Superior Proposal.

I would also like to take this opportunity to thank you for your continued support of Afterpay.

Yours sincerely,

**Elana Rubin**
*Chair*
Afterpay

**12**

Afterpay **Scheme Booklet**    7

# Letter from Square's CEO and Chairman

Friday, 5 November 2021

Dear Afterpay Shareholder,

The Square Board and management are excited to offer you the opportunity to participate in the combination of Square and Afterpay, which will unite two companies aligned in a shared mission of economic empowerment and financial inclusion.

We built our business to make the financial system more fair, accessible, and inclusive, and Afterpay has built a trusted brand aligned with those principles. Together, we can better connect Square's largest ecosystems – Cash App and Seller – to deliver even more compelling products and services for merchants and consumers and ultimately better serve our customers around the world.

Square is recognised as an industry leader with customers across a diverse range of industries and countries. Businesses use Square to reach buyers online and in person, manage their business, and access financing. Individuals use Cash App to spend, send, store, and invest money. Square owns a majority ownership stake in TIDAL, a global music and entertainment platform that expands Square's purpose of economic empowerment to artists. We also recently launched TBD, a bitcoin focused open-developer platform with the goal of making it easier to create non-custodial, permissionless, and decentralized financial services.

As an Afterpay Shareholder, your vote is important in order to ensure the Scheme is implemented and you have the opportunity to participate in the future growth and performance of the Combined Group.

On behalf of the Square Board, we look forward to welcoming you as a shareholder of Square, following the successful closing of this transaction.

Sincerely,

*Jack*

**Jack Dorsey**
President, Chief Executive Officer and Chairman of the Board

**13**

# Key Dates

| Date | Event |
|------|-------|
| Friday, 5 November 2021 | Date of this Scheme Booklet |
| 10.00am on Saturday, 4 December 2021 | **Scheme Meeting proxies** – the last date and time by which Proxy Forms (including proxies lodged online), powers of attorney or certificates of appointment of body corporate representatives for the Scheme Meeting must be received by the Afterpay Share Registry. |
| 7.00pm on Saturday, 4 December 2021 | **Voting Record Date** – the date and time for determining eligibility to vote at the Scheme Meeting. |
| 10.00am on Monday, 6 December 2021 | Scheme Meeting<br><br>As a result of the potential health risks associated with large gatherings and the ongoing COVID-19 pandemic, the Scheme Meeting will be virtual (online only). There will not be a physical meeting where Afterpay Shareholders or their proxies, attorneys or corporate representatives can attend in person.<br><br>Further details relating to the Scheme Meeting are set out in the Frequently Asked Questions section of this Scheme Booklet and in the Notice of Scheme Meeting in Attachment E. |
| **If Afterpay Shareholders approve the Scheme at the Scheme Meeting** | |
| Friday, 10 December 2021 | Second Court Date to approve the Scheme |
| Friday, 10 December 2021 | **Effective Date** – this is the date on which the Scheme comes into effect and is binding on Afterpay Shareholders. Court order lodged with ASIC and announced on ASX.<br><br>Afterpay Shares will continue to trade on ASX after the Effective Date. If the Scheme becomes Effective, Afterpay Shareholders who sell their Afterpay Shares after the Effective Date and prior to the Record Date should be aware that they will not receive the Scheme Consideration on the Implementation Date. In addition, investors who acquire Afterpay Shares after the Effective Date should be aware that all Afterpay Shareholders who hold Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will be provided with the Scheme Consideration in exchange for their Afterpay Shares. The exchange ratio is fixed and holders of Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will receive 0.375 New Square Shares or 0.375 New Square CDIs. Square Class A Shares will continue to trade on NYSE between the Effective Date and the Record Date. |
| Tuesday, 4 January 2022 | **Election Date** – the latest time and date by which CDI Election Forms and Share Election Forms must be received by the Afterpay Share Registry, only if holders wish to make a Share Election or a CDI Election rather than receive their default Scheme Consideration. |
| Thursday, 6 January 2022 | Afterpay Shares will be suspended from trading at the close of trading on ASX on Thursday, 6 January 2022. If the Scheme proceeds, this will be the last day that Afterpay Shares will trade on ASX. |

*For personal use only*



**14**

Letter from Square's CEO and Chairman

| Date | Event |
| --- | --- |
| Friday, 7 January 2022 | Commencement of trading of New Square CDIs on ASX under a symbol to be advised before implementation of the Scheme (deferred settlement basis).[1] |
| Monday, 10 January 2022 | **Record Date** – determination of entitlement of Scheme Shareholders to receive the Scheme Consideration. |
| Tuesday, 18 January 2022 | **Implementation Date** – all Scheme Shareholders[2] will be provided with the Scheme Consideration to which they are entitled on this date. |
| Wednesday, 19 January 2022 | Holding statements or confirmation advice for New Square CDIs will be dispatched. |
| Wednesday, 19 January 2022 | Commencement of trading of New Square CDIs on ASX under a symbol to be advised before implementation of the Scheme (normal settlement basis). |
| Wednesday, 19 January 2022 | Commencement of cross-border conversions of New Square Shares and New Square CDIs between Australia and the US. |
| Wednesday, 19 January 2022 | Commencement of trading of New Square Shares (and Square Class A Shares underlying any New Square CDIs) on NYSE. |
| Thursday, 20 January 2022 | DRS statements for New Square Shares will be dispatched. |

*If the Scheme is approved by Afterpay Shareholders, but any Conditions Precedent remain outstanding on the scheduled date for the Second Court Hearing, the Second Court Hearing would be delayed until those Conditions Precedent have been satisfied or waived (if applicable).*

All dates following the date of the Scheme Meeting are indicative only and are subject to the Court approval process and the satisfaction or, where applicable, waiver of the Conditions Precedent to the implementation of the Scheme (see Key dates section of this Scheme Booklet). All dates and times, unless otherwise indicated, refer to the date and time in Sydney, Australia. Any changes to the above timetable will be announced to ASX and notified on Afterpay's website at https://corporate.afterpay.com/.

---

1. The exact number of New Square Securities to be issued to you will not be known until after the Record Date and will not be communicated to you until after you receive your statement or confirmation advice statements following the Implementation Date. Therefore, please be aware that, if you trade in New Square CDIs during the deferred settlement period and prior to receipt of your holding statement or confirmation advice, you do so at your own risk. See section 7.5(d) for further details.
2. Ineligible Foreign Shareholders will have their New Square Shares issued instead to a Sale Agent. These shares will then be sold by the Sale Agent in the ordinary course of trading on NYSE and the net proceeds of the sale will be paid to the Ineligible Foreign Shareholders promptly afterwards. Refer to section 3.5 for more details on this process.

# 15

# Afterpay Directors' Recommendation and Matters Relevant to your Vote on the Scheme

### (a) Recommendation

The Afterpay Directors unanimously recommend that Afterpay Shareholders vote in favour of the Scheme, in the absence of a Superior Proposal and subject to the Independent Expert continuing to conclude that the Scheme is in the best interests of Afterpay Shareholders. Each Afterpay Director intends to vote all of the Afterpay Shares held or controlled by them in favour of the Scheme subject to the same qualifications.[1]

### (b) Reasons for Recommendation and Advantages of the Scheme

The factors which the Afterpay Board have taken into account in recommending the Scheme to Afterpay Shareholders include:

(i) **The implied value of the Scheme Consideration offered to Afterpay Shareholders represents a significant premium to the trading prices of Afterpay Shares on ASX prior to the announcement of the Scheme**

If the Scheme is approved and implemented, Afterpay Shareholders will be entitled to receive the Scheme Consideration for each Afterpay Share they hold on the Record Date.[2] The Scheme Consideration will comprise 0.375 New Square Securities per Afterpay Share held.

As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the implied value of the Scheme Consideration was A$126.39 per Afterpay Share[3] and represents:

- a 30.8% premium over the undisturbed Afterpay Share Price on 30 July 2021 (being the last trading day prior to the announcement of the Scheme) of A$96.66;
- a 22.1% premium over the undisturbed 10-day VWAP of an Afterpay Share Price to 30 July 2021; and
- a 10.7% premium over the undisturbed 30-day VWAP of an Afterpay Share Price to 30 July 2021.



<div style="text-align: left; color: #999;">For personal use only</div>

---

1. You should note that when considering this recommendation that two of the Afterpay Directors (being Co-CEOs and Managing Directors, Anthony Eisen and Nick Molnar) have previously been issued options under the Afterpay equity incentive plan. As contemplated by the terms of the Scheme Implementation Deed, Mr Eisen and Mr Molnar will each be receiving a benefit if the Scheme proceeds. A pro rata portion of the unvested options they hold will be accelerated and the balance will be forfeited and converted into a Square award as contemplated in Section 4.11 of this Scheme Booklet. These arrangements are described in more detail in Sections 4.10, 4.11 and 10.1. The benefit to each of Anthony Eisen and Nick Molnar in respect of their Co-CEO Options is estimated to be approximately $9,612,242. See footnote 1 in section 10.1 for further information.

   Despite this interest in the outcome of the Scheme, each of Anthony Eisen and Nick Molnar, considers that, given the importance of the Scheme, and their role as Afterpay Directors, it is important and appropriate for them to provide a recommendation to shareholders in relation to voting on the Scheme. The Afterpay Board (excluding Anthony Eisen and Nick Molnar) also considers that it is appropriate for them to make a recommendation on the Scheme given their role in the management and operation of Afterpay.

2. Ineligible Foreign Shareholders will have their New Square Shares issued instead to a Sale Agent. These shares will then be sold by the Sale Agent in the ordinary course of trading on NYSE and the net proceeds of the sale will be paid to the Ineligible Foreign Shareholders promptly afterwards. Refer to Section 3.5 for more details on this process.

3. Based on the Square share price of US$254.50 and the AUD/USD exchange rate of 0.7551 as at the close of trading on NYSE on 29 October 2021, being the last practicable date before the date of this Scheme Booklet.

<div style="text-align: center;">

**16**

</div>

(ii) **The Independent Expert has concluded that the Scheme is fair and reasonable and in the best interests of Afterpay Shareholders in the absence of a Superior Proposal**

The Afterpay Board appointed Lonergan Edwards & Associates to prepare an Independent Expert's Report opining on whether the Scheme is fair and reasonable and in the best interests of Afterpay Shareholders.

The Independent Expert has concluded that the Scheme Consideration is fair and reasonable and, therefore, the Scheme is in the best interests of Afterpay Shareholders, in the absence of a Superior Proposal.

The Independent Expert has assessed the value of an Afterpay Share to be in the range of A$115-135 per Afterpay Share. As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the implied value of the Scheme Consideration was A$126.39 per Afterpay Share[4] which falls within the Independent Expert's range.

The reasons why the Independent Expert reached these conclusions are set out in the Independent Expert's Report, a copy of which is included in Attachment C. The Afterpay Board encourages you to read this report in its entirety.

(iii) **Square brings added value, differentiation and scale to Afterpay's growth strategy**

Afterpay will benefit from the complementarity of Square's large and growing customer base of more than 70 million annual active Cash App customers and millions of sellers, which will expand Afterpay's reach and growth both online and in-store. Afterpay customers will receive certain benefits of Cash App's financial tools, which may include money transfer, stock and bitcoin purchases, Cash Boost, and more.

Combined, Square and Afterpay's complementary businesses will create a global payments provider through multiple avenues:

- Afterpay will be integrated into Seller and Cash App, strengthening the connection between these ecosystems and helping drive more commerce between merchants and customers;
- Afterpay will be integrated into Square's online and in-person checkout solutions, strengthening Square's omnichannel platform;
- Afterpay customers will be able to manage their instalments and repayments directly within Cash App, helping to drive repeat engagement; and
- Cash App will integrate commerce discovery from Afterpay App to help drive lead generation for merchants and customer engagement.

The all scrip Scheme Consideration allows Afterpay Shareholders to participate in the expected benefits of combining the two businesses.

Further information in relation to Square and its business is set out in section 5.

(iv) **The combination brings together two shared visions and cultures to drive a common purpose**

Afterpay and Square are aligned in their shared mission and common purpose and this cultural alignment is a crucial aspect of any successful combination. The all scrip Scheme Consideration allows Afterpay Shareholders to continue to be part of a fast-growing global payments company with a mission of economic empowerment and financial inclusion.

| A shared vision and culture |
| --- |

**Vision**

Shared focus on empowering `merchants` and `consumers`

**Our common purpose**

**"Economic empowerment"**
– Square

**"Power an economy in which everyone wins"**
– Afterpay

**Culture**

Founder-led, `entrepreneurial` management teams with shared purpose, vision, and strong `collaboration` between leadership teams to guide integration and synergies

---

4.   Based on the Square share price of US$254.50 and the AUD/USD exchange rate of 0.7551 as at the close of trading on NYSE on 29 October 2021, being the last practicable date before the date of this Scheme Booklet.

# 17

For personal use only

(v)  **Afterpay Shareholders will benefit from any expected synergies generated by the transaction**

The Afterpay Board believes that a combination of Afterpay and Square makes strong commercial sense and the Scheme will enable Afterpay Shareholders to realise greater longer term value for their shares from the potential expected synergies through the Combined Group. In addition, those Afterpay shareholders who choose to remain as Square stockholders (through holding New Square Shares or New Square CDIs) retain the opportunity for additional value over time to the extent that further benefits are realised.

The Combined Group has the potential to deliver meaningful longer-term growth synergies and presents shareholders with an opportunity to invest behind a significantly scaled global business focused on maximising the utility of both the Afterpay and Square ecosystems.

| | Customers | Merchants |
|---|---|---|
| Expanding the customer and merchant base | • Strengthen Afterpay's customer base of 16 million with 70 million annual active Cash App customers<br>• Bring Afterpay's merchant base more customers through Cash App<br>• Reach new Cash App audiences in global geographies | • Strengthen Afterpay's merchant base with millions of Square sellers<br>• Attract new sellers to Square with BNPL as an acquisition tool<br>• Grow upmarket with larger sellers and in new geographies together |
| Strengthen customer and merchant relationships and build connections | • Add Afterpay BNPL to the Cash App ecosystem<br>• Integrate commerce discovery from Afterpay App into Cash App to drive engagement<br>• Provide Afterpay customers access to the benefits of Cash App's ecosystem, including peer-to-peer transfer, stock and bitcoin purchases, Cash Card, Boost and more | • Enable Afterpay BNPL for Square sellers, supporting their growth with the possibility of higher transaction sizes and conversion rates<br>• Introduce the Seller ecosystem to Afterpay's merchants<br>• Grow Afterpay's presence with SMBs, in-person commerce, and new verticals |

See section 5 for further information on Square and its Seller and Cash App ecosystems.

(vi)  **No Superior Proposal has emerged as at the date of this Scheme Booklet**

Since the announcement of the Scheme on 2 August 2021 and up to the date of this Scheme Booklet, no Superior Proposal has emerged and Afterpay is not aware, as at the date of this Scheme Booklet, of any Superior Proposal that is likely to emerge.

(vii)  **The Afterpay Share Price will continue to be subject to market volatility and may fall if the Scheme is not implemented and in the absence of a Superior Proposal**

If the Scheme is not implemented, Afterpay will continue to operate as a standalone entity and Afterpay Shares will remain quoted on ASX and will continue to be subject to Australian market volatility, and the impact of general economic conditions (including the prevailing uncertainty with respect to the impact of COVID-19 and the regulatory landscape). These factors may have an impact on the Afterpay Share Price in the short, medium and long term.

If the Scheme does not proceed, and no comparable proposal or Superior Proposal is received by the Afterpay Board, then the Afterpay Share Price is expected to fall.

Since market close on 30 July 2021 (being the last trading day before the Scheme was announced), the Afterpay Share Price has increased 27.6% up to a closing price of A$123.29 on 29 October 2021.

(viii)  **Afterpay Shareholders may be eligible to receive the Scheme Consideration in the form of New Square CDIs listed on ASX**

If you are a Scheme Shareholder (other than an Ineligible Foreign Shareholder) you can make a Share Election or a CDI Election, for all of your Afterpay Shares, if you wish to receive Scheme Consideration other than the default consideration that you are eligible to receive as at the Record Date (see section 3.1(c) for details of the default consideration).

**18**

New Square CDIs will be CDIs in respect of New Square Shares. A CDI is an instrument through which shares of foreign companies such as Square can be traded on ASX. Each New Square CDI will represent a beneficial interest in one newly issued Square Class A Share listed on NYSE and will have economic and voting rights that are equivalent to the rights attaching to a Square Class A Share. New Square CDIs will be quoted and traded on ASX in Australian dollars under a symbol to be advised before implementation of the Scheme.

A holder of a New Square CDI has an indirect, beneficial interest in the New Square Share underlying their New Square CDI instead of directly owning the New Square Share. The New Square Shares to which the New Square CDIs relate will be issued by Square (at the direction of and on behalf of Square Acquirer) to a depositary nominee which will hold legal title to those shares on behalf of the holders of the New Square CDIs.

Except for certain differences noted in section 3.4(d), the rights attaching to New Square CDIs are economically equivalent to the rights attaching to New Square Shares. Square will generally be required to treat holders of Square CDIs as if they were the holders of the Square Class A Shares represented by those Square CDIs.

New Square CDIs will be tradeable on ASX only. This may be attractive to Afterpay Shareholders, as it allows New Square CDIs to be traded during Australian business hours using Australian brokers and at prices quoted in AUD. In addition, the CDIs may offer cost-effective advantages relative to the costs of trading directly overseas, since your broker does not need to incorporate other costs of an international service.

(ix) **Scheme Shareholders that are residents of Australia for tax purposes may be eligible for CGT roll-over relief for any gain made from the disposal of their Scheme Shares**

Scheme Shareholders that are residents of Australia for tax purposes and who make a capital gain from the disposal of their Scheme Shares may be eligible to choose CGT scrip-for-scrip roll-over relief provided certain conditions are met. Broadly, CGT scrip-for-scrip roll-over relief enables Scheme Shareholders to disregard the capital gain they make from the disposal of their Scheme Shares under the Scheme.

Afterpay has applied for a class ruling from the Australian Taxation Office (**ATO**) regarding the income tax implications for Scheme Shareholders participating in the Scheme, including the availability of CGT scrip-for-scrip roll-over relief.

A general guide to the tax implications of the Scheme for Scheme Shareholders is set out in section 8.

(x) **Afterpay Shareholders will not incur any brokerage charges on the transfer of your Afterpay Shares if the Scheme proceeds**

You will not incur any brokerage charges on the exchange of your Afterpay Shares for New Square Securities under the Scheme.

It is possible that such brokerage charges (and, potentially GST on those charges) would be incurred if you were to dispose of your Afterpay Shares and separately acquired Square Shares, other than under the Scheme.

### (c) Reasons why Afterpay Shareholders may Consider Voting Against the Scheme and Disadvantages of the Scheme

Although the Afterpay Board unanimously recommends that you vote in favour of the Scheme Resolution in the absence of a Superior Proposal and subject to the Independent Expert continuing to consider the Scheme to be fair and reasonable and in the best interests of Afterpay Shareholders, factors which may lead Afterpay Shareholders to vote against the Scheme include:

(i) **You may wish to maintain your direct investment in Afterpay as an ASX-listed company and prefer Afterpay to continue to operate as a standalone entity**

If the Scheme is implemented and you receive the Scheme Consideration, you will no longer be an Afterpay Shareholder and will forgo any benefits that may result from being a Shareholder of Afterpay on a standalone basis. You may prefer that Afterpay is able to continue to execute its standalone strategy and therefore you prefer Afterpay continue operating on a standalone basis.

An investment in the Combined Group is not the same as an investment in Afterpay, and will have different characteristics (including with respect to your rights and the risks, returns and liquidity profiles) to your current investment in Afterpay. Your ownership percentage and voting power in the Combined Group will be diluted as a result of the Scheme.

**19**

(ii) **There are risks associated with holding shares in the Combined Group which are different from those associated with your shareholding in Afterpay**

In holding New Square Securities, you will be exposed to risk factors relating to Square and the Combined Group. In some cases, those risks are different from or additional to those related to Afterpay and you may prefer the risks and/or the investment profile of the Afterpay business as a standalone entity.

While Square and Afterpay operate broadly in a similar sector (payments), the operational profile, capital structure and size of the Combined Group will be different from that of Afterpay on a standalone basis.

Further details on the risks associated with a shareholding in the Combined Group are set out in section 7.4.

(iii) **You may believe that the Scheme is not in your individual best interests and disagree with the Afterpay Board's recommendation and the Independent Expert's conclusion**

Notwithstanding the unanimous recommendation of the Afterpay Board and the recommendation of the Independent Expert you may believe the Scheme is not in your best interests.

(iv) **The value of the New Square Securities which form part of the Scheme Consideration is not certain until the Implementation Date**

As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the implied value of the Scheme Consideration was A\$123.39.[5] However, because the Scheme Consideration is based on a fixed exchange ratio, the implied value of the Scheme Consideration will vary over time depending on the prevailing Square Share price and the AUD/USD exchange ratio. As a result of changes in these factors, the implied value of the Scheme Consideration is likely to change, including between the date of this Scheme Booklet, the date of the Scheme Meeting and the Implementation Date (being the date on which the Scheme Consideration is received).

The impact of changes in Square Share Price and the AUD/USD exchange ratio on the implied value of the Scheme Consideration (A\$ per Afterpay Share) is shown in the table below.

**Scheme Consideration Sensitivity**

| AUD/USD | Square share price (US\$) | | | | |
|---|---|---|---|---|---|
| Exchange Rate | 270.00 | 272.50 | 275.00 | 277.50 | 280.00 |
| 0.60 | 168.75 | 170.31 | 171.88 | 173.44 | 175.00 |
| 0.65 | 155.77 | 157.21 | 158.65 | 160.10 | 161.54 |
| 0.70 | 144.64 | 145.98 | 147.32 | 148.66 | 150.00 |
| 0.75 | 135.00 | 136.25 | 137.50 | 138.75 | 140.00 |
| 0.80 | 126.56 | 127.73 | 128.91 | 130.08 | 131.25 |

As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the Square Share Price was US\$254.50 and the AUD/USD exchange rate was 0.7551.

(v) **There are risks associated with implementing the Scheme which you may consider outweigh the benefits of the Scheme**

There are a number of material risks associated with implementing the Scheme and with a shareholding in the Combined Group. These are set out in section 7.4, which you should consider in detail, but include risks in relation to integration, business disruption, transaction costs, currency, due diligence, Square's business and industry, Square operational risks, economic, financial and tax risks and legal, regulatory and compliance risks.

---

5.    Based on the Square share price of US\$254.50 and the AUD/USD exchange rate of 0.7551 as at the close of trading on NYSE on 29 October 2021, being the last practicable date before the date of this Scheme Booklet.

# 20

For personal use only

(vi) **You may consider that there is a possibility that a Superior Proposal could emerge in relation to Afterpay in the foreseeable future**

While there is no evidence to suggest a third party may make a Superior Proposal, it remains possible that such a Superior Proposal may emerge.

The Afterpay Board believes that the possibility of a Superior Proposal emerging is low for the following reasons:

- substantial time has elapsed since the announcement of the Scheme (2 August 2021). Since that date, no Superior Proposal has emerged; and

- the potential synergies between Afterpay and Square are significant and the growth prospects of the Combined Group are strong. The Afterpay Board believes it is unlikely that another party would have the ability to make an offer constituting an Afterpay Competing Transaction that has the potential to deliver similar or greater value.

However, if an Afterpay Competing Transaction is received prior to the Scheme Meeting, this will be considered by the Afterpay Board in accordance with their fiduciary duties and the provisions in the Scheme Implementation Deed. Depending on the circumstances, if Afterpay terminates the Scheme Implementation Deed because it determines that the Afterpay Competing Transaction constitutes a Superior Proposal and should be accepted, Afterpay would be required to pay the Break Fee to Square.

**(d) Additional Considerations**

(i) **You may sell your Afterpay Shares on ASX any time prior to the suspension of Afterpay Shares from trading**

If you do not wish to hold your Afterpay Shares and participate in the Scheme, you may offer to sell your Afterpay Shares on ASX at any time prior to Thursday, 6 January 2022. You should note that, in doing so, you may not receive consideration equivalent to the implied value of the Scheme Consideration, and brokerage charges on the sale may be incurred.

**Afterpay Shares will continue to trade on ASX after the Effective Date. If the Scheme becomes Effective, Afterpay Shareholders who sell their Afterpay Shares after the Effective Date and prior to the Record Date should be aware that they will not receive the Scheme Consideration on the Implementation Date. In addition, investors who acquire Afterpay Shares after the Effective Date should be aware that all Afterpay Shareholders who hold Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will be provided with the Scheme Consideration in exchange for their Afterpay Shares. The exchange ratio is fixed and holders of Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will receive 0.375 New Square Shares or 0.375 New Square CDIs. Square Class A Shares will continue to trade on NYSE between the Effective Date and the Record Date.**

You should seek your own independent professional advice to determine if your individual financial or taxation circumstances make it preferable for you to do so.

(ii) **The Scheme may be implemented even if you do not vote or vote against the Scheme at the Scheme Meeting**

You should note that regardless of whether you do not vote or vote against the Scheme, the Scheme may still be implemented if the Requisite Majorities of Afterpay Shareholders and the Court approve the Scheme and the other Conditions Precedent have been satisfied or waived (as applicable). If this occurs, your Afterpay Shares will be transferred to Square Acquirer and you will receive the Scheme Consideration.

(iii) **Implications if the Scheme is not approved**

If the Scheme is not approved by the Requisite Majorities of Afterpay Shareholders at the Scheme Meeting, or by the Court at the Second Court Hearing, or any of the other Conditions Precedent are not satisfied or waived:

- you will not receive your Scheme Consideration;
- your Afterpay Shares will not be transferred to Square Acquirer (they will be retained by you);
- Afterpay will continue to operate as a standalone entity;
- you will continue to be exposed to the benefits and risks associated with an investment in Afterpay;
- Afterpay will continue to implement its business plan; and
- in the absence of a Superior Proposal, the Afterpay Share Price may fall.

**21**

For personal use only

(iv) Costs

Afterpay has incurred significant costs in developing the Scheme with Square to the point that it is capable of being submitted to Afterpay Shareholders for their consideration. These costs include management's and directors' time negotiating with and providing information to Square, engagement of advisers, facilitating Square's access to due diligence, engagement of the Independent Expert and preparation of this Scheme Booklet.

If the Scheme is implemented, these costs will effectively be absorbed by the Combined Group following implementation of the Scheme. If the Scheme is not implemented and if no Superior Proposal emerges and becomes effective, Afterpay expects to incur total costs of approximately A$25 million.

(v) Break Fee

The parties will incur significant costs, including significant opportunity costs, if the Scheme is not implemented. A Break Fee may be payable in certain circumstances by Afterpay to Square or by Square to Afterpay to account for such costs.

The Break Fee of A$385 million is an amount to compensate either Afterpay or Square for any advisory and professional services costs, costs of management and directors' time, out of pocket expenses, distraction of management from conducting business as usual caused by pursuing the Scheme, costs incurred in pursuing the Scheme and damage to reputation associated with a failed transaction and the implication of that damage on its business. Please see section 3.11 for further information regarding the Break Fee, including the circumstances in which Afterpay or Square must pay the Break Fee.

(vi) Differences between applicable corporations and securities laws

Afterpay is incorporated in Australia and Square is incorporated in the US, under the laws of the State of Delaware. Afterpay Shareholders' rights are currently governed by the laws of Australia and the Afterpay Constitution. If the Scheme is implemented, the rights of Afterpay Shareholders who receive and retain New Square Securities will be primarily governed by the General Corporation Law of the State of Delaware, the US federal securities laws, NYSE listing standards and Square's Certificate of Incorporation and Bylaws. Square intends to apply for admission to the official list of ASX as a Foreign Exempt Listing, conditional on the Scheme being implemented. Once Square is listed on ASX as a Foreign Exempt Listing, Square will be exempt from complying with most of the Listing Rules. Please see section 3.4 for further details on this Foreign Exempt Listing.

Although some of the material differences between Australian corporations and securities laws and US corporations and securities laws as they relate to Afterpay and Square respectively could be viewed as advantageous to Afterpay Shareholders, others could be viewed as disadvantageous to Afterpay Shareholders.

For further information on the differences between the applicable corporations and securities laws, see section 9.



**22**

# Next Steps

## Carefully read this Scheme Booklet

This is an important document and you should read it carefully and in its entirety before making a decision on how to vote at the online Scheme Meeting.

## Vote on the Scheme

As an Afterpay Shareholder, you are entitled to vote on whether the Scheme should proceed at the online Scheme Meeting.

Please refer to the following pages of this Scheme Booklet for details on how to vote at the online Scheme Meeting, including by proxy.

## Seek Further Information

If you have any questions in relation to the Scheme or the number of Afterpay Shares you hold or how to vote, please call the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT).

If you are in any doubt as to what to do, you should seek advice from your independent legal, financial and other professional adviser before making any decision regarding the Scheme.

## Why you should Vote

As an Afterpay Shareholder, you have a say in whether Square Acquirer will acquire all of the issued shares in Afterpay. This is your opportunity to play a role in deciding the future of Afterpay.



**23**

# How to Vote

For personal use only

## Who is entitled to Vote at the Scheme Meeting?

If you are registered on the Afterpay Share Register as an Afterpay Shareholder at 7.00pm (AEDT) on Saturday, 4 December 2021, then you will be entitled to attend and vote at the online Scheme Meeting.

## Voting is not Compulsory

Voting is not compulsory. However, your vote will be important in determining whether the Scheme will proceed, as only those votes cast by Scheme Shareholders on the Scheme will be counted in determining whether the Scheme has been approved by Requisite Majorities of Scheme Shareholders.

## Voting by Joint Holders

In the case of Afterpay Shares held by joint holders, only one of the joint holders is entitled to vote. If more than one shareholder votes in respect of jointly held Afterpay Shares, only the vote of the Afterpay Shareholder whose name appears first in the Afterpay Share Register will be counted.

## Your Vote is Important

In order for the Scheme to be implemented, the Scheme Resolution must be approved by Afterpay Shareholders at the online Scheme Meeting.

For this reason, the Afterpay Directors unanimously recommend that you vote in favour of the Scheme Resolution in the absence of a Superior Proposal and subject to the Independent Expert concluding that the Scheme is in the best interests of Afterpay Shareholders and each Afterpay Director intends to vote all of the Afterpay Shares held or controlled by them in favour of the Scheme.[1]

If you are unable to attend the online Scheme Meeting, the Afterpay Directors urge you to lodge your proxy form online at Computershare's website (www.investorvote.com.au) in accordance with the instructions given on the website or complete and return, in the enclosed reply paid envelope, the personalised Proxy Form.

## Location and details of Scheme Meeting

The details of the online Scheme Meeting are as follows:

**Location:**    Virtual meeting at http://web.lumiagm.com/354553219

**Date:**    Monday, 6 December 2021

**Time:**    10.00am

## Scheme Meeting

A copy of the Notice of Scheme Meeting is set out in Attachment E to this Scheme Booklet.

Section 3.3(b) of this Scheme Booklet provides details of the Scheme Resolution and the voting majorities that are required for the Scheme Resolution.

---

1.    You should note that when considering this recommendation that two of the Afterpay Directors (being Co-CEOs and Managing Directors, Anthony Eisen and Nick Molnar) have previously been issued options under the Afterpay equity incentive plan. As contemplated by the terms of the Scheme Implementation Deed, Mr Eisen and Mr Molnar will each be receiving a benefit if the Scheme proceeds. A pro rata portion of the unvested options they hold will be accelerated and the balance will be forfeited and converted into a Square award as contemplated in Section 4.11 of this Scheme Booklet. These arrangements are described in more detail in Sections 4.10, 4.11 and 10.1. The benefit to each of Anthony Eisen and Nick Molnar in respect of their Co-CEO Options is estimated to be approximately $9,612,242. See footnote 1 in section 10.1 for further information.

Despite this interest in the outcome of the Scheme, each of Anthony Eisen and Nick Molnar, considers that, given the importance of the Scheme, and their role as directors of Afterpay, it is important and appropriate for them to provide a recommendation to shareholders in relation to voting on the Scheme. The Afterpay Board (excluding Anthony Eisen and Nick Molnar) also considers that it is appropriate for them to make a recommendation on the Scheme given their role in the management and operation of Afterpay.

**24**

How to Vote

## Voting in person, by Attorney or Corporate Representative

If you wish to vote in person, you must attend the online Scheme Meeting.

If you cannot attend the online Scheme Meeting, you may vote online or by proxy by completing the Proxy Form.

Attorneys who plan to attend the online Scheme Meeting must provide a certified copy of the power of attorney to the Afterpay Share Registry by no later than 10.00am (AEDT) on Saturday, 4 December 2021. The certified copy of the power of attorney may be submitted in the same manner as a completed Proxy Form.

A body corporate which is an Afterpay Shareholder may appoint an individual to act as its corporate representative. The appointment must comply with the requirements of section 250D of the Corporations Act. To vote by corporate representative, a corporate representative must provide written evidence of their appointment by obtaining and completing an 'Appointment of Corporate Representative' form from Computershare or online at www.investorcentre.com/au and select "Printable Forms" under the help tab, 'Printable Forms'. Corporate representative forms must be provided to the Afterpay Share Registry by no later than 10.00am (AEDT) on Saturday, 4 December 2021. A corporate representative form may be submitted in the same manner as a completed Proxy Form.

## Voting by Proxy

If you wish to appoint a proxy to attend and vote at the online Scheme Meeting on your behalf, please complete and sign the personalised Proxy Form accompanying this Scheme Booklet in accordance with the instructions set out on the Proxy Form or lodge your proxy vote online at Computershare's website (www.investorcentre.com.au) in accordance with the instructions given on the website. You may complete the Proxy Form in favour of the chair of the Scheme Meeting or appoint up to two proxies to attend and vote on your behalf at the Scheme Meeting.

TO BE VALID, PROXY FORMS FOR THE SCHEME MEETING MUST BE RECEIVED BY AFTERPAY OR THE AFTERPAY SHARE REGISTRY BY NO LATER THAN 10.00AM (AEDT) ON SATURDAY, 4 DECEMBER 2021.

Proxy forms, duly completed in accordance with the instructions set out on the Proxy Form, may be submitted:

- online to Afterpay's Share Registry by visiting the website, www.investorvote.com.au. You will need your Holder Identifier (Securityholder Reference Number (**SRN**) or Holder Identification Number (**HIN**) as shown on your Proxy Form). You will be taken to have signed the Proxy Form if you lodge in accordance with the instructions on the website;
- by mail (using the reply paid envelope included with the Scheme Booklet) to Afterpay Limited, C/o Computershare Investor Services Pty Limited, GPO Box 242, Melbourne, Vic 3001;
- by fax to Computershare Investor Services Pty Limited on 1800 783 447 (within Australia) or +61 3 9473 2555 (outside Australia); or
- by hand delivering them to Computershare Investor Services Pty Limited at Yarra Falls, 452 Johnston Street, Abbotsford, VIC, 3067 during business hours (Monday – Friday, 9.00am – 5.00pm (AEDT)).

## Regardless of your Vote, decide whether to make a Share Election or a CDI Election

If you are a Scheme Shareholder (other than an Ineligible Foreign Shareholder) you can make a Share Election or a CDI Election for all your Afterpay Shares, if you wish to receive the Scheme Consideration other than the default consideration that you are eligible to receive as at the Record Date (see section 3.1(c) for details of the default consideration).

You can make a Share Election or CDI Election even if you choose to vote against the Scheme or not to vote. This is because, if the Scheme is implemented, all Scheme Shareholders will receive the Scheme Consideration, whether they voted for or against the Scheme, or did not vote.

Scheme Shareholders (excluding Ineligible Foreign Shareholders) who have not made a Share Election or CDI Election or have made an invalid Share Election or CDI Election (as applicable) will by default receive:

- New Square CDIs for all Afterpay Shares held on the Record Date if their registered address as at the Record Date is in Australia or New Zealand; or
- New Square Shares for all Afterpay Shares held on the Record Date if their registered address as at the Record Date is outside Australia or New Zealand.

**25**

For personal use only

Please refer to the below table for a summary of elections that Afterpay Shareholders can make.

| | | What will Afterpay Shareholders receive? | | |
|---|---|---|---|---|
| | | **New Square CDIs traded on ASX** | **New Square Shares traded on NYSE** | **Sale Facility Proceeds** |
| Afterpay Shareholders with a registered address in Australia or New Zealand | Default – Does not make a Share Election | ✓ | | |
| | Makes a Share Election | | ✓ | |
| Afterpay Shareholders with a registered address outside Australia or New Zealand (other than Ineligible Foreign Shareholders) | Default – Does not make a CDI Election | | ✓ | |
| | Makes a CDI Election | ✓ | | |
| Ineligible Foreign Shareholders | | | | ✓ |

Afterpay Shareholders who are eligible to make a CDI Election or Share Election, can only make an election in relation to all (not only some) of the Afterpay Shares to which they are entitled under the Scheme.

The above is a summary only. For further information on how to make a valid Share Election or CDI Election, see section 3.1(c).

## How to Submit the Election Form

You may elect to receive all of your Scheme Consideration other than the default consideration that you are eligible to receive as at the Record Date, by submitting an Election Form to Afterpay's Share Registry. You can contact the Afterpay Shareholder Information Line on or before the Election Date, to request an Election Form. If you wish to submit the Election Form, it must be completed in accordance with the instructions specified in this Scheme Booklet and in the Election Form, and received by the Afterpay Share Registry prior to 5.00pm (AEDT) on the Election Date. Please ensure that you allow sufficient time for the Election Form to be received prior to 5.00pm (AEDT) on the Election Date.

An Election Form that is not submitted in accordance with the instructions specified in this Scheme Booklet and in the Election Form (including if the Election Form is not received by the Afterpay Share Registry prior to 5.00pm (AEDT) on the Election Date) will not be a valid election for the purpose of the Scheme and will not be recognised by Afterpay or Square for any purpose.

Square Acquirer will determine, in its sole discretion, all questions as to the correct completion of an Election Form or Election Withdrawal Form, and the time of receipt of such form. Square Acquirer is not required to communicate with any Scheme Shareholder prior to making this determination. The determination of Square Acquirer will be final and binding on the Scheme Shareholder.

# 26

For personal use only






## Section 1

# Frequently Asked Questions

| No. | Question | Further Information |
|-----|----------|---------------------|
| **An Overview of the Scheme** | | |
| 1. | **Why have I received this Scheme Booklet?** | Section 3 |
| | You have received this Scheme Booklet because you are an Afterpay Shareholder and you are being asked to vote on the Scheme, in respect of the proposed acquisition of Afterpay by Square Acquirer. | |
| | This Scheme Booklet contains important information including: | |
| | (a)  the reasons for Afterpay Directors' recommendation; | |
| | (b)  the reasons why you may choose to vote against the Scheme; | |
| | (c)  information about the Scheme Consideration; | |
| | (d)  information about Afterpay, Square and the Combined Group; | |
| | (e)  the risks associated with the Scheme; and | |
| | (f)  the Independent Expert's Report. | |
| 2. | **What is the Scheme?** | Sections 2 and 3.1 |
| | The Scheme is a proposed transaction under which Square Acquirer would acquire 100% of the issued capital of Afterpay via a scheme of arrangement under Part 5.1 of the Corporations Act for the Scheme Consideration. If the Scheme becomes Effective each Afterpay Shareholder will receive the Scheme Consideration equal to 0.375 New Square Shares per Afterpay Share held on the Record Date. | |

**27**

For personal use only

| No. | Question | Further Information |
|-----|----------|---------------------|
| 3. | **Who is Square?** | Section 5 |
|  | Square is a global fintech company incorporated in Delaware. Square's Class A Shares are listed on NYSE under the symbol SQ. Square has a market capitalisation of approximately US$117 billion as at the close of trading on NYSE on 29 October 2021. There is no public trading market for Square Class B Shares. | |
|  | Founded in 2009, Square builds tools that aim to empower businesses and individuals to participate in the economy. | |
|  | Sellers use Square to reach buyers online and in person, manage their business, and access financing. Individuals use Square's Cash App to spend, send, store, and invest money. Square owns a majority ownership stake in TIDAL, a global music and entertainment platform that expands Square's purpose of economic empowerment to artists. Square also recently launched TBD, a bitcoin-focused business established to build an open developer platform with the sole goal of making it easy to create non-custodial, permissionless, and decentralised financial services. | |
|  | Square has offices in the United States, Canada, Japan, Australia, Ireland, Spain, Norway, and the UK. | |
| 4. | **What are Square's intentions regarding Afterpay?** | Sections 6.3 and 6.5 |
|  | If the Scheme is implemented, Square intends to integrate Afterpay into both the Seller and Cash App ecosystems. Afterpay's Co-Founders and Co-CEOs Anthony Eisen and Nick Molnar will join Square upon implementation of the Scheme. The customer and merchant sides of the Afterpay business will be integrated into Cash App and Seller, led by Brian Grassadonia and Alyssa Henry, respectively. Square will appoint one Afterpay Director as a member of the Square Board effective immediately following the implementation of the Scheme. Further details on Square's intentions regarding Afterpay are set out in section 6.3. | |
| 5. | **How will the Scheme be implemented?** | Section 3.3 |
|  | Details on how the Scheme will be implemented are described in section 3.3. | |
| 6. | **What do the Afterpay Directors recommend?** | Chair's letter and Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
|  | The Afterpay Board unanimously recommends that Afterpay Shareholders vote in favour of the Scheme in the absence of a Superior Proposal and subject to the Independent Expert continuing to conclude that the Scheme is in the best interests of Afterpay Shareholders.[1] | |

---

1.  You should note that when considering this recommendation that two of the Afterpay Directors (being Co-CEOs and Managing Directors, Anthony Eisen and Nick Molnar) have previously been issued options under the Afterpay equity incentive plan. As contemplated by the terms of the Scheme Implementation Deed, Mr Eisen and Mr Molnar will each be receiving a benefit if the Scheme proceeds. A pro rata portion of the unvested options they hold will be accelerated and the balance will be forfeited and converted into a Square award as contemplated in Section 4.11 of this Scheme Booklet. These arrangements are described in more detail in Sections 4.10, 4.11 and 10.1. The benefit to each of Anthony Eisen and Nick Molnar in respect of their Co-CEO Options is estimated to be approximately $9,612,242. See footnote 1 in section 10.1 for further information.

    Despite this interest in the outcome of the Scheme, each of Anthony Eisen and Nick Molnar, considers that, given the importance of the Scheme, and their role as directors of Afterpay, it is important and appropriate for them to provide a recommendation to shareholders in relation to voting on the Scheme. The Afterpay Board (excluding Anthony Eisen and Nick Molnar) also considers that it is appropriate for them to make a recommendation on the Scheme given their role in the management and operation of Afterpay.

**28**

Section 1
Frequently Asked Questions

For personal use only

| No. | Question | Further Information |
|---|---|---|
| 7. | **How are the Afterpay Directors intending to vote?**<br><br>Each Afterpay Director who holds Afterpay Shares intends to vote his or her Afterpay Shares in favour of the Scheme in the absence of a Superior Proposal and subject to the Independent Expert continuing to conclude that the Scheme is in the best interests of Afterpay Shareholders. | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
| 8. | **What is the Independent Expert's opinion of the Scheme?**<br><br>The Independent Expert has concluded that the Scheme Consideration is fair and reasonable and, therefore, the Scheme is in the best interests of Afterpay Shareholders, in the absence of a Superior Proposal.<br><br>The Independent Expert has assessed the value of an Afterpay Share to be in the range of A$115-135 per Afterpay Share. As at the close of trading on NYSE on 29 October 2021, being the last practicable date prior to the date of this Scheme Booklet, the implied value of the Scheme Consideration was A$126.39 per Afterpay Share[2] which falls within the Independent Expert's range.<br><br>The reasons why the Independent Expert reached these conclusions are set out in the Independent Expert's Report, a copy of which is included in Attachment C. The Afterpay Board encourages you to read this report in its entirety. | Attachment C |
| 9. | **Why you may consider voting in favour of the Scheme**<br><br>1. The implied value of the Scheme Consideration offered to Afterpay Shareholders represents a significant premium to the trading prices of Afterpay Shares on ASX prior to the announcement of the Scheme<br>2. The Independent Expert has concluded that the Scheme is fair and reasonable and in the best interests of Afterpay Shareholders in the absence of a Superior Proposal<br>3. Square brings added value, differentiation and scale to Afterpay's growth strategy<br>4. The combination brings together two shared visions and cultures to drive a common purpose<br>5. Afterpay Shareholders will benefit from any expected synergies generated by the transaction<br>6. No Superior Proposal has emerged as at the date of this Scheme Booklet<br>7. The Afterpay Share Price will continue to be subject to market volatility and may fall if the Scheme is not implemented and in the absence of a Superior Proposal<br>8. Afterpay Shareholders may be eligible to receive the Scheme Consideration in the form New Square CDIs listed on ASX<br>9. Afterpay Shareholders that are residents in Australia for tax purposes may be eligible for CGT roll-over relief in respect to the New Square Securities received<br>10. Afterpay Shareholders will not incur any brokerage charges on the transfer of your Afterpay Shares if the Scheme proceeds<br><br>For more information about the reasons to vote in favour of the Scheme, please see **Reasons for recommendation and advantages of the Scheme** in this Scheme Booklet. | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |

---

2. Based on the Square share price of US$254.50 and the AUD/USD exchange rate of 0.7551 as at the close of trading on NYSE on 29 October 2021, being the last practicable date before the date of this Scheme Booklet.

**29**

| No. | Question | Further Information |
|---|---|---|
| 10. | **Why you may consider voting against the Scheme**<br><br>1.  You may wish to maintain your direct investment in Afterpay as an ASX-listed company and prefer Afterpay to continue to operate as a standalone entity<br><br>2.  There are risks associated with holding shares in the Combined Group which are different from those associated with your shareholding in Afterpay<br><br>3.  You may believe that the Scheme is not in your individual best interests and disagree with Afterpay Board's recommendation and the Independent Expert's conclusion<br><br>4.  The value of the New Square Securities which form part of the consideration is not certain until the Implementation Date<br><br>5.  There are risks associated with implementing the Scheme which you may consider outweigh the benefits of the Scheme<br><br>6.  You may consider that there is a possibility that a Superior Proposal could emerge in relation to Afterpay in the foreseeable future<br><br>For more information about the reasons to vote against the Scheme, please see **Reasons why Afterpay Shareholders may consider voting against the Scheme and disadvantages of the Scheme** in this Scheme Booklet. | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
| 11. | **What will happen if a Superior Proposal emerges?**<br><br>Since the Scheme was announced, no Superior Proposal has emerged. If an alternative proposal is received the Afterpay Board will review that proposal and determine if it represents a Superior Proposal and advise you on their recommendation. | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
| 12. | **Is there a break fee payable?**<br><br>If the Scheme is not implemented the parties will incur significant opportunity costs. To reflect this, a Break Fee may be payable by Afterpay to Square or by Square to Afterpay in certain circumstances. For further information on the Break Fees see section 3.11(i). | Section 3.11(i) |
| 13. | **What are the risks associated with an investment in Afterpay if the Scheme does not become Effective?**<br><br>If the Scheme is not approved by Afterpay Shareholders and the Court, Afterpay Shareholders will retain their Afterpay Shares. In the absence of a Superior Proposal, there is a risk that Afterpay Shareholders may not be able to realise a price for all of their Afterpay Shares (at least in the short term) comparable to the price that they would receive under the Scheme. Additionally, if the Scheme does not proceed, and no comparable proposal or Superior Proposal is received by the Afterpay Board, the Afterpay Share Price may fall.<br><br>The consequences of the Scheme not being implemented include:<br><br>(a)  you will not be paid the Scheme Consideration; and<br><br>(b)  you will retain your Afterpay Shares.<br><br>If the Scheme is not implemented, the Afterpay Directors intend to continue to operate the business of Afterpay in the ordinary course and in a manner consistent with its business plan and strategy. Afterpay Shareholders will be exposed to any benefits and risks associated with their investment in Afterpay. | Section 2.4 |

**30**

For personal use only

Section 1
Frequently Asked Questions

For personal use only

| No. | Question | Further Information |
|---|---|---|
| 14. | **What are the transaction costs associated with the Scheme?** | Section 10.11 |
| | Afterpay is expected to have incurred one-off transaction costs of approximately A$25 million which will be payable by Afterpay regardless of whether the Scheme is implemented or not. | |
| | These costs are expected to comprise adviser, legal, accounting and expert fees and various other costs. These costs exclude success-based fees and other costs which are contingent upon the successful implementation of the Scheme. | |
| **An Overview of the Scheme Consideration** | | |
| 15. | **What is the Scheme Consideration?** | Section 3.1 |
| | If the Scheme is implemented Scheme Shareholders (other than Ineligible Foreign Shareholders) will receive the Scheme Consideration comprising 0.375 New Square Shares or 0.375 New Square CDIs for each Scheme Share held as at the Record Date. | |
| 16. | **What is the premium of the Scheme Consideration to Afterpay's Share price?** | Chair's letter and Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
| | Based on Square's closing price of US$254.50 on 29 October 2021, this represents an implied transaction price of approximately A$126.39 per Afterpay Share, a premium of approximately 30.8% to Afterpay's latest closing price prior to the announcement of the Scheme of A$96.66 on 30 July 2021. This represents an approximate 22.1% premium over the 10-day volume weighted average Afterpay Share price, and an approximate 10.7% premium over the 30-day volume weighted average Afterpay Share Price, each as of 30 July 2021. | |
| 17. | **How is the Scheme Consideration being funded?** | Section 3.1 |
| | The Scheme Consideration will be funded by the issuance of New Square Securities. | |
| 18. | **Who is entitled to participate in the Scheme?** | Section 3.3(g) |
| | All Afterpay Shareholders who are registered holders of Afterpay Shares in the Afterpay Share Register at the Record Date are entitled to participate in the Scheme. | |
| 19. | **When will I receive the Scheme Consideration?** | Sections 2.3, 3.2 and 3.3(d) |
| | If the Scheme becomes Effective, Square Acquirer (or Square, at the direction of and on behalf of Square Acquirer) will, provide the New Square Securities to holders of Scheme Shares (other than Ineligible Foreign Shareholders) on the Implementation Date, which is currently expected to be Tuesday, 18 January 2022. | |
| | If you are an Ineligible Foreign Shareholder, the net proceeds from the sale of the New Square Shares that you would have otherwise received will be paid to you in accordance with section 3.2. | |
| 20. | **What are the New Square Securities?** | Section 3.4 |
| | The New Square Securities comprise New Square Shares and New Square CDIs (as applicable) to be issued as Scheme Consideration. See also question 22 below. | |
| 21. | **What is a New Square CDI?** | Sections 3.4(b) and 3.4(c) |
| | CDIs, or CHESS depositary interests are instruments through which shares of foreign companies such as Square can be traded on ASX. Each New Square CDI will represent a beneficial interest in one Square Class A Share. | |

**31**



For personal use only

| No. | Question | Further Information |
|---|---|---|
| 22. | **What is the difference between New Square Shares and New Square CDIs?** | Section 3.4(d) |

New Square Shares will be fully paid Square Class A Shares, ranking equally in all respects with all other Square Class A Shares on issue. New Square Shares will be listed and traded on NYSE in US dollars.

Except for certain differences noted in section 3.4(d), a New Square CDI will have the rights that are economically equivalent to the rights attaching to a Square Class A Share. New Square CDIs will be quoted and traded on ASX in Australian dollars under a symbol to be advised before implementation of the Scheme. A holder of New Square CDIs can, however, elect at any time to convert those CDIs to an equivalent number of Square Class A Shares (see question 24 below).

A holder of New Square CDIs will not be a registered Square stockholder. Instead, Square Class A Shares represented by New Square CDIs will be held in the name of the CDI Nominee, a Subsidiary of ASX. A New Square CDI holder can direct the CDI Nominee to vote the Square Class A Shares represented by its New Square CDIs in accordance with the New Square CDI holder's directions.

For further detail on the difference between New Square Shares and New Square CDIs see section 3.4(d).

| No. | Question | Further Information |
|---|---|---|
| 23. | **Can I elect to receive my Scheme Consideration as New Square Shares rather than New Square CDIs (and vice versa)?** | Section 3.1(c) |

Yes. Where a Scheme Shareholder has a registered address in Australia or New Zealand as at the Record Date, that Scheme Shareholder will receive as Scheme Consideration New Square CDIs that will be tradable on ASX, but may alternatively request to receive that consideration in the form of New Square Shares (that will be tradable on NYSE) registered directly in their name in book-entry form through the DRS.

Where a Scheme Shareholder's address on the Afterpay Register as at the Record Date is located outside of Australia and New Zealand (other than an Ineligible Foreign Shareholder), that Scheme Shareholder will receive as Scheme Consideration New Square Shares registered directly in their name in book-entry form through the DRS, that will be tradable on NYSE, but may alternatively request to receive that consideration in the form of New Square CDIs.

A Scheme Shareholder whose registered address as at the Record Date is in Australia or New Zealand may make a Share Election to receive New Square Shares instead of New Square CDIs by completing a Share Election Form and returning it to the address specified in the Share Election Form so that it is received by the Afterpay Share Registry (and not withdrawn) by no later than 5.00pm on the Election Date.

A Scheme Shareholder whose registered address as at the Record Date is not in Australia or New Zealand (other than an Ineligible Foreign Shareholder) may make a CDI Election to receive New Square CDIs instead of New Square Shares by completing a CDI Election Form and returning it to the address specified in the CDI Election Form so that it is received by the Afterpay Share Registry (and not withdrawn) by no later than 5.00pm on the Election Date.

Afterpay Shareholders who are eligible to make a CDI or Share Election, can only make an election in relation to all (but not only some) of the Afterpay Shares to which they are entitled under the Scheme.

**32**

Section 1
Frequently Asked Questions

| No. | Question | Further Information |
|---|---|---|
| 24. | **Does the CDI Election or Share Election apply to additional Afterpay Shares which I subsequently acquire?**<br><br>Yes, if you acquire additional Afterpay Shares and you hold those additional Afterpay Shares at the Record Date, any CDI or Share Election you make (as applicable) will apply in respect of those Afterpay Shares. | Section 3.1(c) |
| 25. | **Can I convert my Square CDIs to Square Class A Shares (and vice versa)?**<br><br>New Square CDIs can be converted into Square Class A Shares and vice versa at any time following the Implementation Date, by contacting the Square CDI or Share Registry (as applicable). For further detail on the conversion of New Square CDIs to Square Class A Shares (and vice versa), see sections 3.4(c)(ix) and 3.4(c)(x). | Sections 3.4(c)(ix) and 3.4(c)(x) |
| 26. | **What are the tax implications of the Scheme for Scheme Shareholders?**<br><br>If the Scheme becomes Effective, there will be tax consequences for Scheme Shareholders which may include tax being payable on any gain made on disposal of their Scheme Shares. Section 8 provides a general description of the Australian tax consequences of the Scheme.<br><br>Section 8.8 provides a general description of the material US federal income tax consequences of the Scheme, including the likelihood that, under the rules applicable to "passive foreign investment companies" or "PFICs", any gain recognised generally will be treated as ordinary income and that certain interest charges and other adverse tax consequences may apply.<br><br>The tax consequences of the Scheme may vary depending on the nature and characteristics of each Scheme Shareholder and their individual circumstances.<br><br>It is recommended that Scheme Shareholders seek professional tax advice in relation to the income tax implications associated with the Scheme, including the possibility of adverse US federal income tax consequences under the PFIC rules. | Sections 8 and 8.8 |
| 27. | **Will Scheme Shareholders have to pay brokerage or stamp duty?**<br><br>No brokerage or stamp duty should be payable by the Scheme Shareholders on the acquisition by Square Acquirer of their Scheme Shares under the Scheme or on the receipt by Scheme Shareholders of the New Square Securities as Scheme Consideration. If you dispose of your Scheme Shares before the Record Date, brokerage fees may be payable. | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme and 8.5 |

**33**

| No. | Question | Further Information |
|---|---|---|
| 28. | **Can I sell my Afterpay Shares now?** | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
| | You can sell your Afterpay Shares on ASX at any time before the close of trading on the Thursday, 6 January 2022. Afterpay Shares will be suspended from official quotation on ASX from the close of trading on the Thursday, 6 January 2022. You will not be able to sell your Afterpay Shares on ASX after this time. If you cease to be a registered holder before the Record Date, you will not be entitled to the Scheme Consideration. | |
| | Afterpay Shares will continue to trade on ASX after the Effective Date. If the Scheme becomes Effective, Afterpay Shareholders who sell their Afterpay Shares after the Effective Date and prior to the Record Date should be aware that they will not receive the Scheme Consideration on the Implementation Date. In addition, investors who acquire Afterpay Shares after the Effective Date should be aware that all Afterpay Shareholders who hold Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will be provided with the Scheme Consideration in exchange for their Afterpay Shares. The exchange ratio is fixed and holders of Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will receive 0.375 New Square Shares or 0.375 New Square CDIs. Square Class A Shares will continue to trade on NYSE between the Effective Date and the Record Date. | |
| 29. | **When will Afterpay Shares cease trading on ASX?** | Key dates and Section 3.3(e) |
| | Provided that the Scheme becomes Effective, Afterpay Shares are expected to be suspended from trading on ASX from the close of trading on Thursday, 6 January 2022. | |
| 30. | **When do New Square Securities start trading?** | Key dates and Section 3.6 |
| | New Square CDIs are currently scheduled to commence trading on ASX on a deferred settlement basis on Friday, 7 January 2022 and a normal settlement basis on Wednesday, 19 January 2022. | |
| | New Square Shares are currently scheduled to start trading on NYSE on the next New York trading day after the Implementation Date. | |

**Ineligible Foreign Shareholders**

| No. | Question | Further Information |
|---|---|---|
| 31. | **Who is classified as an Ineligible Foreign Shareholder?** | Section 3.2 |
| | An Afterpay Shareholder whose address shown in the Register is a place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States or who is acting on behalf of such a person unless Square or Square Acquirer determines that: | |
| | (a) it is lawful and not unduly onerous or unduly impracticable to issue that Afterpay Shareholder with the New Square Shares or New Square CDIs on implementation of the Scheme; and | |
| | (b) it is lawful for that Afterpay Shareholder to participate in the Scheme by the law of the relevant place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States. | |
| | Please contact the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT), if you have any questions regarding what jurisdictions are impacted by the treatment of Ineligible Foreign Shareholders. | |

# 34

For personal use only

Section 1
Frequently Asked Questions

| No. | Question | Further Information |
|---|---|---|
| 32. | **What will Ineligible Foreign Shareholders receive under the Scheme?** | Section 3.2 |
|  | Where an Ineligible Foreign Shareholder would otherwise be entitled to receive New Square Shares as Scheme Consideration, Square Acquirer has no obligation to provide any New Square Shares to the Ineligible Foreign Shareholder, and instead Square Acquirer (or Square at the direction of and on behalf of Square Acquirer): |  |
|  | (a) will issue to a Sale Agent any New Square Shares to which an Ineligible Foreign Shareholder would otherwise be entitled; |  |
|  | (b) will procure that, as soon as reasonably practicable and in any event not more than 30 days after the Implementation Date, the Sale Agent: |  |
|  | (i) sells or procures the sale of all of the New Square Shares issued to the Sale Agent in the ordinary course of trading on NYSE; and |  |
|  | (ii) remits to Square Acquirer (or Square at the direction of and on behalf of Square Acquirer), or an agent acting on behalf of Square Acquirer or Square, the proceeds of sale (after deducting any applicable brokerage, stamp duty and other selling costs, taxes and charges); and |  |
|  | (c) as soon as practicable after the last sale of New Square Shares, Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) will pay to each Ineligible Foreign Shareholder an amount in Australian dollars equal to the proportion of the net proceeds of sale received by Square Acquirer to which that Ineligible Foreign Shareholder is entitled in full satisfaction of the Ineligible Foreign Shareholder entitlement to the relevant New Square Shares. |  |
| **Scheme, Voting and Approvals** | | |
| 33. | **Are there any conditions that must be satisfied or waived in order for the Scheme to be implemented?** | Section 3.11(a) |
|  | In order for the Scheme to become Effective and then be implemented, each of the Conditions Precedent must be satisfied or waived (if applicable). The Conditions Precedent include, but are not limited to, Afterpay Shareholder approval, Court approval and other regulatory approvals. If the Conditions Precedent are not satisfied or waived (if applicable), the Scheme will not proceed. |  |
|  | Further details on the Conditions Precedent are set out in section 3.11(a). |  |
| 34. | **What happens if these conditions are not satisfied or the Scheme Implementation Deed is terminated?** | Section 3.11 |
|  | If the Conditions Precedent above are not satisfied or waived (if applicable), or the Scheme Implementation Deed is terminated, the Scheme will not proceed. |  |

**35**

For personal use only

| No. | Question | Further Information |
|-----|----------|---------------------|
| 35. | **What happens if the Scheme is approved, all conditions are satisfied and it is implemented?** | Section 2.3 |
|     | Afterpay Scheme Shareholders will receive the Scheme Consideration and become holders of New Square Securities. | |
|     | Afterpay will be integrated into the Combined Group and Scheme Shareholders will be exposed to the risks associated with a shareholding in the Combined Group. | |
| 36. | **Can the Scheme be terminated?** | Section 3.11(j) |
|     | The Scheme Implementation Deed may be terminated in certain circumstances as described in clause 14 of the Scheme Implementation Deed. If the Scheme Implementation Deed is terminated, the Scheme will not proceed. For further details on the termination rights, see Section 3.11(j). | |
| 37. | **Am I entitled to vote at the Scheme Meeting?** | Section 3.3(b) |
|     | Each Afterpay Shareholder who is registered on the Afterpay Share Register on the Voting Record Date (currently expected to be 7.00pm (AEDT) on Saturday, 4 December 2021) is entitled to vote at the Scheme Meeting. | |
|     | *More Information* | |
|     | The Notice of Scheme Meeting contained in Attachment E sets out further details on your entitlement to vote. | |
| 38. | **How do I vote?** | How to vote and Attachment E |
|     | You can vote: | |
|     | (a) in person by attending the online Scheme Meeting; or | |
|     | (b) by appointing a proxy, attorney or, if you are a body corporate, a duly appointed corporate representative, to attend the online Scheme Meeting and vote on your behalf. | |
|     | You can appoint a proxy online or by completing the Proxy Form and returning the form to Afterpay or Computershare by 10.00am (AEDT) on Saturday, 4 December 2021. | |
|     | *More Information* | |
|     | The Notice of Scheme Meeting contained in Attachment E sets out further details on your entitlement to vote and how to submit a Proxy Form. | |

# 36

Section 1
Frequently Asked Questions

| No. | Question | Further Information |
|-----|----------|---------------------|
| 39. | **When and where will the Scheme Meeting be held?** | How to vote and Attachment E |
| | The Scheme Meeting will be held as a virtual (online only) meeting on Monday, 6 December 2021, commencing at 10.00am (AEDT). | |
| | You (or your proxy, attorney or, if you are a body corporate, your duly appointed corporate representative) may virtually attend the Scheme Meeting by using a **web browser** at http://web.lumiagm.com/354553219 on your smartphone, tablet or computer. You will need the latest versions of Chrome, Safari, Edge or Firefox. Please ensure your browser is compatible. | |
| | The **meeting ID** for the Scheme Meeting is: 354553219. | |
| | Your **username** is your SRN/HIN. | |
| | Your **password** is the postcode of your registered address for your holding if you are an Australian shareholder. If you are an overseas shareholder, your password is your three-character country code. | |
| | Please refer to the online meeting user guide at www.computershare.com.au/virtualmeetingguide for further details. | |
| | The online platform enables participants to view the Scheme Meeting live, ask questions online and vote on the Scheme Resolution in real time. | |
| | *More Information* | |
| | The Notice of Scheme Meeting contained in Attachment E sets out further details on your entitlement to vote. | |
| 40. | **Is voting compulsory?** | How to vote |
| | Voting is not compulsory. However, your vote will be important in determining whether the Scheme will proceed, as only those votes cast by Scheme Shareholders on the Scheme will be counted in determining whether the Scheme has been approved by Requisite Majorities of Scheme Shareholders. | |
| 41. | **What vote is required to approve the Scheme?** | Sections 2.2 and 3.3(b) |
| | For the Scheme to be approved, the Scheme Resolution must be passed by the Requisite Majorities, being: | |
| | (a) more than 50% by number of Afterpay Shareholders who are present and voting, either in person or by proxy, by attorney or, in the case of a corporation, by its duly appointed corporate representative, at the Scheme Meeting; and | |
| | (b) at least 75% of the total number of votes cast on the Scheme Resolution. | |
| 42. | **What happens if I do not vote or if I vote against the Scheme?** | Afterpay Directors' recommendation and matters relevant to your vote on the Scheme |
| | If the Scheme is approved by the Requisite Majorities of Afterpay Shareholders, then, subject to the other Conditions Precedent being satisfied or waived (if applicable) and the Scheme becoming Effective, the Scheme will be implemented and will be binding on all Scheme Shareholders, including those who voted against the Scheme, or did not vote. | |
| 43. | **Can I keep my shares in Afterpay?** | Section 2.3 |
| | If the Scheme is implemented, Afterpay Shareholders will not be able to keep their Afterpay Shares as these will be exchanged for New Square Securities. | |
| 44. | **When will the results of the Scheme Meeting be available?** | |
| | The results of the Scheme Meeting will be made available by Afterpay on ASX on the date of the Scheme Meeting following the close of the Scheme Meeting and the finalisation of results. | |

# 37

| No. | Question | Further Information |
|-----|----------|---------------------|

<div style="background:#b2f0d6;">**Conditions Precedent**</div>

| 45. | **When does the Scheme become Effective?** | Section 3.3 |

In order to become Effective, the Scheme must be approved by the Court at the Second Court Hearing. Afterpay will apply to the Court for an order approving the Scheme, if the Scheme is approved by the Requisite Majorities of Scheme Shareholders voting at the Scheme Meeting and all other Conditions Precedent (other than approval of the Court) have been satisfied or waived. If the Court makes orders approving the Scheme, Afterpay will lodge a copy of those orders with ASIC under section 411(10) of the Corporations Act. As soon as the copies of the Court orders approving the Scheme are lodged with ASIC, the Scheme will become Effective. This is expected to occur on, or on the next Business Day after, the date on which the Court issues orders approving the Scheme (currently scheduled to be Friday, 10 December 2021).

| 46. | **What are the Conditions Precedent to the Scheme becoming Effective?** | Section 3.11(a) |

In order for the Scheme to become Effective and then be implemented, each of the Conditions Precedent must be satisfied or waived (if applicable). The Conditions Precedent include, but are not limited to, Afterpay Shareholder approval, Court approval and other regulatory approvals. If the Conditions Precedent are not satisfied or waived (if applicable), the Scheme will not proceed.

Further details of the Conditions Precedent are set out in section 3.11(a).

<div style="background:#b2f0d6;">**Trading**</div>

| 47. | **Can I sell my Afterpay Shares before the Scheme is implemented?** | Section 3.3(e) |

You are able to sell your Afterpay Shares on market in the usual manner on or before Thursday, 6 January 2022 if you do not wish to hold them and participate in the Scheme.

However, you should note that if you choose to sell your Afterpay Shares, you may not receive consideration equivalent to the implied value of the Scheme Consideration, and brokerage expenses on sale may be incurred.

Afterpay Shares will continue to trade on ASX after the Effective Date. If the Scheme becomes Effective, Afterpay Shareholders who sell their Afterpay Shares after the Effective Date and prior to the Record Date should be aware that they will not receive the Scheme Consideration on the Implementation Date. In addition, investors who acquire Afterpay Shares after the Effective Date should be aware that all Afterpay Shareholders who hold Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will be provided with the Scheme Consideration in exchange for their Afterpay Shares. The exchange ratio is fixed and holders of Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will receive 0.375 New Square Shares or 0.375 New Square CDIs. Square Class A Shares will continue to trade on NYSE between the Effective Date and the Record Date.

If you are in any doubt as to what you should do, you should seek advice from independent and appropriately licensed financial, legal and taxation advisers before making any decision regarding the Scheme.

For the purpose of determining entitlements under the Scheme, Afterpay will not accept for registration or recognise any transfer or transmission application in respect of Afterpay Shares received after the Record Date.

| 48. | **When will Afterpay Shares cease trading on ASX?** | Section 3.3(e) |

Provided the Scheme becomes Effective, Afterpay's Shares are expected to be suspended from trading on ASX from the close of trading on Thursday, 6 January 2022.

**38**

For personal use only

Section 1
Frequently Asked Questions

| No. | Question | Further Information |
|---|---|---|
| **Information on the Combined Group** | | |
| 49. | **If the Scheme is implemented, what will the Combined Group look like?** | Section 6 |
| | Information on the Combined Group is contained in section 6, including details regarding the proposed Combined Group board of directors and senior management team. | |
| 50. | **What are Square's intentions in relation to the Combined Group?** | Section 6 |
| | Square's intentions in relation to the Combined Group are set out in section 6. | |
| 51. | **What are the key risks associated with implementation of the transaction and the creation of the Combined Group?** | Sections 7.3 to 7.6 |
| | The key risks associated with the implementation of the transaction and the creation of the Combined Group are detailed in sections 7.3 to 7.6. | |
| 52. | **What is Square's dividend policy?** | Section 5.6 |
| | Like Afterpay, Square has never declared nor paid any cash dividends on its capital stock. Square currently intends to retain all available funds and any future earnings for use in the operation of its business and does not expect to pay any dividends on its capital stock in the foreseeable future. | |
| | Any future determination relating to Square's dividend policy will be at the discretion of the Square Board, subject to applicable laws, and will depend on Square's financial position, results of operations, capital requirements, general business conditions, and other factors that the Square Board considers relevant. | |
| 53. | **What voting rights will Afterpay Shareholders have in the Combined Group?** | Section 5.15(a)(i) and 5.15(b) |
| | Unlike Afterpay, Square has a dual class stock structure, comprising Square Class A Shares and Square Class B Shares. Under that structure, holders of Square Class A Shares held, in the aggregate, approximately 38.98% of the outstanding voting power of Square as of 31 July 2021, and holders of Square Class B Shares held, in the aggregate, approximately 61.02% as of 31 July 2021. Certain of Square's directors and executive officers, and their affiliates, held 61.77% of the voting power as at that date. | |
| | The Scheme Consideration comprises Square Class A Shares (and CDIs over those shares). Accordingly, Afterpay Shareholders on the Record Date (with the exception of Ineligible Foreign Shareholders) will receive New Square Shares or New Square CDIs and, as with all other holders of Square Class A Shares, will have the right to one vote per Square Class A Share or Square CDI. | |
| **Further Information** | | |
| 54. | **What if I want further information?** | Next steps |
| | If you have any questions about the Scheme or you would like a hard copy of this Scheme Booklet, please contact the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT). | |
| | For information about your individual financial or taxation circumstances please consult your financial, legal, taxation or other professional adviser. | |

**39**

For personal use only

Section 2

# Summary of the Scheme

## 2.1  Background to the Scheme

On 2 August 2021, Afterpay announced that it had executed a Scheme Implementation Deed with Square and Square Acquirer, under which the parties have agreed to implement the Scheme between Afterpay and the Scheme Shareholders. A full copy of the Scheme Implementation Deed is available on ASX's website (www.asx.com.au) and Afterpay's website (https://corporate.afterpay.com/investors/asx-announcements).

If the Scheme is approved by Afterpay Shareholders at the Scheme Meeting and by the Court, and if all other necessary approvals and conditions for the Scheme are satisfied or waived (as applicable), Afterpay will become a wholly-owned indirect subsidiary of Square, will be delisted from ASX and Scheme Shareholders will receive the Scheme Consideration. If the Scheme is not approved, the Scheme will not be implemented, Scheme Shareholders will not receive the Scheme Consideration and Afterpay will continue as a standalone entity listed on ASX.

## 2.2  Implementation of the Scheme

The Scheme is proposed to be undertaken pursuant to a Court approved scheme of arrangement. A scheme of arrangement is a statutory procedure under Part 5.1 of the Corporations Act that allows companies, with shareholder and Court approval, to carry out transactions that become binding on all shareholders by operation of law upon the Court orders approving the scheme of arrangement being lodged with ASIC. Approval of a scheme of arrangement requires a 50% majority of the number of shareholders voting (unless the Court orders otherwise) and a 75% majority of the total votes cast being in favour of the scheme, as well as approval by the Court.

The Scheme will become binding on Afterpay and Afterpay Shareholders only if the conditions to the Scheme are satisfied or waived (as applicable).

## 2.3  If the Scheme is approved

If the Scheme is approved by Afterpay Shareholders and the Court, all other Conditions Precedent are satisfied or waived (as applicable) and the Scheme is implemented:

(a)  the Scheme will bind all Scheme Shareholders, including those who did not vote on the Scheme and those who voted against it, meaning that all Scheme Shares will be transferred to Square Acquirer;

(b)  all Afterpay Shareholders as at the Record Date (whether they voted for or against the Scheme, or did not vote) will receive the Scheme Consideration; and

(c)  Afterpay will be delisted from ASX.



**40**

## 2.4  What if the Scheme is not implemented?

If the Scheme is not implemented, Afterpay shareholders will retain their Afterpay Shares. In the absence of a Superior Proposal, there is a risk that Afterpay shareholders may not be able to realise a consideration for all of their Afterpay Shares (at least in the short term) comparable to the consideration that they would receive under the Scheme.

The consequences of the Scheme not being implemented include:

(a)  Square Acquirer will not provide the Scheme Consideration; and

(b)  Afterpay Shareholders will retain their Afterpay Shares.

If the Scheme is not implemented, the Afterpay Directors intend to continue to operate the business of Afterpay in the ordinary course and in a manner consistent with current practices. Afterpay Shareholders will continue to be exposed to any benefits and risks associated with their investment in Afterpay.

## 2.5  Strategy and intentions for Afterpay if the Scheme does not proceed

If the Scheme does not proceed, the Afterpay Board and management team intend to continue to operate the business of Afterpay in the ordinary course and in a manner consistent with current practices. Through its six strategic pillars, Afterpay will continue to drive its vision and mission outlined in section 4.1.

For personal use only

**41**

For personal use only

Section 3

# Overview of the Scheme

## 3.1. Scheme Consideration

### (a) Overview

If the Scheme becomes Effective, all Scheme Shareholders, will receive the Scheme Consideration, comprising 0.375 New Square Securities[1] for each Scheme Share, representing ownership interest in shares of Square Class A common stock (**Square Class A Shares**).

### (b) New Square Securities

Scheme Shareholders (other than Ineligible Foreign Shareholders) may receive New Square Securities as either New Square Shares or New Square CDIs. Further detail regarding the treatment of Ineligible Foreign Shareholders is set out in section 3.2.

New Square Shares will be fully paid Square Class A Shares and will be listed and traded on NYSE in US dollars.

A CDI is an instrument through which shares of foreign companies such as Square can be traded on ASX. Each New Square CDI will represent a beneficial interest in one Square Class A Share and will have economic and other rights largely equivalent to the rights attaching to a Square Class A Share. New Square CDIs will be quoted and traded on ASX in Australian dollars under a symbol to be advised before implementation of the Scheme.

### Existing instructions to the Share Registry

Except for tax file numbers, if not prohibited by law, all instructions, notifications or elections by an Afterpay Shareholder to Afterpay are binding or deemed binding between the Afterpay Shareholder and Afterpay relating to the Afterpay Shares (including any email addresses, instructions relating to communications from Afterpay, whether dividends are to be paid by cheque or into a specific bank account or by Global Wire, notices of meetings or other communications from Afterpay) and will be deemed from the Implementation Date (except to the extent determined otherwise by Square in its sole discretion), by reason of the Scheme, to be made by the Afterpay Shareholder to Square until that instruction, notification or election is revoked or amended in writing addressed to the Square CDI or Share Registry (as applicable) at its registered address.

For further details on New Square Securities, see section 3.4.

---

1.  Ineligible Foreign Shareholders will have their New Square Shares issued instead to a Sale Agent. These shares will then be sold by the Sale Agent in the ordinary course of trading on NYSE and the net proceeds of the sale will be paid to the Ineligible Foreign Shareholders promptly afterwards. Refer to Section 3.5 for more details on this process.

**42**

**(c) Share Election or CDI Election**

Where a Scheme Shareholder's registered address on the Record Date is in Australia or New Zealand, that shareholder will receive New Square CDIs (tradeable on ASX) by default but may elect to receive New Square Shares (**Share Election**). Where a Scheme Shareholder's registered address on the Record Date is located outside of Australia and New Zealand (other than an Ineligible Foreign Shareholder), that shareholder will receive New Square Shares (tradeable on NYSE) by default but may elect to receive New Square CDIs (**CDI Election**).

To make a Share Election, Scheme Shareholders must complete a Share Election Form and return it to the address specified in the Share Election Form so that it is received by the Afterpay Share Registry (and not withdrawn) by no later than 5.00pm on the Election Date. Please contact the Afterpay Shareholder Information Line to request a Share Election Form.

To make a CDI Election, Scheme Shareholders must complete a CDI Election Form and return it to the address specified in the CDI Election Form so that it is received by the Afterpay Share Registry (and not withdrawn) by no later than 5.00pm on the Election Date. If ASX does not grant approval for Australian Admission on or before the Business Day after the Effective Date, all CDI Elections will be disregarded and the entitlements of all Scheme Shareholders (including those who made a CDI Election) will be satisfied by the distribution of New Square Shares. Please contact the Afterpay Shareholder Information Line to request a CDI Election Form.

Afterpay Shareholders who are eligible to make a CDI Election or a Share Election, can only make an election in relation to all (but not only some) of the Afterpay Shares to which they are entitled under the Scheme.

Scheme Shareholders may withdraw their Share Election or their CDI Election (for all and not only some) of their Afterpay Shares, by lodging an Election Withdrawal Form so that it is received by the Afterpay Share Registry by no later than 5.00pm on the Election Date. Please contact the Afterpay Shareholder Information Line to request an Election Withdrawal Form.

Scheme Shareholders who are eligible to make a CDI Election or a Share Election, can only make an election in relation to all (not only some) of the Afterpay Shares held by the relevant Scheme Shareholder as at the Record Date. A Scheme Shareholder who holds one or more parcels of Afterpay Shares as trustee or nominee for, or otherwise on account of, another person, may not make separate elections in relation to each of those parcels of Afterpay Shares. If some of the underlying beneficiaries prefer that the Scheme Consideration is received in the form of New Square CDIs, while others prefer that the Scheme Consideration is received in the form of New Square Shares, the trustee or nominee must, prior to an Election Form being submitted, establish separate and distinct holdings in the Afterpay Share Register in respect of each parcel of Afterpay Shares in order to allow the trustee or nominee to make separate elections in respect of each parcel of Afterpay Shares. Accordingly, trustees and nominees should only provide one Election Form for each registered shareholding of Afterpay Shares.

All items and documents (including Election Forms and Election Withdrawal Forms) sent to, from, by or on behalf of Afterpay Shareholders are sent entirely at the Afterpay Shareholders' risk.

Square Acquirer will determine, in its sole discretion, all questions as to the correct completion of a CDI Election Form, Share Election Form or Election Withdrawal Form, and time of receipt of such form. Square Acquirer is not required to communicate with any Scheme Shareholder prior to making this determination. The determination of Square Acquirer will be final and binding on the Scheme Shareholder.

## 3.2. Ineligible Foreign Shareholders

A Scheme Shareholder will be an Ineligible Foreign Shareholder for the purposes of the Scheme if, on the Record Date, his or her address as shown in the Afterpay Share Register is in a jurisdiction other than Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, the United Kingdom and the United States, unless Square or Square Acquirer determines:

(a) it is lawful and not unduly onerous or unduly impracticable to issue that Scheme Shareholder with New Square Securities on implementation of the Scheme; and

(b) it is lawful for that Afterpay Shareholder to participate in the Scheme by the law of the relevant place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States.

Nominees, custodians and other Afterpay Shareholders who hold Afterpay Shares on behalf of a beneficial owner resident outside Australia, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States may not forward this Scheme Booklet (or any accompanying document) to anyone outside these countries without the consent of Afterpay.

# 43

If you are an Ineligible Foreign Shareholder and the Scheme is implemented, you will not be issued the Scheme Consideration under the Scheme. Instead, New Square Shares that would otherwise be issued to you under the Scheme will instead be issued to the Sale Agent. Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) will procure that, as soon as reasonably practicable (and in any case no later than 30 days after the Implementation Date), the Sale Agent sells or procures the sale of all the New Square Shares issued to the Sale Agent in the ordinary course of trading on NYSE. The Sale Agent will then remit the net sale proceeds to Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) or an agent acting on behalf of Square Acquirer or Square. Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) will then, as soon as reasonably practicable, pay (or cause to be paid to) Ineligible Foreign Shareholders their pro rata proportion of the net proceeds (in cash) in Australian dollars, as described in section 3.5 below. None of Afterpay, Square, Square Acquirer or the Sale Agent give any assurance as to the price that will be achieved for the sale of the New Square Shares and the sale of the New Square Shares will be at the risk of the Ineligible Foreign Shareholder.

Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) will make, or procure the making of, payments to Ineligible Foreign Shareholders by:

(a) electronic funds transfer in Australian dollars to a bank account with any Australian "Authorised Deposit-taking Institution" (as defined in the Corporations Act) notified to Afterpay by the Ineligible Foreign Shareholder;

(b) Global Wire Payment Service, if an Afterpay Shareholder who resides outside of Australia has elected to receive payments electronically in their local currency using the Afterpay Registry's Global Wire Payment Service; or

(c) if a bank account or Global Wire Payment instructions have not been notified to Afterpay's Share Registry as at 7.00pm on the Record Date, dispatching a cheque for the relevant amount in Australian dollars to the Ineligible Foreign Shareholder by prepaid post to their registered address (as at the Record Date), such cheque being drawn in the name of the Ineligible Foreign Shareholder.

If you wish to update your direct credit instructions or Global Wire Payment details, please visit www.computershare.com.au/easyupdate/apt and update these details by 7.00pm (AEDT) on the Record Date. For a list of currencies offered for the Global Wire Payment Service or for further information on how to subscribe to this service, please contact the Afterpay Registry. Cheques, direct credit payment advices and Global Wire Payment advices will be mailed by ordinary pre-paid post, at your risk, to your address as shown on the Afterpay Shares Register at 7.00pm (AEDT) on the Record Date.

## 3.3. Steps for Implementing the Scheme

### (a) Preliminary steps

Afterpay, Square and Square Acquirer entered into the Scheme Implementation Deed on 2 August 2021, pursuant to which, among other things, Afterpay agreed to propose the Scheme. The Scheme Implementation Deed sets out each of Afterpay, Square and Square Acquirer's rights and obligations in connection with the implementation of the Scheme.

Square and Square Acquirer have executed the Deed Poll pursuant to which Square Acquirer has agreed to cause Square to, and Square will at the direction of and on behalf of Square Acquirer, subject to the Scheme becoming Effective, provide each Scheme Shareholder with, or procure the provision to each Scheme Shareholder of, the Scheme Consideration to which it is entitled under the Scheme.

A copy of the proposed Scheme is included in this Scheme Booklet as Attachment A. A copy of the Deed Poll is attached to this Scheme Booklet as Attachment B.

### (b) Scheme Meeting

The Court has ordered that the Scheme Meeting be held at 10.00am on Monday, 6 December 2021 for the purposes of approving the Scheme Resolution. The Notice of Scheme Meeting for Afterpay Shareholders which sets out the Scheme Resolution is included in Attachment E to this Scheme Booklet.

Each Afterpay Shareholder who is registered on the Afterpay Share Register at 7.00pm (AEDT) on Saturday, 4 December 2021 is entitled to attend and vote at the Scheme Meeting, either in person or by proxy or attorney or in the case of a body corporate, by its corporate representative appointed in accordance with section 250D of the Corporations Act.

Instructions on how to attend and vote at the Scheme Meeting in person, or to appoint a proxy to attend and vote on your behalf, are set in the 'How to Vote' section of this Scheme Booklet.

**44**

Section 3
Overview of the Scheme

The Scheme Resolution must be approved by:

(i)    a majority in number (more than 50%) of Afterpay Shareholders present and voting at the Scheme Meeting (whether in person, by proxy, by attorney or, in the case of corporate Afterpay Shareholders, by a corporate representative) (the **Headcount Test**); and

(ii)   at least 75% of the total number of votes cast on the Scheme Resolution at the Scheme Meeting.

It should be noted that the Court has the power to waive the Headcount Test.

**(c)  Second Court hearing**

In the event that:

(i)    the Scheme Resolution is approved by the Requisite Majorities of Afterpay Shareholders at the Scheme Meeting; and

(ii)   all Conditions Precedent of the Scheme have been satisfied or remain capable of being satisfied, or waived (if applicable),

Afterpay will apply to the Court for orders approving the Scheme. The Court has a broad discretion whether or not to approve the Scheme under section 411(4)(b) of the Corporations Act, even if the Scheme is approved by the Requisite Majorities of Afterpay Shareholders at the Scheme Meeting.

The Second Court Hearing is currently expected to be Friday, 10 December 2021, though an earlier or later date may be sought. Any change to this date will be announced through ASX and will be available on Afterpay's website at https://corporate.afterpay.com/.

Any Afterpay Shareholder, or with the Court's permission, any other interested person may appear at the Second Court Hearing in person or through counsel to support or oppose the approval by the Court of the Scheme or make representations to the Court in relation to the Scheme.

**(d)  Effective Date**

If the Court makes orders approving the Scheme, Afterpay will lodge with ASIC an office copy of the Court orders given under section 411(4)(b) of the Corporations Act approving the Scheme. It is anticipated that this will occur on the Business Day immediately following the Court Approval Date.

Once the Scheme becomes Effective:

(i)    Square Acquirer will become bound to pay Scheme Shareholders the Scheme Consideration on the Implementation Date; and

(ii)   subject to payment of the aggregate Scheme Consideration by Square Acquirer as referred to in section 3.3(a) of this Scheme Booklet below, Afterpay will become bound to take the steps required for Square Acquirer to become the holder of all Afterpay Shares.

**(e)  Suspension of trading of Afterpay Shares**

If the Court approves the Scheme, Afterpay will notify ASX of that approval on the day it is received.

It is expected that suspension of trading in Afterpay Shares on ASX will occur from the close of trading on Thursday, 6 January 2021.

Afterpay Shareholders are able to sell Afterpay Shares on market in the usual manner on or before Thursday, 6 January 2021.

**Afterpay Shares will continue to trade on ASX after the Effective Date. If the Scheme becomes Effective, Afterpay Shareholders who sell their Afterpay Shares after the Effective Date and prior to the Record Date should be aware that they will not receive the Scheme Consideration on the Implementation Date. In addition, investors who acquire Afterpay Shares after the Effective Date should be aware that all Afterpay Shareholders who hold Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will be provided with the Scheme Consideration in exchange for their Afterpay Shares. The exchange ratio is fixed and holders of Afterpay Shares on the Record Date (other than Ineligible Foreign Shareholders) will receive 0.375 New Square Shares or 0.375 New Square CDIs. Square Class A Shares will continue to trade on NYSE between the Effective Date and the Record Date.**

For the purpose of determining entitlements under the Scheme, Afterpay will not accept for registration or recognise any transfer or transmission application in respect of Afterpay Shares received after the Record Date.

40

**(f) Record Date and determination of persons entitled to Scheme Consideration**

Those Afterpay Shareholders who are recorded on the Afterpay Share Register on the Record Date (currently expected to be 7.00pm (AEDT) on Saturday, 4 December 2021) or such other time and date as the parties agree) will be entitled to receive the Scheme Consideration in respect of the Afterpay Shares they hold at that time.

**(g) Dealings on or prior to the Record Date**

For the purposes of determining who is a Scheme Shareholder (i.e. an Afterpay Shareholder on the Record Date), dealings in Afterpay Shares will be recognised only if:

- in the case of dealings of the type to be effected using Clearing House Electronic Subregister System (**CHESS**), the transferee is registered on the Afterpay Share Register as the holder of the relevant Afterpay Shares on or before the Record Date; and

- in all other cases, registrable transfer or transmission applications in respect of those dealings, or valid requests in respect of other alterations, are received by the Afterpay Share Registry on or before the Record Date at the place where the Afterpay Share Register is kept (and the transferee remains registered as at the Record Date).

For the purposes of determining entitlements under the Scheme, Afterpay will not accept for registration or recognise any transfer or transmission applications in respect of Afterpay Shares received after the Record Date (except a transfer to Square Acquirer pursuant to this Scheme and any subsequent transfer by Square Acquirer or its successors in title).

**(h) Dealings after the Record Date**

For the purpose of determining entitlements to the Scheme Consideration, Afterpay must maintain the Afterpay Share Register in its form as at the Record Date until the Scheme Consideration has been paid to the Scheme Shareholders. The Afterpay Share Register in this form will solely determine entitlements to the Scheme Consideration.

After the Record Date:

- any statements of holding in respect of Scheme Shares (other than statements of holding in favour of Square Acquirer and its successors in title) will cease to have effect as documents of title in respect of those shares; and

- each entry current on the Afterpay Register as at the Record Date (other than entries in respect of Square Acquirer or its successors in title) will cease to have effect except as evidence of entitlement to the Scheme Consideration.

**(i) Implementation Date – transfer and registration of Afterpay Shares**

The Implementation Date is expected to be Tuesday, 18 January 2022. On the Implementation Date, Square must, at the direction of and on behalf of Square Acquirer, issue New Square Securities to each Scheme Shareholder entitled to them as the Scheme Consideration and cause their names and addresses to be entered in the Square register. After the Implementation Date, Square must send a holding statement or confirmation advice to each Scheme Shareholder (other than an Ineligible Foreign Shareholder) representing the number of New Square Securities issued to the Scheme Shareholder pursuant to the Scheme.

For further information regarding issuance of the Scheme Consideration, see section 3.8 and clause 6 of the Scheme set out in Attachment A.

## 3.4. New Square Securities

**(a) New Square Shares**

New Square Shares will be Square Class A Shares, ranking equally in all respects with all other Square Class A Shares on issue. New Square Shares will be listed and traded on NYSE. They will not be quoted or traded on ASX. Accordingly, investors who wish to trade New Square Shares on the open market must do so on NYSE. Such trades must be undertaken through a broker entitled to trade on NYSE. It is the responsibility of Afterpay Shareholders to ensure that appropriate arrangements are in place if they wish to hold and trade New Square Shares on NYSE.

As trading in New Square Shares on NYSE will be in US dollars, the Australian dollar value of the New Square Shares will depend on the AUD/USD exchange rate.

**46**

**(b) New Square CDIs**

CDIs are CHESS Depositary Interests, used to enable trading on ASX of financial products issued by entities domiciled in countries whose laws may not recognise uncertificated holders or electronic transfer of title through CHESS. CDIs represent an interest in the underlying security of a foreign company. This allows investors to trade interests in foreign securities by trading the relevant CDIs on ASX.

In the case of the New Square CDIs provided as Scheme Consideration, each New Square CDI will represent a beneficial interest in one Square Class A Share and will have rights that are economically equivalent to the rights attaching to a Square Class A Share, except for certain differences noted in section 3.4(d).

The Square Class A Shares to which the New Square CDIs relate will be provided by Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) to a depositary nominee which will hold legal title, or beneficial owner to a depositary nominee which will hold legal title, or beneficial ownership, to those shares on behalf of the holders of the New Square CDIs. It is Square's current intention to appoint CHESS Depositary Nominees Pty Ltd, a wholly owned subsidiary of ASX Limited, as depositary nominee. New Square CDIs will be quoted and traded on ASX in Australian dollars under a symbol to be advised before implementation of the Scheme. New Square CDIs will not be quoted or traded on NYSE.

**(c) Key features of New Square CDIs**

**(i) General**

Except for certain differences noted in section 3.4(d), the rights attaching to New Square CDIs are economically equivalent to the rights attaching to Square Class A Shares, and Square will generally be required to treat holders of New Square CDIs as if they were the holders of the Square Class A Shares represented by those New Square CDIs.

In accordance with clause 4.7 of the Scheme Implementation Deed, all New Square Shares, and New Square CDIs, will rank equally in all respects with all Square Class A Shares.

**(ii) Ratio**

Each New Square CDI will represent one Square Class A Share.

**(iii) Voting**

Holders of New Square CDIs will be sent notices of meetings of Square shareholders at the same time as they are sent to Square shareholders. As holders of New Square CDIs are not the registered holders of the Square Class A Shares represented by Square CDIs, they will not be automatically entitled to vote at a meeting of Square shareholders.

However, the holder of a New Square CDI can direct the CDI Nominee to cast votes in a particular manner on their behalf or they can require the CDI Nominee to appoint the holder (or a person nominated by the holder) as proxy to exercise the votes attaching to the Square Class A Shares represented by the holder's New Square CDIs. In the latter case, a holder of a Square CDI may, as proxy, vote at a meeting of Square shareholders.

Except as mentioned in this paragraph, if a holder of a New Square CDI wishes to vote at a meeting of Square shareholders, the holder must first convert their New Square CDIs into the underlying Square Class A Shares in sufficient time before the record date for the meeting.

**(iv) Takeovers**

The CDI Nominee must not accept a takeover offer in respect of any Square CDIs representing Square Class A Shares unless otherwise authorised by holders of Square CDIs to accept the offer. It is the CDI Nominee's responsibility to ensure that the bidder processes those acceptances.

**(v) Communications from Square**

Square will communicate directly with holders of New Square CDIs with respect to corporate actions and will send notices and other documents (e.g. notices of meetings) to holders of New Square CDIs at the same time, to the extent practicable, as they are sent to Square shareholders.

**(vi) Trading**

Following the listing of the New Square CDIs on ASX, New Square CDIs can be traded on ASX. New Square CDIs will not be tradeable on NYSE. If a holder of New Square CDIs wishes to trade on NYSE, they must convert the New Square CDIs into Square Class A Shares (see section 3.4(ix)).

**47**

For personal use only

For personal use only

### (vii) Dividends

In accordance with the ASX Settlement Operating Rules, Square will distribute any dividend declared on Square Class A Shares to holders of Square CDIs.

Dividend record and payment dates will be the same for New Square Shares and New Square CDIs. See section 6.3(g) for further details on Square's intentions in relation to dividends.

### (viii) Evidence of ownership

If New Square CDIs are issued to you under the Scheme, you will receive a holding statement or confirmation advice in respect of your Square CDIs rather than a holding statement for the underlying Square Class A Shares. Revised holding statements will be provided on a periodic basis if there is a change in the number of Square CDIs held by you. New Square CDIs may be held on an issuer sponsored subregister or on a CHESS subregister. New Square CDIs will be received:

- on the Square CDI issuer sponsored subregister, to the extent they are issued for Afterpay Shares held on the Afterpay issuer sponsored subregister as at the Record Date; and
- on the Square CDI CHESS subregister, to the extent they are issued for Afterpay Shares held on the Afterpay CHESS subregister as at the Record Date.

### (ix) Conversion of New Square CDIs into Square Class A Shares

Holders of New Square CDIs may at any time (following the Implementation Date) request to convert their New Square CDIs into Square Class A Shares listed on NYSE by contacting:

- Computershare, the Square CDI registry, if their New Square CDIs are held directly on the Square CDI issuer sponsored subregister. Square CDI holders will be provided with a CDI cancellation request form for completion and return to Computershare; or
- their sponsoring participant (usually their broker), if their New Square CDIs are held on the Square CDI CHESS subregister. In this case, your sponsoring broker will arrange for completion of the relevant form and its return to Computershare.

Computershare will then arrange for the transfer of Square Class A Shares from the CDI Nominee to the former Square CDI holder and, depending on the request made, issue the Square Class A Shares to the former Square CDI holder in book-entry form directly on the US share register or deliver to their account held with a participant within The Depository Trust Company, US central securities depository. Trading on ASX will no longer be possible.

It is expected that requests for conversion will ordinarily be processed by the next business day, provided that Computershare is in receipt of a duly completed and valid removal request form. However, no guarantee can be given about the time for this conversion to take place.

Computershare will not charge an individual security holder a fee for transferring Square CDIs into Square Class A Shares (although a fee will be payable by market participants).

No trading of the underlying Square Class A Shares can take place on NYSE until the conversion process has been completed. The decision whether to convert New Square CDIs to Square Class A Shares will depend on your individual circumstances. You should seek advice from your own independent and appropriately licensed financial, legal and taxation advisers before deciding whether to convert New Square CDIs to Square Class A Shares.

### (x) Conversion of New Square Shares into Square CDIs

Afterpay Shareholders that receive New Square Shares instead of Square CDIs, and existing Square Shareholders, may at any time (following the Implementation Date) convert them into Square CDIs by contacting Computershare in the US. Computershare will not charge a fee to a shareholder seeking to convert Square Class A Shares to CDIs (although a fee will be payable by market participants).

In this instance, underlying Square Class A Shares will be transferred to the CDI Nominee and a holding statement for the CDIs will be issued to the relevant security holder. No trading in Square CDIs on ASX can take place until this conversion process is complete.

The decision whether to convert New Square Shares to Square CDIs will depend on your individual circumstances. You should seek advice from your own independent and appropriately licensed financial, legal and taxation adviser before deciding whether to convert New Square Shares to Square CDIs.

**48**

**(d)  Principal differences between holding New Square CDIs and New Square Shares**

(i)  The principal difference between holding a New Square CDI and holding a New Square Share is that the holder of a New Square CDI has an indirect, beneficial interest in the New Square Share underlying their New Square CDI instead of directly owning the New Square Share. This means that the holder of the New Square CDI is not the holder of the underlying New Square Share and therefore:

- cannot directly trade the underlying New Square Share; and
- is a beneficial holder (rather than a registered legal holder) of the underlying New Square Share.

(ii)  Other differences

(A)  **Exercise of shareholder rights**

As holders of New Square CDIs are not registered shareholders of Square, the rights attaching to New Square Shares which underlie their New Square CDIs must be exercised by the CDI Nominee. A holder of New Square CDIs may instruct the CDI Nominee to exercise those rights on their behalf. In contrast, a registered holder of New Square Shares can directly exercise the rights attaching to their New Square Shares in such manner as they choose. For example, as described above, a holder of a New Square CDI cannot vote at a Square meeting as a Square shareholder but can direct the CDI Nominee how to vote, or appoint the holder as proxy, at that Square shareholder meeting.

(B)  **New Square CDIs will be quoted and trade on ASX and New Square Shares will be quoted and trade on NYSE**

New Square Shares will be tradeable on NYSE only. They will not be quoted or tradeable on ASX. Accordingly, investors who wish to trade New Square Shares on the open market must do so on NYSE. Such trades must be undertaken through a broker entitled to trade on NYSE. It is the responsibility of Afterpay shareholders to ensure that appropriate arrangements are in place if they wish to hold and trade New Square Shares on NYSE.

New Square CDIs will be tradeable on ASX only. This may be attractive to Afterpay Shareholders, as it allows New Square CDIs to be traded during Australian business hours using Australian brokers in prices quoted in AUD.

See section 7.5(b) for further discussion of the liquidity of the market for New Square CDIs and the potential risk that they may trade at a discount to New Square Shares on NYSE.

**(e)  Foreign Exempt Listing**

Square intends to apply for admission to the official list of ASX as a Foreign Exempt Listing, conditional on the Scheme being implemented. Once listed on ASX as a Foreign Exempt Listing, Square will be exempt from complying with most of the Listing Rules. For further details on this Foreign Exempt Listing, see section 6.4.

## 3.5.  Sale Facility in Respect of Ineligible Foreign Shareholders

**(a)  Sale Facility Mechanics**

Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) will establish the Sale Facility and appoint the Sale Agent to sell any New Square Shares that would otherwise be issued to Ineligible Foreign Shareholders.

If the Scheme becomes Effective, the New Square Shares that would otherwise be issued to Ineligible Foreign Shareholders will be provided by Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) to the Sale Agent on the Implementation Date.

Within 30 days after the Implementation Date, the Sale Agent must sell or procure the sale (including on an aggregated or partially aggregated basis), in the ordinary course of trading on NYSE, of all the New Square Shares issued to the Sale Agent on behalf of the Ineligible Foreign Shareholders, at such price or price as the Sale Agent determines in good faith. The Sale Agent must remit to Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) or an agent acting on behalf of Square Acquirer or Square the proceeds of those sales (after deduction of any applicable brokerage, stamp duty and other selling costs, taxes and charges) in Australian dollars (**Sale Facility Proceeds**).

**49**

Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) must, as soon as reasonably practicable after the last sale of the relevant New Square Shares, pay (or cause to be paid) to each Ineligible Foreign Shareholder their pro rata proportion of the Sale Facility Proceeds, calculated in accordance with the following formula:

$$A = (B \div C) \times D$$

where:

A    is the amount to be paid to the Ineligible Foreign Shareholder;

B    is the number of New Square Shares attributable to, and that would otherwise have been issued to, that Ineligible Foreign Shareholder had it not been an Ineligible Foreign Shareholder and which are instead issued to the Sale Agent;

C    is the total number of New Square Shares attributable to, and which would otherwise have been issued to, all Ineligible Foreign Shareholders collectively and which are instead issued to the Sale Agent; and

D    is the Sale Facility Proceeds.

### (b) Value of the Sale Facility Proceeds

The cash amount received by Ineligible Foreign Shareholders will depend on the price at which the New Square Shares can be sold under the Sale Facility by the Sale Agent at the relevant time and the amount of any applicable brokerage, taxes and charges incurred by the Sale Agent in connection with the sales under the Sale Facility.

The cash amount received by an Ineligible Foreign Shareholder under the Sale Facility may be more or less than the value of the New Square Shares that the Afterpay Shareholder would have received had they not been an Ineligible Foreign Shareholder.

None of Afterpay, Square, Square Acquirer, or the Sale Agent give any assurance as to the price that will be achieved for the sale of New Square Shares by the Sale Agent under the Sale Facility.

For further information regarding payment of the Sale Facility Proceeds, including the timing for receipt of that payment, see sections 3.2 and 3.5(a).

## 3.6.  Commencement of Trading of New Square Securities

Deferred settlement trading of New Square CDIs is expected to be available on ASX from Friday, 7 January 2022.

Trading on ASX of New Square CDIs is expected to commence on a normal settlement basis on Wednesday, 19 January 2022.

Trading on NYSE of New Square Shares is expected to commence on the next New York trading day after the Implementation Date (which is currently expected to be Wednesday, 19 January 2022).

## 3.7.  Delisting of Afterpay

After the Scheme has been implemented, Afterpay will request that ASX removes it from the official list of ASX, and such delisting is expected to occur one Business Day following the Implementation Date.

## 3.8.  Issuance of the Scheme Consideration

Square and Square Acquirer have entered into the Deed Poll under which Square and Square Acquirer have covenanted in favour of Scheme Shareholders such that in accordance with the Scheme:

- Square Acquirer will provide or procure the provision of the Scheme Consideration to each Scheme Shareholder; and
- Square Acquirer agrees to cause Square to, and Square will at the direction of and on behalf of Square Acquirer (in satisfaction of Square Acquirer's obligation to provide such Scheme Consideration to the Scheme Shareholders), issue the Scheme Consideration.

For personal use only

**50**

**(a) Issue of New Square Securities**

If the Scheme becomes Effective, any New Square Securities to be provided to a Scheme Shareholder under the Scheme will be provided by Square Acquirer (or Square at the direction of and on behalf of Square Acquirer), on the Implementation Date.

The name and address of such Scheme Shareholders will be recorded in:

(i)   the Square Share register in respect of those New Square Shares that are issued on the Implementation Date, and holding statements for those New Square Shares will be sent to those Scheme Shareholders;

(ii)  the Square CDI CHESS subregister in respect of those New Square CDIs that are issued on the Implementation Date, to the extent that are issued for Afterpay Shares held on the Afterpay CHESS subregister, and confirmation advices of beneficial ownership for those New Square CDIs will be sent to those Scheme Shareholders; or

(iii) the Square issuer sponsored CDI subregister, in respect of those New Square CDIs that are issued on the Implementation Date, to the extent they are issued for Afterpay Shares held on the Afterpay issuer sponsored subregister, and holding statements for those New Square CDIs will be sent to those Scheme Shareholders.

## 3.9. Fractional Entitlements and Shareholding Splitting or Division

If the number of Scheme Shares held by a Scheme Shareholder at the Record Date is such that the aggregate entitlement of the Scheme Shareholder to the Scheme Consideration includes a fractional entitlement to a New Square Share or New Square CDI, then the entitlement of that Scheme Shareholder must be rounded up or down, with any such fractional entitlement of:

(a)  less than 0.5 being rounded down to the nearest whole number of New Square Securities; and

(b)  0.5 or more being rounded up to the nearest whole number of New Square Securities.

If Afterpay and Square are of the opinion (acting reasonably) that two or more Scheme Shareholders have, before the Record Date, been party to shareholding splitting or division in an attempt to obtain an unfair advantage by reference to such rounding, Afterpay may give notice to those Scheme Shareholders:

(a)  setting out their names and registered addresses as shown in the Afterpay Share Register;

(b)  stating that opinion; and

(c)  attributing to one of them specifically identified in the notice the Scheme Shares held by all of them.

After such notice has been given, the Scheme Shareholder specifically identified in the notice as the deemed holder of all the specified Scheme Shares will, for the purposes of the Scheme, be taken to hold all of those Scheme Shares and each of the other Scheme Shareholders whose names and registered addresses are set out in the notice will, for the purposes of the Scheme, be taken to hold no Scheme Shares.

## 3.10. Foreign Selling Restrictions

**(a) Canada**

The New Square Securities (including in the form of New Square CDIs) will be provided by Square Acquirer (or Square, at the direction of and on behalf of Square Acquirer) in reliance upon exemptions from the prospectus and registration requirements of the applicable Canadian securities law in each province and territory of Canada. No securities commission in Canada has reviewed or in any way passed upon this document or the merits of the Scheme.

**(b) Hong Kong**

WARNING: The contents of this Scheme Booklet have not been reviewed or approved by any regulatory authority in Hong Kong. You are advised to exercise caution in relation to the Scheme. If you are in any doubt about any of the contents of this Scheme Booklet, you should obtain independent professional advice.

This Scheme Booklet does not constitute an offer or invitation to the public in Hong Kong to acquire or subscribe for or dispose of any securities. This Scheme Booklet also does not constitute a prospectus (as defined in section 2(1) of the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32 of the Laws of Hong Kong)) or notice, circular, brochure or advertisement offering any securities to the public for subscription or purchase or calculated to invite such offers by the public to subscribe for or purchase any securities, nor is it an advertisement, invitation or document containing an advertisement or invitation falling within the meaning of section 103 of the Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong).

For personal use only

Accordingly, unless permitted by the securities laws of Hong Kong, no person may issue or cause to be issued this Scheme Booklet in Hong Kong, other than (i) to persons who are "professional investors" (as defined in the Securities and Futures Ordinance and any rules made thereunder) or (ii) in other circumstances that do not result in the Scheme Booklet being a "prospectus" as defined in the Companies (Winding Up and Miscellaneous Provisions) Ordinance or that do not constitute an offer to the public within the meaning of the Companies (Winding Up and Miscellaneous Provisions) Ordinance.

No person may issue or have in its possession for the purposes of issue, this Scheme Booklet or any advertisement, invitation or document relating to these securities that is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than any such advertisement, invitation or document relating to securities that are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made thereunder.

Copies of this Scheme Booklet may be issued to a limited number of persons in Hong Kong in a manner that does not constitute any issue, circulation or distribution of this Scheme Booklet, or any offer or an invitation in respect of these securities, to the public in Hong Kong. This Scheme Booklet is for the exclusive use of Afterpay Shareholders in connection with the Scheme. No steps have been taken to register or seek authorisation for the issue of this Scheme Booklet in Hong Kong.

This Scheme Booklet is confidential to the person to whom it is addressed and no person to whom a copy of this Scheme Booklet is issued may issue, circulate, distribute, publish, reproduce or disclose (in whole or in part) this Scheme Booklet to any other person in Hong Kong or use for any purpose in Hong Kong other than in connection with consideration of the Scheme by Afterpay Shareholders.

### (c) New Zealand

This Scheme Booklet is not a New Zealand disclosure document and has not been registered, filed with or approved by any New Zealand regulatory authority under or in accordance with the Financial Markets Conduct Act 2013 or any other New Zealand law.

The offer of New Square Securities (including in the form of New Square CDIs) under the Scheme is being made to existing Afterpay Shareholders in reliance upon the Financial Markets Conduct (Incidental Offers) Exemption Notice 2016 and, accordingly, this Scheme Booklet may not contain all the information that a disclosure document is required to contain under New Zealand law.

### (d) Singapore

This Scheme Booklet and any other document relating to the Scheme have not been, and will not be, registered as a prospectus with the Monetary Authority of Singapore and the Scheme is not regulated by any financial supervisory authority in Singapore. Accordingly, statutory liabilities in connection with the contents of prospectuses under the Securities and Futures Act, Cap. 289 (the **SFA**) will not apply.

This Scheme Booklet and any other document relating to the Scheme may not be made the subject of an invitation for subscription, purchase or receipt, whether directly or indirectly, to persons in Singapore except pursuant to exemptions in Subdivision (4) Division 1, Part XIII of the SFA, including the exemption under section 273(1)(c) of the SFA, or otherwise pursuant to, and in accordance with the conditions of, any other applicable provisions of the SFA.

Any offer is not made to you with a view to New Square Securities (including in the form of New Square CDIs) being subsequently offered for sale to any other party. You are advised to acquaint yourself with the SFA provisions relating to on-sale restrictions in Singapore and comply accordingly.

This Scheme Booklet is being furnished to shareholders of Afterpay on a confidential basis and solely for their information and may not be reproduced, disclosed, or distributed to any other person. Any investment referred to in this Scheme Booklet may not be suitable for you and it is recommended that you consult an independent investment advisor if you are in doubt about such investment.

Neither Afterpay nor Square is in the business of dealing in securities or holds itself out, or purports to hold itself out, to be doing so. As such, Afterpay and Square are neither licensed nor exempted from dealing in securities or carrying out any other regulated activities under the SFA or any other applicable legislation in Singapore.

For personal use only

**52**

Section 3
Overview of the Scheme

**(e)  Switzerland**

The New Square Securities (including in the form of New Square CDIs) may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange or on any other stock exchange or regulated trading facility in Switzerland. Neither this Scheme Booklet nor any other document relating to the Scheme constitutes a prospectus or a similar notice as such terms are understood pursuant to art. 35 of the Swiss Financial Services Act or the listing rules of any stock exchange or regulated trading facility in Switzerland. Neither this Scheme Booklet nor any other document relating to the Scheme may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this Scheme Booklet nor any other document relating to the Scheme or the New Square Securities (including in the form of CDIs) have been, or will be, filed with or approved by any Swiss regulatory authority or authorised review body. In particular, this Scheme Booklet will not be filed with, and the offer of New Square Securities (including in the form of New Square CDIs) will not be supervised by, the Swiss Financial Market Supervisory Authority.

This Scheme Booklet may be distributed in Switzerland only to existing Afterpay Shareholders and is not for general circulation in Switzerland.

**(f)  United Kingdom**

Neither this Scheme Booklet nor any other document relating to the Scheme has been delivered for approval to the Financial Conduct Authority in the United Kingdom and no prospectus (within the meaning of section 85 of the Financial Services and Markets Act 2000, as amended (**FSMA**)) has been published or is intended to be published in respect of the New Square Securities (including in the form of New Square CDIs).

This Scheme Booklet does not constitute an offer of transferable securities to the public within the meaning of the UK Prospectus Regulation or the FSMA. Accordingly, this Scheme Booklet does not constitute a prospectus for the purposes of the UK Prospectus Regulation or the FSMA.

Any invitation or inducement to engage in investment activity (within the meaning of section 21 FSMA) received in connection with the issue or sale of the New Square Securities (including in the form of New Square CDIs) has only been communicated or caused to be communicated and will only be communicated or caused to be communicated in the United Kingdom in circumstances in which section 21(1) FSMA does not apply to Afterpay or Square.

In the United Kingdom, this Scheme Booklet is being distributed only to, and is directed at, persons (i) who fall within Article 43 (members of certain bodies corporate) of the Financial Services and Markets Act 2000 (Financial Promotions) Order 2005, or (ii) to whom it may otherwise be lawfully communicated (together "relevant persons"). The investments to which this Scheme Booklet relates are available only to, and any invitation, offer or agreement to purchase will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this Scheme Booklet.

**(g)  United States**

This Scheme Booklet is neither an offer to sell nor a solicitation of an offer to buy securities as such terms are defined under the Securities Act. The New Square Shares have not been and will not be registered under the Securities Act.

Afterpay and Square intend to rely on an exemption from the registration requirements of the Securities Act provided by section 3(a)(10) of the Securities Act in connection with the issuance of New Square Shares.

The Court was aware at the time of the First Court Hearing that approval of the Scheme by the Court will be relied upon by Afterpay and Square for the purpose of qualifying for the section 3(a)(10) exemption.

None of the SEC, any US state securities commission or any other US regulatory authority has approved or disapproved of the securities to be issued by Square (at the direction of and on behalf of Square Acquirer) or passed comment upon or endorsed the merits of the Scheme or the accuracy, adequacy or completeness of this Scheme Booklet. Any representation to the contrary may be a criminal offence.

**53**

For personal use only

## 3.11.  Scheme Implementation Deed

Afterpay, Square and Square Acquirer entered into the Scheme Implementation Deed on 2 August 2021. The Scheme Implementation Deed sets out the steps required to be taken by Square, Square Acquirer and Afterpay to implement the Scheme. A copy of the Scheme Implementation Deed is available on ASX and via Afterpay's website at https://corporate.afterpay.com/. The key terms of the Scheme Implementation Deed are set out below.

### (a)  Conditions Precedent

The Scheme is subject to a number of Conditions Precedent set out in clause 3.1 of the Scheme Implementation Deed including but not limited to the following:

| No. | Condition Precedent | Status |
| --- | --- | --- |
| 1. | **(Regulatory approvals):** approvals from all the relevant regulatory bodies, including FIRB, NZ OIO, Bank of Spain, Spain FDI Authority, US Department of Justice under the HSR Act, ASX and NYSE required for the Scheme. | The waiting period under the HSR Act has expired. Other relevant regulatory approvals are expected to be obtained or waived prior to the date of the Scheme Meeting. While not a Condition Precedent, the ACCC has confirmed that it does not intend to conduct a public review of the transaction. |
| 2. | **(Afterpay Shareholder approval):** Afterpay Shareholders approve the Scheme by the Requisite Majorities in accordance with the Corporations Act. | The Scheme Meeting is scheduled for Monday, 6 December 2021. |
| 3. | **(Square Shareholder Approval):** Square Shareholders approve the issue of the New Square Securities by the requisite majority in accordance with the Listing Rules of NYSE. | Square Shareholder Approval was obtained on Wednesday, 3 November 2021. This Condition Precedent has been satisfied. |
| 4. | **(Court approval):** the Court approves the Scheme in accordance with section 411(4)(b) of the Corporations Act. | The Second Court Hearing is scheduled for Friday, 10 December 2021. |
| 5. | **(Other prescribed events):** the following do not occur between the date of the Scheme Implementation Deed and 8.00am on the Second Court Date: (a) no Governmental Authority (including any court) has issued an order, temporary restraining order, preliminary or permanent injunction, decree or ruling enjoining, restraining or otherwise imposing a legal restraint or prohibition preventing the Scheme; (b) no Afterpay Material Adverse Effect; (c) no Square Material Adverse Effect; (d) no Afterpay Prescribed Event; and (e) no Square Prescribed Event. | As at the date of this Scheme Booklet, neither Afterpay nor Square is aware of anything that will cause these Conditions Precedent not to be satisfied. |
| 6. | **(Representations and warranties):** the representations and warranties given by each of Afterpay, Square and Square Acquirer are true and correct as and to the extent required under the Scheme Implementation Deed. | As at the date of this Scheme Booklet, neither Afterpay nor Square is aware of anything that will cause these Conditions Precedent not to be satisfied. |

# 54

Section 3
Overview of the Scheme

| No. | Condition Precedent | Status |
|---|---|---|
| 7. | **(Performance of Obligations):** the Afterpay Group and the Square Group shall have performed or complied in all material respects with the obligations, covenants, and agreements required to be performed or complied with by it under the Scheme Implementation Deed prior to 8.00am on the Second Court Date. | As at the date of this Scheme Booklet, neither Afterpay nor Square is aware of anything that will cause these Conditions Precedent not to be satisfied. |
| 8. | **(ASX Quotation):** before 8.00am on the Second Court Date, the New Square CDIs have been approved for official quotation on ASX, subject only to customary conditions and the Scheme becoming Effective. | An application in respect of admission of Square to the Official List (as an ASX Foreign Exempt Listing), and approval of the New Square CDIs for quotation on ASX, are expected to be lodged with ASX after the date of this Scheme Booklet. |
| 9. | **(NYSE Quotation):** before 8.00am on the Second Court Date, the New Square Shares have been approved for quotation on NYSE, subject only to official notice of issuance. | The approval for quotation on NYSE is expected to occur following Square Shareholder Approval. |
| 10. | **(Australian tax ruling):** before 8.00am on the Second Court Date, Afterpay has received confirmation from the ATO that it is prepared to issue a class ruling confirming that qualifying Australian resident Afterpay Shareholders who hold their Afterpay Shares on capital account will be eligible to choose roll-over relief under the *Income Tax Assessment Act 1997* (Cth) to the extent to which they receive New Square Securities. | The application for that class ruling has been lodged with the ATO and Afterpay considers that the ATO should provide this confirmation prior to the Second Court Date. |

If the Conditions Precedent relating to Regulatory Approvals are not satisfied or waived by the date of the Scheme Meeting, it is expected that the Afterpay Board would delay the Scheme Meeting until such time as those Conditions Precedent were satisfied or waived.

Square and Afterpay have agreed to use reasonable endeavours to procure satisfaction of the Conditions Precedent and to ensure that the Conditions Precedent remain satisfied until the last time they are to be satisfied (as required). Clause 3.1 of the Scheme Implementation Deed sets out which party can waive each of the Conditions Precedent. For the avoidance of doubt, the ability of the parties to vary any provision of the Scheme Implementation Deed includes the ability to vary the waivability of any conditions (including conditions that are not currently waivable under the agreement) to the Scheme.

If there is an act, failure or occurrence which will prevent a Condition Precedent set out in clauses 3.1(a)-(k), (r), (s) or (v) of the Scheme Implementation Deed from being satisfied or a breach or non-fulfilment of any of these Conditions Precedent which is not waived by the time satisfaction is required, Afterpay and Square must consult in good faith with a view to determining whether the parties wish to continue with the Scheme and if so, whether the Scheme may proceed by way of alternative means or methods, whether the relevant time for satisfaction of the Conditions Precedent should be extended, or if the End Date should be extended.

If Square and Afterpay are unable to reach an agreement following such consultation or do not both wish to pursue the Scheme within 5 Business Days (or any shorter period ending at 5.00pm the date before the Second Court Date), then unless the relevant Condition Precedent is waived by Afterpay or Square in accordance with the Scheme Implementation Deed, either party may terminate the Scheme Implementation Deed before 8.00am on the Second Court Date unless the relevant Condition Precedent has not been satisfied or an agreement cannot be reached as a result of a breach by the terminating party of the Scheme Implementation Deed.

For personal use only

**55**

For personal use only

**(b) Afterpay Board recommendation**

Clause 6.1 of the Scheme Implementation Deed states that, subject to the exclusivity provisions, the Afterpay Board must make and not withdraw or change its recommendation in favour of the Scheme unless:

- there is an Afterpay Superior Proposal and the Afterpay Board determines in good faith and acting reasonably, having received legal advice from its external legal advisers (who must be reputable advisers experienced in transactions of this nature) that failing to do so would constitute a breach of their fiduciary or statutory duties to Afterpay Shareholders; or
- the Independent Expert concludes that the Scheme is not in the best interests of Afterpay Shareholders, or adversely changes its previously given opinion that the Scheme is in the best interests of Afterpay Shareholders.

Square has acknowledged to Afterpay that, in circumstances where it sought to enforce clause 6.1(a) of the Scheme Implementation Deed, it would give no effect to the words "acting reasonably" in clause 6.1(a) of the Scheme Implementation Deed.

**(c) No shop restriction**

During the Exclusivity Period, Afterpay has agreed that it must ensure that Afterpay and its representatives do not directly or indirectly:

- solicit, invite, facilitate, encourage or initiate enquiries, negotiations or discussions; or
- communicate any intention to do any of these things,

with a view to obtaining any offer, proposal or expression of interest in relation to an Afterpay Competing Transaction.

**(d) No talk restriction**

Subject to the exceptions set out below in section 3.11(f), during the Exclusivity Period Afterpay must ensure that neither it nor its Representatives:

- negotiates or enters into negotiations or discussions; or
- participates in negotiations or discussions with any other person regarding,

an Afterpay Competing Transaction or any agreement, understanding or arrangement that could be reasonably expected to lead to an Afterpay Competing Transaction even if that person's Afterpay Competing Transaction was not directly or indirectly solicited, invited or initiated by Afterpay or its Representatives or the person has publicly announced the Afterpay Competing Transaction.

**(e) Due Diligence Information**

Subject to the exceptions below in section 3.11(f), during the Exclusivity Period, Afterpay must ensure that neither it nor its Representatives in relation to an Afterpay Competing Transaction:

- enable any other person, other than Square or its Representatives, to undertake due diligence investigations on any member of the Afterpay Group or their businesses or solicit, invite, initiate, encourage, facilitate or permit another person other than Square or its Representatives to undertake due diligence investigations on any member of the Afterpay Group or their businesses or operations; or
- make available to any other person, or permit any other person to receive, other than Square or its Representatives any non-public information relating to any member of the Afterpay Group or their businesses or operations,

in connection with the person formulating, developing, finalising or assisting in the formulation, development or finalisation of an Afterpay Competing Transaction.

**(f) Exceptions to the due diligence information and no-talk restrictions**

The due diligence information and no-talk restrictions do not apply to the extent that they restrict Afterpay or the Afterpay Board from taking or refusing to take any action with respect to a genuine Afterpay Competing Transaction that did not result, directly or indirectly, from a material breach of the no-talk, no-shop and due diligence information restrictions provided the Afterpay Board has determined in good faith after receiving advice from its financial and external legal advisers, that:

- the Afterpay Competing Transaction is, or would reasonably be expected to become, a Superior Proposal; and
- failing to respond to the Afterpay Competing Transaction would constitute a breach of the Afterpay Board's fiduciary or statutory obligations.



Section 3
Overview of the Scheme

### (g)  Notice of unsolicited approach

During the Exclusivity Period Afterpay has agreed to promptly (and in any event within 36 hours) inform Square if it, or its Representatives:

- receives any approach with respect to any Afterpay Competing Transaction; or
- receives any request for information or provides any information to any person relating to any member of the Afterpay Group or any of their businesses or operations in connection with a current or future Afterpay Competing Transaction.

If a notice of an unsolicited approach is required to be given, Afterpay has agreed to specify all material details of the relevant event, including the identity of the person who made the relevant approach, inquiry or proposal, the material terms and conditions (including price, conditions precedent, timetable and break or reimbursement fees) and the nature of any information requested and/or provided.

During the Exclusivity Period Afterpay must also provide a copy of written materials or (if unavailable) a written statement of any non-public information relating to Afterpay or its related bodies corporate made available to any person formulating, developing or finalising an Afterpay Competing Transaction and which differs from, or is more extensive than, the information which has been provided to Square.

In addition, Afterpay is required to keep Square reasonably informed on a prompt and timely basis of the status and material terms and any material developments, discussions or negotiations regarding the Afterpay Competing Transaction.

### (h)   Matching rights

During the Exclusivity Period Afterpay must:

- not enter into an agreement or understanding to undertake an actual, proposed or potential Afterpay Competing Transaction; and
- procure that the Afterpay Board does not change its recommendation in favour of the Scheme to publicly recommend an actual, proposed or potential Afterpay Competing Transaction,

unless (i) Afterpay has provided Square with material terms of the Afterpay Competing Transaction (ii) Afterpay has negotiated in good faith with Square for 5 Business Days to the extent Square wishes to negotiate and make itself reasonably available to negotiate, to enable Square to propose revisions to the terms of the Scheme Implementation Deed, (iii) the Afterpay Board has determined that the Afterpay Competing Transaction constitutes a Superior Proposal and failing to take such actions would constitute a breach of its fiduciary or statutory duties to Afterpay Shareholders and (iv) after considering in good faith any binding revisions to the Scheme Implementation Deed proposed by Square, the Afterpay Board determines in good faith after receiving advice from its financial and outside legal advisers that such Afterpay Competing Transaction would nevertheless continue to constitute an Afterpay Superior Proposal if such revisions were to be given effect and that the failure to take such actions would continue to constitute a breach of its fiduciary or statutory duties to Afterpay Shareholders.

Afterpay has agreed that each successive material modification to the terms of any Afterpay Competing Transaction will constitute a new Afterpay Competing Transaction and, accordingly, will comply with its obligations outlined above in respect of any new Afterpay Competing Transaction.

### (i)  Break fees

### (i)  Afterpay Break Fee

Afterpay has agreed to pay a Break Fee to Square in the following circumstances:

- before the Effective Date an Afterpay Competing Transaction is publicly announced or made and within 12 months of the End Date an Afterpay Competing Transaction is completed;
- Square validly terminates the Scheme Implementation Deed prior to 8.00am on the Second Court Date on the basis of the Afterpay Board changing, withdrawing or adversely modifying its recommendation or otherwise making a public statement indicating that it no longer supports the Scheme except where the change, withdrawal or modification is made after the Independent Expert concludes that in the opinion of the Independent Expert the Scheme is not in the best interest of Afterpay Shareholders, or in circumstances arising as a result of Square's material breach of the Scheme Implementation Deed;



52

- Afterpay validly terminates the Scheme Implementation Deed at any time prior to 8.00am on the Second Court Date on the basis of the Afterpay Board determining that an Afterpay Competing Transaction is a Superior Proposal; or
- Square validly terminates the Scheme Implementation Deed at any time prior to 8.00am on the Second Court Date on the basis of Afterpay being in material breach of a term of the Scheme Implementation Deed (excluding any representation and warranty not being true and correct), taken in the context of the Scheme as a whole, subject to notice of breach setting out the relevant circumstances and 30 Business Day cure period (or such shorter period ending at 8:00 a.m. (AEDT) on the Second Court Date) after such notice is given.

If the Scheme becomes Effective no Break Fee is payable by Afterpay and any amount that has been paid must be refunded by Square.

If the Break Fee is payable, Afterpay must pay Square A$385 million for advisory costs, costs of management and directors' time, out-of-pocket expenses, the distraction of Square's management team from conducting business as usual by pursuing the Scheme, reasonable opportunity costs and damage to Square's reputation associated with the failed transaction.

**(ii) Reverse Break Fee**

Square has agreed to pay a Break Fee to Afterpay in the following circumstances:

- Afterpay validly terminates the Scheme Implementation Deed prior to 8.00am on the Second Court Date on the basis of the Square Board changing, withdrawing or adversely modifying its recommendation to Square shareholders that they approve the issuance of New Square Shares (including the shares underlying the New Square CDIs) to Afterpay Shareholders pursuant to the Scheme and Deed Poll or otherwise making a public statement indicating that it no longer supports the Scheme except where the change, withdrawal or modification is made after Afterpay's material breach of a term of the Scheme Implementation Deed;
- Afterpay validly terminates the Scheme Implementation Deed at any time prior to 8.00am on the Second Court Date on the basis of Square being in material breach of a term of the Scheme Implementation Deed (excluding any representation and warranty not being true and correct), taken in the context of the Scheme as a whole, subject to notice of breach setting out the relevant circumstances and 30 Business Day cure period (or such shorter period ending at 8:00 a.m. (AEDT) on the Second Court Date) after such notice is given; or
- before the Effective Date a Square Competing Transaction is publicly announced or made and within 12 months of the End Date a Square Competing Transaction is completed.

If the Scheme becomes effective no Break Fee is payable by Square and any amount that has been paid must be refunded by Afterpay.

If the Break Fee is payable, Square must pay Afterpay A$385 million for advisory costs, costs of management and directors' time, out-of-pocket expenses, the distraction of Afterpay's management team from conducting business as usual by pursuing the Scheme, reasonable opportunity costs and damage to Afterpay's reputation associated with the failed transaction.

**(j) Termination rights**

The Scheme Implementation Deed may be terminated by Square at any time prior to 8.00am on the Second Court Date if the Afterpay Board changes, withdraws or adversely modifies its recommendation to the Scheme Shareholders that they vote in favour of the resolution to approve the Scheme or otherwise makes a public statement indicating that it no longer supports the Scheme.

The Scheme Implementation Deed may be terminated by Afterpay:

- at any time prior to 8.00am on the Second Court Date if the Square Board changes, withdraws or adversely modifies its recommendation to the Square shareholders that they vote in favour of the issuance of New Square Securities or otherwise makes a public statement that it no longer supports the Scheme; or
- at any time prior to 8.00am on the Second Court Date if the Afterpay Board determines in accordance with the Scheme Implementation Deed that an Afterpay Competing Transaction is a Superior Proposal provided that there has not been a material breach by Afterpay of its obligations under clause 9.7 of the Scheme Implementation Deed;

**58**

Section 3
Overview of the Scheme

The Scheme Implementation Deed may be terminated by either party:

- if the Scheme has not become Effective on or before 2 August 2022 (the **End Date**) (unless the failure to implement the Scheme is due to a party seeking to terminate the Scheme Implementation Deed failing to perform its obligations under the Scheme Implementation Deed);

- at any time prior to 8.00am on the Second Court Date, if the other is in material breach of a term of the Scheme Implementation Deed (excluding representations and warranties), taken in context of the Scheme as a whole subject to notice of breach setting out the relevant circumstances and 30 Business Day cure period (or such shorter period ending at 8:00 a.m. (AEDT) on the Second Court Date) after such notice is given;

- at any time prior to 8.00am on the Second Court Date, if any Governmental Authority who must grant a Regulatory Approval that constitutes a Condition Precedent has denied such Regulatory Approval (and the denial has become unappealable), or any Governmental Authority of competent jurisdiction has issued a final and non-appealable order, injunction, decree or other legal restraint or prohibition permanently enjoining or otherwise prohibiting or making illegal the consummation of the Scheme (unless this is due to the failure of the party seeking to terminate the Scheme Implementation Deed to perform its obligations under the Scheme Implementation Deed);

- if there is a breach or non-fulfilment of a Condition Precedent set out in clauses 3.1(a)-(k), (r), (s) or (v) of the Scheme Implementation Deed which is not waived, and if the parties cannot reach agreement or do not both wish to pursue the Scheme within 5 Business Days (provided that if the relevant Condition Precedent may be waived by and exists for the benefit of one party only, only that party may terminate the Scheme Implementation Deed) (unless the relevant Condition Precedent has not been satisfied or agreement cannot be reached as a result of a breach by the terminating party of the Scheme Implementation Deed); or

- if agreed in writing by Square and Afterpay.

## 3.12.  Representations and Warranties

Each of Afterpay, on the one hand, and Square and Square Acquirer, on the other hand, has given representations and warranties to the other which are customary for an agreement of this kind.

## 3.13.  Deed Poll

Square and Square Acquirer have entered into the Deed Poll under which Square and Square Acquirer have covenanted in favour of Scheme Shareholders at the Record Date, such that in accordance with the Scheme:

- Square Acquirer will provide or procure the provision of the Scheme Consideration to each Scheme Shareholder at the Record Date; and

- Square Acquirer agrees to cause Square to, and Square will at the direction of and on behalf of Square Acquirer (in satisfaction of Square Acquirer's obligation to provide such Scheme Consideration to the Scheme Shareholders at the Record Date), issue the Scheme Consideration.

The terms of the Deed Poll are set out in Attachment B.

## 3.14.  Further Questions

If you have any further questions, you should call the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT).



**59**



## Section 4

# Information on Afterpay

For personal use only

### 4.1. Overview of Afterpay

Founded in 2014 in Sydney, Australia, and listed on ASX in 2016, Afterpay is a global BNPL provider that enables customers to pay for purchases in four instalments (online or in-store). Afterpay empowers customers to access the things they want and need, using their own money, enabling them to maintain financial wellness and control. Via a combination of user experience, brand trust and product utility, Afterpay is able to drive new and repeat customers to merchants, resulting in higher incremental sales volume and increased order size. Afterpay is deeply committed to helping customers spend responsibly and without having to pay interest or falling into revolving debt. Those customers who use Afterpay and repay on time, can do so without incurring fees. Afterpay does not offer interest bearing products.

As at 30 June 2021, Afterpay had grown to 16.2 million active global customers and 98.2k merchant partners who use the platform globally across Australia, New Zealand, the US, Canada, UK, Spain, France and Italy. The UK, Spain, France and Italy are branded as Clearpay. Afterpay's global team as at August 2021 is made up of approximately 1,300 people and growing. Whilst BNPL has become more prominent, it only accounted for approximately 2% of eCommerce spend in 2020. Total eCommerce spend in existing geographies is expected to grow to US$10 trillion in 2024[1], presenting a significant growth opportunity for Afterpay.

**Afterpay's journey**

| | | |
|---|---|---|
| **2016**<br>Listed on ASX | **2018**<br>Expanded into US through Matrix partnership | **2020**<br>5m customers in the US and launched in Canada |
| **2014**<br>Founded in Sydney, Australia | **2017**<br>Merged with Touchcorp to enable full integration of product and technology offering | **2019**<br>Expanded into the UK through acquisition of Clearpay | **2021**<br>Expanded into Spain, Italy and France. Announced acquisition by Square |

1.    Represents global opportunity, based on IDC's Worldwide New Media Market Model forecast for 2024.

**60**

For personal use only

**Section 5**

# Information on Square

## 5.1. Background

Square is a global fintech company.

It builds tools that aim to empower businesses and individuals to participate in the economy.

Businesses, as sellers, use Square to reach buyers online and in person, manage their business, and access financing. Individuals use Square's Cash App to spend, send, store, and invest money. Square also owns a majority ownership stake in TIDAL, a global music and entertainment platform that seeks to expand Square's purpose of economic empowerment to artists. Square also recently launched TBD, a bitcoin-focused ecosystem established to build an open developer platform with the sole goal of making it easy to create non-custodial, permissionless, and decentralised financial services.

Square's financial model is based on the recurrent use of its tools, attracting transaction-based revenue, subscription and services-based revenue, hardware revenue and bitcoin revenue.

In the six months ended 30 June 2021, the Square Group's total net revenue was US$9,738.0 million and its net profit after tax attributable to common shareholders was US$243.0 million. As of 30 June 2021, the Square Group's consolidated total assets were approximately US$13,815.8 million and its consolidated net assets were approximately US$2,736.7 million.

## 5.2. Brief History and Overview of Square's Business

### (a) Overview

Square, Inc. was founded in San Francisco in 2009 by Jack Dorsey and Jim McKelvey as a simple way to enable anyone with a mobile device to accept card payments, anywhere, anytime. Square's first product was the Square Reader, a small communication device that is plugged into a smart phone and used to facilitate on-the-spot credit card payments. Following the success of the Square Reader, Square soon developed a range of products and services for merchants.

Square became a public company and listed on NYSE under the symbol "SQ" on 19 November 2015. Prior to that date, there was no public trading market for Square Class A Shares. There has never been a public trading market for Square Class B Shares.

Since listing, Square has grown to provide financial services and digital payments solutions in international markets outside the US. The business has expanded to provide more than 30 distinct products and services to sellers (together the "Seller ecosystem"), while through Cash App, the business provides a parallel ecosystem of financial services to support individuals in managing their money (together the "Cash App ecosystem").

**61**

Section 5
Information on Square

For personal use only

Beginning on 30 June 2020, Square updated the way it reported its results from one operating and reportable segment to two, being Seller and Cash App, reflecting these two ecosystems and the way management reviews and assesses the performance of the business.

More specifically, Square categorises its business into a range of products that focus on different customer segments, being:

(i)   the Seller ecosystem, incorporating a range of products and services to help merchants start, run, and grow their businesses, including:

    (A)   software for point of sale, invoices, appointments, online sales, team management, loyalty, marketing, gift cards and business analytics;

    (B)   other financial services, such as debit cards, business loans, and managed payments and transfers. In Australia, the only financial services offered by Square are business loans and payment acceptance; and

    (C)   hardware, such as contactless, and chip card readers, which enable merchants to accept card and other payments, and stands, registers, and terminals that provide full point of sale functions for merchants (and combine with software);

(ii)   the Cash App ecosystem, a mobile app and peer-to-peer payments service that enables customers to request, receive, store, spend, and invest money. Cash App is not currently available in Australia;

(iii)   TIDAL, a global music and entertainment platform that brings fans and artists together through unique music, content, and experiences; and

(iv)   TBD, Square's Decentralised Financial Services group, a new business division dedicated to building an open developer platform with the sole goal of making it easy for third parties to create non-custodial, permissionless and decentralised financial services, with a primary focus on bitcoin.



A more detailed description of each of Square's current products is provided below in section 5.4(b).

**(b)  COVID-19 response**

In 2020, Square made certain focused investments in each of its Seller and Cash App ecosystems to help its customers adapt to COVID-19.

For sellers, Square provided resources with information and advice, eliminated fees for software products in March and April of 2020, and introduced options for sellers to pause subscriptions temporarily based on their circumstances. Square prioritised omnichannel product launches to help sellers transition to serving more of their customers online and through contactless commerce, including curbside pickup and delivery for Square Online and a website for customers to purchase eGift cards from sellers. Square also temporarily offered sellers free marketing campaigns to update their buyers on recent changes and to promote their businesses. As a participant in the US Paycheck Protection Program (**PPP**), Square distributed loans to sellers. As of 31 December 2020, Square Capital (now Square Loans) had facilitated approximately US$857 million of PPP loans, excluding cancelled loans, providing access to a financial lifeline to over 80,000 small businesses.



**62**

For personal use only

For Cash App customers, Square published educational materials to help them understand the Coronavirus Aid, Relief, and Economic Security Act stimulus programs. Square expanded direct deposit access to many of its Cash App customers, allowing them to direct deposit government funds into their Cash App accounts. Customers could spend their funds on Cash Card and Square adapted certain Cash Boost rewards to pandemic relevant merchants and categories (e.g. grocery stores) to benefit customers.

In the quarter ended 30 June 2021, Square noted improvements in its business as the majority of US markets transitioned to varying states of economic recovery and re-openings. Square identified a positive impact on performance in Seller Gross Payment Volume (**GPV**) as in-person activity at sellers increased, and a positive impact on performance in Square's Cash App business associated with increased customer spending and inflows, as Square continued to benefit from the strength of a broader macroeconomic recovery, regional re-openings, and government stimulus and relief programs enacted in response to COVID-19.

## 5.3.  Industry Overview

### (a)  Opportunities and growth drivers

The global software, financial services and digital payments industry is dynamic and evolving. Square management sees potential to continue to grow its available opportunity across Seller and Cash App ecosystems by launching new products and services, and expanding to reach new customers, which includes entering additional geographies. Growth of this opportunity also has the potential to be supported by:

(i)   broader macroeconomic factors and the health of the economy;

(ii)  increases in customer spending power, including government disbursements to customers;

(iii) growth in card payments, shifting customer preferences towards card payments and away from cash; and

(iv)  greater adoption of software with integrated, digitised financial services products by individuals and businesses.

### (b)  Regulatory framework

Foreign and domestic laws and regulations apply to many key aspects of Square's business. Key features of the current applicable regulatory frameworks are summarised below. Existing regulatory frameworks are subject to interpretation and change, and new regulatory frameworks may arise.

### (i)  Payments regulation

Various laws and regulations govern the payments industry in the United States and globally. For example, certain jurisdictions in the United States require a license to offer money transmission services, such as Cash App's peer-to-peer payments, and Square maintains a licence in each of those jurisdictions and complies with new licence requirements as they arise. Square is also registered as a "Money Services Business" with the US Department of Treasury's Financial Crimes Enforcement Network. These licenses and registrations subject Square, among other things, to record-keeping requirements, reporting requirements, bonding requirements, limitations on the investment of customer funds, and inspection by state and federal regulatory agencies.

Outside the United States, Square provides localised versions of some of its services to customers, including through various foreign subsidiaries. The activities of those non-US entities are, or may be, supervised by regulatory authorities in the jurisdictions in which they operate. For instance, Square holds an AFSL issued by ASIC to provide non-cash payments in Australia, and it is licensed as an Electronic Money Institution to provide payments services and electronic money in the United Kingdom by the Financial Conduct Authority and in the European Union by the Central Bank of Ireland and the Bank of Lithuania.

### (ii)  Consumer protection

The US Consumer Financial Protection Bureau and other federal, local, state, and foreign regulatory and law enforcement agencies regulate financial products and enforce consumer protection laws, including credit, deposit, and payments services, and other similar services. These agencies have broad consumer protection mandates, and they promulgate, interpret, and enforce rules and regulations that affect Square's business.

### (iii)  Anti-money laundering

Square is subject to AML laws and regulations in the United States and other jurisdictions. Square has implemented an AML program designed to prevent its payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity.

# 63

Section 5
Information on Square

For personal use only

Square's program is also designed to prevent its network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the US Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities.

Square's AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.

### (iv) Bank regulation

On 1 March 2021, the industrial loan company charter for SFS was approved by FDIC and the State of Utah and SFS began banking operations. SFS maintains capital and leverage ratios, as well as minimum liquidity levels that meet or exceed regulatory levels as defined by the FDIC to be considered "well capitalised". SFS offers banking services including certain loan and deposit products. SFS subjects Square to direct state and federal regulatory oversight and requires compliance with all applicable banking regulations and requirements.

### (v) Broker-dealer regulation

Square's subsidiary, Cash App Investing, operates as a broker-dealer and is therefore registered with the SEC and a member of FINRA. As a broker-dealer, Cash App Investing is subject to SEC and FINRA laws and regulations including, without limitation, how it markets its services, handles customer assets, keeps records, and reports to the SEC and FINRA. Cash App Investing is also registered in each state where Square conducts business, and subject to those states' securities laws and regulations.

### (vi) Virtual currency regulation

Square is subject to certain licensing and regulatory frameworks triggered by its Cash App offering, through which customers can use their stored funds to buy, hold and sell bitcoin, and transfer bitcoin to and from Cash App. Square currently holds a New York State Bitlicense. The laws and regulations applicable to virtual currency are evolving and subject to interpretation and change. Therefore, Square's virtual currency services may be or become subject to additional licensing and regulatory requirements by other authorities.

### (vii) Protection and use of information

Square collects and uses a wide variety of information for various purposes in its business, including to help ensure the integrity of its services and to provide features and functionality to its customers. This aspect of Square's business, including the collection, use, disclosure, and protection of the information it acquires from its own services as well as from third-party sources, is subject to laws and regulations in the United States, the European Union, and elsewhere.

Accordingly, Square publishes its privacy policies and terms of service, which describe its practices concerning the use, transmission, and disclosure of information. As Square's business continues to expand in the United States and worldwide, and as laws and regulations continue to be passed and their interpretations continue to evolve in numerous jurisdictions, additional laws and regulations may become relevant to Square.

### (viii) Communications regulation

Square sends texts, emails, and other communications in a variety of contexts, such as when providing digital receipts and marketing. Communications laws and regulations, including those promulgated by the Federal Communications Commission, apply to certain aspects of this activity in the United States and elsewhere.

### (ix) Additional developments

Various regulatory agencies in the United States and elsewhere in Square's international markets continue to examine a wide variety of issues that could impact Square's business, including products liability, import and export compliance, accessibility for the disabled, insurance, marketing, privacy, data protection, information security, and labour and employment matters.

As Square's business continues to develop and expand, additional rules and regulations may become relevant. For example, if Square chooses to offer Square Payroll in more jurisdictions, additional regulations, including tax rules, will apply.

**64**

**(c) Competition**

The markets in which Square's Seller ecosystem operates are competitive and evolving. Square's competitors range from large, well-established vendors to smaller, earlier-stage emerging private companies.

Square seeks to differentiate itself from competitors primarily on the basis of its extensive commerce ecosystem and its focus on building products and services that are cohesive, fast, self-serve, and elegant. In addition, Square differentiates itself by offering transparent pricing, no long-term contracts, and Square's ability to innovate and reshape the industries in which it operates to expand access to traditionally unserved or underserved sellers and customers. With respect to each of these factors, Square management believes that Square compares favourably to its competitors. Competitors that overlap with certain functions and features that Square provides include:

(i)   pen and paper, manual processes, and paper currency;

(ii)  software providers such as those that provide POS, website building, inventory management, analytics, customer relationship management invoicing, and appointment booking solutions;

(iii) payment terminal vendors;

(iv)  merchant acquirers;

(v)   banks that provide payment processing, loans, and payroll;

(vi)  payroll processors; and

(vii) established or new alternative lenders.

The Cash App ecosystem competes with other companies in the peer-to-peer payments, debit and prepaid cards, credit card rewards, stock trading, and bitcoin spaces. Square's competitors in this segment include money transfer apps, prepaid debit card offerings, brokerage firms, and crypto trading services.

Square primarily competes based on its brand and the simplicity and quality of its customer experience. Square invests in brand, design, and technology with the aim to keep its products fast and simple, while also improving and expanding its features.

## 5.4.  Business Overview

### (a)  Introduction

Square builds tools that aim to empower businesses and individuals to participate in the economy. Square started by enabling businesses to accept card payments, an important capability that was previously inaccessible to many businesses, and has since evolved into a broader financial services company with multiple business units. Square has a diversified customer base. Square's sellers represent a diverse range of industries (including services, food-related, and retail businesses) and sizes, ranging from sole proprietors to multi-location businesses. These sellers also span geographies, including the United States, Canada, Japan, Australia, the United Kingdom, Ireland, France and Spain. Cash App has a diverse mix of customers across the United States and Europe. In the United States, Cash App had transacting active customers in each of the 50 states and nearly every county as of December 2020. As of 30 June 2021, Square employed 6,875 full-time employees worldwide with 1,057 outside of the United States.

The key investment highlights resulting from Square's business model include:

(i)   global leadership in the software and payments industry with a broad range of services and a large geographical footprint;

(ii)  a highly diversified customer base and range of revenue streams;

(iii) a trusted brand;

(iv)  recurring and predictable revenues;

(v)   robust cohort economics including strong revenue and gross profit retention, efficient acquisition, and attractive returns on investment in its Seller and Cash App ecosystems; and

(vi)  as customers have found value across its Seller and Cash App ecosystems, they have adopted more products which has driven greater monetisation.

**65**

Section 5
Information on Square

For personal use only

**(b)  Square's product and service offering**

Square offers its products and services across its business ecosystems.

**(i)  Seller ecosystem**



The Seller ecosystem offers a suite of products that helps Square's sellers start, run, and grow their businesses. Square combines software, hardware, and financial services to create products and services that are cohesive, fast, self-serve, and elegant. These attributes differentiate Square from competitors in a fragmented industry that traditionally forces sellers to stitch together products and services from multiple vendors and rely on inefficient non-digital processes and tools. Square's ability to add new sellers efficiently, help them grow their business, and cross-sell products and services, has historically led to continued and sustained long-term growth. In the year ended 31 December 2020, Square served more than 4 million sellers globally. At the end of 2020, the Square POS ecosystem had approximately 295 million items listed on Square by sellers. In the three months and six months ended 30 June 2021, the Seller ecosystem generated US$585 million and US$1,053 million of gross profit, respectively.

The Seller ecosystem consists of over 30 distinct software, hardware, and financial services products. Square monetises these products through a combination of transaction, subscription, and service fees.

(A)  **Software:** Square offers a growing suite of cloud-based software solutions to help sellers more effectively operate and manage their businesses. Square's software is designed to be self-serve and intuitive to make initial setup and new employee training fast and easy. Its products are integrated to create a seamless experience and enable a holistic view of sales, customers, employees, and locations. Sellers get frequent software updates and upgrades automatically. Software includes Square's Online, Point of Sale, Developer Platform, Customer Relationship Management, and Team Management products.

Square's POS products help sellers make sales, send digital receipts, and collect instant customer feedback to improve their service. Each product takes payments, tracks sales, inventory and customers' purchase histories, and enables employees to clock in and clock out in the app. All POS products have a free software tier without a subscription fee, which Square monetises only through payments transaction fees. Among Square's POS products, Square Appointments, Square for Retail, and Square for Restaurants also have premium tiers with additional functionality, which Square monetises through subscription fees in addition to transaction fees on payments.

- Square Point of Sale is a general purpose POS software solution. It is available for both iOS and Android and is pre-installed on Square Register and Square Terminal hardware devices.
- Square Appointments is an integrated solution that includes support for booking, retail sales, invoicing, and payments. It can be used on iOS or Android as well as via a web browser on other operating systems. Appointments includes a free online booking site so buyers can easily schedule appointments and select their preferred time, service, and staff member. It is also integrated with Square Assistant which is an artificial intelligence enabled automated messaging tool that responds to buyers efficiently and professionally, saving sellers' time and helping prevent no-shows.

**66**

For personal use only

- Square for Retail is tailored for sellers in the retail industry and includes barcode scanning, advanced inventory management, support for tens of thousands of items, cost of goods sold reporting, purchase orders, and vendor management.
- Square for Restaurants is enhanced and tailored for the food and beverage industry and includes table, order and course management. It also provides back of the house functionality including a kitchen display system and revenue and cost reporting. These premium features aim to help managers and owners make informed decisions and run a more efficient business.

Square's online products are designed to make it easier to sell online and via social media. When also used in conjunction with Square's POS products, sellers can offer omnichannel experiences for their customers such as buy online, pickup in store (or curbside) and buy online, return in store. All online products have a free tier without a subscription fee, which Square monetises only through transaction fees on payments. Square Online and Square Invoices also have premium tier(s) with additional functionality that is monetised via software fees in addition to transaction fees on payments.

- Square Online helps sellers across a range of verticals reach customers in more ways. It makes it easy to build a website and online store as well as sell on Instagram and Facebook. The online store is mobile responsive, delivering an app-like ordering experience on a buyer's phone. With integrated support for QR code ordering, sellers can also streamline their in-store operations by posting the QR code and having their buyers order from their own phones. Fulfillment options include pickup, delivery managed by Square's sellers, and partner delivery platforms. Orders, items, inventory, and customer data stay in sync when selling both online and in-person.
- Square Online Checkout makes it easy to sell online without a website by allowing sellers to create a checkout link with only a name and price for their good or service.
- Square Invoices is a customisable digital invoicing solution with integrated and secure online payment acceptance. This eliminates the need to print and mail statements to customers and wait for cheques to arrive. Sellers use Square Invoices for upcoming, recurring, or previously-delivered goods and services, such as catering orders, contractor services, lessons, and retail orders. Square Invoices also lets sellers send estimates and collect partial payments for goods and services.
- Square Virtual Terminal allows sellers to use a computer as a card terminal. Sellers can take a payment, set up recurring billing, record sales, and send digital receipts for payments, including those made by cheque and bank transfer.

Square's business and customer relationship management products give sellers digital tools to streamline their operations. These tools seamlessly integrate with other Square products, eliminating the latent, time-consuming, and error prone processes typically used to copy and sync data between disparate systems. Square monetises these products via software fees with the exception of Square Contracts, Feedback, and Dashboard, which Square does not directly monetise.

- Square Team Management makes it easy to schedule staff, view team performance and sales analytics in real time, and pay employees in minutes when used together with Square Payroll. It also enables limiting access to Square software features per employee or role. The Square Team App enables team members to clock in and out, view and adjust their schedules, see timecards, hours worked, and estimated pay from their mobile phone. Team members paid via Square Payroll can also view their pay stubs in the Square Team App.
- Square Contracts helps sellers protect themselves by creating custom and template-based digital contracts with e-signature support for uses such as service agreements and liability waivers. These contracts can be used on their own or easily added to Square Invoices or Square Appointments.
- Square Loyalty, Marketing, Gift Cards, and Feedback and messages help sellers engage with their buyers in-store and online to grow their business. By linking customer data and feedback with POS and online commerce data, Square aims to offer sellers integrated omnichannel loyalty, marketing and feedback. Square allows sellers to easily assess performance and return on investment.
- Square Dashboard provides sellers with real-time data and insights about orders, items, inventory, customers, employees, payments, marketing, and loyalty performance. It can be used via the web or the Dashboard iOS app. This reporting is designed to enable sellers to stay informed and make timely decisions about their business from anywhere.

Square also offers a developer platform including APIs and SDKs that enable external developers to integrate with the Square ecosystem.

- Payment APIs support in-person, online, and mobile payments. Square Reader SDK enables developers to seamlessly integrate Square hardware with a seller's custom POS, allowing them to build unique checkout experiences such as self-ordering kiosks powered by Square's managed payments service. With Square's online payments APIs, developers can integrate Square payments into a seller's e-commerce website or online store. Our In-App Payments SDK enables developers to build customer mobile apps that use Square to process payments. These products are primarily monetised through transaction fees on payment volumes.

# 67

Section 5
Information on Square

For personal use only

- Commerce APIs include more than 30 commerce APIs, through which developers can create and manage orders, subscriptions, product catalogues, inventory, customer profiles, employees, loyalty programs, gift cards and more in order to build applications that enrich and integrate with Square's ecosystem of products. In addition, these APIs enable developers to build integrations with their existing business systems such as accounting, CRM, employee management, and ERP software.

(B) **Hardware:** Square designs hardware that can process all major card payment forms, including magnetic stripe, EMV chip, and NFC (contactless). Sellers are able to accept cards issued by Visa, MasterCard, American Express, Discover, JCB, Interac Flash (in Canada), e-Money (in Japan), and eftpos (in Australia). Square hardware can be integrated with additional accessories such as cash drawers, receipt printers, and barcode scanners to provide sellers with a comprehensive POS solution. Square's hardware portfolio includes the following:

- Magstripe reader enables swiped transactions of magnetic stripe cards by connecting with an iOS or Android smartphone or tablet via the headphone jack or lightning connector. Available only in the US and Canada.
- Contactless and chip reader accepts EMV chip cards and NFC payments, enabling acceptance via Apple Pay, Google Pay, and other mobile wallets.
- Square Stand enables an iPad to be used as a payment terminal or full POS solution. It features an integrated magnetic stripe reader, provides power to a connected iPad, and can connect to the contactless and chip reader wirelessly or via USB.
- Square Register is an all-in-one offering that combines Square's hardware, POS software, and payments technology. The dedicated hardware consists of two screens: a seller display and a customer display with a built-in card reader that accepts tap, dip, and swipe payments.
- Square Terminal is a portable, all-in-one payments device and receipt printer to replace traditional keypad terminals. It accepts tap, dip, and swipe payments and has a battery that lasts all day, enabling payments anywhere in the store.

(C) **Financial services:** Square acts as both the merchant of record for the transaction as well as the PSP. As the merchant of record, Square is the party responsible for settling funds with the seller and helps manage transaction risk loss on behalf of the merchant. For example, Square can more efficiently onboard new sellers through its website, leveraging its risk assessment models, and it has insights into transaction-level data that it uses to inform sellers and launch new products. Square has negotiated terms and entered into contractual arrangements directly with the other service providers of transaction processing services, including the acquiring processors and card networks, and indirectly with the issuing banks. These contracts include negotiated terms, such as more favourable pricing, that are generally not available to sellers if they were to contract directly with these sub-service providers.

Square offers a growing number of accessible financial services that make it easier for sellers to manage cash flow and get faster access to funds. These include Square's Managed Payments, Business Banking, and Payroll products.

- Managed Payments includes next-day settlements, payment dispute management, data security, and PCI compliance. Sellers can onboard in minutes and, once onboarded, accept payments in person via swipe, dip, or tap of a card or online via a stored card on file or payment entry form. Sellers pay a transparent transaction fee.
- Risk Manager gives sellers insight into online payment fraud patterns and enables them to set custom rules and alerts to manage risk. Machine learning algorithms automatically identify fraud patterns and adapt to fit a seller's operations.
- Instant Transfer enables sellers to receive funds from their payments instantly or later that same day. Instant Transfer is an important tool for sellers that need faster access to their funds in order to better manage their cash flow or working capital.
- Square Card is a free business prepaid debit card that provides a way for sellers to spend and manage their funds, enabling sellers to spend their proceeds as soon as they make a sale. When a seller takes a payment, the proceeds immediately go into their Square stored balance and can be spent using their card or withdrawn from an ATM. Square earns interchange fees when sellers make purchases with Square Card.
- Square Savings is a high-yield business savings account, with no monthly fees or minimums, designed to make cash flow management easier for Square's sellers. With Square Savings, sellers can easily and automatically put aside a portion of their sales into their savings account while also organising their money within folders, streamlining the process of saving funds for specific goals and priorities, such as quarterly tax obligations.

**68**

- Square Checking provides sellers with a FDIC-insured account that gives them instant access to their sales and the ability to immediately use those funds via the Square Debit Card or ACH transfers, or for paying their team with Square Payroll.

- Square Loans facilitates loans to qualified Square sellers. It eliminates the lengthy and uncertain loan application process. Square is able to approve sellers for loans while facilitating prudent risk management by using its unique data set of a seller's Square transactions to help facilitate loan underwriting and collections. The terms are straightforward for sellers, and once approved, they get their funds quickly, often the next business day. Generally, for loans to Square sellers, loan repayment occurs automatically through a fixed percentage of every card transaction a seller takes. Loans are sized to be less than 20% of a seller's expected annual GPV and, by simply running their business, sellers historically have repaid their loan in less than nine months on average. Square currently funds a majority of these loans from arrangements with institutional third-party investors who purchase the loans on a forward-flow basis. This funding allows Square to mitigate its balance sheet and liquidity risk. Since its public launch in May 2014, Square Loans has facilitated more than 1.2 million loans and advances, representing more than US$8.1 billion. This includes approximately US$857 million in PPP loans, excluding cancelled loans, to more than 80,000 sellers, which Square Loans facilitated in 2020.

- Square Payroll is designed to assist sellers to hire and onboard employees, pay wages and associated employee taxes, and offer employee benefits. The Square ecosystem drives competitive differentiation for the Square Payroll product with the ability to use Square Payroll in conjunction with Square's POS products, Team Management, and Cash App.

**(ii)  Cash App ecosystem**



Square's Cash App ecosystem provides financial products and services to help individuals manage their money. Cash App aims to redefine the world's relationship with money by making it more relatable, instantly available, and universally accessible. Cash App has a diverse set of customers across demographics and domestic regions. Cash App primarily serves customers in the United States with its breadth of products, and also provides certain services to customers in Europe, primarily the United Kingdom and Spain. While Cash App started with the single ability to send and receive money, it now provides an ecosystem of financial services that allows individuals to store, send, receive, spend, and invest their money in traditional stocks and bitcoin. In the three months and six months ended 30 June 2021, the Cash App ecosystem generated US$546 million and US$1,042 million of gross profit, respectively, and had 40 million monthly transacting active customers as of June 2021.

**69**

For personal use only

Section 5
Information on Square

For personal use only

(A) **Storing, sending and receiving funds:** Customers can use Cash App to store funds by receiving money from another Cash App customer through the app's core peer-to-peer transfer service or by transferring money from a bank account. Square has worked to enhance the efficiency of peer-to-peer transfers by streamlining the onboarding process for new Cash App customers. Many Cash App accounts also have a routing number and a unique account number, which allows customers to deposit funds directly from their paychecks. These funds can then be sent to another customer through the app, spent anywhere that accepts cards or withdrawn from an ATM using the Cash Card, invested in stocks or ETFs, used to buy bitcoin, or transferred to a bank account (either instantly for a fee or for free in 1-3 days). Cash App is designed to make it easier for people to manage a business by enabling payments to their Cashtag, allowing higher weekly limits, and providing relevant tax reporting forms. As of 31 December 2020, Cash App had stored balances of approximately US$2.0 billion from its customers.

Cash App is focused on expanding globally to reach more customers. In the quarter ended 31 March 2020, Square launched cross-border payments between the United States and the United Kingdom, allowing customers to instantly transfer funds between these countries using real-time exchange rates with no fees.

(B) **Spending:** Cash Card is a prepaid debit card that is linked directly to a customer's Cash App balance. Customers can order a Cash Card for free and use their Cash Card anywhere that accepts Visa to make purchases, drawing down from the funds stored in their Cash App balance. Square earns interchange fees when individuals make purchases with Cash Card. Cash Card also offers customers discounts at certain businesses through the Cash Boost program. Cash Boost is a free and instant rewards program for Cash App customers, which offers a discount at a specific business or a discount at certain business types. Customers can select the Cash Boost they want to apply to their Cash Card through the Cash App, and the discount is instantly applied to their Cash App balance when customers make eligible transactions. Some Cash Boosts are selected and funded by Square, while others will be funded by Square's partners. Costs related to the Cash Boost rewards program that are funded by Square are recognised as reductions to revenue.

(C) **Investing:** Cash App makes investing more accessible by giving customers access to hundreds of listed stocks and ETFs, as well as the ability to buy and sell bitcoin. Stocks, ETFs, or bitcoin can be purchased using the funds in a customer's Cash App balance or from a linked debit card and once the order is filled, all investments are viewable through the Investing tab on the Cash App home screen. Cash App customers can buy fractional amounts of a stock, ETF, or bitcoin starting at $1, which expands access to investing to more people. Cash App recognises revenue when customers purchase or sell bitcoin within the app.

(D) **Tax preparation:** At the end of 2020, Square acquired Credit Karma Tax, which is intended to add a tax filing product for individuals to Cash App's ecosystem. Credit Karma Tax provides a seamless, mobile-first solution for individuals to file their taxes for free.

### (iii) TIDAL

Square owns a majority ownership stake in TIDAL, a global music and entertainment platform that expands Square's purpose of economic empowerment to artists. TIDAL offers superior sound quality and an extensive catalogue of more than 70 million songs and 250,000 high-quality videos. TIDAL puts the fan experience at the centre of decisions, providing artists direct access to their audience and allowing fans deeper connections to their favourite artists through original, exclusive, and curated content and events. TIDAL has a global presence with listeners in more than 56 countries and relationships with more than 100 labels and distributors.

### (iv) TBD

Square recently launched TBD, a bitcoin-focused ecosystem established to build an open developer platform with the sole goal of making it easy to create non-custodial, permissionless, and decentralised financial services.

### (c) Product development and technology

Square designs its products and services with the intention that they be cohesive, fast, self-serve, and elegant, and Square organises its product teams accordingly, combining individuals from product management, engineering, data science, analytics, design, and product marketing. Square's products and services are platform-agnostic with most supporting iOS, Android, and web. Square frequently updates its software products and strives for a rapid software release schedule with improvements deployed regularly. Square's services are built on a scalable technology platform, and Square places a strong emphasis on data analytics and machine learning to maximise the efficacy, efficiency, and scalability of its services.

**70**

**(d) Corporate structure**

Square's business currently functions through a number of different entities. Square, Inc. is the parent company of the Square Group. The major subsidiaries of Square, Inc. as of 30 June 2021 are:

| Subsidiary name | Jurisdiction of incorporation |
| --- | --- |
| Square Capital, LLC | Delaware, U.S. |
| Square Financial Services, Inc. | Utah, U.S. |
| Cash App Investing, LLC | Delaware, U.S. |
| Squareup International Limited | Ireland |
| Squareup Pte. Ltd. | Singapore |
| Square Canada, Inc. | Canada |
| Square Technologies, Inc. | Canada |
| Squareup Europe Ltd. | United Kingdom |
| Squareup (UK) Ltd. | United Kingdom |
| Decentralized Global Payments, S.L.U. | Spain |
| Verse Payments Lithuania UAB | Lithuania |
| Credit Karma Tax, Inc. | Delaware, U.S. |
| Aspiro AB | Sweden |
| Project Panther US, LLC | Delaware, U.S. |
| Tidal Music AS | Norway |

**(e) Operating structure**

From 30 June 2020, Square changed the structure of its internal financial reporting to better align with how it manages its business. The new reportable operating segments are described as follows:

(i)   Seller (50% of total gross profit in the six months ended 30 June 2021) – this segment provides the Seller ecosystem;

(ii)  Cash App (49.5% of total gross profit in the six months ended 30 June 2021) – this segment provides the Cash App ecosystem; and

(iii) Corporate and Other (0.5% of total gross profit in the six months ended 30 June 2021) – this segment relates to products and services that are not assigned to a specific reportable segment.

**(f) Geographical footprint**

Square operates in multiple countries, including the United States, Canada, Japan, Australia, Ireland, Spain, Norway and the United Kingdom. Square's strongest presence is in the United States, which represented more than 97.6% of total net revenues in the six months ended 30 June 2021.

No individual country from the international markets contributed in excess of 10% of total net revenue for the six months ended 30 June 2021 and 2020.

# 71

Section 5
Information on Square

**(g) Customer overview**

**(i)  Sellers**

Square's sellers represent a diverse range of industries (including services, food-related, and retail businesses) and sizes, ranging from sole proprietors to multi-location businesses. These sellers also span geographies, including the United States, Canada, Japan, Australia, the United Kingdom, Ireland, France and Spain as of 30 September 2021.

Square believes the diversity of its sellers underscores the accessibility and flexibility of Square's offerings. Square is also increasingly serving larger sellers, which Square defines as sellers that generate more than US$125,000 in annualised GPV. Square's ability to service larger sellers is due to its ability to offer more flexible and complex solutions as well as a growing product suite. GPV from larger sellers represented 60% of seller GPV in the quarter ending 31 December 2020, up from 56% in the prior year period. For the years ended 31 December 2020, 2019 and 2018, Square had no customer who accounted for greater than 5% of its GPV or its total net revenue.

The charts below show the percentage mix of Square's GPV by seller industry and seller size, excluding Cash App, for the year ended 31 December 2020:

% of GPV by industry



- Food and Drink
- Retail
- Professional Services
- Beauty and Personal Care
- Healthcare and Fitness
- Home and Repair
- Other

GPV mix by seller size



**(ii) Cash App customers**

As of June 2021, Cash App had 40 million monthly transacting active customers across the United States and Europe who had at least one financial transaction using any Cash App product or service during the specified period. In 2020, Cash App was the number one finance app in both the iOS App Store and Google Play, and was the number nine and number five app in the iOS App Store and Google Play, respectively, based on downloads in the United States. Cash App has a diverse mix of customers. In the United States, Cash App had transacting active customers in each of the 50 states and nearly every county as of December 2020.

**72**

For personal use only

**(h)  Revenue model**

Broad portfolio of Seller products with multiple monetisation levers

| | | Transaction-based | Subscription and services | Hardware |
|---|---|---|---|---|
| Sidecar Payments | POS App with payments usage only | ● | | |
| Software and Integrated payments | Invoices, Virtual Terminal, Developer, APIs/SDKs, Third Party Apps | ● | | |
| | Square for Retail, Restaurants, Appointment, Square Online Store | ● | ● | |
| | Team Management, Marketing, Loyalty | | ● | |
| Financial Services | Square Card, Instant Transfer | | ● | |
| Capital | Core Flex Loans | | ● | |
| Hardware | Square Register, Terminal, Stand and Contactless and Chip Reader, Third Party Peripherals | | | ● |

Broad portfolio of Cash App products with multiple monetisation levers

| | Engagement Drivers | Revenue Stream | Transaction-based | Subscription and services | Bitcoin |
|---|---|---|---|---|---|
| Sending Money | Peer-to-Peer (fiat and bitcoin) | Instant Deposit Cash for Business Credit Card funding | ● | ● | |
| Spending Money | Boost (rewards) Stored balance Direct Deposit | Cash Card interchange Cash Card Studio ATM withdrawals Interest income | | ● | |
| Investing Money | Bitcoin Stock Brokerage | Bitcoin | | | ● |

As further described in section 5.4(b), Square derives the majority of its revenue in the following forms:

(i)   **Transaction based revenue:** Square charges its sellers a transaction fee generally based on a percentage of the total transaction amount processed. Custom pricing is also selectively offered for certain larger sellers. Cash App customers are also charged amounts for peer-to-peer transactions to business accounts and payments sent from a credit card.

(ii)  **Subscription and services-based revenue:** Revenue from Cash App, Square Loans, and Instant Transfers for sellers currently comprise the majority of our subscription and services-based revenue. Cash App subscription and services-based revenue is primarily comprised of transaction fees from both Cash App Instant Deposit and Cash Card. Square Loans facilitates loans to sellers which are generally repaid through withholding a percentage of the collections of the seller's receivables processed by Square. Square sells certain loans to third-party investors for an upfront fee and is retained by those investors to service the loans and earn a servicing fee for facilitating the repayment of these receivables through Square's payments solutions. Other subscription and services-based products include Square Online and domain name registration services, Gift Cards, Square Appointments, Square Restaurants, Square Retail, Customer Engagement, Employee Management, Square Payroll, Square Card.

(iii) **Hardware revenue:** Hardware revenue includes revenue from sales of contactless and chip readers, Square Stand, Square Register, Square Terminal, and third-party peripherals.



**73**

Section 5
Information on Square

For personal use only

(iv) **Bitcoin revenue:** Square recognises revenue when Cash App customers purchase bitcoin and it is transferred to their account. Square purchases bitcoin from private broker dealers or from Cash App customers and applies a small margin before selling it to customers.

### (i)  Key assets

### (i)  Human capital

Square's employees are a driving force in Square's business. Attracting, developing, and retaining top talent remain a focus in the development of Square's human capital programs. As of 30 June 2021, Square had 6,875 full-time employees worldwide with 1,057 full-time employees outside of the US. Square also engages temporary employees and consultants as needed to support its operations.

Square has a purpose-driven culture, with a focus on employee input and well-being, which Square believes enables it to attract and retain exceptional talent. While Square has always had distributed teams collaborating around the globe, the COVID-19 pandemic provided an unexpected experiment in remote work, as the vast majority of Square's employees pivoted to working from home starting in March 2020. In May 2020, Square announced that most employees would continue to have the option to work remotely even after Square's offices were reopened. Square management believes this flexible location policy has unlocked opportunities to source, connect, and hire talent in more locations.

A key focus of Square's human capital management approach is Square's commitment to improving inclusion and diversity, including by growing employee resource groups, equipping managers to build inclusive teams, and making diversity a central component of Square's recruiting strategy.

### (ii)  Intellectual property

Square seeks to protect its intellectual property rights by relying on a combination of federal, state, and common law rights in the United States and other countries, as well as on contractual measures. It is Square's practice to enter into confidentiality, non-disclosure, and invention assignment agreements with its employees and contractors, and into confidentiality and non-disclosure agreements with other third parties, in order to limit access to, and disclosure and use of Square's confidential information and proprietary technology. In addition to these contractual measures, Square also relies on a combination of trademarks, trade dress, copyrights, registered domain names, trade secrets, and patent rights to help protect its brand and its other intellectual property.

Square has developed a patent program and strategy to identify, apply for, and secure patents for innovative aspects of its products, services, and technologies where appropriate.

Square actively pursues registration of its trademarks, logos, service marks, trade dress, and domain names in the United States and in other jurisdictions. From time to time, Square also incorporates certain intellectual property licensed from third parties, including under certain open source licenses. However, even if any such third-party technology did not continue to be available to Square on commercially reasonable terms, Square management believes that alternative technologies would be available as needed in every case.

## 5.5.  Strategy

Square's strategic plan emphasises the core areas that are intended to support future earnings growth in each business segment.

### (a)  Cash App ecosystem

Cash App has focused on strengthening its network, driving engagement and increasing inflows into the Cash App ecosystem.

### (i)  Strengthening the network

Cash App remains focused on the health of its network, including attracting and retaining engaged customers. Peer-to-peer payments have been a primary driver of customer acquisition. Based on evidence of increased frequency and volume of transactions through the Cash App network from existing and newer customers, Square believes customers have found increased utility across its ecosystem and peer-to-peer has continued to strengthen Cash App's customer base.

**74**

Cash App's marketing efforts are directed to attracting customers who could use more products and bring greater funds into the Cash App ecosystem. Cash App has increased its investment into new and existing paid marketing channels, brand awareness, bringing customers back into its ecosystem, and a number of creative marketing campaigns and partnerships to reach new audiences.

**(ii)  Driving engagement**

Cash App is focused on increasing the number of active customers transacting on products in its ecosystem, including Cash Card, Cash Boost, Stock Brokerage, Bitcoin, Direct Deposit, and Cross-Border. Cash App has invested in product and feature enhancements to increase the utility of these products.

Cash App also intends to increase customer engagement of its ecosystem by launching new and differentiated products for its customers.

**(iii)  Increasing inflows into the ecosystem**

A focus for Cash App has been attracting greater inflows into its ecosystem. Square intends to continue investing in Cash App's foundation by expanding its deposit and limit capabilities. As customers find value across the ecosystem, they have brought more money into Cash App, and growth in inflows has continued to be the primary driver of Cash App gross profit growth.

**(b)  Seller ecosystem**

In relation to the Seller ecosystem, Square is continuing to enhance the ecosystem of products, grow upmarket and expand globally.

**(i)  Enhancing Square's Seller ecosystem of products**

Square continues to strengthen its Seller ecosystem by launching new software, financial services, and hardware products and expanding features of its existing product set. Through this product innovation, the Seller ecosystem has focused on growing its omnichannel capabilities and expanding access to financial services. Recent launches for the Seller ecosystem include Square Banking for US sellers, which includes Square Savings, Square Checking, and Square Loans (formerly known as Square Capital), Square Messages, a new feature that helps sellers interact with their buyers more effectively through text message or email, an interactive kitchen display system (**KDS**) that helps sellers simplify and automate the complexities of running a restaurant, and self-serve ordering using QR codes.

**(ii)  Growing upmarket**

Larger sellers showed strong momentum in the quarter ended 30 June 2021 as moving upmarket is a key focus for Square.

Square has focused on acquisition of larger sellers by increasing its sales and marketing investments, including performance marketing, awareness campaigns, and an increase in its sales team.

Square believes the breadth of its omnichannel software offerings is a primary reason that mid-market sellers join and stay with Square. The cohesive Seller ecosystem supports seamless integrations across online and in person channels. Square has continued to build software and integrated payments offerings, which have been the fastest-growing products in the Seller ecosystem and have improved seller retention.

**(iii)  Expanding globally**

International expansion has remained a key priority for the Seller ecosystem. Square's international strategy is focused on investing further into brand and product awareness while improving product parity in new and existing markets. Square recently launched brand awareness campaigns in countries around the world with a focus on driving a broader understanding of its product capabilities.

Square is also launching in new markets, recently entering Ireland and France and will continue to explore expansion into new markets.

## 5.6.  Dividend and Distribution Policy and History

Square has never declared nor paid any cash dividends on its capital stock. Square currently intends to retain all available funds and any future earnings for use in the operation of its business and does not expect to pay any dividends on its capital stock in the foreseeable future. Any future determination relating to Square's dividend policy will be at the discretion of the Square Board, subject to applicable laws, and will depend on Square's financial position, results of operations, capital requirements, general business conditions, and other factors the Square Board considers relevant.

Section 5
Information on Square

## 5.7. Board and Executive Officers

### (a) Board

As at the date of this Scheme Booklet, the Square Board comprises the following members:

**Jack Dorsey**
*President, Chief Executive Officer and Chairman*

Jack Dorsey is Square's co-founder and has served as Square's President and Chief Executive Officer and as a member of the Square Board since July 2009. From May 2007 to October 2008, Mr Dorsey served as President and Chief Executive Officer of Twitter, Inc. In July 2015, Mr Dorsey returned to Twitter and serves as Chief Executive Officer. He has served as a director of Twitter since May 2007. Mr Dorsey is committed to his chief executive officer roles at both Square and Twitter. Mr Dorsey also served as a member of the board of directors of The Walt Disney Company until March 2018.

**Roelof Botha**
*Director*

Roelof Botha has served as a member of the Square Board since January 2011. Since January 2003, Mr Botha has served in various positions at Sequoia Capital, a venture capital firm, including as a Managing Member of Sequoia Capital Operations, LLC. From 2000 to 2003, Mr Botha served in various positions at PayPal, Inc., including as Chief Financial Officer. Mr Botha currently serves on the boards of directors of Eventbrite, Inc., Natera, Inc., MongoDB, Inc., Unity Software, Inc., 23andme Inc. and a number of privately-held companies. Mr Botha holds a B.S. in Actuarial Science, Economics and Statistics from the University of Cape Town and an M.B.A. from the Stanford Graduate School of Business.

**Amy Brooks**
*Director*

Amy Brooks has served as a member of the Square Board since October 2019. Since November 2017, Ms Brooks has served as President, Team Marketing & Business Operations and Chief Innovation Officer at the National Basketball Association (the **NBA**), after serving as Executive Vice President from May 2014 to November 2017 and Senior Vice President from January 2010 to May 2014. She has served in roles of increasing responsibility at the NBA since January 2005. Ms Brooks also currently serves on the board of the Positive Coaching Alliance and on the board of directors of a privately-held company. Ms Brooks holds a B.A. in Political Science and Communication from Stanford University and an M.B.A. from the Stanford Graduate School of Business.

**Shawn 'JAY-Z' Carter**
*Director*

Shawn Carter, known professionally as JAY-Z, has served as a member of the Square Board since May 2021. Mr Carter is a musician, songwriter, record executive, producer, 22-time Grammy award-winner and entrepreneur. He has served as the co-founder and majority owner of Roc Nation LLC and founder of Marcy Media LLC, a full-service agency and entertainment company, since 2008 and co-founder and manager of Marcy Venture Partners, L.P., a venture capital and private equity firm, since March 2019. Since March 2015, he has been a founder, shareholder and artist of TIDAL, a global music and entertainment platform that brings artists and fans closer together through unique original content and exclusive events, which is currently majority owned by Square. Since 2014, Mr Carter has served as the co-founder, manager and board member of Ace of Spades Holdings, LLC, a luxury champagne company, and serves on the board of directors of a number of privately-held companies. Mr Carter has also served as the Chief Visionary Officer of TPCO Holdings Corp. since November 2020, and previously the Chief Brand Strategist of Caliva, from July 2019 until its acquisition by TPCO Holdings Corp. in November 2020. Since 2003, Mr Carter has served as the founder of the Shawn Carter Scholarship Foundation, a charitable organisation focused on education. He also currently serves on the board of directors of REFORM, a philanthropic organisation advocating for criminal justice reform.

For personal use only

**76**

For personal use only

### Paul Deighton
*Director*

Paul Deighton has served as a member of the Square Board since May 2016. Mr Deighton has served as the non-executive chairman of The Economist Group since June 2018 and of Heathrow Airport Holdings Limited, the owner of Heathrow Airport in the United Kingdom, since June 2016. From December 2012 to May 2015, Mr Deighton served as Commercial Secretary to the Treasury and as a member of the House of Lords in the United Kingdom. Mr Deighton previously served as the Chief Executive Officer of the London Organising Committee of the Olympic and Paralympic Games and held various roles at The Goldman Sachs Group, an investment bank. Mr Deighton currently serves on the board of the Hakluyt Company Limited, an advisory firm, and as a member of the Parliamentary Committee overseeing the restoration of the Houses of Parliament. Mr Deighton holds a B.A. in Economics from Trinity College, Cambridge University.

### Randy Garutti
*Director*

Randy Garutti has served as a member of the Square Board since July 2017. Since April 2012, Mr Garutti has served as Chief Executive Officer and on the board of directors of Shake Shack. Prior to becoming Chief Executive Officer, Mr Garutti served as Chief Operating Officer of Shake Shack since January 2010. Before Shake Shack, Mr Garutti was the Director of Operations for Union Square Hospitality Group, LLC, overseeing the operations for all its restaurants. Additionally, Mr Garutti currently serves on the board of directors of USHG Acquisition Corp., a company focused on the acquisition of hospitality and culture driven companies, and the Columbus Avenue Business Improvement District, a not-for-profit organisation. Mr Garutti holds a B.S. from Cornell University's School of Hotel Administration.

### James 'Jim' McKelvey
*Director*

James McKelvey is Square's co-founder and has served as a member of the Square Board since July 2009. Since July 2013, Mr McKelvey has served as a Managing Director of SixThirty FinTech Accelerator, LLC, a financial technology accelerator. Since January 2018, Mr McKelvey has served as a General Partner of FinTop Capital, a venture capital firm. Since January 2017, Mr McKelvey has served as the Founder and CEO of Invisibly, Inc., a data publishing company. From March 2012 to December 2017, he served as a General Partner of Cultivation Capital, a venture capital firm. Since January 1990, Mr McKelvey has served in various positions at Mira Smart Conferencing, a digital conferencing company. Mr McKelvey currently serves on the boards of directors of a number of privately-held companies, as well as the Federal Reserve Bank of St. Louis. Mr McKelvey holds a B.S. in Computer Science and a B.A. in Economics from Washington University in St. Louis.

### Mary Meeker
*Director*

Mary Meeker has served as a member of the Square Board since June 2011. Since January 2019, Ms Meeker has served as a General Partner of Bond Capital. From December 2010 to December 2018, Ms Meeker served as a General Partner of Kleiner Perkins Caufield & Byers. From 1991 to 2010, Ms Meeker worked at Morgan Stanley as a Managing Director and Research Analyst. Ms Meeker previously served on the boards of directors of LendingClub Corporation from June 2012 to June 2019 and DocuSign from June 2012 to June 2019, and currently serves on the boards of directors of a number of privately-held companies. Ms Meeker holds a B.A. in Psychology from DePauw University and an M.B.A. from Cornell University.



**77**

Section 5
Information on Square

For personal use only

### Anna Patterson
*Director*

Anna Patterson has served as a member of the Square Board since November 2017. Since April 2017, Ms Patterson has served as Founder and Managing Partner at Gradient Ventures, Google's artificial intelligence-focused venture fund, and since September 2010, as a Vice President of Engineering at Google. Prior to that, from January 2007 to September 2010, Ms Patterson served as Co-Founder and President at Cuil, and from February 2004 to January 2007, as Director of Engineering at Google. Ms Patterson also currently serves on the National Council at the School of Engineering and Applied Science at Washington University in St. Louis and on the boards of directors of a number of privately-held companies. Ms Patterson holds a B.S. in Computer Science and Electrical Engineering from Washington University in St. Louis and a Ph.D. in Computer Science from the University of Illinois at Urbana Champaign.

### Lawrence Summers
*Director*

Dr Lawrence Summers has served as a member of the Square Board since June 2011. Since January 2011, Dr Summers has served as the Charles W. Eliot University Professor & President Emeritus of Harvard University and the Weil Director of the Mossavar-Rahmani Center for Business & Government at the Harvard Kennedy School. From January 2009 to December 2010, Dr Summers served as Director of the National Economic Council for President Obama. Dr Summers previously served as President of Harvard University, and he has also served in various other senior policy positions, including as Secretary of the Treasury and Vice President of Development Economics and Chief Economist of the World Bank. Dr Summers currently serves on the boards of directors of Doma Holdings, Inc. and Skillsoft Corp., as the Chairman of the International Advisory Board at Santander Bank and on the boards of directors of a number of privately-held companies. Dr Summers holds a B.S. in Economics from Massachusetts Institute of Technology and a Ph.D. in Economics from Harvard University.

### David Viniar
*Director*

David Viniar has served as a member of the Square Board since October 2013. From August 1980 until his retirement in January 2013, Mr Viniar served in various positions at The Goldman Sachs Group, including as Chief Financial Officer, Executive Vice President and Head of the Operations, Technology, Finance and Services Division. Mr Viniar currently serves on the boards of directors of The Goldman Sachs Group and a number of privately-held companies. Mr Viniar holds a B.A. in Economics from Union College and an M.B.A. from Harvard Business School.

### Darren Walker
*Director*

Darren Walker has served as a member of the Square Board since June 2020. Since 2013, Mr Walker has served as the President of the Ford Foundation, a philanthropic organisation. From 2010 to 2013, he served as Vice President for Education, Creativity and Free Expression at the Ford Foundation. Prior to the Ford Foundation, Mr Walker worked for the Rockefeller Foundation, a philanthropic organisation, and served as a Vice President responsible for foundation initiatives from 2005 to 2010. Mr Walker currently serves on the boards of directors of PepsiCo, Inc. and Ralph Lauren Corporation and on the boards of several non-profit organisations. Mr Walker is also a member of the Council on Foreign Relations and the American Academy of Arts and Sciences. Mr Walker holds B.A., B.S. and J.D. degrees from the University of Texas at Austin.

**78**

## (b) Executive officers

### Jack Dorsey
*President, Chief Executive Officer and Chairman*

See section 5.7(a).

### Amrita Ahuja
*Chief Financial Officer*

Amrita Ahuja has served as Square's Chief Financial Officer since January 2019. From March 2018 to January 2019, Ms Ahuja served as the Chief Financial Officer of Blizzard Entertainment, Inc., a division of Activision Blizzard, Inc. Beginning in June 2010, she served in various positions at Activision Blizzard, Inc., including as Senior Vice President of Investor Relations from January 2015 to May 2018, Vice President, Finance and Operations from August 2012 to January 2015 and Vice President, Strategy and Business Development from June 2010 to August 2012. Prior to that, she was a Director of Business Development at Fox Networks Group, served in strategic planning at the Walt Disney Company from 2003 to 2005 and worked in investment banking at Morgan Stanley from 2001 to 2003. She holds an M.B.A. from Harvard Business School and an A.B. from Duke University.

### Brian Grassadonia
*Cash App Lead*

Brian Grassadonia has served as Square's Cash App Lead since January 2013. From May 2012 to January 2013. Mr Grassadonia served as Square's Director of Product Development, as well as Square's Director of Growth from February 2011 to May 2012. He joined Square in September 2010 and served as Product Manager until February 2011. Mr Grassadonia currently serves on the board of directors of a privately-held company. Mr Grassadonia holds a Bachelor of Applied Science (BASc) in Management Science from the University of California, San Diego.

### Alyssa Henry
*Seller Lead*

Alyssa Henry has served as Square's Seller Lead since October 2014. From May 2014 to October 2014, Ms Henry served as Square's Engineering Lead, Infrastructure. From April 2006 to April 2014, Ms Henry served in various positions at Amazon.com, Inc., including as Vice President, Amazon Web Services Storage Services, and as General Manager of Amazon S3. Prior to Amazon, Ms Henry held technical and leadership roles at Microsoft from 1994 to 2006. Ms Henry currently serves on the boards of directors of Confluent Inc., Intel Corporation and Unity Software, Inc. Ms Henry holds a B.S. in Mathematics-Applied Science with a Specialization in Computing from the University of California, Los Angeles.

### Sivan Whiteley
*General Counsel and Corporate Secretary*

Sivan Whiteley has served as Square's General Counsel and Corporate Secretary since March 2018. From January 2016 to March 2018, Ms Whiteley served as Square's Associate General Counsel, as well as acting Co-General Counsel from September 2016 to December 2016. She joined Square as Counsel in March 2013 and was Director, Counsel from September 2013 to December 2015. Prior to that, Ms Whiteley served as Associate General Counsel at Better Place, Inc., as Commercial and Product Counsel at eBay Inc., and was a litigator at Bingham McCutchen LLP. Ms Whiteley holds a B.A., magna cum laude, in Political Science from the University of California, San Diego, and a J.D., cum laude, from Harvard Law School.



**79**

For personal use only

## 5.8.  Interests of the Square Directors and Executive Officers

### (a) Shareholding interests in Afterpay

Dr Lawrence Summers, a member of the Square Board, has served as a member of Afterpay's US Advisory Board (the **Advisory Board**) since September 2019 and in connection with his service as an Advisory Board member Dr Summers has received cash compensation of US$50,000 per quarter. The Advisory Board was not involved in the negotiation of the Scheme. Dr Summers was also granted an option to purchase 100,000 Afterpay ordinary shares at a weighted average exercise price of A$31.90. In connection with the Scheme, Dr Summers' options will be subject to the same treatment as other Afterpay options. In particular, any Afterpay ordinary shares issued to Dr Summers upon exercise of his options will be entitled to the same consideration as those held by other Afterpay Shareholders pursuant to the Scheme.

Mr Roelof Botha, a member of the Square Board, is a partner at Sequoia Capital, an investment firm whose related hedge fund Sequoia Capital Global Equities (**SCGE**) beneficially owns equity interests in Afterpay. SCGE and funds affiliated with Sequoia Capital also beneficially own equity interests in competitors of Afterpay. In addition to his beneficial ownership of and pecuniary interest in funds affiliated with Sequoia Capital, Mr Botha also has a passive investment in SCGE. Afterpay ordinary shares held by SCGE represent less than 1% of Afterpay ordinary shares outstanding, and Mr Botha has no investment discretion over SCGE or access to information about Afterpay or its competitors. Any Afterpay ordinary shares held by SCGE at the Record Date will be entitled to the same consideration as those held by other Afterpay Shareholders pursuant to the Scheme.

### (b) Fees or benefits given or agreed to be given in connection with the Scheme

No fees or benefits have been given or agreed to be given to any Square Director or senior manager in connection with the Scheme.

### (c) Material contracts with directors and executive officers

In July 2019, Square entered into a lease agreement to lease certain office space located in St. Louis, Missouri, from an affiliate of Mr Jim McKelvey. The term of the agreement is 15.5 years with total minimum lease payments over the term of approximately US$42.7 million. As of 30 June 2021, Square had recorded right-of-use assets of US$21.2 million and associated lease liabilities of US$33.4 million related to this lease arrangement.

On 30 April 2021, Square completed its acquisition of a majority stake in TIDAL pursuant to the Share Purchase Agreement (**TIDAL SPA**), dated 3 March 2021, between Vandutch Acquisition Corp., a direct wholly-owned subsidiary of Square (**Vandutch**), Project Panther, Ltd. (**Project Panther**), certain holders of equity interests in Project Panther (the **TIDAL Sellers**) and Mr Shawn Carter, as TIDAL Sellers' Representative. Pursuant to the TIDAL SPA, Vandutch purchased a majority interest in Project Panther in exchange for approximately US$302 million, which amount is subject to customary adjustments (the **TIDAL Transaction**). As part of the TIDAL Transaction, Mr Carter, directly and indirectly through entities affiliated with him, received approximately US$63.4 million, and a family member received approximately US$450,000, in each case in the form of cash and Square Class A Shares. The cash portion of this payment includes repayment of outstanding indebtedness owed by Project Panther and its subsidiaries to such affiliated entities. Mr Carter, the entities affiliated with him and the family member (collectively, the **TIDAL Related Parties**) may also be entitled to receive additional amounts from certain indemnification holdbacks in the future in connection with the TIDAL Transaction. Mr Carter was also reimbursed US$4.5 million in connection with certain insurance expenses related to the TIDAL Transaction which he previously paid on behalf of Project Panther. Following the TIDAL Transaction, the TIDAL Related Parties continue to retain a minority interest in Project Rising, LLC, TIDAL's new parent company and a direct subsidiary of Vandutch. In connection with the TIDAL Transaction, Square retains a call option to acquire this minority interest in the future.

Other than these arrangements relating to Mr McKelvey and Mr Carter, or as otherwise described in this section 5, no Square Director or executive officer has entered into a material contract with Square.

**80**

### (d) Employment agreements with CFO and CEO

Square is party to employment letters (the **Employment Letters**) with each of Jack Dorsey and Amrita Ahuja. Mr Dorsey is the President and CEO of Square and reports to the Square Board. Ms Ahuja has served as CFO of Square since 14 January 2019.

Each employment letter has no specific term and provides for at-will employment. Mr Dorsey's annual base salary is a nominal US$2.75. Ms Ahuja is entitled to receive an annual base salary of US$475,000. Square executives, including Ms Ahuja, receive discretionary equity incentives through a mix of stock options and restricted stock-based awards. Ms Ahuja has received equity awards annually since commencing employment. Typically, Square's equity awards vest over four years, contingent on continued service, and Ms Ahuja's outstanding equity awards follow this practice, with her stock options vesting on a monthly basis and her restricted stock units vesting quarterly. Ms Ahuja's 2020 equity awards was granted in a mix of approximately 50% stock options and 50% restricted stock-based awards, with a grant date value of US$8,168,441. Mr Dorsey did not receive any equity awards in 2020 at his request, and because Square's Compensation Committee believed that his existing equity ownership position sufficiently aligned his interests with those of Square's shareholders.

Mr Dorsey and Ms Ahuja are each subject to a change of control and severance agreement (the **COC Agreements**). Under the COC Agreements, if, before a change of control, Square decides to terminate Mr Dorsey's or Ms Ahuja's (as relevant) employment with Square without cause, or due to his or her death or "disability" (as such terms are defined in his or her COC Agreement), outside the period commencing three months before, and ending 12 months after, a change of control (the **COC Period**):

(i)   in the case of Ms Ahuja, Square may request that she continue to remain employed for a period of up to 180 days following that request (the **Transition Period**), during which Transition Period she would be expected to perform such transition and other duties as reasonably requested by Square and would continue to be paid her base salary, vest in her equity awards in accordance with their terms and be eligible to participate in Square's bonus and commission plans (if any) and employee benefit plans, each in accordance with their terms; and

(ii)  in the case of either Mr Dorsey and Ms Ahuja, he or she will be eligible to receive the following payments and benefits if he or she timely signs and does not revoke a release of claims:

(A)   a lump-sum payment equal to: for Ms Ahuja, base salary for a number of days equal to (i) 180 minus (ii) the number of days in the entire Transition Period (or, if, during the Transition Period, Ms Ahuja's employment is terminated by Square without cause or due to his or her death or disability, the actual days worked during the Transition Period) (the Severance Period); and for Mr Dorsey, 75% of annual base salary;

(B)   a lump-sum payment equal to a pro rata portion of the annual bonus that Ms Ahuja and Mr Dorsey would have earned for the year of his or her termination if he or she had remained employed until eligible to receive the bonus;

(C)   a taxable lump-sum payment equal to the monthly COBRA premium required to continue health insurance coverage for: for Ms Ahuja and her eligible dependents, the Severance Period; and for Mr Dorsey, 9 months;

(D)   for Ms Ahuja, if the termination is due to reasons other than cause (excluding by reason of death or disability), each her then-outstanding time-based equity awards will immediately vest and become exercisable as to the number that were otherwise scheduled to vest and become exercisable had she remained employed with Square through the end of the Severance Period and no change of control occurred during the Severance Period; and

(iii) if the termination is due to death or disability, fully accelerated vesting and exercisability of all outstanding equity awards, and, with respect to equity awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at 100% of target levels.

If , within the COC Period, Mr Dorsey's or Ms Ahuja's employment is terminated by Square without cause or due to death or disability or Mr Dorsey or Ms Ahuja resign for "good reason" (as defined in the relevant COC Agreement), and in the case of Ms Ahuja, she has completed any Square-requested Transition Period, Mr Dorsey and Ms Ahuja will be entitled to the following benefits if he or she signs and does not revoke a release of claims:

(A)   a lump-sum payment equal to 100% of his or her annual base salary as of immediately before termination (or, if termination is due to resignation for good reason based on material salary reduction then as of immediately before the reduction), or, if the amount is greater, as of immediately before the change of control;

(B)   a lump-sum payment equal to 100% of his or her target annual bonus (for the year of termination);

For personal use only

**81**

Section 5
Information on Square

For personal use only

(C) a taxable lump-sum payment equal to 12 months of the monthly COBRA premium required to continue health insurance coverage for Ms Ahuja and Mr Dorsey and his or her eligible dependents; and

(D) 100% accelerated vesting of all outstanding equity awards, and, with respect to equity awards with performance-based vesting, all performance goals or other vesting criteria will be deemed achieved at the greater of actual performance or 100% of target levels.

None of Square's executive officers, including Mr Dorsey and Ms Ahuja, are expected to receive any severance or other compensation as a result of the transaction contemplated by the Scheme Implementation Deed, including the implementation of the Scheme.

Further information in relation to the remuneration of Square's executive officers can be found in Square's annual proxy statement, which is on file with the SEC. Square's annual proxy statement is not incorporated into this Scheme Booklet.

### (e) Post-employment compensation

In addition to the COC Agreements described above, Square has also entered into change of control and severance agreements with Brian Grassadonia, Alyssa Henry and Sivan Whiteley that provide for certain specified payments and benefits if a termination of employment occurs under specified circumstances, including following a change of control of Square. Square believes that these protections are necessary to provide its valuable executives with incentives to forego other employment opportunities and remain employed with Square and to maintain continued focus and dedication to their responsibilities to maximise stockholder value, including if there is potential transaction that could involve a change of control. In addition, these protections are available only if a named executive officer executes and does not revoke a general release of claims in favour of Square. The terms of these agreements were determined by Square's Compensation Committee, with input from its management team, following a review of analysis of relevant market data for other companies with whom Square competes for executive talent. These agreements are reviewed annually by Square's Compensation Committee.

### (f) Other director compensation

With the exception of the Employment Letter agreed with Mr Dorsey, Square is not party to any other employment contract with any of its directors. Square's non-employee directors participate in the Square Outside Director Compensation Policy, which provides that Square non-employee directors will receive compensation in the form of equity granted under the terms of Square's 2015 Equity Incentive Plan, as amended and restated (the **2015 Plan**), and cash, as described below.

Square's Compensation Committee periodically reviews Square's Outside Director Compensation Policy, including review of competitive practices provided by an independent compensation consulting firm.

### (i) Director equity compensation

Square's 2015 Plan contains maximum limits on the size of the equity awards that can be granted to each of Square's non-employee directors in any fiscal year, but those maximum limits do not reflect the intended size of any potential grants or a commitment to make any equity award grants to Square's non-employee directors in the future. The only commitment to make equity award grants to Square's non-employee directors is under Square's Outside Director Compensation Policy, as it may be amended from time to time. The maximum limits under the 2015 Plan provide that no non-employee director may be granted, in any fiscal year, equity awards having a grant date fair value (determined in accordance with US generally accepted principles (**GAAP**)) of more than US$1 million, provided, that, the limit is US$2 million in connection with the director's initial service as a non-employee director. Equity awards granted to an individual while he or she was an employee or a consultant, but not a non-employee director, do not count for purposes of these limits.

Under the Outside Director Compensation Policy, Square Directors receive initial and annual awards as detailed below:

(A) **Initial award:** Subject to any limits in Square's 2015 Plan, each person who first becomes a non-employee director will receive an initial grant of RSUs on the date of his or her appointment having a grant date fair value (determined in accordance with GAAP) equal to the portion of US$250,000 multiplied by a fraction (i) the numerator of which is (x) 12 minus (y) the number of months between the date of the last annual meeting of stockholders and the date the non-employee director becomes a member of the Square Board and (ii) the denominator of which is 12.

**82**

For personal use only

(B) **Annual award:** On the date of each annual meeting of shareholders, and subject to any limits in Square's 2015 Plan, each of Square's non-employee directors is granted RSUs having a grant date fair value (determined in accordance with GAAP) equal to US$250,000.

David Viniar, as Square's Lead Independent Director, receives an annual grant of RSUs, in addition to the annual grant provided to all non-employee directors, on the date of each annual meeting of shareholders having a grant date fair value (determined in accordance with GAAP) of US$70,000, subject to any limits in Square's 2015 Plan.

The Square Class A Shares underlying the RSUs vest in full upon the earlier of (i) the first anniversary of the grant date or (ii) the date of the next annual meeting of shareholders, in each case subject to continued service through the vesting date.

The awards granted to a non-employee director under Square's Outside Director Compensation Policy will become fully vested upon a change in control.

### (ii) Director cash compensation

Each of Square's non-employee directors also receives an annual cash retainer of US$40,000 for serving on the Square Board. In addition, each year, Square's non-employee directors are eligible to receive the following cash fees for service on the committees of the Square Board.

| Board Committee | Chair Fee | Member Fee |
|---|---|---|
| Audit and Risk Committee | US$20,000 | US$10,000 |
| Compensation Committee | US$15,000 | US$5,000 |
| Nominating and Corporate Governance Committee | US$10,000 | US$2,500 |

Subject to any limits under Square's 2015 Plan, each non-employee director may elect to convert any cash compensation that they would otherwise be entitled to receive under Square's Outside Director Compensation Policy into an award of RSUs under Square's 2015 Plan. If the non-employee director makes this election in accordance with the policy, each such award of RSUs will be granted on the first business day following the last day of the fiscal quarter for which the cash compensation otherwise would be paid under the policy, will be fully vested on the grant date and will cover a number of shares equal to (i) the aggregate amount of cash compensation otherwise payable to the non-employee director on that date, divided by (ii) the closing price per share as of the last day of the fiscal quarter for which the grant relates.

### (iii) Director and executive officer indemnification

Square has entered into indemnification agreements with the Square Directors and Square's executive officers. The indemnification agreements, and Square's Certificate of Incorporation and Bylaws, require Square to indemnify the Square Directors and Square's executive officers to the fullest extent permitted by Delaware law.

## 5.9. Corporate Governance

### (a) Overview

Square is incorporated under the laws of the State of Delaware and listed on NYSE. As such, Square's general corporate activities are not primarily regulated by the Corporations Act or by ASIC, but instead are regulated by the DGCL, U.S. Securities Act of 1933, as amended (the **Securities Act**), U.S. Securities Exchange Act of 1934, as amended (the **Exchange Act**), and the rules and regulations of the SEC and NYSE.

As Square is a US company which is listed on NYSE, the Square Board has adopted corporate governance guidelines and board committee charters reflecting NYSE listing standards. These documents can be found on Square's website at https://investors.squareup.com/governance/governance-documents/default.aspx.

Square has also agreed to establish a secondary listing for CDIs on ASX.

# 83

Section 5
Information on Square

### (b) Square Board

The business and affairs of Square are managed by or under the direction of the Square Board. The Square Board may exercise all powers of the company that are not required to be exercised by the company's stockholders.

The Square Board is responsible for electing, and may remove, the elected officers of the company, including the CEO, President and CFO.

### (c) Square Board committees

The Square Board has established an audit and risk committee (**Square Audit and Risk Committee**), a compensation committee (**Square Compensation Committee**) and a nominating and corporate governance committee (**Square Nominating and Corporate Governance Committee**).

#### (i)   Square Audit and Risk Committee

The Square Audit and Risk Committee is, among other things, responsible for the following:

- selecting and hiring a qualified independent registered public accounting firm to audit Square's financial statements;
- helping to ensure the independence and performance of the independent registered public accounting firm;
- reviewing Square's financial statements and discussing the scope and results of the independent audit and quarterly reviews with the independent registered public accounting firm, and reviewing, with management and the independent registered public accounting firm, Square's interim and year-end results of operations and the reports and certifications regarding internal controls over financial reporting and disclosure controls;
- preparing, reviewing and approving the audit and risk committee report that the SEC requires to be included in Square's annual proxy statement;
- reviewing the adequacy and effectiveness of Square's disclosure controls and procedures, and developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;
- reviewing Square's program and policies on risk assessment and risk management, including risks associated with data privacy and cybersecurity; reviewing and overseeing related party transactions for which review or oversight is required by applicable law or required to be disclosed in Square's financial statements or SEC filings; and
- approving or, as required, pre-approving, all audit and all permissible non-audit services and fees to be performed by the independent registered public accounting firm.

Each member of the Square Audit and Risk Committee meets the requirements for independence for audit committee members under the listing standards of the NYSE and SEC rules and regulations. The current members of the Square Audit and Risk Committee are David Viniar (Chair), Roelof Botha, Anna Patterson and Lawrence Summers.

#### (ii) Square Compensation Committee

The Square Compensation Committee is, among other things, responsible for the following:

- reviewing, approving and determining, or making recommendations to the Square Board regarding, the compensation of Square's executive officers;
- overseeing Square's overall compensation philosophy and compensation policies, plans and benefits programs, including those for Square's executive officers;
- administering Square's equity compensation plans; and
- reviewing, approving and making recommendations to the Square Board regarding incentive compensation and equity compensation plans.

Each member of the Square Compensation Committee meets the requirements for independence for compensation committee members under the listing standards of the NYSE and SEC rules and regulations. The current members of the Square Compensation Committee are Roelof Botha, Paul Deighton and Mary Meeker (Chair).

For personal use only

**84**

For personal use only

**(iii) Square Nominating and Corporate Governance Committee**

The Square Nominating and Corporate Governance Committee is, among other things, responsible for the following:

- identifying, evaluating and making recommendations to the Square Board regarding nominees for election to the Square Board and its committees;
- evaluating the performance of the Square Board, individual directors and Square's Chief Executive Officer;
- considering and making recommendations to the Square Board regarding the composition of the Square Board and its committees;
- overseeing, reviewing and making recommendations to the Square Board regarding Square's corporate governance practices, including Square's Corporate Governance Guidelines;
- overseeing Square's process for stockholder communications with the Square Board;
- conducting a periodic review of environmental, social and governance and other corporate responsibility matters of significance to Square;
- overseeing Square's commitment to inclusion and diversity (**Square I&D**), including the Square I&D policies and programs, and conducting a periodic review of the Square I&D efforts with Square's People Lead and Inclusion and Diversity Lead;
- reviewing and monitoring compliance with Square's Code of Business Conduct and Ethics and other actual and potential conflicts of interest, other than transactions with related parties reviewed by Square's Audit and Risk Committee; and
- reviewing the succession planning for Square's Chief Executive Officer, as well as each of Square's other members of Square's executive management team.

Each member of the Square Nominating and Corporate Governance Committee meets the requirements for independence for nominating and corporate governance committee members under the listing standards of the NYSE and SEC rules and regulations. The current members of the Square Nominating and Corporate Governance Committee are David Viniar, Amy Brooks, Randy Garutti (Chair) and Darren Walker.

**(d) Insider Trading Policy and prohibitions on hedging and pledging transactions**

Square's Insider Trading Policy among other things, prohibits Square's employees, including officers or directors from making short sales, engaging in transactions in publicly-traded options (such as puts and calls) and other derivative securities relating to Square's common stock, pledging any of Square's securities as collateral for a loan and holding any of Square's securities in a margin account, whether such securities are granted as compensation or are held, directly or indirectly, by the employee or director. This prohibition extends to any hedging or similar transaction designed to decrease the risks associated with holding Square securities.

**(e) Code of Business Conduct and Ethics**

The Square Board has adopted a written Code of Business Conduct and Ethics, which applies to all employees, officers and directors of Square.

The objectives of the Code of Business Conduct and Ethics are to ensure that high standards of corporate and individual behaviour are observed by all of Square's employees and that employees always act lawfully, honestly and ethically and in the best interest of Square.

## 5.10.  Financial Information of Square

### (a) Introduction

This section 5.10 contains the historical financial information of the **Square Group**, which is comprised of the **Square Historical Financial Information**, being:

(i) Square Group historical consolidated income statements for the years ended 31 December 2019 and 31 December 2020 and the six months ended 30 June 2021 (**Square Historical Income Statements**);

(ii) Square Group historical consolidated statement of financial position as at 30 June 2021 (**Square Historical Statement of Financial Position**); and

(iii) Square Group historical consolidated statements of cash flows for the years ended 31 December 2019 and 31 December 2020, and the six months ended 30 June 2021 (**Square Historical Cash Flow Statements**).

# 85

Section 5
Information on Square



The Square Historical Financial Information has been reviewed by the Investigating Accountant, in accordance with the Australian Standard on Assurance Engagements ASAE 3450 Assurance Engagements involving Corporate Fundraisings and/or Prospective Financial Information, as stated in its Independent Limited Assurance Report included in Attachment D. Afterpay Shareholders should note the scope and limitations of the Independent Limited Assurance Report.

Square Group's full year and quarterly consolidated financial statements, including all notes to those consolidated financial statements and a summary of Square Group's accounting policies can be found in:

(i)   the Square 10-K Annual Reports for the year ended 31 December 2019 (filed with the SEC on 26 February 2020) and for the year ended 31 December 2020 (filed with the SEC on 23 February 2021); and

(ii)  the Square 10-Q Quarterly Report for the quarter ended 30 June 2021 (filed with the SEC on 2 August 2021).

The complete versions of these reports are available from Square's website https://investors.squareup.com/ or the SEC's website, www.sec.gov.

This section 5.10 should be read in conjunction with the risks to which Square is subject and the risks associated with the Scheme, as set out in section 7.3.



### (b) Basis of preparation

The Square Historical Financial Information included in this section 5.10 is intended to present Afterpay Shareholders with information to assist them in understanding the historical financial performance, financial position and cash flows of the Square Group. Square management is responsible for the preparation and presentation of the Square Historical Financial Information.

The Square Historical Financial Information has been prepared on a going concern basis, which assumes continuity of normal business activities and the realisation of assets and the settlement of liabilities in the ordinary course of business.

The Square Historical Financial Information has been prepared in a manner consistent with Square Group accounting policies applied by Square in preparing the Square Quarterly Report for the quarter ended 30 June 2021 and the Annual Report for the year ended 31 December 2020. The accounting principles used in the preparation of the Square Historical Financial Information are consistent with those set out in Square's Quarterly Report for the quarter ended 30 June 2021 and the Annual Report for the year ended 31 December 2020.

The Square Historical Financial Information for the years ended 31 December 2019 and 31 December 2020 has been derived from the Square Group's consolidated financial statements prepared for the Square 10-K Annual Reports for the respective years. These consolidated financial statements in Square's 10-K Annual Reports were prepared in accordance with U.S. GAAP.



The Square Historical Financial Information as at and for the six months ended 30 June 2021 has been derived from the Square Group's interim consolidated financial statements prepared for the Square 10-Q Quarterly Report for the quarter ended 30 June 2021. These interim consolidated financial statements in Square's 10-Q Quarterly Report were prepared in accordance with U.S. GAAP and the applicable rules and regulations of the SEC for interim financial information. Accordingly, they do not include all of the information and footnotes required by U.S. GAAP for full financial statements.

The Square Historical Financial Information, reported in USD thousands in the Square Group's 10-K Annual and 10-Q Quarterly Reports, has been converted into USD millions for the purposes of this Scheme Booklet. The Square Historical Financial Information is presented in USD as Square has determined USD as its functional currency and, unless otherwise noted, is rounded to the nearest USD hundred thousand.

Square Group's consolidated financial statements for the years ended 31 December 2019 and 31 December 2020 were audited by Ernst & Young LLP, Independent Registered Public Accounting Firm for Square, in accordance with the standards of the Public Company Accounting Oversight Board (United States). Ernst & Young LLP issued unqualified audit opinions on these consolidated financial statements. Ernst & Young LLP performs reviews of Square's interim financial statements filed with the SEC in accordance with the standards of the Public Company Accounting Oversight Board (United States).



The Square Historical Financial Information contained in section 5.10 is presented in an abbreviated form as it does not include all the disclosures, statements or comparative information that are required by U.S. GAAP applicable to full financial statements or to financial statements prepared in accordance with the applicable rules and regulations of the SEC and Corporations Act.

**86**

**(c) Square Historical Income Statements**

Square Historical Income Statements for the years ended 31 December 2019 and 31 December 2020, and the six months ended 30 June 2021, are set out below.

Table 5.1:  Square Historical Income Statements

| (US$ millions) | Year ended 31 December 2019 | Year ended 31 December 2020 | Six months ended 30 June 2021[1] |
|---|---:|---:|---:|
| Revenue | | | |
| Transaction-based revenue | 3,081.1 | 3,295.0 | 2,187.2 |
| Subscription and services-based revenue | 1,031.5 | 1,539.4 | 1,242.9 |
| Hardware revenue | 84.5 | 91.7 | 72.5 |
| Bitcoin revenue | 516.5 | 4,571.5 | 6,235.4 |
| Total net revenue | 4,713.6 | 9,497.6 | 9,738.0 |
| Cost of revenue | | | |
| Transaction-based costs[2] | 1,938.0 | 1,911.9 | 1,206.6 |
| Subscription and services-based costs[2] | 234.3 | 222.7 | 209.4 |
| Hardware costs | 136.4 | 143.9 | 101.9 |
| Bitcoin costs | 508.2 | 4,474.5 | 6,105.8 |
| Amortisation of acquired technology[2] | 7.0 | 11.2 | 9.7 |
| Total cost of revenue | 2,823.9 | 6,764.2 | 7,633.4 |
| Gross profit | 1,889.7 | 2,733.4 | 2,104.6 |
| Operating expenses | | | |
| Product development[3] | 670.6 | 881.8 | 633.7 |
| Sales and marketing[3] | 624.8 | 1,109.7 | 723.9 |
| General and administrative | 436.3 | 579.2 | 416.9 |
| Transaction and loan losses | 127.0 | 177.7 | 68.6 |
| Bitcoin impairment losses | – | – | 65.1 |
| Amortisation of acquired customer assets[3] | 4.5 | 3.9 | 3.6 |
| Total operating expenses | 1,863.2 | 2,752.3 | 1,911.8 |
| Operating income/(loss) | 26.5 | (18.9) | 192.8 |
| Gain on sale of asset group | (373.4) | – | – |
| Interest expense, net | 21.5 | 56.9 | 6.7 |
| Other expense/(income), net | 0.3 | (291.7) | (48.3) |
| Income before income tax | 378.1 | 215.9 | 234.4 |
| Provision/(benefit) for income taxes | 2.8 | 2.9 | (8.4) |
| Net income | 375.3 | 213.0 | 242.8 |

Footnotes:

[1]    The Square Group's 10-Q Quarterly Report for the 6 months ended 30 June 2021 is presented in condensed form and certain financial information line items have been reclassified in the above table to enable comparison with comparatives.

[2]    Amortisation of acquired technology costs (US$9.7m) in the 6 months to 30 June 2021 10-Q Quarterly Report was condensed into Transaction-based costs (US$5.0m) and Subscription and service-based costs (US$4.7m). This has been reclassified in the above table to present Amortisation of acquired technology costs as a separate line item to align with the presentation Square will adopt going forward, which reverts to the 2019 and 2020 10-K Annual Report presentation.

[3]    Amortisation of acquired customer assets (US$3.6m) in the 6 months to 30 June 2021 10-Q Quarterly Report was condensed into Product development (US$2.9m) and Sales and marketing (US$0.6m). This has been reclassified in the above table to present Amortisation of acquired customer assets as a separate line item to align with the presentation Square will adopt going forward, which reverts to the 2019 and 2020 10-K Annual Report presentation.

**87**

**(d) Square Historical Statement of Financial Position**

Square Historical Statement of Financial Position as at 30 June 2021 is set out below.

Table 5.2:  Square Historical Statement of Financial Position

| (US$ millions) | 30 June 2021 |
|---|---|
| ASSETS | |
| Current Assets | |
| Cash and cash equivalents | 4,581.2 |
| Investments in short-term debt securities | 1,014.9 |
| Settlements receivable | 1,155.8 |
| Customer funds | 2,847.5 |
| Loans held for sale | 807.4 |
| Other current assets | 593.5 |
| Total Current Assets | 11,000.3 |
| Property and equipment, net | 260.9 |
| Goodwill | 501.4 |
| Acquired intangible assets, net | 262.2 |
| Investments in long-term debt securities | 947.1 |
| Operating lease right-of-use assets | 461.3 |
| Other non-current assets | 382.6 |
| TOTAL ASSETS | 13,815.8 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | |
| Current liabilities | |
| Customers payable | 3,993.2 |
| Settlements payable | 257.0 |
| Accrued expenses and other current liabilities | 515.8 |
| Operating lease liabilities, current | 57.1 |
| PPP Liquidity Facility advances | 823.7 |
| Total current liabilities | 5,646.8 |
| Long-term debt | 4,841.3 |
| Operating lease liabilities, non-current | 404.6 |
| Other non-current liabilities | 186.4 |
| TOTAL LIABILITIES | 11,079.1 |
| Stockholders' equity | |
| Additional paid-in capital | 2,632.2 |
| Accumulated other comprehensive income | 7.8 |
| Retained earnings | 48.8 |
| Total stockholders' equity attributable to common stockholders | 2,688.8 |
| Non-controlling interests | 47.9 |
| Total stockholders' equity | 2,736.7 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 13,815.8 |

For personal use only

**88**

**(e) Square Historical Cash Flow Statements**

Square Historical Cash Flow Statements for the years ended 31 December 2019 and 31 December 2020, and the six months ended 30 June 2021, are presented below.

Table 5.3:  Square Historical Cash Flow Statements

| (US$ millions) | Year ended 31 December 2019 | Year ended 31 December 2020 | Six months ended 30 June 2021 |
|---|---|---|---|
| Cash flows from operating activities | | | |
| Net income | 375.3 | 213.0 | 242.8 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | |
| Depreciation and amortisation | 75.6 | 84.2 | 57.6 |
| Non-cash interest and other[1] | 33.5 | 76.1 | 11.3 |
| Loss on extinguishment of long-term debt | – | 6.7 | – |
| Non-cash lease expense | 29.7 | 70.3 | 41.0 |
| Share-based compensation | 297.9 | 397.8 | 265.0 |
| Gain on sale of asset group | (373.4) | – | – |
| Loss (gain) on revaluation of equity investment | 12.3 | (295.3) | (47.8) |
| Bitcoin impairment losses | – | – | 65.1 |
| Transaction and loan losses | 127.0 | 177.7 | 68.6 |
| Change in deferred income taxes | (1.4) | (8.0) | (0.5) |
| Changes in operating assets and liabilities | | | |
| Settlements receivable[2] | (326.6) | (547.5) | (221.0) |
| Customer funds | (204.2) | (1,151.5) | (758.0) |
| Purchases and originations of loans | (2,266.7) | (1,837.1) | (1,664.0) |
| Sales, principal payments, and forgiveness of loans | 2,168.7 | 1,505.4 | 1,284.1 |
| Customers payable | 523.8 | 1,733.1 | 985.3 |
| Settlements payable | 41.7 | 143.5 | 17.6 |
| Other assets and liabilities | (47.5) | (186.8) | (49.3) |
| Net cash provided by operating activities | 465.7 | 381.6 | 297.8 |
| Cash flows from investing activities | | | |
| Net cash flows from/(used in) purchase and maturities of marketable debt securities[3] | (149.0) | (337.9) | (864.9) |
| Purchase of property and equipment | (62.5) | (138.4) | (66.6) |
| Purchase of bitcoin investments[4] | – | (50.0) | (170.0) |
| Purchase of other investments[4] | (15.3) | (1.3) | (45.4) |
| Proceeds from sale of equity investments | 33.0 | – | 378.2 |
| Proceeds from sale of asset group | 309.3 | – | – |
| Business combinations, net of cash acquired | (20.4) | (79.2) | (164.3) |
| Net cash provided by/(used in) investing activities | 95.1 | (606.8) | (933.0) |

**89**

Section 5
Information on Square

| (US$ millions) | Year ended 31 December 2019 | Year ended 31 December 2020 | Six months ended 30 June 2021 |
|---|---|---|---|
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of convertible senior notes, net | – | 2,116.5 | – |
| Purchase of convertible senior note hedges | – | (338.1) | – |
| Proceeds from issuance of warrants | – | 232.1 | – |
| Proceeds from issuance of senior unsecured notes, net | – | – | 1,971.8 |
| Proceeds from PPP Liquidity Facility advances | – | 464.1 | 681.5 |
| Repayments of PPP Liquidity Facility advances | – | – | (322.0) |
| Payments for tax withholding related to vesting of restricted stock units | (212.3) | (314.0) | (292.2) |
| Proceeds from the exercise of stock options and purchases under the employee stock purchase plan | 118.5 | 162.0 | 72.2 |
| Other financing activities | (5.1) | (7.4) | – |
| **Net cash provided by/(used in) financing activities** | **(98.9)** | **2,315.2** | **2,111.3** |
| Effect of foreign exchange rate on cash and cash equivalents | 3.8 | 13.0 | (7.1) |
| **Net increase in cash, cash equivalents and restricted cash** | **465.9** | **2,103.0** | **1,469.0** |

Footnotes:

[1]    Non-cash interest and other for the year ended 31 December 2019 includes recovery of common stock in connection with indemnification settlement agreement (US$1.1m) which was presented as a separate line item in the 2019 10-K Annual Report. Square has reclassified this line item to Non-cash interest and other in the 2020 10-K Annual Report, and the 2019 historical comparative period has been restated in the above table to align with the presentation Square adopted for the year ended 31 December 2020. Square will continue to adopt this presentation going forward.

[2]    Charge-offs to accrued transaction losses were presented as a separate line item in the 2019 (US$78.3m) and 2020 (US$73.6m) 10-K Annual Reports, this has been reclassified in the above table to Settlements receivables for the year ended 31 December 2019 and 31 December 2020 to align with the presentation Square adopted in the 10-Q Quarterly Report for the 6 months ended 30 June 2021. Square will adopt this presentation going forward.

[3]    Net cash flows from/(used in) purchase and maturities of marketable debt securities is comprised of six separate line items that are individually reported in the 2019 and 2020 10-K Annual Reports and the 10-Q Quarterly Report for the 6 months ended 30 June 2021. These line items include purchase of marketable debt securities, proceeds from maturities of marketable debt securities, proceeds from sale of marketable debt securities, purchase of marketable debt securities from customer funds, proceeds from maturities of marketable debt securities from customer funds, and proceeds from sale of marketable debt securities from customer funds.

[4]    Purchase of bitcoin investments were classified in the Purchase of other investments (US$51.3m) line item in the 2020 10-K Annual Report. This has been reclassified in the above table to Purchase of bitcoin investments (US$50m) for the year ended 31 December 2020 to align with the presentation Square adopted in its 10-Q Quarterly Report for the 6 months ended 30 June 2021. Square will adopt this presentation going forward.

## (f)  Material changes in financial position since 30 June 2021

Other than as disclosed in this Scheme Booklet, within the knowledge of Square as at the date of this Scheme Booklet, the financial position of the Square Group has not materially changed since 30 June 2021, being the latest date of the statement of financial position available for the Square Group as disclosed in its 10-Q Quarterly Report for the six months ended 30 June 2021.

**90**



### (g) Financing

Long-term debt comprised the following as at 30 June 2021:

### (i) Revolving Credit Facility

In May 2020, Square entered into a revolving credit agreement with certain lenders, which provided a US$500.0 million senior unsecured revolving credit facility (the **2020 Credit Facility**) maturing in May 2023.

On 28 May 2020, Square amended the credit agreement for the 2020 Credit Facility (the **Credit Agreement**) to permit Square's wholly owned subsidiary, Square Capital, LLC (**Square Capital**), to incur indebtedness in an aggregate principal amount of up to US$500.0 million pursuant to the PPPLF authorised under the Federal Reserve Act of 1913. In connection with its convertible debt offerings in November 2020, Square entered into a second amendment to the Credit Agreement on 9 November 2020 to permit convertible debt in an aggregate principal amount not to exceed US$3.6 billion. On 28 January 2021, Square entered into a third amendment to the Credit Agreement to increase the amount of indebtedness that Square Capital is permitted to incur pursuant to the PPPLF from an aggregate principal amount of up to US$500.0 million to an aggregate principal amount of up to US$1.0 billion. On 25 May 2021, Square entered into a fourth amendment to the Credit Agreement to, among other things, extend the maturity date of the loans advanced to 1 May 2024.

The Credit Agreement also contains a financial covenant that requires Square to maintain a quarterly minimum liquidity amount (consisting of the sum of Unrestricted cash and Cash Equivalents plus Marketable Securities, each as defined in the Credit Agreement) of at least US$250.0 million, tested on a quarterly basis. Square is obligated to pay customary fees for a credit facility of this size and type including an unused commitment fee of 0.15%. As of 30 June 2021, no funds had been drawn and no letters of credit have been issued under the 2020 Credit Facility. US$500.0 million remained available for draw. Square incurred US$0.2 million and US$0.4 million in unused commitment fees during the three and six months ended 30 June 2021, respectively, compared to US$0.1 million for the three and six months ended 30 June 2020, respectively. As of 30 June 2021, Square was in compliance with all financial covenants associated with the 2020 Credit Facility.

Loans under the 2020 Credit Facility bear interest at Square's option of (i) a base rate based on the highest of the prime rate, the federal funds rate plus 0.50%, and the adjusted LIBOR rate plus 1.00%, in each case, plus a margin ranging from 0.25% to 0.75% or (ii) an adjusted LIBOR rate plus a margin ranging from 1.25% to 1.75%. The Credit Agreement includes provisions allowing Square to replace or update LIBOR with a replacement rate. The margin is determined based on Square's total leverage ratio, as defined in the Credit Agreement. The Credit Agreement also contains customary affirmative and negative covenants typical for a financing of this type that, among other things, restricts Square and certain of its subsidiaries' ability to incur additional indebtedness, create liens, merge or consolidate or make certain dispositions, pay dividends and make distributions, enter into restrictive agreements, enter into agreements with affiliates, and make certain investments and acquisitions.

### (ii) Paycheck Protection Program Liquidity Facility

On 2 June 2020, Square Capital was approved to borrow under the PPPLF with the Federal Reserve Bank of San Francisco (**First PPPLF Agreement**) at an annual interest rate of 0.35%. The PPPLF extends credit to eligible financial institutions that have originated or purchased PPP loans. Advances under the PPPLF are non-recourse and are secured by a pledge of PPP loans held by Square Capital. The maturity date of any PPPLF loan will be the maturity date of the PPP loans pledged to secure such PPPLF loan. The maturity date of any PPPLF loan will be accelerated on and to the extent of (i) the date of any loan forgiveness reimbursement by the SBA for any PPP loan securing such PPPLF loan; or (ii) the date of purchase by the SBA from Square Capital of any PPP loan securing such PPPLF loan to realise on the SBA's guarantee of such PPP loan.

The maturity date of all PPPLF loans shall be accelerated upon the occurrence of certain events of default by Square Capital, including but not limited to the failure to comply with a requirement of the PPPLF agreement or any representation, warranty, or covenant of Square Capital under the PPPLF agreement being inaccurate on or as of the date it is deemed to be made or on any date on which an PPPLF loan remains outstanding. Square can also at its option prepay the advances in full or in part without penalty. Square Capital also shall prepay PPPLF loans so that the amount of any PPPLF loans outstanding does not exceed the outstanding amount of PPP loans pledged to secure such PPPLF loans.

On 29 January 2021, Square Capital entered into a second PPPLF agreement with the Federal Reserve Bank of San Francisco (**Second PPPLF Agreement**) to secure additional credit collateralised by loans from the subsequent rounds of the PPP program in an aggregate principal amount of up to US$1.0 billion under both PPPLF agreements. As of 30 June 2021, US$823.7 million of PPPLF advances were outstanding and are, generally, collateralised by the same value of PPP loans. Any differences between the amounts are generally due to the timing of PPP loan repayment or forgiveness, and repayment of PPPLF advances.

**91**

Section 5
Information on Square

### (iii) Senior Unsecured Notes due in 2026 and 2031

On 20 May 2021, Square issued an aggregate principal amount of US$2.0 billion senior unsecured notes comprised of US$1.0 billion of senior unsecured notes due 2026 (**2026 Senior Notes**) and US$1.0 billion senior unsecured notes due 2031 (**2031 Senior Notes** and, together with the 2026 Senior Notes, the **Senior Notes**). The 2026 Senior Notes mature on June 1, 2026, unless earlier redeemed or repurchased, and bear interest at a rate of 2.75% payable semi-annually on 1 June and 1 December of each year. The 2031 Senior Notes mature on 1 June 2031, unless earlier redeemed or repurchased, and bear interest at a rate of 3.50% payable semi-annually on 1 June and 1 December of each year.

The Senior Notes are subject to optional redemption provisions. At any time prior to 1 May 2026, in the case of the 2026 Senior Notes, and 1 March 2031, in the case of the 2031 Senior Notes, Square may redeem the applicable series in whole or part at a price equal to 100% of the principal amount of the notes to be redeemed plus an applicable premium and accrued and unpaid interest, if any, to but excluding the redemption date. The applicable premium for any note is the greater of: (1) 1.0% of the principal amount of such note, and (2) the excess, if any, of (a) the present value at the redemption date of all scheduled payments of interest plus principal on such note (excluding accrued but unpaid interest, if any, to, but excluding, the redemption date) computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points, over (b) the principal amount of such note. At any time on or after 1 May 2026, in the case of the 2026 Senior Notes, and 1 March 2031, in the case of the 2031 Senior Notes, Square may redeem the notes of the applicable series in whole or part at a price of 100% of the principal amount of the notes to be redeemed plus accrued and unpaid interest, if any, to but excluding the redemption date.

If Square experiences a change of control triggering event (as defined in the applicable indenture governing the applicable Senior Notes), Square must offer to repurchase each series of Senior Notes at a repurchase price equal to 101% of the principal amount of the applicable notes to be repurchased, plus accrued and unpaid interest, if any, to, but excluding, the applicable repurchase date. In the event of default, the trustee or holders of at least 25% in aggregate principal amount of the applicable series of outstanding Senior Notes under the applicable indenture may declare all of the notes of the applicable series to be due and immediately payable. If the event of default is the result of specified events of bankruptcy, insolvency or reorganisation, all of the notes of the applicable series will become due without any declaration or action by the trustee or holders. If there is a default in the payment of interest, Square shall pay the defaulted interest plus, to the extent lawful, interest payable on the defaulted interest at the rate provided in the Senior Notes.

Debt issuance costs related to the 2026 Senior Notes and 2031 Senior Notes were comprised of discounts and commissions payable to the initial purchasers of US$22.5 million and third party offering costs of US$5.7 million. Issuance costs are amortised to interest expense using the effective interest method at an effective interest rate of 3.06% and 3.69% for each of the respective terms of the 2026 Senior Notes and 2031 Senior Notes, respectively.

### (iv) Convertible Notes due in 2026 and 2027

On 13 November 2020, Square issued an aggregate principal amount of US$1.15 billion of convertible senior notes comprised of US$575.0 million of convertible senior notes due 2026 (**2026 Convertible Notes**) and US$575.0 million of convertible senior notes due 2027 (**2027 Convertible Notes**). The 2026 Convertible Notes mature on 1 May 2026, unless earlier converted or repurchased, and bears a zero rate of interest. The 2027 Convertible Notes mature on 1 November 2027, unless earlier converted or repurchased, and bear interest at a rate of 0.25% payable semi-annually on 1 May and 1 November of each year. Both the 2026 Convertible Notes and 2027 Convertible Notes are convertible at an initial conversion rate of 3.3430 Square Class A Shares per US$1,000 principal amount, which is equivalent to an initial conversion price of approximately US$299.13 per Square Class A Share.

Holders may convert their relevant series of notes at any time prior to the close of business on the business day immediately preceding 1 February 2026 and 1 August 2027 for the 2026 Convertible Notes and 2027 Convertible Notes, respectively, only under the following circumstances: (1) during any calendar quarter, commencing after the calendar quarter ending on 31 March 2021 (and only during such calendar quarter), if the last reported sale price of Square Class A Shares for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price (as defined in the indenture governing the 2026 Convertible Notes and 2027 Convertible Notes) per US$1,000 principal amount of 2026 Convertible Notes and 2027 Convertible Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of Square Class A Shares and the conversion rate on each such trading day; (3) if Square calls any or all of the 2026 Convertible Notes and 2027 Convertible Notes for redemption, such relevant series of notes called for redemption may be converted at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (4) upon the occurrence of specified corporate events, including certain distributions, the occurrence of a fundamental change (as defined in the indenture governing the 2026 Convertible Notes and 2027 Convertible Notes) or a transaction resulting in Square Class A Shares converting into other securities or property or assets.

**92**

For personal use only

In addition, upon occurrence of the specified corporate events prior to the maturity date, Square would increase the conversion rate for a holder who elects to convert their relevant series of notes in connection with such an event in certain circumstances. On or after 1 February 2026 in the case of the 2026 Convertible Notes, and on or after 1 August 2027 in the case of the 2027 Convertible Notes, up until the close of business on the second scheduled trading day immediately preceding the maturity date, a holder of the relevant series of notes may convert all or any portion of its 2026 Convertible Notes or 2027 Convertible Notes regardless of the foregoing circumstances. Upon conversion, Square will pay or deliver, as the case may be, cash, Square Class A Shares, or a combination of cash and Square Class A Shares, at Square's election. The circumstances required to allow the holders to convert their 2026 Convertible Notes and 2027 Convertible Notes were not met during the six months ended 30 June 2021. On or after 5 November 2023 for the 2026 Convertible Notes, and on or after 5 November 2024 for the 2027 Convertible Notes, Square may redeem all or a portion of each series of convertible notes for cash at its option, if the last reported sale price of Square Class A Shares has been at least 130% of the conversion price for the relevant series of notes then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which Square provides notice of redemption at a redemption price equal to 100% of the principal amount of the 2026 Convertible Notes and 2027 Convertible Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date.

As of 30 June 2021, the if-converted value of the 2026 Convertible Notes and 2027 Convertible Notes did not exceed the outstanding principal amount.

### (v)  Convertible Senior Notes due in 2025

On 5 March 2020, Square issued an aggregate principal amount of US$1.0 billion of convertible senior notes (**2025 Convertible Notes**). The 2025 Convertible Notes mature on 1 March 2025, unless earlier converted or repurchased, and bear interest at a rate of 0.1250% payable semi-annually on 1 March and 1 September of each year. The 2025 Convertible Notes are convertible at an initial conversion rate of 8.2641 Square Class A Shares per US$1,000 principal amount of 2025 Convertible Notes, which is equivalent to an initial conversion price of approximately US$121.01 per Square Class A Share.

Holders may convert their 2025 Convertible Notes at any time prior to the close of business on the business day immediately preceding 1 December 2024 only under the following circumstances: (1) during any calendar quarter, commencing after the calendar quarter ending on 30 June 2020 (and only during such calendar quarter), if the last reported sale price of Square Class A Shares for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price (as defined in the indenture governing the 2025 Convertible Notes) per US$1,000 principal amount of 2025 Convertible Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of Square Class A Shares and the conversion rate on each such trading day; (3) if Square calls any or all of the 2025 Convertible Notes for redemption, such 2025 Convertible Notes called for redemption may be converted at any time prior to the close of business on the scheduled trading day immediately preceding the redemption date; or (4) upon the occurrence of specified corporate events, including certain distributions, the occurrence of a fundamental change (as defined in the indenture governing the 2025 Convertible Notes) or a transaction resulting in Square Class A Shares converting into other securities or property or assets.

In addition, upon occurrence of the specified corporate events prior to the maturity date, Square would increase the conversion rate for a holder who elects to convert their 2025 Convertible Notes in connection with such an event in certain circumstances. On or after 1 December 2024, up until the close of business on the second scheduled trading day immediately preceding the maturity date, a holder may convert all or any portion of its 2025 Convertible Notes regardless of the foregoing circumstances. Upon conversion, Square will pay or deliver, as the case may be, cash, Square Class A Shares, or a combination of cash and Square Class A Shares, at Square's election. Square may redeem for cash all or any part of the 2025 Convertible Notes, at its option, on or after 5 March 2023, if the last reported sale price of Square Class A Shares has been at least 130% of the conversion price for the 2025 Convertible Notes then in effect for at least 20 trading days (whether or not consecutive) during any 30 consecutive trading day period (including the last trading day of such period) ending on, and including, the trading day immediately preceding the date on which Square provides notice of redemption at a redemption price equal to 100% of the principal amount of the 2025 Convertible Notes to be redeemed, plus accrued and unpaid interest to, but excluding, the redemption date. The circumstances to allow the holders to convert their 2025 Convertible Notes were met in the first quarter of 2021.

As of 30 June 2021, the if-converted value of the 2025 Convertible Notes exceeded the outstanding principal amount by US$1.0 billion.

**93**

Section 5
Information on Square

For personal use only

**(vi) Convertible Senior Notes due in 2023**

On 25 May 2018, Square issued an aggregate principal amount of US$862.5 million of convertible senior notes (**2023 Convertible Notes**). The 2023 Convertible Notes mature on 15 May 2023, unless earlier converted or repurchased, and bear interest at a rate of 0.50% payable semi-annually on 15 May and 15 November of each year. The 2023 Convertible Notes are convertible at an initial conversion rate of 12.8456 shares of Square Class A Shares per US$1,000 principal amount of 2023 Convertible Notes, which is equivalent to an initial conversion price of approximately US$77.85 per Square Class A Share.

Holders may convert their 2023 Convertible Notes at any time prior to the close of business on the business day immediately preceding 15 February 2023 only under the following circumstances: (1) during any calendar quarter (and only during such calendar quarter), if the last reported sale price of Square Class A Shares for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price (as defined in the indenture governing the 2023 Convertible Notes) per US$1,000 principal amount of 2023 Convertible Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of Square Class A Shares and the conversion rate on each such trading day; or (3) upon the occurrence of specified corporate events, including certain distributions, the occurrence of a fundamental change (as defined in the indenture governing the 2023 Convertible Notes) or a transaction resulting in Square Class A Shares converting into other securities or property or assets. On or after 15 February 2023, up until the close of business on the second scheduled trading day immediately preceding the maturity date, a holder may convert all or any portion of its 2023 Convertible Notes regardless of the foregoing circumstances. Upon conversion, Square will pay or deliver, as the case may be, cash, Square Class A Shares, or a combination of cash and Square Class A Shares, at Square's election. The circumstances to allow the holders to convert their 2023 Convertible Notes were met in the fourth quarter of 2020 and continued to be met through 30 June 2021. As of 30 June 2021, certain holders of the 2023 Convertible Notes have converted an aggregate principal amount of US$113.4 million of their 2023 Convertible Notes. Square has settled the conversions through the issuance of 1.5 million Square Class A Shares.

As of 30 June 2021, the if-converted value of the 2023 Convertible Notes exceeded the outstanding principal amount by US$1.6 billion.

**(vii) Convertible Senior Notes due in 2022**

On 6 March 2017, Square issued an aggregate principal amount of US$440.0 million of convertible senior notes (**2022 Convertible Notes**). The 2022 Convertible Notes mature on 1 March 2022, unless earlier converted or repurchased, and bear interest at a rate of 0.375% payable semi-annually on 1 March and 1 September of each year. The 2022 Convertible Notes are convertible at an initial conversion rate of 43.5749 Square Class A Shares per US$1,000 principal amount of 2022 Convertible Notes, which is equivalent to an initial conversion price of approximately US$22.95 per Square Class A Share.

Holders may convert their 2022 Convertible Notes at any time prior to the close of business on the business day immediately preceding 1 December 2021 only under the following circumstances: (1) during any calendar quarter (and only during such calendar quarter), if the last reported sale price of Square Class A Shares for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day; (2) during the five business day period after any five consecutive trading day period (the "measurement period") in which the trading price (as defined in the indenture governing the 2022 Convertible Notes) per US$1,000 principal amount of 2022 Convertible Notes for each trading day of the measurement period was less than 98% of the product of the last reported sale price of Square Class A Shares and the conversion rate on each such trading day; or (3) upon the occurrence of specified corporate events, including certain distributions, the occurrence of a fundamental change (as defined in the indenture governing the 2022 Convertible Notes) or a transaction resulting in Square Class A Shares converting into other securities or property or assets. On or after 1 December 2021, up until the close of business on the second scheduled trading day immediately preceding the maturity date, a holder may convert all or any portion of its 2022 Convertible Notes regardless of the foregoing circumstances. Upon conversion, Square will pay or deliver, as the case may be, cash, Square Class A Shares, or a combination of cash and Square Class A Shares at Square's election. The circumstances required to allow the holders to convert their 2022 Convertible Notes were met in the fourth quarter of 2017 and continued to be met through 30 June 2021.

**94**

As of 30 June 2021, certain holders of the 2022 Convertible Notes have converted an aggregate principal amount of US$435.3 million of their 2022 Convertible Notes, of which US$3.8 million was converted during the six months ended 30 June 2021. Square has settled the conversions through a combination of US$219.4 million in cash and issuance of 16.3 million Square Class A Shares. The conversions during the six months ended 30 June 2021 were settled entirely in Square Class A Shares.

As of 30 June 2021, the if-converted value of the 2022 Convertible Notes exceeded the outstanding principal amount by US$45.4 million.

### (viii) Convertible Note Hedge and Warrant Transactions

In connection with the offering of the 2027 Convertible Notes, Square entered into convertible note hedge transactions (**2027 convertible note hedges**) with certain financial institution counterparties (**2027 Convertible Notes Counterparties**) whereby Square has the option to purchase a total of approximately 1.92 million Square Class A Shares at a price of approximately US$299.13 per share. The total cost of the 2027 convertible note hedge transactions was US$104.3 million. In addition, Square sold warrants (**2027 warrants**) to the 2027 Convertible Notes Counterparties whereby the 2027 Convertible Notes Counterparties have the option to purchase a total of 1.92 million Square Class A Shares at a price of approximately US$414.18 per share for the 2027 warrants. Square received US$68.0 million in cash proceeds from the sale of the 2027 warrants. Taken together, the purchase of the 2027 convertible note hedges and sale of the 2027 warrants are intended to reduce dilution from the conversion of the 2027 Convertible Notes and/or offset any cash payments Square is required to make in excess of the principal amount of the converted 2027 Convertible Notes, as the case may be, and to effectively increase the overall conversion price from approximately US$299.13 per share to approximately US$414.18 per share for the 2027 warrants. As these instruments are considered indexed to Square's own stock and are considered equity classified, the 2027 convertible note hedges and 2027 warrants are recorded in stockholders' equity, are not accounted for as derivatives and are not re-measured each reporting period. The net costs incurred in connection with the 2027 convertible note hedges and 2027 warrant transactions were recorded as a reduction to additional paid-in capital on the condensed consolidated balance sheets.

In connection with the offering of the 2026 Convertible Notes, Square entered into convertible note hedge transactions (**2026 convertible note hedges**) with certain financial institution counterparties (**2026 Convertible Notes Counterparties**) whereby Square has the option to purchase a total of approximately 1.92 million shares of Square Class A Shares at a price of approximately US$299.13 per share. The total cost of the 2026 convertible note hedges was US$84.6 million. In addition, Square sold warrants (**2026 warrants**) to the 2026 Convertible Notes Counterparties whereby the 2026 Convertible Notes Counterparties have the option to purchase a total of 1.92 million shares of Square Class A Shares at a price of approximately US$368.16 per share for the 2026 warrants. Square received US$64.6 million in cash proceeds from the sale of the 2026 warrants. Taken together, the purchase of the 2026 convertible note hedges and sale of the 2026 warrants are intended to reduce dilution from the conversion of the 2026 Convertible Notes and/or offset any cash payments Square is required to make in excess of the principal amount of the converted 2026 Convertible Notes, as the case may be, and to effectively increase the overall conversion price from approximately US$299.13 per share to approximately US$368.16 per share for the 2026 warrants. As these instruments are considered indexed to Square's own stock and are considered equity classified, the 2026 convertible note hedges and 2026 warrants are recorded in stockholders' equity, are not accounted for as derivatives and are not remeasured each reporting period. The net costs incurred in connection with the 2026 convertible note hedges and 2026 warrants were recorded as a reduction to additional paid-in capital on the condensed consolidated balance sheets.

In connection with the offering of the 2025 Convertible Notes, Square entered into convertible note hedge transactions (**2025 convertible note hedges**) with certain financial institution counterparties (**2025 Convertible Notes Counterparties**) whereby Square has the option to purchase a total of approximately 8.26 million Square Class A Shares at a price of approximately US$121.01 per share. The total cost of the 2025 convertible note hedges was US$149.2 million. In addition, Square sold warrants (**2025 warrants**) to the 2025 Convertible Notes Counterparties whereby the 2025 Convertible Notes Counterparties have the option to purchase a total of 8.26 million Square Class A Shares at a price of approximately US$161.34 per share. Square received US$99.5 million in cash proceeds from the sale of the 2025 warrants. Taken together, the purchase of the 2025 convertible note hedges and sale of the 2025 warrants are intended to reduce dilution from the conversion of the 2025 Convertible Notes and/or offset any cash payments Square is required to make in excess of the principal amount of the converted 2025 Convertible Notes, as the case may be, and to effectively increase the overall conversion price from approximately US$121.01 per share to approximately US$161.34 per share. As these instruments are considered indexed to Square's own stock and are considered equity classified, the 2025 convertible note hedges and 2025 warrants are recorded in stockholders' equity, are not accounted for as derivatives and are not remeasured each reporting period. The net costs incurred in connection with the 2025 convertible note hedges and 2025 warrants were recorded as a reduction to additional paid-in capital on the condensed consolidated balance sheets.

For personal use only

## 95

Section 5
Information on Square

In connection with the offering of the 2023 Convertible Notes, Square entered into convertible note hedge transactions (**2023 convertible note hedges**) with certain financial institution counterparties (**2018 Counterparties**) whereby Square has the option to purchase a total of approximately 11.1 million Square Class A Shares at a price of approximately US$77.85 per share. The total cost of the 2023 convertible note hedges was US$172.6 million. In addition, Square sold warrants (**2023 warrants**) to the 2018 Counterparties whereby the 2018 Counterparties have the option to purchase a total of 11.1 million Square Class A Shares at a price of approximately US$109.26 per share. Square received US$112.1 million in cash proceeds from the sale of the 2023 warrants. Taken together, the purchase of the 2023 convertible note hedges and sale of the 2023 warrants are intended to reduce dilution from the conversion of the 2023 Convertible Notes and/or offset any cash payments Square is required to make in excess of the principal amount of the converted 2023 Convertible Notes, as the case may be, and to effectively increase the overall conversion price from approximately US$77.85 per share to approximately US$109.26 per share. As these instruments are considered indexed to Square's own stock and are considered equity classified, the 2023 convertible note hedges and 2023 warrants are recorded in stockholders' equity, are not accounted for as derivatives and are not remeasured each reporting period. The net costs incurred in connection with the 2023 convertible note hedges and 2023 warrants were recorded as a reduction to additional paid-in capital on the condensed consolidated balance sheets. Square also exercised a pro-rata portion of the 2023 convertible note hedges, which were immaterial as of 30 June 2021.

In connection with the offering of the 2022 Convertible Notes, Square entered into convertible note hedge transactions (**2022 convertible note hedges**) with certain financial institution counterparties (**2017 Counterparties**) whereby Square has the option to purchase a total of approximately 19.2 million Square Class A Shares at a price of approximately US$22.95 per share. The total cost of the 2022 convertible note hedge transactions was US$92.1 million. In addition, Square sold warrants (**2022 warrants**) to the 2017 Counterparties whereby the 2017 Counterparties have the option to purchase a total of 19.2 million Square Class A Shares at a price of approximately US$31.18 per share. Square received US$57.2 million in cash proceeds from the sale of the 2022 warrants. Taken together, the purchase of the 2022 convertible note hedges and sale of the 2022 warrants are intended to reduce dilution from the conversion of the 2022 Convertible Notes and/or offset any cash payments Square is required to make in excess of the principal amount of the converted 2022 Convertible Notes, as the case may be, and to effectively increase the overall conversion price from approximately US$22.95 per share to approximately US$31.18 per share. As these instruments are considered indexed to Square's own stock and are considered equity classified, the 2022 convertible note hedges and 2022 warrants are recorded in stockholders' equity, are not accounted for as derivatives and are not remeasured each reporting period. The net costs incurred in connection with the 2022 convertible note hedges and 2022 warrants were recorded as a reduction to additional paid-in capital on the condensed consolidated balance sheets. Square has exercised a pro-rata portion of the 2022 convertible note hedges to offset the Square Class A Shares issued to settle the conversion of the 2022 Convertible Notes discussed above. The 2022 convertible note hedges were net share settled, and as of 30 June 2021, Square has received 14.9 million Square Class A Shares from the 2017 Counterparties, of which 0.2 million was received in the quarter ended 30 June 2021.

## 5.11.  Market Risk Position and Policy

Square financing arrangements as at 30 June 2021 are described at section 5.10(g). In addition to those arrangements, Square monitors, and considers the use of, a variety of techniques to mitigate the impact of market risks including credit risk, interest rate risk, currency risk and bitcoin market price risk.

### (a) Credit risk

Financial instruments that potentially subject Square to concentrations of credit risk consist primarily of cash and cash equivalents, restricted cash, marketable debt securities, settlements receivable, customer funds, reverse repurchase agreements, loans held for sale, and loans held for investment.

Square mitigates the associated risk of concentration for cash and cash equivalents and restricted cash by banking with creditworthy institutions. At certain times, amounts on deposit exceed federal deposit insurance limits. Square also mitigates the associated risk of concentration for marketable debt securities by holding a diversified portfolio of highly rated investments. Further, settlements receivable are amounts due from well-established payment processing companies and normally take one or two business days to settle, which mitigates the associated risk of concentration. The associated risk with reverse repurchase agreements is mitigated by the securities held as collateral and their short-term nature. The associated risk of concentration for loans held for sale and loans held for investment are partially mitigated by credit evaluations that are performed prior to facilitating the offering of and origination of loans and ongoing performance monitoring of Square's loan customers. Square considers the risk associated with the PPP loans to be low due to government guarantees on those loans.



For personal use only

For the three and six months ended 30 June 2021 and 30 June 2020, Square had no customer that accounted for greater than 10% of total net revenue. Square had two third-party payment processors that represented approximately 49% and 36% of settlements receivable as of 30 June 2021. As of 31 December 2020, there were two parties that represented approximately 59% and 27% of settlements receivable. All other third-party processors were insignificant.

### (b) Interest rate risk

Square's cash and cash equivalents, and marketable debt securities as of 30 June 2021, were held primarily in cash deposits, money market funds, US government and agency securities, commercial paper, and corporate bonds. The fair value of Square's cash, cash equivalents, and marketable debt securities would not be significantly affected by either an increase or decrease in interest rates due mainly to the short-term nature of a majority of these instruments. Square also has the ability to hold these instruments until maturity if necessary to reduce its risk. Any future borrowings incurred under Square's credit facility would accrue interest at a floating rate based on a formula tied to certain market rates at the time of incurrence. A hypothetical 10% increase or decrease in interest rates would not have a material effect on Square's financial results.

### (c) Currency risk

Most of Square's revenue is earned in US dollars and therefore Square's revenue is not currently subject to significant foreign currency risk. While Square's foreign operations are denominated in the currencies of the countries in which those operations are located, and may be subject to fluctuations due to changes in foreign currency exchange rates, a 10% increase or decrease in current exchange rates would not have a material impact on Square's financial results.

### (d) Bitcoin market price risk

Square invested US$50.0 million and US$170.0 million in bitcoin in the fourth quarter of 2020 and first quarter of 2021, respectively. Bitcoin is accounted for as an indefinite lived intangible asset and is thus subject to impairment losses if the fair value of bitcoin decreases below the carrying value during the assessed reporting period. Impairment losses cannot be recovered for any subsequent increase in fair value until the sale of the asset. As of 30 June 2021, the fair value of the investment in bitcoin was US$281.4 million based on observable market prices resulting in US$126.5 million in unrecognised gains. Square recorded an impairment charge of US$45.3 million and US$65.1 million in the three and six months ended 30 June 2021 due to fluctuations in the market price of bitcoin observed during the period. A hypothetical 10% increase or decrease in the market price of bitcoin as of 30 June 2021 would have resulted in approximately US$15.5 million increase or decrease in the value of the bitcoin investment. Any decreases to the carrying value of bitcoin assets are recorded in operating expenses in Square's condensed consolidated statements of operations.

## 5.12. Capital Structure

As at the date of this Scheme Booklet, Square is authorised to issue 1,600,000,000 shares of capital stock comprising:

(a)  1,000,000,000 Square Class A Shares, par value US$0.0000001 per share;

(b)  500,000,000 shares of Square Class B Shares, par value US$0.0000001 per share; and

(c)  100,000,000 shares of preferred stock, par value US$0.0000001 per share.

As at 28 October 2021, Square had outstanding:

(a)  399,412,363 Square Class A Shares; and

(b)  62,100,770 Square Class B Shares.

Square does not have any equity compensation plans that are not approved by Square stockholders. Except with respect to voting rights and conversion rights, Square Class A Shares and Square Class B Shares are treated equally and identically.

See section 5.15 for a summary of the rights attaching to New Square Securities.

As at 28 October 2021, Square is party to obligations under which it has agreed to issue new Square Class A Shares in the future (not in connection with the Scheme) as set out in the table below and described in detail in section 5.15.

**97**

Section 5
Information on Square

Square has also issued Square Convertible Notes and entered into related hedge and warrant transactions, which are described in detail in sections 5.10(g)(iv)–(viii).

| Grant type | Maximum number of Square Shares underlying RSAs, RSUs and Options |
| --- | --- |
| Restricted Stock Awards | 118,218 |
| Restricted Stock Units | 13,775,823 |
| Options | 9,379,446 |
| Maximum total number of Square Shares underlying all RSAs, RSUs and Options | 23,273,487 |

## 5.13. Substantial Holders

Based on public filings made by institutional investment managers and other holders of 5% or more of Square Class A Shares or Square Class B Shares, as well as information provided by Square Directors and executive officers, Square is aware that the following persons beneficially owned more than 5% of all Square Shares as of 31 July 2021:

| | Number of Square shares | | |
| --- | --- | --- | --- |
| Stockholder | Square Class A Shares | Square Class B Shares | Total voting power |
| Morgan Stanley[1] | 6.11% | * | 2.38% |
| The Vanguard Group[2] | 6.06% | * | 2.36% |
| BlackRock Inc.[3] | 5.26% | * | 2.05% |
| Jack Dorsey[4] | * | 78.40% | 47.84% |
| James McKelvey[5] | * | 20.60% | 12.58% |

\* Represents beneficial ownership of less than one percent (1%) of the outstanding shares of Square common stock.

Footnotes:

[1] Based solely on a Schedule 13G/A, reporting beneficial ownership as of 31 December 2020, filed with the SEC on 12 February 2021, with sole dispositive power over 0 shares of Square Class A common stock, sole voting power over 0 shares of Square Class A common stock, shared dispositive power over 24,316,533 shares of Square Class A common stock and shared voting power over 18,958,700 shares of Square Class A common stock. The address for Morgan Stanley is 1585 Broadway, New York, NY 10036.

[2] Based solely on a Schedule 13G/A, reporting beneficial ownership as of 31 December 2020, filed with the SEC on 10 February 2021, with sole dispositive power over 23,237,356 shares of Square Class A common stock, sole voting power over 0 shares of Square Class A common stock, shared dispositive power over 895,398 shares of Square Class A common stock and shared voting power over 391,289 shares of Square Class A common stock. The address for The Vanguard Group is 100 Vanguard Blvd., Malvern, PA 19355.

[3] Based solely on a Schedule 13G/A, reporting beneficial ownership as of 31 December 2020, filed with the SEC on 5 February 2021, with sole dispositive power over 20,935,606 shares of Square Class A common stock, and sole voting power over 18,084,122 shares of Square Class A common stock. The address for BlackRock, Inc. is 55 East 52nd Street, New York, NY 10055.

[4] Consists of (i) 36,763,992 shares of Square Class B common stock held of record by the Jack Dorsey Revocable Trust u/a/d 12/8/10, for which Mr Dorsey serves as trustee, and (ii) 12,080,574 shares of Square Class B common stock held of record by Start Small LLC, which Mr Dorsey manages.

[5] Consists of (i) 2,768 shares of Square Class A common stock and 200,000 shares of Square Class B common stock held of record by Mr McKelvey, (ii) 12,631,216 shares of Square Class B common stock held of record by the James McKelvey, Jr. Revocable Trust dated 2 July 2014, for which Mr McKelvey serves as trustee, and (iii) 175,000 shares of Square Class A common stock held of record by the Anna Elefteria Ntenta Revocable Trust dated 30 November 2017.

**98**

## 5.14. Employee Incentive Schemes

Square sponsors two share-based employee compensation plans under which equity awards have been granted:

(a)  the Square Inc. 2009 Stock Plan (**2009 Plan**); and

(b)  the Square Inc. 2015 Equity Incentive Plan, as amended and restated (**2015 Plan**),

together the **Equity Plans**.

The 2015 Plan serves as the successor to the 2009 Plan. The 2015 Plan became effective as of 17 November 2015. Outstanding awards under the 2009 Plan continue to be subject to the terms and conditions of the 2009 Plan. Since 17 November 2015, no additional awards have been nor will be granted in the future under the 2009 Plan.

In addition, Square maintains the Square 2015 Employee Stock Purchase Plan (**ESPP**), under which awards may also be granted. The ESPP became effective on 17 November 2015.

The Equity Plans and ESPP are administered by the Square Board and its Compensation Committee.

### (a)  Equity Plans

Under the 2015 Plan, Square Class A Shares are reserved for the issuance of incentive and non-statutory stock options (**ISOs** and **NSOs**, respectively, together being **Options**), restricted stock awards (**RSAs**), restricted stock units (**RSUs**), performance shares (**PSs**), and stock bonuses (together with Options, RSAs, RSUs and PSs, **Awards**) to eligible participants. Under the 2009 Plan, shares of common stock are reserved for the issuance of Options to eligible participants.

(i)  **Eligibility and transferability:** Employees, directors and consultants of Square are eligible to participate in the Equity Plans (collectively, the **Participants**). Awards are generally non-transferable; however, the plan administrator may permit transfers to family members in certain circumstances.

(ii)  **Share limits and outstanding Awards:** Initially, 30,000,000 shares were reserved under the 2015 Plan and any shares subject to options or other similar awards granted under the 2009 Plan that expire, are forfeited, are repurchased by Square or otherwise terminate unexercised will become available under the 2015 Plan. The number of shares available for issuance under the 2015 Plan will be increased on the first day of each fiscal year, in an amount equal to the least of (i) 40,000,000 shares, (ii) 5% of the outstanding shares on the last day of the immediately preceding fiscal year, or (iii) such number of shares determined by the administrator of the Plan.

(iii)  **Options:** Options under the Equity Plans must generally be granted at a price per share not less than the fair market value at the date of grant. Options granted generally vest over a 4-year term from the date of grant, at a rate of 25% after one year, then monthly on a straight-line basis thereafter.

The 2009 Plan allows for early exercise of Options whereby the Option holder is allowed to exercise prior to vesting. Any unvested shares are subject to repurchase by Square at their original exercise prices.

The Square Compensation Committee determines the number of shares of Square common stock subject to each Option, its exercise price, its duration and the manner and time of its exercise. The Square Compensation Committee may provide that any Option is subject to vesting limitations that make it exercisable during its entire duration or during any lesser period of time.

A summary of Option activity for the six months ended 30 June 2021 is as follows (in thousands, except share and per share data):

| | Number of Stock Options Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at 31 December 2020 | 13,630,882 | 17.84 | 3.84 | 2,723,394 |
| Granted | 183,441 | 253.79 | | |
| Exercised | (2,941,086) | 12.92 | | |
| Balance at 31 December 2020 | 10,873,237 | 23.16 | 4.03 | 2,400,927 |
| Options exercisable as of 30 June 2021 | 9,415,552 | 13.51 | 3.32 | 2,168,406 |

# 99

Section 5
Information on Square

For personal use only



Aggregate intrinsic value represents the difference between Square's estimated fair value of its common stock and the exercise price of outstanding, "in-the-money" Options. Aggregate intrinsic value for Options exercised for the years ended 31 December 2020, 2019, and 2018 was US$1.2 billion, US$616.3 million, and US$720.1 million, respectively.

The total weighted average grant-date fair value of options granted was US$27.04, US$30.58 and US$16.25 per share for the years ended 31 December 2020, 2019 and 2018, respectively.

(iv) **RSAs, RSUs and PSs:** The Square Compensation Committee may grant RSAs and RSUs, being rights to receive shares of Square common stock at a specified future time, and PSs, being rights to receive shares of Square common stock at a specified future time and based on satisfaction of applicable performance goals. The Compensation Committee may also establish certain conditions and restrictions, including the period of restriction, purchase price, and with respect to PSs, the performance periods and goals. Subject to the satisfaction of applicable restrictions or performance goals during the applicable performance period, shares of common stock are generally delivered at settlement of the RSA, RSU or PS.

Payment of RSUs and PSs may be in cash, shares of Square common stock or some combination thereof, but generally such payment has been in shares of Square common stock.

Square issues RSAs and RSUs under the 2015 Plan, which typically vest over a term of 4 years.

Activity related to RSAs and RSUs during the six months ended 30 June 2021 is set out below:

| | Number of shares | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested as of 31 December 2020 | 15,622,645 | 71.71 |
| Granted | 3,344,454 | 241.35 |
| Vested | (3,561,075) | 58.31 |
| Forfeited | (463,928) | 85.96 |
| Unvested as of 30 June 2021 | 14,942,096 | 112.43 |

The total fair value of shares vested in the year ended 31 December 2020, 2019, and 2018 were US$817.5 million, US$552.9 million, and US$489.3 million, respectively.

## (b) Square Employee Stock Purchase Plan (ESPP)

The ESPP allows eligible employees of Square to purchase shares of Square's common stock at a discount through payroll deductions of up to 15% of their eligible compensation (or 25% for offering periods that commence after 1 November 2019), subject to any plan limitations.

The ESPP provides for 12-month offering periods, scheduled to start on the first trading day on or after 15 May and 15 November of each year. Each offering period includes two purchase periods, which begin on the first trading day on or after 15 November and 15 May, and ending on the last trading day on or before 15 May and 15 November, respectively. Employees are able to purchase shares at 85% of the lower of the fair market value of Square's common stock on the first trading day of the offering period or the last trading day of the purchase period.

The number of shares available for sale under the ESPP is to be increased annually on the first day of each fiscal year, equal to the least of (i) 8,400,000 shares, (ii) 1% of the outstanding shares of Square's common stock as of the last day of the immediately preceding fiscal year, or (iii) such other amount as determined by the administrator.

As of 31 December 2020, 5,829,106 shares had been purchased under the ESPP and 17,816,248 shares were available for future issuance under the ESPP.

At the end of each offering, options issued will be exercised and the accumulated payroll deductions are also required to be retained by Square as full payment of the option price unless the Participant elects prior to the exercise date to receive a cash payout of the accumulated payroll deductions instead. Each Participant is entitled to receive a number of whole shares of Square common stock equal to the accumulated payroll deductions credited to the Participant's account as of the exercise date divided by the option price.

Prior to the exercise date, a Participant may withdraw and request payment of an amount in cash equal to the accumulated payroll deductions credited to the Participant's account. Cash payments will also be made if the Participant is terminated or dies prior to the exercise date.

# 100

## 5.15.  Rights Attaching to Square Issued Securities

### (a) Common stock

#### (i)   Voting rights

Holders of Square Class A Shares are entitled to one vote per share and holders of Square Class B Shares are entitled to ten votes per share on all matters to be voted upon by the stockholders. The holders of Square Class A Shares and Class B Shares will generally vote together as a single class on all matters submitted to a vote of its stockholders, unless otherwise required by US Delaware law or Square's amended and restated certificate of incorporation. The holders of Square's common stock do not have cumulative voting rights in the election of directors.

#### (ii)  Dividends

Holders of Square's common stock are entitled to rateably receive dividends if, as, and when declared from time to time by the Square Board, after payment of any dividends required to be paid on preferred stock. Under US Delaware law, Square can only pay dividends either out of "surplus" or out of the current or the immediately preceding year's net profits. Surplus is defined as the excess, if any, at any given time, of the total assets of a corporation over its total liabilities and statutory capital. The value of a corporation's assets can be measured in a number of ways and may not necessarily equal its book value.

#### (iii)  Right to receive liquidation distributions

Upon Square's dissolution, liquidation, or winding-up, the assets legally available for distribution to its stockholders are distributable rateably among the holders of its common stock, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights and payment of liquidation preferences, if any, on any shares of preferred stock.

#### (iv) Conversion

Each Square Class B Share is convertible at any time at the option of the holder into one Square Class A Share. In addition, subject to certain exceptions, each share of Square's Class B Shares will convert automatically into one Square Class A Share upon any transfer, whether or not for value. All outstanding Square Class B Shares will convert into Square Class A Shares when the Square Class B Shares represent less than 5% of the combined voting power of Class A and Class B Shares.

#### (v)  Other matters

Square's common stock has no pre-emptive rights and no redemption or sinking fund provisions apply to it.

### (b) New Square Securities

There are no differences between the rights attaching to the New Square Shares and the rights of other outstanding Square Class A Shares. There are certain differences between the New Square CDIs and New Square Shares, and thus by extension other outstanding Square Class A Shares. A summary of these differences is set out in section 3.4(a). There are also a number of differences between US/Delaware law and Australian law, a summary of which is set out in section 9.

## 5.16.  Recent Square Class A Share price performance

The below chart shows the performance of Square Shares on NYSE over the last 2 years.

As at the close of trading on NYSE on 29 October 2021, being the last practicable day before the date of this Scheme Booklet:

(a)  the last recorded trading price of Square Class A Shares on NYSE was US$254.50; and

(b)  the lowest and highest closing prices of Square Class A Shares during the previous 3 months were US$226.25 and US$281.81,

respectively.

# 101

Section 5
Information on Square

As at 30 July 2021, being the last trading day before Afterpay and Square announced that they had entered into the Scheme Implementation Deed, the closing price of Square Class A Shares on NYSE was US$247.26.



## 5.17. Litigation

Square is currently subject to, and may in the future be involved in, various litigation matters, legal claims, and investigations. Square is subject to various legal matters and disputes arising in the ordinary course of business. Square cannot at this time fairly estimate a reasonable range of exposure, if any, of the potential liability with respect to these matters.

Although occasional adverse decisions or settlements may occur, Square does not believe that the final disposition of any of these matters will have a material adverse effect on its results of operations, financial position, or liquidity. Square cannot give any assurance regarding the ultimate outcome of these matters, and their resolution could be material to Square's operating results for any particular period.

## 5.18. No Pre-Transaction Benefits

Except as provided in this Scheme Booklet, during the period of 4 months before the date of this Scheme Booklet, neither Square nor any associate of Square gave, or offered to give, a benefit to another person which was likely to induce the other person, or an associate of the other person, to:

(a)   vote in favour of the Scheme; or

(b)   dispose of Afterpay Shares,

and which will not be provided to all Scheme Shareholders under the Scheme.

## 5.19. Existing Interests in Afterpay Shares

With the exception of the interests of Mr Summers and Mr Botha which are detailed above in section 5.8(a), neither Square nor any of its associates has a Relevant Interest in Afterpay Shares as at the date of this Scheme Booklet.

## 5.20. Dealing in Afterpay Shares in Previous 4 Months

Except for the consideration to be provided under the Scheme, and the arrangements involving Mr Summers and Mr Botha which are detailed above in section 5.8(a) neither Square nor any of its associates has provided, or agreed to provide, consideration for any Afterpay Shares under any purchase or agreement during the period of four months before the date of this Scheme Booklet.

## 5.21. Further Information

Square files annual, quarterly and current reports, proxy statements and other information with the SEC. Square's SEC filings are available to the public at the SEC's website at www.sec.gov or at Square's website at www.squareup.com.

# 102

For personal use only

**Section 6**

# Overview of the Combined Group



This section of the Scheme Booklet contains information in relation to the Combined Group that will be created if the Scheme is implemented.

## 6.1.  Overview of the Combined Group

### (a) Overview

Square and Afterpay are each industry leaders with best-in-class products and have a strong cultural alignment.

| A shared vision and culture |
|---|

| Vision | Culture |
|---|---|
| Shared focus on empowering merchants and consumers | Founder-led, entrepreneurial management teams with shared purpose, vision, and strong collaboration between leadership teams to guide integration and synergies |

Our common purpose

**"Economic empowerment"**
– Square

**"Power an economy in which everyone wins"**
– Afterpay

# 103

## Section 7

# Key Risks

## 7.1. Overview

In considering the Scheme you should be aware that there are a number of risk factors, both general and specific, associated with the Scheme. This section describes a number of key risks associated with:

- the business and operations of Afterpay, including your current investment in Afterpay Shares;
- implementation of the Scheme;
- operations of the Combined Group;
- trading;
- New Square Securities; and
- share ownership.

A significant number of these risks are, or will be, risks to which Afterpay Shareholders are already exposed. However, as the nature of the Combined Group's business will differ from that of Afterpay as a standalone business, Afterpay Shareholders will be potentially exposed to additional risks in respect of the Combined Group.

The information set out in this section is a summary only, should be considered in conjunction with other information contained in this Scheme Booklet and is not, and should not be relied on as, an exhaustive list of the risks that Afterpay Shareholders may face or to which you may be exposed.

These risks are general in nature and have been prepared without reference to the investment objectives, financial and taxation situation or particular needs of any Afterpay Shareholder or any other person.

Additional risks and uncertainties that Afterpay and Square are currently unaware of, or that may currently be considered immaterial, may also become important factors that can adversely affect the Combined Group's operating and financial performance.

## 7.2. Risks Relating to the Business and Operations of Afterpay

Risk factors in respect of the Afterpay business that Shareholders will remain exposed to if the Scheme does not proceed are described below.

### (a) Compliance with laws, regulations and industry standards

Afterpay operates in a range of jurisdictions including Australia, New Zealand, North America, Spain, Italy, France and the UK. Afterpay's business principally consists of providing financial services to consumers and is therefore subject to significant regulation and different regulatory frameworks in the various jurisdictions in which Afterpay operates.



**104**

Section 7
Key Risks

For personal use only

Afterpay is also exposed to a number of regulatory risks including risks associated with anti-money laundering, counter-terrorism financing, anti-bribery and corruption and sanctions laws, payment system regulation, privacy laws, compliance costs, product design and conduct. Furthermore, with the geographic expansion of Afterpay's business, Afterpay may become subject to additional legal, regulatory, tax, licensing, compliance requirements and industry standards.

Afterpay must maintain robust internal systems, processes and controls to ensure that Afterpay and its employees and representatives comply with these legal obligations. Failure to comply with any applicable laws and regulations in Australia, New Zealand, North America, Spain, Italy, France or the UK may result in legal or regulatory sanctions or enforcement action.

Regulators have become increasingly focussed on the BNPL industry as it continues to grow, and such increased regulatory interest may lead to new or modified laws or regulations or regulatory guidance which may adversely affect Afterpay's business and operations. In addition, existing laws or regulations may be subject to differing or new interpretations by regulators and others over time.

### (b) Changing laws, regulations and industry standards

Afterpay operates within a changing regulatory landscape. This changing regulatory landscape, and the increased scrutiny of industry participants' compliance with regulatory requirements and recent proposed regulation relating to the BNPL industry, may lead to new or modified laws or regulations which may adversely affect Afterpay's business and operations. There is a risk that such changes in laws, regulations or industry standards may impose significant compliance costs, or even make it uneconomic for Afterpay to continue to operate in its current markets, or to expand in accordance with its strategy. This may materially and adversely impact Afterpay's ability to achieve its strategic goals, and negatively impact its revenue and profitability by preventing its business from reaching sufficient scale in particular markets. Afterpay's inability, or perceived inability, to comply with new compliance obligations could lead to a regulator investigating Afterpay, which could result in administrative or enforcement action, such as fines, penalties, and/or enforceable undertakings. This could also damage Afterpay's reputation. New and stricter laws and regulations or changing interpretations of existing laws and regulations, or industry standards to which Afterpay may become subject, could require the implementation of new or more demanding procedures that may carry higher compliance costs, and/or impact on Afterpay's ability to execute its strategy.

### (c) Loss of key contracts and relationships

Afterpay's business depends on its contracts and relationships with significant merchants, strategic partners (including strategic payment partners) and end customers. There can be no guarantee that these contracts and relationships will continue or, if they do continue, that they remain successful. Afterpay's contracts with merchants and strategic payment partners can generally be terminated on short notice. Any loss of Afterpay's key merchants, strategic partners and end customers or a failure to secure new merchants, strategic partners or customers on favourable terms, may materially and adversely impact Afterpay's results from operations and profitability, and also have a negative impact on Afterpay's reputation and prospects.

### (d) Competitors and new entrants

Afterpay operates in the highly competitive consumer finance sector. This sector includes the provision of a range of products that enable customers to purchase goods and services for no (or nominal) upfront costs, such as personal loans, credit cards, and BNPL products. There are a number of different competitors in the BNPL space, ranging from start-ups to established financial institutions and global payments providers, who currently offer, have announced an intention to offer, or who have the capability to offer in the future, BNPL services in Australia and/or in Afterpay's other key markets. Afterpay also competes more broadly with financial institutions and other payments providers in the broader payments space. Existing competitors and new competitors both in Australia and elsewhere, may engage in aggressive customer and/or merchant acquisition campaigns, develop superior technology offerings or consolidate with other entities to deliver enhanced scale benefits. Such competitive pressures may materially erode Afterpay's share and revenue, or prevent or limit its growth, and may materially and adversely impact Afterpay's results from operations, profitability and prospects.

### (e) Exposure to Afterpay's end customer bad debts

A major part of Afterpay's operations and earnings depends on Afterpay's revenue generated from BNPL services used by customers and Afterpay's ability to recoup the purchase value of those services. Afterpay relies on its technology to assess end customers' repayment capability for each transaction. Prolonged miscalculation of customers' repayment ability, or a material increase in repayment failures due to job losses or other adverse events, such as events consequential to the COVID-19 outbreak and related containment measures taken in response to the pandemic, or other macroeconomic events, may cause Afterpay's

**105**

For personal use only

business to be overly exposed to bad debts due to increased customers' failure to meet their repayment obligations to Afterpay. Afterpay also has exposure, to the potential insolvency of a merchant to which Afterpay has advanced funds. This may materially and adversely impact Afterpay's results from operations, profitability and prospects.

### (f)  Funding

Afterpay has receivables financing arrangements in Australia, New Zealand, the United States and the United Kingdom (**Warehouse Facilities**) to support Afterpay's funding of purchases by customers. If repayments are not made or certain terms and conditions are not satisfied under the Warehouse Facilities, lenders may terminate their respective financing arrangements. In these circumstances, Afterpay's capacity to pay merchants in advance of collecting purchase price instalments from customers may be diminished if Afterpay is unable to secure financing from other lenders on equivalent terms or at all. This would significantly slow down Afterpay's growth and may impair Afterpay's ability to finance its business.

### (g) Failures or disruptions to technology systems and communication networks

Afterpay relies on technology and third-party communication networks to assess customer repayment capabilities. There is a risk that these systems may fail to perform as expected or be adversely impacted by a number of factors outside of Afterpay's control.

This includes damage, equipment faults, power failure, fire, natural disasters, computer viruses and external malicious interventions such as hacking, ransomware or denial-of-service attacks. This may cause part or all of Afterpay's technology system and/or the communication networks to become unavailable.

There is a risk that repeated failures to keep Afterpay's technology available may result in reduced customers or merchants cancelling their contracts with Afterpay. This may materially and adversely impact Afterpay's business, results from operations, profitability, as well as negatively impacting Afterpay's reputation and prospects.

### (h)  Banking and payment processing performance

Afterpay relies on online payment gateways, banking and financial and other institutions, and POS devices for the validation of payment methods (such as bank cards), processing and settlement of payments. As a result of these interdependent and complex systems, any technology failures, cyber attacks, information security breaches or other disruptions to such platforms and technology may affect Afterpay's ability to effect transactions or service its clients and have an adverse impact on its business, results from operations, profitability and prospects.

### (i)   Third-party network infrastructure providers

Afterpay relies on third-party service providers to maintain its network infrastructure for software application offerings. Such network infrastructure involves major risks including, (i) any breakdown or system failures resulting in a sustained shutdown of all or a material part of Afterpay's servers, including failures which may be attributable to power shutdowns, or loss or corruption of data or malfunctions of software or hardware; and (ii) any disruption or failure in the national backbone telecommunication network. Afterpay has no control over the cost of the services provided by these third-party service providers, and may be required to pay for any additional costs, which may affect Afterpay's business, financial position and operations.

### (j)  Exposure to potential security breaches, cyber-attacks and data protection issues

Through the ordinary course of business, Afterpay collects, processes and stores a wide range of confidential and personal data and information. The measures Afterpay takes to protect such information and data may be insufficient to prevent security breaches from arising, or other unauthorised access or disclosure of such information and data. Any data security breaches or Afterpay's failure to protect private personal or confidential information could result in a significant disruption to Afterpay's systems, reputational damage, loss of system integrity and breaches of Afterpay's obligations under applicable laws, each of which may materially and adversely impact Afterpay's business, results from operations, profitability, reputation and prospects. Further, laws relating to data privacy are evolving across all jurisdictions and any changes to standards may adversely impact Afterpay's current systems and operating procedures.

Security breaches may also involve unauthorised access to Afterpay's networks, systems and databases and the deployment of malicious software designed to create system and service disruptions, exposing financial, proprietary and/or personal information. Any systemic failure or sustained disruption to the effective operation of Afterpay's technology (e.g. through cyber-attacks) could severely damage Afterpay's reputation and its ability to generate new business or retain existing business, directly impair Afterpay's operations or require increased expenditure on technology or generally across the business.

# 106

Section 7
Key Risks

**(k) Activities of fraudulent parties**

Afterpay may be exposed to fraud attempts, including risks from the potential collusion between internal and external parties, large scale attempts to impersonate existing customers or take over existing customer accounts, and end customers attempting to circumvent Afterpay's systems (such as Afterpay's repayment capability assessments). Fraud attempts may potentially result in damage to Afterpay's reputation, a higher than budgeted cost of fraud to rectify and safeguard business operations or result in bad debt that cannot be collected and must be written off, which may materially adversely impact Afterpay's results from operations, profitability, reputation and prospects.

**(l)  Protection and ownership of technology and intellectual property**

Unauthorised use or copying of any of Afterpay's software, data, specialised technology or platforms may occur and the validity, ownership or authorised use of intellectual property relevant to Afterpay's business may be successfully challenged by third parties. This could result in significant expense and the inability to use the intellectual property in question, which may materially and adversely impact Afterpay's business, results of operations, profitability and prospects. Such disputes (whether or not successful) may also temporarily and adversely impact Afterpay's ability to integrate new systems or develop new services, and could involve significant costs of litigation and diversion of management attention, all of which may adversely impact Afterpay's results from operations, profitability and prospects.

There is also a risk that Afterpay will be unable to register or otherwise protect new intellectual property it develops in the future. Afterpay's competitors may then be able to offer identical or very similar services or services that are otherwise competitive against those provided by Afterpay, which could adversely affect Afterpay's business, results from operations and prospects.

**(m) Ability of Afterpay's technology to integrate with third party platforms**

The success of Afterpay's services, and the ability to attract additional end customers and merchants, will depend on the ability of Afterpay's technology and systems to integrate into and operate with various third party systems and platforms, particularly websites, POS systems and other merchant systems. In addition, as these systems and platforms are regularly updated, it is possible that when such updates occur it could cause Afterpay's services to not operate as efficiently as previously or not at all. This will require Afterpay to change the way some of its systems operate, and may disrupt the provision of services permanently or temporarily, which may take time and expense to remedy, and could adversely affect Afterpay's business, results from operations and prospects.

**(n) Afterpay's technology may be superseded by other technology or changes in business practice**

Afterpay's success will in part depend on its ability to offer services and systems that remain current with the continuing changes in technology, evolving industry standards and changing customer preferences. Afterpay may not be successful in addressing these developments in a timely manner, or expenses may be greater than expected. In addition, new products or technologies (or alternative systems) developed by third parties may supersede Afterpay's technology. This may materially and adversely impact Afterpay's results from operations and profitability.

**(o) Loss of or failure to attract key personnel**

Afterpay's ability to effectively execute its growth strategies depends on the performance and expertise of its key personnel. The market for talented personnel in the BNPL space and fintech industry more broadly is extremely competitive. The loss of key personnel or any delay in their replacement, may adversely affect Afterpay's future financial performance. Further, Afterpay requires skilled personnel for entry into new markets that may be in short supply or that may be sought after by competitors and new entrants. An inability to attract and retain skilled personnel would inhibit the success of new market entry and may adversely affect Afterpay's future financial performance.

**(p) Capacity constraints**

Continued increases in transaction volumes may require Afterpay to expand and adapt its network and applications infrastructure to avoid interruptions to its systems. Any unprecedented transaction volumes may interrupt Afterpay's systems, reduce the number of completed transactions, increase expenses, and reduce the level of customer service, and these factors may adversely impact Afterpay's business, results from operations and profitability. Expansions into new offshore markets may require additional data centre capacity in those markets due to data security requirements or capacity constraints. An inability to obtain such capacity in a timely manner may adversely impact Afterpay's business, results from operations and profitability.

**107**

For personal use only

**(q) Inability to identify suitable targets or successfully integrate acquisitions**

Afterpay's strategy may involve the acquisition of additional businesses that are aligned with Afterpay's Core Business. Acquisition transactions involve inherent risks, including accurately assessing the value, strengths, weaknesses, contingent and other liabilities and potential profitability of a business, integration risks, excessive diversion of management attention from the operations of the existing business, potential loss of key personnel and key clients of the acquired business, unanticipated changes in the industry or general economic and regulatory conditions that affect the assumptions underlying the acquisition and decline in the value of, and unanticipated costs, problems or liabilities associated with the acquired business.

Any of these or similar risks could cause Afterpay to not realise the benefits and synergies anticipated from any acquisition of a new business and could have a material adverse impact on its results from operations, profitability, financial position and prospects.

**(r)  Exposure of earnings to fluctuating foreign exchange rates**

Afterpay has operations in many jurisdictions. Therefore, it will be exposed to foreign earnings, expenses and borrowings affecting the value of transactions when translated back to the functional currency on a transaction basis. As Afterpay may hold some borrowings denominated in a foreign currency, it will therefore be exposed to this risk in the absence of effective hedging.

To the extent Afterpay does not hedge effectively, or at all, against movements in the exchange rate of these currencies, such exchange rate movements may adversely affect its earnings and/or statement of financial position.

**(s)  International operations**

Afterpay conducts operations in a number of geographies and countries. The future operating results in the countries or regions in which Afterpay will operate, or may in the future operate, could be negatively affected by a variety of factors beyond the control of Afterpay, including political instability, economic conditions, legal and regulatory constraints, trade policies, currency regulations, and risks associated with having facilities located in countries which have historically been subject to volatility in one or more of these areas. Additional risks inherent in Afterpay's global operations generally include, among other things, the costs and difficulties of managing international operations, adverse tax consequences arising from carrying on operations in a large number of countries and the conduct of cross-border transactions and greater difficulty in enforcing intellectual property rights in certain countries.

**(t)  Accounting standards and judgements**

Afterpay's accounting policies are fundamental to how it records and reports its financial position and results from operations. These policies require the use of estimates, assumptions and judgements that affect the reported value of Afterpay's assets, liabilities, bad and doubtful debts and results from operations. Afterpay's management is required to determine estimates and apply subjective and complex assumptions and judgements about accounting matters that are inherently uncertain.

In addition, changes in interpretations by accounting standard setting bodies, regulators, or Afterpay's external auditor may also arise from time to time. The timing and nature of these changes may be difficult to predict. The application of these changes in accounting standards, policies, interpretations, estimates, assumptions and judgments could have a material impact on the financial results of Afterpay. In some cases, Afterpay may be required to apply a new or revised standard or change in interpretation retrospectively, which may require Afterpay to re-present its previously reported financial information.

**(u)  COVID-19**

The events relating to COVID-19 have caused significant market volatility, including in the prices of securities trading on ASX and on other foreign securities exchanges. While there has been significant economic recovery since March 2020, there is continued uncertainty as to the further impact of COVID-19 including in relation to governmental action, vaccine hesitancy and efficacy, work stoppages, lockdown, quarantines, travel restrictions and the impact on the Australian and global economy and share markets. In light of recent Australian and global macroeconomic events, including though not limited to the impact of COVID-19 and other factors, Australia and other international economies could experience a further recession or downturn of uncertain severity and duration which could further affect spending by consumers, impact on the operating and financial performance and prospects of Afterpay. Afterpay may not be able to renew contracts with existing merchants or develop business relationships with new merchants as a result of any negative economic and retail conditions associated with COVID-19. Any future outbreak of public health epidemics may restrict economic activities, reduce business volume or

**108**

For personal use only

disrupt Afterpay's business operations. While governments around the world have implemented stimulus and liquidity measures, it is unclear whether these, or any future, actions taken by governments will be successful in mitigating the economic disruption. If these measures are unsuccessful or the COVID-19 pandemic is prolonged, the negative impact on macroeconomic conditions may be amplified and adversely affect Afterpay's business, reputation, prospects and operating and financial performance.

## 7.3. Risks Associated with the Implementation of the Scheme

### (a) Market value of the Scheme Consideration

Because the Scheme Consideration is based on a fixed exchange ratio, if the Scheme is implemented, Scheme Shareholders (other than Ineligible Foreign Shareholders) will receive the Scheme Consideration, comprising 0.375 New Square Securities for each Scheme Share. Ineligible Foreign Shareholders will not be entitled to receive any New Square Shares and will instead receive cash under the Sale Facility for any New Square Shares that they would otherwise have been entitled to receive. As at the close of trading on NYSE on 29 October 2021, the implied value of the Scheme Consideration was A$126.39 per Afterpay Share.[1]

The implied value of the Scheme Consideration will vary over time depending on the prevailing Square Share Price and the AUD/USD exchange rate. As a result of changes in these factors, the implied value of the Scheme Consideration is likely to change, including between the date of this Scheme Booklet, the date of the Scheme Meeting, the Election Date and the Implementation Date (being the date on which the Scheme Consideration is received). The exchange ratio will not be adjusted in the event of changes in the value of Square Class A Shares or Afterpay Shares or the implied value of the Scheme Consideration, which changes may be material. Accordingly, you will not know the implied value of the Scheme Consideration you will receive on the Implementation Date at the time you vote.

Following implementation of the Scheme, the price of any New Square Securities received will continue to rise or fall based on market conditions and the Combined Group's financial and operating performance.

### (b) Conditions Precedent

The implementation of the Scheme is subject to a number of Conditions Precedent which are summarised in section 3.11(a). These Conditions Precedent include obtaining all the relevant Regulatory Approvals. Certain Conditions Precedent are beyond the control of Square and Afterpay. There can be no guarantee that the Conditions Precedent will be satisfied or waived in a timely fashion or at all. Any failure or delay in satisfying the Conditions Precedent could prevent or delay the completion of the Scheme, which could reduce the benefits that Square and Afterpay expect to obtain from the Scheme, increase the costs associated with the Scheme and impede successful integration of Square and Afterpay's businesses.

The Scheme will not be implemented unless all of the Conditions Precedent have been satisfied or waived. In particular, if the Regulatory Approvals have not been obtained, or the Condition Precedent waived, before the Second Court Hearing (currently scheduled for Friday, 10 December 2021), the Second Court Hearing will be delayed, which may in turn delay the Implementation Date.

In addition, the Scheme will not proceed if the Regulatory Approvals are not obtained by the End Date.

As such, a failure to satisfy any of the Conditions Precedent (including the Regulatory Approvals) or a delay in satisfaction of the Conditions Precedent could prevent or delay the implementation of the Scheme and may adversely affect the price of Afterpay Shares or Square Class A Shares.

### (c) Court approval

There is a risk that the Court may not approve the Scheme or that the approval of the Court is delayed. In particular, if there is a material change in circumstances between the Scheme Meeting and the Second Court Date, then the Court will have regard to that change in deciding how it should proceed. If such changes are so important that they materially alter the Scheme, there is a risk that the Court may not approve the Scheme at the Second Court Hearing. If the Scheme is not approved by the Court, then unrecoverable transaction costs already paid by Afterpay are estimated to be approximately A$25 million.



**(d) Change in risk and investment profile**

After implementation of the Scheme, Scheme Shareholders (other than Ineligible Foreign Shareholders) will be exposed to additional risks relating to Square, and to certain additional risks relating to the Combined Group and the integration of the two businesses as set out in section 7.4. In some cases, those risks are different from or additional to those related to Afterpay and you may prefer the risks and the investment profile of the Afterpay business as a standalone entity.

Whilst the operations of Afterpay and Square are similar in a number of ways, the business mix, portfolio of merchant clients and customers, capital structure and size of the Combined Group will be different from that of Afterpay currently.

**(e) Risks for Shareholders if the Scheme does not proceed**

If the Scheme does not proceed and no other acceptable proposal is received, Afterpay will continue to operate on a stand-alone basis and Afterpay Shareholders will retain their Afterpay Shares. In these circumstances the price at which Afterpay Shares may trade on ASX is uncertain. Afterpay Shareholders will continue to be exposed to the risks of holding Afterpay Shares set out in section 7.2.

**(f) Taxation consequences for Scheme Shareholders**

If the Scheme is successfully implemented, there may be tax consequences for Scheme Shareholders. The tax consequences for Scheme Shareholders will vary depending on a number of factors, including their place of residence for tax purposes and their individual tax circumstances.

A summary of the general Australian income tax, stamp duty and GST consequences for Scheme Shareholders participating in the Scheme is set out in section 8.

For US federal income tax purposes, the receipt of New Square Securities in exchange for Afterpay Shares pursuant to the Scheme will be a taxable transaction. Subject to the application of the "passive foreign investment company" or "PFIC" rules (see below), a US holder generally will recognise gain or loss for US federal income tax purposes equal to the difference, if any, between (i) the sum of the fair market value of the New Square Securities received pursuant to the Scheme and (ii) the US holder's adjusted tax basis in its Afterpay Shares surrendered in exchange therefore.

Afterpay believes that it (i) was not a PFIC during any taxable year prior to the taxable year ended June 30, 2021 (however, there can be no assurance that the US Internal Revenue Service will not successfully challenge this position), (ii) likely was a PFIC for the taxable year ended June 30, 2021, and (iii) will likely remain a PFIC through the taxable year that includes the Implementation Date. Whether Afterpay is a PFIC for a particular taxable year is a factual determination made annually after the close of that taxable year.

If Afterpay is or has been a PFIC for any taxable year during which a US holder held Afterpay Shares, such US holder generally will be subject to special rules, which could result in adverse tax consequences (see section 8.8 "Material United States Federal Income Tax Consequences of the "Scheme" for a more detailed discussion).

The rules dealing with PFICs are very complex and affected by various factors. Afterpay Shareholders are encouraged to consult with their own tax advisors regarding the tax consequences applicable to them, including the impact of Afterpay being a PFIC for any taxable year in which you held Afterpay Shares.

**(g) Differing disclosure requirements**

Square is a US issuer that is required to prepare and file its periodic and other filings in accordance with US securities laws. As a result, certain information about Square that is contained in this Scheme Booklet was prepared in accordance with US disclosure regulations, rather than the requirements that would apply to Afterpay or other issuers in Australia. Because US disclosure requirements are different from Australian requirements, the information about Square contained in this Scheme Booklet may not be comparable to similar information available about Afterpay or other Australian issuers.

**(h) Pro forma financial information**

The Combined Group Pro Forma Historical Financial Information contained in this Scheme Booklet is presented for illustrative purposes only and may not be an indication of Square's financial condition or results of operations following the Scheme for several reasons. For example, the Combined Group Pro Forma Historical Financial Information has been derived from the historical financial statements of Square and Afterpay and certain adjustments and assumptions have been made regarding Square after giving effect to the Scheme. The information upon which these adjustments and assumptions have been made is preliminary, and these kinds of adjustments and assumptions are difficult to make with complete

# 110

For personal use only

Section 7
Key Risks

accuracy. Moreover, the Combined Group Pro Forma Historical Financial Information does not reflect all costs that are expected to be incurred by Square in connection with the Scheme. For example, the impact of any incremental costs incurred in integrating Square and Afterpay is not reflected in the Combined Group Pro Forma Historical Financial Information. Additionally, certain assumptions were made in the Combined Group Pro Forma Historical Financial Information with regard to the timing, form and amounts of settlement of the Afterpay Minority Interests, whose eventual outcome may differ depending on Afterpay's discussions with applicable counterparties. As a result, the actual financial condition and results of operations of Square following the Scheme may not be consistent with, or evident from, the Combined Group Pro Forma Historical Financial Information. Additionally, the purchase price used in preparing the Combined Group Pro Forma Historical Financial Information is based on the closing market price of Square Class A common stock, as well as the exchange rate between the US dollar and the Australian dollar, as of 16 September, 2021, which may be materially different from the closing price of Square Class A Shares and the exchange rate between the US dollar and the Australian dollar on the Implementation Date. The assumptions used in preparing the Combined Group Pro Forma Historical Financial Information may not prove to be accurate, and other factors may affect Square's financial condition or results of operations following the Scheme. Square's stock price may be adversely affected if the actual results of Square fall short of the historical results reflected in the Combined Group Pro Forma Historical Financial Information contained in this Scheme Booklet.

## 7.4.  Risks Associated with the Operations of the Combined Group

### (a) Integration risk

The success of the Scheme will depend, amongst other things, on the ability of the Combined Group to realise the anticipated benefits from combining the businesses of Square and Afterpay. The Combined Group's ability to realise these anticipated benefits depends on the successful integration of the businesses of Square and Afterpay, which will be complex and time-consuming.

Potential difficulties that may be encountered in the integration process include the following:

- challenges and difficulties associated with managing the larger, more complex, combined company;
- conforming standards, controls, procedures and policies, and compensation structures between the companies;
- integrating personnel from the two companies while maintaining focus on developing, producing and delivering consistent, high quality products and services;
- consolidating corporate and administrative infrastructures;
- coordinating geographically dispersed organisations;
- addressing possible differences in business backgrounds, corporate cultures and management philosophies;
- potential unknown liabilities and unforeseen expenses, delays or regulatory conditions associated with the Scheme;
- effecting potential actions that may be required in connection with obtaining regulatory approvals;
- performance shortfalls at one or both of the companies as a result of the diversion of management's attention caused by implementing the Scheme and integrating the companies' operations; and
- the ability of the Combined Group to deliver on its strategy, including the ability of the Scheme to accelerate growth and to strengthen the integration between Square's Seller and Cash App ecosystems.

### (b) Business disruption

Parties with which Square and Afterpay do business may experience uncertainty associated with the Scheme, including with respect to current or future business relationships with Square, Afterpay or the Combined Group following the implementation of the Scheme. Square's and Afterpay's relationships may be subject to disruption as merchants, customers, suppliers and other persons with whom Square and Afterpay have a business relationship may delay or defer certain business decisions or might decide to seek to terminate, change or renegotiate their relationships with Square or Afterpay, as applicable, or consider entering into business relationships with parties other than Square or Afterpay. These disruptions could have an adverse effect on the results of operations, cash flows and financial position of Square, Afterpay or the Combined Group following the implementation of the Scheme, including an adverse effect on Square's ability to realise the expected synergies and other benefits of the Scheme. The risk, and adverse effect, of any disruption could be exacerbated by a delay in the implementation of the Scheme or the termination of the Scheme Implementation Deed.



### (c) Transaction costs

Square and Afterpay expect to incur significant costs associated with the Scheme and combining the operations of the two companies. The Combined Group's fees and expenses related to the Scheme include financial adviser fees, filing fees, legal and accounting fees and regulatory fees, some of which will be paid regardless of whether the Scheme is implemented. The Combined Group's costs in connection with the integration of Square and Afterpay are difficult to predict before the integration process begins, and the Combined Group may incur unanticipated costs as a consequence of difficulties arising from its integration efforts.

### (d) Currency risk

Square is currently subject to some foreign currency exchange risk because it conducts business operations in several foreign countries through its foreign subsidiaries or affiliates, which conduct business in their respective local currencies. Afterpay conducts a significant portion of its operations outside of the United States through its subsidiaries or affiliates, which also operate in their respective local currencies. Therefore, following the implementation of the Scheme, the Combined Group's international operations will account for a more significant portion of its overall operations than they do presently and the Combined Group's exposure to fluctuations in foreign currency exchange rates will increase. Because the Combined Group's financial statements will continue to be presented in US dollars subsequent to the implementation of the Scheme, the local currencies will be translated into US dollars at the applicable exchange rates for inclusion in the Combined Group's consolidated financial statements, thereby increasing the foreign exchange translation risk.

### (e) Due diligence

Before executing the Scheme Implementation Deed, Square and Afterpay undertook a period of mutual due diligence for the purpose of evaluating the merits and negotiating the terms of the Scheme. Although Square and Afterpay decided to proceed with the Scheme following that due diligence exercise, there is a risk that the due diligence undertaken was insufficient or failed to identify or appreciate the impact of key issues or identify all liabilities of either Afterpay or Square. These liabilities, and any additional risks and uncertainties related to the Scheme not currently known to Square or that Square may currently deem immaterial or unlikely to occur, could negatively impact the Combined Group's business, financial position and results from operations.

### (f) Potential liabilities

The Scheme and the integration of Afterpay with Square may pose special risks, including write-offs or restructuring charges, unanticipated costs, and the loss of key employees. There can be no assurance that the integration will be accomplished effectively or in a timely manner. In addition, the Scheme and the integration of Afterpay will subject Square to liabilities (including potential tax liabilities) that may exist at Afterpay or may arise in connection with the completion of the Scheme, some of which may be unknown. Although Square and its advisers have conducted due diligence on the operations of Afterpay, there can be no guarantee that Square is aware of all liabilities of Afterpay. These liabilities, and any additional risks and uncertainties related to the Scheme not currently known to Square or that Square may currently deem immaterial or unlikely to occur, could negatively impact the Combined Group's business, financial condition and results of operations.

### (g) Risks related to Square's business and industry

Square is subject to numerous risks and uncertainties related to its business and industry, including those outside of Square's control, that could cause Square's actual results to be harmed, including the following risks:

- The ongoing COVID-19 pandemic and measures intended to prevent its spread may have a material and adverse effect on Square's business and results from operations.
- Square's participation in government relief programs set up in response to the COVID-19 pandemic, such as facilitating loans to businesses under the Paycheck Protection Program or unemployment benefits and stimulus payments to individuals through Cash App, may subject Square to new risks and uncertainties.
- Square's business depends on a strong and trusted brand, and any failure to maintain, protect, and enhance Square's brand would adversely affect Square's business.
- As Square's revenue has increased, Square's growth rate has slowed at times in the past and may slow or decline in the future, and Square's growth rates in each of Square's reporting segments may vary. Future revenue growth depends on Square's ability to retain existing sellers, attract new sellers, and increase sales to both new and existing sellers, as well as Square's ability to attract and retain Cash App customers and grow their use of Cash App services.

# 112

Section 7
Key Risks

For personal use only

- Square has generated significant net losses in the past, and Square intends to continue to invest substantially in Square's business. Thus, Square may not be able to maintain profitability.
- Square's efforts to expand Square's product portfolio and market reach may not succeed and may reduce Square's revenue growth.
- Square's long-term success depends on Square's ability to develop products and services to address the rapidly evolving market for payments and financial services, and, if Square is not able to implement successful enhancements and new features for Square's products and services, Square's business could be materially and adversely affected.
- Substantial and increasingly intense competition in Square's industry may harm Square's business.
- Expanding Square's business globally could subject Square to new challenges and risks.
- Any acquisitions, strategic investments, entries into new businesses, joint ventures, divestitures, and other transactions could fail to achieve strategic objectives, disrupt Square's ongoing operations or result in operating difficulties, liabilities and expenses, harm Square's business, and negatively impact Square's results from operations.
- Square's recent acquisition of a majority interest in TIDAL represents a new line of business for Square and subjects Square to new risks and uncertainties.
- Square Banking subjects Square to risks related to bank partnerships and FDIC and other regulatory obligations.
- Square Loans are subject to additional risks related to availability of capital, seller payments, interest rate, deposit insurance premiums, and general macroeconomic conditions.

## (h) Square operational risks

Square is subject to numerous risks and uncertainties related to its operations, including those outside of Square's control, that could cause Square's actual results to be harmed, including the following risks:

- Square, Square's sellers, Square's partners, and others who use Square's services obtain and process a large amount of sensitive data. Any real or perceived improper or unauthorised use of, disclosure of, or access to such data could harm Square's reputation as a trusted brand, as well as have a material and adverse effect on Square's business.
- Square's products and services may not function as intended due to errors in Square's software, hardware, and systems, product defects, or due to security breaches or human error in administering these systems, which could materially and adversely affect Square's business.
- Systems failures, interruptions, delays in service, catastrophic events, and resulting interruptions in the availability of Square's products or services, or those of Square's sellers, could harm Square's business and Square's brand, and subject Square to substantial liability.
- The loss or destruction of a private key required to access Square's bitcoin may be irreversible. If Square is unable to access Square's private keys or if Square experiences a hack or other data loss relating to the bitcoins Square holds on behalf of Square and Square's customers, Square and Square's customers may be unable to access such bitcoins and it could harm customer trust in Square and Square's products.
- Square's risk management efforts may not be effective, which could expose Square to losses and liability and otherwise harm Square's business.
- Square is dependent on payment card networks and acquiring processors, and any changes to their rules or practices could harm Square's business.
- Square relies on third parties and their systems for a variety of services, including the processing of transaction data and settlement of funds to Square and Square's sellers, and these third parties' failure to perform these services adequately could materially and adversely affect Square's business.
- Square depends on key management, as well as Square's experienced and capable employees, and any failure to attract, motivate, and retain Square's employees could harm Square's ability to maintain and grow Square's business.
- If Square does not continue to improve its operational, financial, and other internal controls and systems to manage growth effectively, Square's business could be harmed.
- Square's services must integrate with a variety of operating systems, and the hardware that enables merchants to accept payment cards must interoperate with third-party mobile devices utilising those operating systems. If Square is unable to ensure that Square's services or hardware interoperate with such operating systems and devices, Square's business may be materially and adversely affected.
- Many of Square's key components are procured from a single or limited number of suppliers. Thus, Square is at risk of shortage, price increases, tariffs, changes, delay, or discontinuation of key components, which could disrupt and materially and adversely affect Square's business.
- Square's business could be harmed if Square is unable to accurately forecast demand for Square's products and to adequately manage Square's product inventory.

**113**

For personal use only

- Square's TIDAL services depend upon maintaining complex licenses with copyright owners, and it is difficult to estimate the amount payable under Square's license agreements.
- Square's TIDAL business is at risk of artificial manipulation of stream counts and failure to effectively manage and remediate such fraudulent streams could have an adverse impact on TIDAL's business, operating results, and financial position.

### (i)  Economic, financial, and tax risks

Square is subject to numerous economic, financial, and tax risks and uncertainties, including those outside of Square's control, that could cause Square's actual results to be harmed, including the following risks:

- A deterioration of general macroeconomic conditions could materially and adversely affect Square's business and financial results.
- Square may have exposure to greater-than-anticipated tax liabilities, which may materially and adversely affect Square's business.
- Square has in the past recorded, and may in the future record, significant valuation allowances on Square's deferred tax assets, which may have a material impact on Square's results from operations and cause fluctuations in such results.
- Square may not be able to secure financing on favourable terms, or at all, to meet its future capital needs, and Square's existing credit facility and Square's senior unsecured notes contain, and any future debt financing may contain, covenants that impact the operation of Square's business and pursuit of business opportunities.
- Servicing the Square Convertible Notes and Senior Notes may require a significant amount of cash, and Square may not have sufficient cash or the ability to raise the funds necessary to settle conversions of the Square Convertible Notes in cash, repay the Square Convertible Notes and Senior Notes at maturity, or repurchase the Square Convertible Notes and Senior Notes as required following a fundamental change.
- Square is subject to counterparty risk with respect to the convertible note hedge transactions.
- Square's investments in bitcoin may be subject to volatile market prices, impairment, and other risks of loss.

### (j)  Legal, regulatory, and compliance risks

Square is subject to numerous legal, regulatory, and compliance risks and uncertainties, including those outside of Square's control, that could cause Square's actual results to be harmed, including the following risks:

- Square's business is subject to extensive regulation and oversight in a variety of areas, all of which are subject to change and uncertain interpretation. Laws, regulations, and standards are subject to changes and evolving interpretations and application, including by means of legislative changes and executive orders, and it can be difficult to predict how they may be applied to Square's business and the way Square conducts its operations, particularly as Square introduces new products and services and expands into new jurisdictions.
- Square's business is subject to complex and evolving regulations and oversight related to privacy and data protection.
- As a licensed money transmitter, Square is subject to important obligations and restrictions.
- Square's subsidiary SFS is a Utah state-chartered industrial bank, which requires that Square serve as a source of financial strength to it and subjects Square to potential regulatory sanctions.
- SFS is subject to extensive supervision and regulation, including the Dodd-Frank Act and its related regulations, which are subject to change and could involve material costs or affect operations.
- Square's subsidiary Cash App Investing is a broker-dealer registered with the SEC and a member of FINRA, and therefore is subject to extensive regulation and scrutiny.
- Cash App Investing is subject to net capital and other regulatory capital requirements; failure to comply with these rules could harm Square's business.
- It is possible that FINRA will require changes to Square's business practices based on Square's ownership of Cash App Investing, which could impose additional costs or disrupt Square's business.
- Square is subject to risks related to litigation, including intellectual property claims, government investigations or inquiries, and regulatory matters or disputes.
- Intellectual property rights are valuable, and any inability to protect them could reduce the value of Square's products, services, and brand.
- Assertions by third parties of infringement or other violation by TIDAL of their intellectual property rights could harm Square's business.

# 114

For personal use only

Section 7
Key Risks

The outline of risks in sections 7.4(g), (h), (i), and (j) is a summary only. More detailed information in relation to risk factors relating to the business and operations of Square can be found in Square's Annual Report on Form 10-K for the year ended 31 December 2020, filed with the SEC on 23 February 2021, and Square's Quarterly Report on Form 10-Q for the quarter ended 30 June 2021, filed with the SEC on 2 August 2021. Square's SEC filings are available to the public at the SEC's website at www.sec.gov or at Square's website at www.squareup.com.

## 7.5.  Trading Risks

### (a) Flowback

If a large number of Afterpay Shareholders do not intend to continue to hold the New Square Securities received as Scheme Consideration and instead choose to sell, there is a risk that the trading price of New Square Securities will be adversely impacted by selling.

In addition, the Sale Agent will be issued New Square Shares attributable to certain Ineligible Foreign Shareholders and will be seeking to sell those securities on NYSE as soon as reasonably practicable, which may also contribute to any potential adverse impact on the trading price of the New Square Shares.

### (b) Liquidity of New Square CDIs

The market for New Square CDIs may be less liquid than the market for Square Class A Shares. This may have the effect of reducing the volume of New Square CDIs that can be bought and sold on ASX and the speed with which they can be bought and sold. This reduced liquidity may also result in New Square CDIs trading at a discount to New Square Shares on NYSE.

As set out in section 3.4(ix), holders of New Square CDIs can convert their New Square CDIs into Square Class A Shares. If Scheme Shareholders that receive their New Square Securities as New Square CDIs subsequently convert their New Square CDIs into Square Class A Shares, this may further reduce the liquidity in the market for New Square CDIs, and increase the likelihood of New Square CDIs trading at a discount to New Square Shares.

### (c) Volatility of New Square CDIs

New Square CDIs will be quoted and traded on ASX in Australian dollars. The price of New Square CDIs will therefore reflect movements in both the Square Class A Share Price and the AUD/USD exchange rate. The combination of movements may cause the New Square CDIs to be more volatile than the historical volatility of Afterpay Shares.

### (d) Trading of New Square CDIs during deferred settlement trading period

Scheme Shareholders will not necessarily know the exact number of New Square CDIs that they will receive (if any) until a number of days after those securities can be traded on ASX on a deferred settlement basis. Scheme Shareholders who trade New Square CDIs on a deferred settlement basis without knowing the number of New Square CDIs they will receive as Scheme Consideration may risk adverse financial consequences if they purport to sell more New Square CDIs than they receive.

## 7.6.  Risks associated with Square Securities

### (a) The rights attaching to New Square Securities will be different than those attaching to Afterpay Shares

If the Scheme is implemented, the rights attaching to New Square Shares will be primarily governed by the DGCL, the US federal securities laws, NYSE listing rules and Square's Certificate of Incorporation and Bylaws.

### (b) The rights attaching to New Square CDIs are different than those attaching to New Square Shares

The holder of a New Square CDI has, through the CDI Nominee, an indirect, beneficial interest in the New Square Share underlying their New Square CDI instead of directly owning that New Square Share. This means that the holder of the New Square CDI is not the registered holder of the underlying New Square Share and therefore:

- cannot directly trade the underlying New Square Share; and
- is a beneficial holder (rather than registered legal holder) of the underlying New Square Share.

The differences between the New Square Shares and New Square CDIs are summarised in section 3.4(d).

## 115

For personal use only

### (c) The dual class structure of Square's common stock

Square Class B Shares have ten votes per share, and Square Class A Shares have one vote per share. Certain of Square's executive officers and directors, and their affiliates, held approximately 61.77% of the voting power of Square's combined outstanding capital stock as of 31 July 2021. Because of the ten-to-one voting ratio between Square Class B Shares and Square Class A Shares, the holders of Square Class B Shares, including certain of Square's directors, executive officers and their affiliates, collectively hold more than a majority of the combined voting power of its common stock, and therefore such holders are able to control all matters submitted to Square's stockholders for approval. When Square Class B Shares represent less than 5% of the combined voting power of Square Class A Shares and Square Class B Shares, the then-outstanding shares of Square Class B Shares will automatically convert into Square Class A Shares.

Transfers by holders of Square Class B Shares will generally result in those shares converting to Square Class A Shares, subject to certain exceptions. Such conversions of Square Class B Shares to Square Class A Shares upon transfer will have the effect, over time, of increasing the relative voting power of those holders of Square Class B Shares who retain their shares in the long term. If, for example, the holders of Square Class B Shares retain Square Class B Shares constituting as little as 10% of all outstanding Square Class A Shares and Square Class B Shares combined, they will continue to control a majority of the combined voting power of Square's outstanding capital stock.

### (d) Volatility of the market price of Square Class A Shares

The market price of Square's Class A Shares has been and may continue to be subject to wide fluctuations in response to various factors, some of which are beyond Square's control and may not be related to Square's operating performance. In addition to the factors discussed in this "Key Risks" section and elsewhere in this Scheme Booklet, factors that could cause fluctuations in the market price of Square Class A Shares include the following:

- general economic, regulatory, and market conditions, in particular conditions that adversely affect Square's sellers' business and the amount of transactions they are processing;
- public health crises and related measures to protect public health;
- sales of Square Shares by Square or its stockholders;
- issuance of Square Class A Shares, whether in connection with an acquisition or upon conversion of some or all of the outstanding Square Convertible Notes;
- short selling of Square's Class A Shares or related derivative securities;
- from time to time Square makes investments in equity that is, or may become, publicly held, and it may experience volatility due to changes in the market prices of such equity investments;
- fluctuations in the price of bitcoin, and potentially any impairment charges in connection with Square's investments in bitcoin;
- reports by securities or industry analysts that are interpreted either negatively or positively by investors, failure of securities analysts to maintain coverage and/or to provide accurate consensus results of Square, changes in financial estimates by securities analysts who follow Square, or Square's failure to meet these estimates or the expectations of investors;
- the financial or other projections Square may provide to the public, any changes in those projections, or its failure to meet those projections;
- announcements by Square or its competitors of new products or services;
- rumours and market speculation involving Square or other companies in its industry;
- actual or perceived data security incidents that Square or its service providers may suffer; and
- actual or anticipated developments in Square's business, its competitors' businesses, or the competitive landscape generally.

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. Such litigation, if instituted against Square, could result in substantial costs and a diversion of its management's attention and resources.

### (e) Square's convertible note hedge and warrant transactions

In connection with the issuance of each series of Square Convertible Notes, Square entered into convertible note hedge transactions with the option counterparties. Square also entered into warrant transactions with the option counterparties pursuant to which it sold warrants for the purchase of its Square Class A Shares. The convertible note hedge transactions are expected generally to reduce the potential dilution to Square Class A Shares upon any conversion of the Square Convertible Notes and/or offset any cash payments

# 116

Section 7
Key Risks

Square is required to make in excess of the principal amount of converted Square Convertible Notes, as the case may be. The warrant transactions would separately have a dilutive effect to the extent that the market price per Square Class A Share exceeds the strike price of any warrants unless, subject to the terms of the warrant transactions, Square elects to cash settle the warrants.

From time to time, the option counterparties or their respective affiliates may modify their hedge positions by entering into or unwinding various derivative transactions with respect to Square Class A Shares and/or purchasing or selling its Square Class A Shares or other securities of Square in secondary market transactions prior to the maturity of the Square Convertible Notes. This activity could cause or avoid an increase or a decrease in the market price of Square Class A Shares.

### (f) The anti-takeover provisions contained in Square's Certificate of Incorporation, Bylaws, and provisions of Delaware law

Square's Certificate of Incorporation, Bylaws, and Delaware law contain provisions that could have the effect of rendering more difficult, delaying, or preventing an acquisition deemed undesirable by the Square Board and therefore depress the trading price of Square Class A Shares.

Among other things, Square's dual-class common stock structure provides its holders of Square Class B Shares with the ability to significantly influence the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of its outstanding shares of common stock. Further, Square's Certificate of Incorporation and Bylaws include provisions (i) creating a classified board of directors whose members serve staggered three-year terms; (ii) authorising "blank check" preferred stock, which could be issued by its board of directors without stockholder approval and may contain voting, liquidation, dividend, and other rights superior to Square's common stock; (iii) limiting the ability of its stockholders to call special meetings; (iv) eliminating the ability of its stockholders to act by written consent without a meeting or to remove directors without cause; and (v) requiring advance notice of stockholder proposals for business to be conducted at meetings of its stockholders and for nominations of candidates for election to its board of directors. These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in Square's management.

As a Delaware corporation, Square is also subject to provisions of Delaware law, including section 203 of the DGCL, which prevents certain stockholders holding more than 15% of its outstanding capital stock from engaging in certain business combinations without the approval of its board of directors or the holders of at least two-thirds of its outstanding capital stock not held by such stockholder.

Any provision of Square's Certificate of Incorporation, Bylaws, or Delaware law that has the effect of delaying or preventing a change in control could limit the opportunity for its stockholders to receive a premium for their shares of Square's capital stock and could also affect the price that some investors are willing to pay for Square Class A Shares.

### (g) The exclusive forum provisions in Square's Bylaws

Square's Bylaws provide that, unless it consents to the selection of an alternative forum, a state court located within the State of Delaware (or, if no state court located within the State of Delaware has jurisdiction, the federal district court for the District of Delaware) is the sole and exclusive forum for (i) any derivative action or proceeding brought on Square's behalf; (ii) any action asserting a claim of breach of fiduciary duty owed by any of its directors, officers, or other employees to Square or its stockholders; (iii) any action asserting a claim arising pursuant to the DGCL, Certificate of Incorporation or Bylaws; or (iv) any action asserting a claim governed by the internal affairs doctrine. The choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favourable for disputes with Square or its directors, officers, or other employees, which may discourage such lawsuits against Square and its directors, officers, and other employees. Alternatively, if a court were to find the choice of forum provision contained in Square's Bylaws to be inapplicable or unenforceable in an action, it may incur additional costs associated with resolving such action in other jurisdictions, which could have a material and adverse impact on its business.

For personal use only

**117**

## Section 8

# Taxation Considerations for Scheme Shareholders

This section 8 provides a general overview of certain tax considerations that may be applicable to Scheme Shareholders on implementation of the Scheme. This general overview has been prepared for informational purposes only. It is not intended to provide tax advice in relation to individual circumstances, and should not be relied on for tax advice. You should consult your own professional tax advisor in relation to your personal circumstances.

## Australian Taxation Considerations for Scheme Shareholders

### 8.1.  Scope and Tax Comments

This is a general overview of the Australian income tax (including CGT), GST and stamp duty implications for certain Australian and foreign resident Scheme Shareholders on implementation of the Scheme.

The categories of Scheme Shareholders considered in this summary are limited to individuals, companies (other than life insurance companies), trusts and complying superannuation funds that hold their Scheme Shares on capital account for Australian income tax purposes. The tax comments outlined in this summary are not applicable to all Scheme Shareholders and do not cover Scheme Shareholders who:

(a)   hold their Scheme Shares as a revenue asset (i.e. trading entities or entities who acquired their Scheme Shares for the purposes of resale at a profit) or as trading stock;

(b)   hold or are entitled to acquire, either alone or together with associates, 10% or more of the Scheme Shares;

(c)   are partnerships or individuals who are partners of such partnerships;

(d)   hold their shares as an asset in a business that is carried on through a permanent establishment in Australia;

(e)   acquired their Scheme Shares pursuant to an employee share plan;

(f)   are under a legal disability;

(g)   are exempt from Australian income tax;

(h)   are Ineligible Foreign Shareholders;

(i)   are subject to the taxation of financial arrangements rules in Division 230 of the *Income Tax Assessment Act 1997* (Cth) in relation to gains and losses on their Scheme Shares;

(j)   are subject to the Investment Manager Regime under Subdivision 842-I of the *Income Tax Assessment Act 1997* (Cth) in respect of their Scheme Shares;

(k)   may be subject to special rules, such as banks, insurance companies, tax exempt organisations, certain trusts, superannuation funds (unless otherwise stated) or dealers in securities;

(l)   are 'temporary residents' as that term is defined in section 995-1(1) of the *Income Tax Assessment Act 1997* (Cth); or

(m) change their tax residence whilst holding Scheme Shares.



**118**





For personal use only

## Section 9

# Comparison of Relevant Australian and US Laws

## 9.1. Background

Afterpay is a public company limited by shares and registered in Victoria under Australian law. Afterpay Shares are quoted on ASX.

Square is incorporated in the United States, under the laws of the State of Delaware. Square Class A Shares are listed on NYSE.

If the Scheme is implemented, the rights of Afterpay Shareholders in respect of New Square Shares or New Square CDIs will be primarily governed by the DGCL, US federal securities laws, NYSE listing standards and Square's Certificate of Incorporation and Bylaws.

In addition, Square will apply for admission to the ASX Official List as a Foreign Exempt Listing, conditional on the Scheme being implemented. Once Square is listed on ASX as a Foreign Exempt Listing, the rights of Afterpay Shareholders who receive New Square CDIs will also be governed by the terms of the New Square CDIs and the ASX Listing Rules relating to transfers and issues of securities and certain other procedural and administrative matters. However, once listed on ASX as a Foreign Exempt Listing, Square (as the parent company of the Combined Group) will be exempt from complying with most of the ASX Listing Rules (see section 6.4 for more information).

A comparison of some of the material provisions of Australian law and Delaware law as they relate to Afterpayand Square respectively is set out below, along with a description of certain securities laws and stock exchange rules where applicable.

References to Australian law where they appear in this section 9 are references to the Corporations Act, ASX Listing Rules, ASX Settlement Operating Rules and Australian common law, as applicable.

The terms of Square's Certificate of Incorporation and Bylaws and Delaware law are more detailed than the general information provided below. As such, you should rely on the actual provisions of those documents and laws. If you would like to read Square's Certificate of Incorporation or Bylaws, these documents are filed with the SEC.

The information in this section of the Scheme Booklet concerning Square has been prepared by Square and is the responsibility of Square.

The comparison below is not an exhaustive statement of all relevant laws, rules and regulations and is intended as a general guide only. You should seek your own independent professional legal advice if you require further information.

**119**

For personal use only

## Section 10

# Additional Information

## 10.1. Afterpay Securities held by Afterpay Directors

The table below lists the Relevant Interests of Afterpay Directors in Afterpay Shares as at the date of this Scheme Booklet.

| Afterpay Director | Position | Relevant Interest in Afterpay Shares | Number of unlisted options |
|---|---|---|---|
| Elana Rubin | Chair, Independent Non-Executive Director | 65,151 | Nil |
| Anthony Eisen | Co-CEO and Managing Director | 19,408,463 | 125,000 with an exercise price of $37.31 per option and an expiry date of 1 July 2024<br>40,203 with an exercise price of $98.97 per option and an expiry date of 1 July 2025[1] |
| Nick Molnar | Co-CEO and Managing Director | 19,408,463 | 125,000, with an exercise price of $37.31 per option and an expiry date of 1 July 2024<br>40,203 with an exercise price of $98.97 per option and an expiry date of 1 July 2025[1] |
| Gary Briggs | Independent Non-Executive Director | 2,630^ | Nil |
| Pat O'Sullivan | Independent Non-Executive Director | 7,473 | Nil |

1.    The Co-CEOs, Anthony Eisen and Nick Molnar, each hold 165,203 Afterpay Options (together the **Co-CEO Options**). Consistent with the manner in which each other Afterpay Option will be treated (as set out in section 4.11(b) of this Scheme Booklet), the Co-CEO Options held by Anthony Eisen and Nick Molnar will vest immediately following the Effective Date on a "pro rata basis" based on the proportion of the then-current vesting period that has elapsed at the Effective Date (measured based on the number of completed months). Assuming the Effective Date is 10 December 2021, this means that approximately 242,654 Co-CEO Options in aggregate will vest and become exercisable into Afterpay Shares. Based on the implied value of the Scheme Consideration as at 29 October 2021, being A$126.39 per Afterpay Share, and taking into account the exercise price of the Co-CEO Options, Anthony Eisen and Nick Molnar would each receive approximately $9,612,242 worth of Afterpay Shares issued as a result of the exercise of the Co-CEO Options. Any unvested Co-CEO Options remaining will be forfeited and, on the Implementation Date, Square will grant Square Options of comparable value to the forfeited Afterpay Options. For more information on the treatment of Afterpay Options refer to section 4.11(b) of the Scheme Booklet.

## 120

For personal use only

| Afterpay Director | Position | Relevant Interest in Afterpay Shares | Number of unlisted options |
|---|---|---|---|
| Sharon Rothstein | Independent Non-Executive Director | 3,350^ | Nil |
| Dana Stalder | Independent Non-Executive Director | 19,300 | Nil |

^ ATFPF (OTC US) – US traded depositary receipt shares that were purchased on the over the counter market in the US.

Afterpay Directors who hold Afterpay Shares will be entitled to vote at the Scheme Meeting and receive the Scheme Consideration along with all other Afterpay Shareholders.

Each Afterpay Director states that he or she intends to vote, or cause to be voted, all Afterpay Shares held or controlled by them, or on their behalf, in favour of the Scheme, in the absence of a Superior Proposal.[2]

## 10.2. Interests in Square held by Afterpay Directors

No Afterpay Director holds any interest in a Square Member.

No Afterpay Director acquired or disposed of a Relevant Interest in any shares in a Square Member in the 4 month period ending on the date immediately before the date of this Scheme Booklet.

## 10.3. Interests held by Afterpay Directors in Contracts of a Square Member

No Afterpay Director has an interest in any contract entered into by a Square Member.

## 10.4. Other Interests of Afterpay Directors

Save as noted above and as set out in section 10.5 below, no Afterpay Director has any other interest, whether as a director, member or creditor of Afterpay or otherwise, which is material to the Scheme, other than in their capacity as a holder of Afterpay Securities.

## 10.5. Agreements or Arrangements with Afterpay Directors

Save as noted above, there is no agreement or arrangement made between any Afterpay Director and any other person, including a Square Member, in connection with or conditional upon the outcome of the Scheme.

---

2.    You should note that when considering this recommendation that the two of the Afterpay Directors (being Co-CEOs and Managing Directors, Anthony Eisen and Nick Molnar) have previously been issued options under the Afterpay equity incentive plan. As contemplated by the terms of the Scheme Implementation Deed, Mr Eisen and Mr Molnar will each be receiving a benefit if the Scheme proceeds. A pro rata portion of the unvested options they hold will be accelerated and the balance will be forfeited and converted into a Square award as contemplated in Section 4.11 of this Scheme Booklet. These arrangements are described in more detail in Sections 4.10, 4.11 and 10.1. The benefit to each of Anthony Eisen and Nick Molnar in respect of their Co-CEO Options is estimated to be approximately $9,612,242. See footnote 1 in section 10.1 for further information.

Despite this interest in the outcome of the Scheme, each of Anthony Eisen and Nick Molnar, considers that, given the importance of the Scheme, and their role as directors of Afterpay, it is important and appropriate for them to provide a recommendation to shareholders in relation to voting on the Scheme. The Afterpay Board (excluding Anthony Eisen and Nick Molnar) also considers that it is appropriate for them to make a recommendation on the Scheme given their role in the management and operation of Afterpay.

**121**

Section 10
Additional Information

## 10.6. Payments and other Benefits to Directors, Secretaries or Executive Officers of Afterpay

The table below lists the payments and other benefits of Afterpay Directors, secretaries or executive officers as at the date of this Scheme Booklet.

| Name | Position | Number and type of security |
|---|---|---|
| Rebecca Lowde | CFO | 4,282 CFO Options^ |
| | | 16,580 RSUs (unvested) |
| | | 814 RSUs (vested) |
| Amanda Street | Company Secretary | 2,106 RSUs |

^ $78.87 each for the 4,282 CFO Options. The exercise price for the CFO Options was calculated based on the market value of Afterpay Shares equal to the 10 day VWAP in the period up to and including the date Rebecca Lowde commenced as CFO. The expiry date is 1 July 2025.

## 10.7. Top 20 Afterpay Shareholders

As at 29 October 2021, the top 20 Afterpay Shareholders in the Afterpay Share Register held approximately 86.19% of all issued Afterpay Shares.

| Name | Number of Afterpay Shares | Percentage of issued Afterpay Shares |
|---|---|---|
| HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED | 71,380,783 | 24.58 |
| J P MORGAN NOMINEES AUSTRALIA PTY LIMITED | 49,375,936 | 17.00 |
| CITICORP NOMINEES PTY LIMITED | 38,570,296 | 13.28 |
| ANTHONY MATHEW EISEN | 18,505,963 | 6.37 |
| NICHOLAS MOLNAR PTY LTD <NICHOLAS DAVID FAMILY A/C> | 17,005,963 | 5.86 |
| HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED - A/C 2 | 11,827,622 | 4.07 |
| HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED-GSCO ECA | 6,322,115 | 2.18 |
| CLEEVECORP PTY LTD | 5,267,000 | 1.81 |
| NATIONAL NOMINEES LIMITED | 5,203,151 | 1.79 |
| CITICORP NOMINEES PTY LIMITED <COLONIAL FIRST STATE INV A/C> | 4,251,397 | 1.46 |
| CITICORP NOMINEES PTY LIMITED <CITIBANK NY ADR DEP A/C> | 3,593,196 | 1.24 |
| HSBC CUSTODY NOMINEES (AUSTRALIA) LIMITED <GSCO CUSTOMERS A/C> | 2,806,498 | 0.97 |
| BNP PARIBAS NOMINEES PTY LTD <AGENCY LENDING DRP A/C> | 2,511,786 | 0.86 |
| BNP PARIBAS NOMS PTY LTD <DRP> | 2,395,398 | 0..82 |
| BNP PARIBAS NOMINEES PTY LTD <IB AU NOMS RETAILCLIENT DRP> | 2,224,616 | 0.77 |
| BNP PARIBAS NOMS PTY LTD BP2S PROPLEND ASSETS <DRP A/C> | 1,972,868 | 0.68 |
| NATIONAL NOMINEES LIMITED <N A/C> | 1,917,597 | 0.66 |
| ATC CAPITAL PTY LTD | 1,892,304 | 0.65 |
| BNP PARIBAS NOMINEES PTY LTD SIX SIS LTD <DRP A/C> | 1,757,549 | 0.61 |
| BRISPOT NOMINEES PTY LTD <HOUSE HEAD NOMINEE A/C> | 1,523,941 | 0.52 |

**122**

## 10.8. Afterpay's Substantial Holders

The substantial holders of Afterpay Shares as at 15 October 2021 are as follows:

| Name | Number of Afterpay Shares | Voting interest at time of notice % |
|---|---|---|
| Anthony Eisen | 19,408,463 | 6.69 |
| Nicholas Molnar | 19,408,463 | 6.69 |
| Vanguard Group | 18,658,783 | 6.43 |
| Blackrock Group | 15,165,738 | 5.23 |

The shareholdings listed in this section 10.8 are as disclosed to Afterpay by the shareholders in substantial holding notices or otherwise. Information in regard to substantial holdings arising, changing or ceasing after this time or in respect of which the relevant announcement is not available on ASX website is not included above.

## 10.9. Warranty by Scheme Shareholders about their Afterpay Shares

The effect of clause 5.6 of the Scheme is that all Scheme Shareholders, including those who vote against the Scheme and those who do not vote, will be deemed to have warranted to Square on the Implementation Date that:

(a) all their Scheme Shares (including any rights and entitlements attaching to their Scheme Shares) transferred to Square Acquirer under the Scheme will, as at the date of the transfer, be fully paid and free from all:

   (i) security for the payment of money or performance of obligations, including mortgages, charges, liens, pledges, trusts, powers or title retentions or flawed deposit arrangements and any security interests (including any 'security interests' within the meaning of section 12(1) or (2) of the Personal Properties Securities Act 2009 (Cth)), right of first refusals, pre-emptive rights; and

   (ii) any similar restrictions, or any agreements to create any of them or allow them to exist; and

(b) they have full power and capacity to sell and to transfer their Scheme Shares (including any rights and entitlements attaching to those shares) to Square Acquirer under this Scheme.

Clause 5.6 of the Scheme is set out in Attachment A to this Scheme Booklet.



**123**

## 10.10.  Consents and Disclaimers

The following parties have given, and have not withdrawn before the date of this Scheme Booklet, their consent to:

- be named in this Scheme Booklet in the form and context in which they are named;

- the inclusion of their respective reports or statements noted next to their names or the references to those reports or statements in the form and context in which they are included in this Scheme Booklet; and

- the inclusion of other statements in this Scheme Booklet which are based on or referable to other statements made by those persons in the form and context in which they are included:

| Name of person | Named as | Reports or Statements |
|---|---|---|
| Square, Inc. | Square | Square Information |
| Gilbert + Tobin | Australian legal adviser to Afterpay | – |
| Cravath, Swaine & Moore LLP | US legal adviser to Afterpay | – |
| Goldman Sachs | Financial adviser to Afterpay | – |
| Qatalyst Partners | Financial adviser to Afterpay | – |
| Highbury Partnership | Financial adviser to Afterpay's Board | – |
| Lonergan Edwards & Associates | Independent Expert | Independent Expert's Report set out in Attachment C |
| Computershare Investor Services Pty Limited | Afterpay Share Registry | – |
| PwC | Australian tax adviser to Afterpay | – |
| Ernst & Young Strategy and Transactions Limited | Investigating Accountant | Independent Limited Assurance Report set out in Attachment D |
| Ernst & Young | Provider of financial due diligence services and auditor of Afterpay | – |
| Ernst & Young LLP | Independent Registered Public Accounting Firm for Square | – |

Each of the above persons:

- does not make, or purport to make, any statement in this Scheme Booklet or any statement on which a statement in this Scheme Booklet is based, other than a statement or report included in this Scheme Booklet with the consent of that party; and

- to the maximum extent permitted by law, expressly disclaims and takes no responsibility for any part of this Scheme Booklet, other than, in the case of:

  — Square;

  — the Independent Expert; or

  — Ernst & Young Strategy and Transactions Limited in respect of its Independent Limited Assurance Report set out in Attachment D,

  a statement or report included in this Scheme Booklet with the consent of that party as listed in the table above.

Square has given, and has not withdrawn before the date of this Scheme Booklet, its consent to be named in this Scheme Booklet in the form and context in which it is named and to the inclusion of the Square Information, on the basis set out in the 'Responsibility for Information' statement contained in the 'Important Notices and Disclaimers' included at the start of this Scheme Booklet.

For personal use only

**124**

## 10.11. Adviser Fees

Each of the persons named in this section as performing a function in a professional, advisory or other capacity in connection with the Scheme or the preparation or distribution of this Scheme Booklet will be entitled to receive professional fees charged in accordance with their normal basis of charging.

If the Scheme is implemented, Afterpay expects to pay an aggregate of approximately A$155 million (excluding GST) in transaction costs, which includes:

- fees and expenses for professional services paid or payable to:
  - Goldman Sachs for acting as financial adviser to Afterpay;
  - Qatalyst Partners for acting as financial adviser to Afterpay;
  - Highbury Partnership for acting as financial adviser to Afterpay's board;
  - Gilbert + Tobin for acting as legal adviser to Afterpay;
  - Cravath, Swaine & Moore LLP for acting as US legal adviser to Afterpay;
  - PwC for acting as Australian tax adviser to Afterpay;
  - Ernst & Young Strategy and Transactions Limited for acting as Investigating Accountant;
  - Ernst & Young for acting as provider of financial due diligence services;
  - Computershare Investor Services Pty Limited for acting as the Afterpay Share Registry; and
  - Lonergan Edwards & Associates Limited for acting as Independent Expert;
- other fees and expenses associated with the Court proceedings, Scheme Booklet design, printing and distribution, convening and holding the Scheme Meeting and other general and administrative expenses.

If the Scheme is not implemented, Afterpay expects to pay an aggregate of approximately A$25 million (excluding GST) in transaction costs, being costs that have already been incurred as at the date of this Scheme Booklet or will be incurred even if the Scheme is not implemented (but excluding any break fee that may be payable).

## 10.12. Regulatory Consents – ASX Relief

Afterpay has applied for, and ASX has granted, confirmations and waivers in relation to the following Listing Rules as they apply to Afterpay:

- confirmation under Listing Rule 15.1.3 that ASX does not object to the draft Scheme Booklet;
- a waiver from ASX Listing Rule 6.23.2 to enable the Afterpay Group to cancel the unvested portion of each Afterpay Equity Award in consideration for a Square award of the same character and comparable value to the forfeited corresponding Afterpay Equity Award; and
- a waiver from ASX Listing Rule 7.40 in relation to the timetable for the implementation of the Scheme.

Square intends to submit an application for admission to the official list of ASX as a Foreign Exempt Listing on or around the date of this Scheme Booklet, with such listing to be conditional on the Scheme being implemented.

## 10.13. Documents Available

An electronic version of this Scheme Booklet including the Independent Expert's Report and the Scheme Implementation Deed are available for viewing and downloading online at Afterpay's website at https://corporate.afterpay.com/.

## 10.14. Continuous Disclosure

Afterpay is subject to regular reporting and disclosure obligations under the Corporations Act and ASX Listing Rules. Afterpay has an obligation (subject to limited exceptions) to notify ASX immediately upon becoming aware of any information which a reasonable person would expect to have a material effect on the price or value of Afterpay Shares.

Copies of documents filed with ASX may be obtained from ASX's website (www.asx.com.au).

In addition, Afterpay is also required to lodge various documents with ASIC. Copies of documents lodged with ASIC in relation to Afterpay may be obtained from, or inspected at, an ASIC office.

**125**

## 10.15.  Directors' Statements

The issue of this Scheme Booklet has been unanimously authorised by the Afterpay Board.

The Afterpay Board has given (and not withdrawn) its consent to lodgement of this Scheme Booklet with ASIC.

## 10.16.  Supplementary Information

If Afterpay becomes aware of any of the following between the date of lodgement of this Scheme Booklet for registration with ASIC and the Court Approval Date:

- a material statement in this Scheme Booklet is false or misleading in a material respect;
- a material omission from this Scheme Booklet;
- a significant change affecting a matter in this Scheme Booklet has occurred; or
- a significant new matter has arisen and it would have been required to be included in this Scheme Booklet if known about at the date of lodgement with ASIC,
- depending on the nature and timing of the changed circumstances, and subject to obtaining any relevant approvals, Afterpay may circulate and publish any supplementary document by:
- making an announcement to ASX;
- posting the supplementary document to Afterpay Shareholders at their registered address as shown in the Register; or
- posting a statement on Afterpay's website at https://corporate.afterpay.com/,

as Afterpay in its absolute discretion considers it appropriate.

ASIC will be provided with an opportunity to review and comment on any supplementary documents prior to their issue by Afterpay.

## 10.17.  No Unacceptable Circumstances

The Afterpay Board believes that the Scheme does not involve any circumstances in relation to the affairs of Afterpay that could reasonably be characterised as constituting unacceptable circumstances for the purposes of section 657A of the Corporations Act.

## 10.18.  Other

### (a) Lodgement of Scheme Booklet with ASIC

A draft copy of this Scheme Booklet was lodged with ASIC on 11 October 2021 in accordance with section 411(2)(b) of the Corporations Act.

### (b) Other material information

Otherwise than as contained or referred to in this Scheme Booklet, including the Independent Expert's Report and the information that is contained in the Attachments to this Scheme Booklet, there is no other information that is material to the making of a decision by a Afterpay Shareholder whether or not to vote in favour of the Scheme Resolution to approve the Scheme, being information that is known to any Afterpay Director and which has not previously been disclosed to Afterpay Shareholders.

**126**

Section 11

# Glossary

In this Scheme Booklet unless the context otherwise requires:

**£** means Great Britain Pound.

**2009 Plan** means the Square 2009 Stock Plan.

**2015 Plan** means the Square 2015 Equity Incentive Plan, as amended and restated.

**AASB** means the Australian Accounting Standards Board.

**ACCC** means the Australian Competition and Consumer Commission.

**Active customers** means customers who have transacted at least once in the last 12 months.

**Active merchants** means merchants who have transacted at least once in the last 12 months.

**Advisory Board** means the Afterpay US Advisory Board.

**AFSL** means Australian Financial Services Licence.

**Afterpay** means Afterpay Limited (ACN 618 280 649).

**Afterpay App** means the mobile application produced by Afterpay.

**Afterpay Board** means the board of directors of Afterpay.

**Afterpay Competing Transaction** means an offer, proposal, transaction or arrangement (whether by way of stock purchase, tender offer, exchange offer, merger, consolidation, share exchange, business combination, joint venture, reorganisation, recapitalisation, takeover bid, scheme of arrangement, capital reduction, buy back, sale, lease or assignment of assets, sale or issue of securities, reverse takeover bid, dual listed company structure (or other synthetic merger), deed of company arrangement, debt for equity arrangement or otherwise), or a series of any of the foregoing (other than the Scheme), which, if completed, would mean:

(a) the Afterpay Shareholders immediately prior to such transaction do not own more than 80% of the voting power of securities of the resulting entity or its ultimate parent;

(b) a person (other than Square or its Related Bodies Corporate), whether alone or together with its associates, would:

    (i) directly or indirectly acquire a Relevant Interest in or become the holder of 20% or more of the Afterpay Shares (other than as custodian, nominee or bare trustee);

    (ii) acquire control of Afterpay, within the meaning of section 50AA of the Corporations Act; or

    (iii) directly or indirectly acquire, obtain a right to acquire, or otherwise obtain an interest in (including through any license arrangement) 20% or more of the consolidated assets of the Afterpay Group; or

(c) Square would be required to abandon, or otherwise fail to proceed with, the Scheme.

# 127

Section 11
Glossary

For personal use only

**Afterpay Constitution** means the constitution of Afterpay.

**Afterpay Director** or **your director** means a director of Afterpay as at the date of this Scheme Booklet.

**Afterpay Employee Incentive** means an Afterpay Security issued under an Afterpay Employee Incentive Plan.

**Afterpay Employee Option** means an option to purchase Afterpay Shares issued under an Afterpay Employee Incentive Plan operated by the Afterpay Group.

**Afterpay Employee Plan** means any plan, program, policy, contract, agreement or other arrangement providing for compensation (except salaries and hourly wages), bonus pay, severance, benefits, termination pay, change in control pay, deferred compensation, performance awards, stock or stock-related awards, phantom stock, commission, vacation, profit sharing, pension benefits, welfare benefits, fringe benefits or other employee benefits (except salaries and hourly wages) of any kind, funded or unfunded, including each "employee benefit plan," within the meaning of section 3(3) of ERISA (whether or not subject to ERISA) which is maintained, contributed to, or required to be contributed to, by the Afterpay Group for the benefit of any current or former Afterpay director, officer, employee or other service provider or with respect to which the Afterpay Group has any direct or indirect liability; provided, however, that the term "Afterpay Employee Plan" shall not include any plans, programs, policies, contracts, agreements or other arrangements sponsored or maintained by a Governmental Authority.

**Afterpay Group** means Afterpay and its Subsidiaries, and **Afterpay Group Member** means any of those entities comprising the Afterpay Group.

**Afterpay Historical Financial Information** has the meaning given in section 4.6.

**Afterpay Historical Income Statements** has the meaning given in section 4.6.

**Afterpay Historical Statement of Financial Position** has the meaning given in section 4.6.

**Afterpay Historical Cash Flow Statements** has the meaning given in section 4.6.

**Afterpay Information** means all information contained in this Scheme Booklet (other than the Square Information, the Independent Expert's Report and the Independent Limited Assurance Report).

**Afterpay Material Adverse Effect** means any event, matter or circumstance which has, or would be reasonably likely to have, either individually or when aggregated with any other events, matters or circumstances, a material adverse effect on the assets and liabilities (taken as a whole), financial condition, business or results of operations of the Afterpay Group (taken as a whole) but does not include events, matters or circumstances to the extent resulting from or arising out of:

(a)  any matter Disclosed to Square;

(b)  changes in general economic, industry, regulatory or political conditions, the securities or other capital markets in general or law;

(c)  any epidemic, pandemic (including COVID-19 or COVID-19 Measures), hurricane, earthquake, flood, weather conditions, calamity or other natural disaster, act of God or other force majeure event (or any worsening of or recovery from any of the foregoing);

(d)  geopolitical conditions, hostilities, civil or political unrest, any acts of war, sabotage, cyberattack or terrorism (including any outbreak, escalation or worsening of any of the foregoing);

(e)  any change in taxation rates, interest rates or exchange rates;

(f)  any change in generally accepted accounting principles or the authoritative interpretation of them;

(g)  the taking of any action required under the Scheme Implementation Deed, the Scheme or the transactions contemplated by them (other than, to the extent not excluded by another clause of this definition, Afterpay's compliance with its obligations pursuant to clause 8 of the Scheme Implementation Deed);

(h)  any change in the market price or trading volume of Afterpay Shares (but this exception will not prevent the underlying cause or contributing factor of any such change, if not falling within any other exception in this definition, from being taken into account in determining whether there has been an Afterpay Material Adverse Effect);

(i)  any failure, in and of itself, by Afterpay or a member of the Afterpay Group to meet any internal or published projections, forecasts, estimates or predictions of revenues, earnings or other financial or operating metrics for any period (but this exception will not prevent the underlying cause or contributing factor of any such failure, if not falling within any other exception in this definition, from being taken into account in determining whether there has been an Afterpay Material Adverse Effect);

**128**

For personal use only

(j)    the execution, delivery or performance of the Scheme Implementation Deed, the announcement or pendency of the Scheme or the other transactions contemplated by the Scheme Implementation Deed (including the impact of any of the foregoing on the relationship of Afterpay or a member of the Afterpay Group with their respective employees, customers, creditors, suppliers or contractual counterparties), provided that this clause (j) shall not apply with respect to any representation or warranty that addresses the consequences of the execution, delivery or performance of the Scheme Implementation Deed or the announcement or pendency of the Scheme or the other transactions contemplated by the Scheme Implementation Deed or with respect to the Conditions Precedent that relate to such representations or warranties;

(k)    the identity of, or any facts or circumstances relating to, Square or any member of the Square Group;

(l)    any actions, suits or claims arising from allegations of a breach of fiduciary duty or violation of securities laws, in each case relating to the Scheme Implementation Deed, the Scheme or the transactions contemplated by the Scheme Implementation Deed; or

(m) any action (or the failure to take any action) with the written consent or at the written request of Square;

except, in the case of each of the foregoing clauses (b), (c), (d), (e) and (f), if the effects of such events, matters or circumstances are disproportionately adverse to the Afterpay Group as compared to the effects on other companies in the industry in which the Afterpay Group operates, and then solely to the extent of such disproportionate effect.

**Afterpay Minority Interests** means the Matrix Convertible Notes, the Clearpay Call Option, SGX Convertible Notes and the Pagantis Convertible Note.

**Afterpay Prescribed Event** means, except to the extent contemplated by the Scheme Implementation Deed or the Scheme, any of the following events:

(a)    **(conversion) Afterpay** converts all or any of its shares into a larger or smaller number of shares;

(b)    **(reduction of share capital)** Afterpay or another member of the Afterpay Group (other than a wholly owned Subsidiary of Afterpay) resolves to reduce its share capital in any way or resolves to reclassify, combine, split or redeem or repurchase directly or indirectly any of its shares, other than (i) any actions taken to comply with clause 4.8(a) of the Scheme Implementation Deed or as required pursuant to an Afterpay Employee Plan, (ii) as a result of the forfeiture or exercise of any Employee Share Rights (including the withholding of shares to satisfy any exercise price or Tax liability), or (iii) to the extent required by a Minority Interest in accordance with its terms or actions taken in compliance with clause 5.10 of the Scheme Implementation Deed;

(c)    **(buy-back)** Afterpay or another member of the Afterpay Group (other than a wholly owned Subsidiary of Afterpay):

(i)    enters into a buy-back agreement; or

(ii)    resolves to approve the terms of a buy-back agreement under the Corporations Act;

(d)    **(distribution)** Afterpay makes or declares, or announces an intention to make or declare, any distribution (whether by way of dividend, capital reduction or otherwise and whether in cash or in specie);

(e)    **(issuing or granting shares or options)** any member of the Afterpay Group:

(i)    issues shares;

(ii)    grants an option over its shares; or

(iii)    agrees to make an issue of or grant an option over shares,

in each case to a person that is not Afterpay or a wholly owned Subsidiary of Afterpay other than (A) actions taken to comply with clause 4.8(a) of the Scheme Implementation Deed, required pursuant to an Afterpay Employee Plan or in accordance with clause 7.9 of the Scheme Implementation Deed, (B) the issuance of shares in connection with the exercise or vesting of any Employee Share Rights in the ordinary course in accordance with their terms as of the date of the Scheme Implementation Deed or as modified not in breach of the Scheme Implementation Deed, (C) the issuance of securities in connection with employee incentives that are not in breach of clause 8.3(h) of the Scheme Implementation Deed, or (D) to the extent required by a Minority Interest in accordance with its terms or actions taken in compliance with clause 5.10 of the Scheme Implementation Deed;

**129**

Section 11
Glossary

(f) **(securities or other instruments)** any member of the Afterpay Group issues or agrees to issue securities or other instruments convertible into shares in each case to a person that is not Afterpay or a wholly owned Subsidiary of Afterpay other than (i) actions taken to comply with clause 4.8(a) of the Scheme Implementation Deed, required pursuant to an Afterpay Employee Plan or in accordance with clause 7.9 of the Scheme Implementation Deed, (ii) the issuance of securities in connection with employee incentives that are not in breach of clause 8.3(h) of the Scheme Implementation Deed, or (iii) of the Scheme Implementation Deed to the extent required by a Minority Interest in accordance with its terms or actions taken in compliance with clause 5.10 of the Scheme Implementation Deed;

(g) **(constitution)** Afterpay or any non-wholly owned Subsidiary of Afterpay adopts a new constitution or modifies or repeals its constitution or a provision of it;

(h) **(acquisitions, disposals or tenders)** any member of the Afterpay Group:

    (i) acquires or disposes of;

    (ii) agrees to acquire or dispose of; or

    (iii) offers, proposes, announces a bid or tenders for,

any business, entity or undertaking or assets comprising a business (A) (x) in the case of disposals, the value of which exceeds A$20 million individually or in the aggregate or (y) in the case of acquisitions, bids or tenders, the value of which exceeds A$20 million individually or in the aggregate, or (B) where that acquisition, disposal, bid or tender will or is reasonably likely to have a material adverse effect on the Timetable or the prospects of obtaining any Regulatory Approval;

(i) **(encumbrances)** any member of the Afterpay Group creates, or agrees to create, any Encumbrance over or declares itself the trustee of all or a material part of the Afterpay Group's business or property;

(j) **(merger)** (i) Afterpay or (ii) any material member of the Afterpay Group merges or consolidates with any other person (other than, in the case of clause (ii) Afterpay or a wholly owned Subsidiary of Afterpay) or restructures, reorganises or completely or partially liquidates or dissolves;

(k) [reserved];

(l) **(Insolvency)** Afterpay or any of its material Related Bodies Corporate becomes Insolvent,

provided that an Afterpay Prescribed Event will not include any matter:

    (i) Disclosed to Square;

    (ii) required by law, regulation, changes in generally accepted accounting principles in Australia or by an order of a court or Governmental Authority;

    (iii) made at the written request of Square; or

    (iv) the undertaking of which Square has approved in writing (which approval will not be unreasonably withheld, delayed or conditioned, and will not be withheld if to do so would contravene competition laws).

**Afterpay RSU Award** each restricted stock unit or performance right corresponding to Afterpay Shares issued under an Afterpay Employee Incentive Plan.

**Afterpay Securities** means any securities issued by the Afterpay Group, including Afterpay Shares, Afterpay Employee Options, Afterpay UK Options, Afterpay US Employee Options, and Afterpay US Shares.

**Afterpay Share** means a fully paid ordinary share issued in the capital of Afterpay.

**Afterpay Share Price** means the price of Afterpay Shares as quoted on ASX in AUD.

**Afterpay Shareholder Information Line** means the information line set up for the purpose of answering enquiries from Afterpay Shareholders in relation to the Scheme, being on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT)

**Afterpay Shareholders** means each person who is registered in the Register of Afterpay as the holder of Afterpay Shares.

**Afterpay Share Register** means the register of the members of Afterpay maintained in accordance with the Corporations Act.

**Afterpay Share Registry** means Computershare Investor Services Pty Limited.

**Afterpay UK Option** means an option to acquire a share in Clearpay issued under an Afterpay Employee Incentive Plan.

**130**

For personal use only

**Afterpay US Employee Option** means an option to purchase Afterpay US Shares issued under an Afterpay Employee Incentive Plan.

**Afterpay US Share** means a share in the capital of Afterpay US.

**Afterpay US** means Afterpay US, Inc.

**AML** means anti-money laundering.

**API** means application programming interface.

**ASIC** means the Australian Securities and Investments Commission.

**ASX** means ASX Limited ACN 008 624 691 or, as the context requires, the financial market operated by it.

**ASX Listing Rules** means the official listing rules, from time to time, of ASX.

**ASX Official List** means the official list of the entities that ASX has admitted and not removed.

**ASX Settlement Operating Rules** means the operating rules of the clearing and settlement facility provided by ASX Settlement Pty Limited (ABN 49 008 504 532).

**Attachment** means an attachment to this Scheme Booklet.

**ATO** means the Australian Taxation Office.

**AUD, A$** means Australian dollars.

**Australian Admission** means the admission of Square to the ASX Official List as an ASX foreign exempt listing and the official quotation of all New Square CDIs on ASX.

**BNPL** means buy now, pay later.

**BNZ** means Bank of New Zealand.

**Break Fee** means an amount equal to A$385 million.

**Business Day** means a business day as defined in the Listing Rules; provided that such day is neither:

(a) a day on which the banks in Sydney, New South Wales, Australia, are authorised or required to close, nor

(b) a day on which the Banks in San Francisco, California, United States of America, are authorised or required to close.

**Bylaws** means the Amended and Restated Bylaws of Square.

**CAGR** means compound annual growth rate.

**Cash App** means each of:

(a) the Cash App mobile application produced by Square;

(b) Square's Cash App operating and reportable business segment; and

(c) relating to the provision by Square of financial services to support individuals in managing their money through Cash App (the Cash App ecosystem), as described in section 5.2.

**Cash App Investing** means Cash App Investing LLC.

**Cash Boost** means Square's rewards program for Cash App customers, as described in section 5.4(b)(ii)(B).

**Cash Card** means a debit card linked directly to a customer's Cash App balance.

**Cash Election** means the change in Scheme Consideration to the Cash Election Payment for each Afterpay Share; plus either:

(a) where that Scheme Participant is a Share Elected Shareholder, 0.37125 New Square Shares; or

(b) where that Scheme Participant is a CDI Elected Shareholder, 0.37125 New Square CDIs.

**Cash Election Payment** means an amount in cash, in Australian dollars (rounded to the nearest whole cent), equal to the product of (w) 0.01, (x) the Square VWAP, (y) 0.375 and (z) the exchange rate of 1 US dollar into 1 Australian dollar as of 4:00 p.m. New York time on the Determination Date, as calculated by Bloomberg L.P. or, if not reported therein, another authoritative source mutually selected by the parties.

**CDI** means a CHESS Depositary Interest, being a unit of beneficial interest in shares of a foreign registered company, registered in the name of the CDI Nominee, or held in the form of beneficial ownership.

**131**

For personal use only

Section 11
Glossary

**CDI Election** means a valid election for New Square CDIs made by a Scheme Shareholder whose registered address on the Afterpay Register as at the Record Date is not in Australia or New Zealand (other than an Ineligible Foreign Shareholder) pursuant to the terms of the Scheme.

**CDI Election Form** means an Election Form for a CDI Election.

**CDI Nominee** means CHESS Depositary Nominees Pty Limited (ACN 071 346 506).

**Certificate of Incorporation** means the Amended and Restated Certificate of Incorporation of Square.

**CGT** means capital gains tax.

**CHESS** means the Clearing House Electronic Subregister System or share transfers operated by ASX Settlement and Transfer Corporation Pty Ltd.

**Clearpay** means Clearpay Finance Limited.

**Clearpay Call Option** has the meaning given to that term in section 4.13(b).

**Computershare** means Computershare Investor Services Pty Limited (ABN 48 078 279 277)

**Combined Group** means the combined Afterpay Group and Square Group following implementation of this Scheme.

**Combined Group Pro Forma Historical Financial Information** has the meaning given in section 6.8(a).

**Combined Group Pro Forma Historical Income Statements** has the meaning given in section 6.8(a).

**Combined Group Pro Forma Historical Cash Flows** has the meaning given in section 6.8(a).

**Combined Group Pro Forma Historical Statement of Financial Position** has the meaning given in section 6.8(a).

**Conditions Precedent** means the conditions precedent to the Scheme as set out in section 3.11(a).

**Core Business** means customer finance, retail and retail purchase financing.

**Corporations Act** means the *Corporations Act 2001* (Cth), as amended from time to time.

**Corporations Regulations** means the *Corporations Regulations 2001* (Cth).

**Court** means the Supreme Court of New South Wales or such other court of competent jurisdiction under the Corporations Act agreed to in writing by Afterpay and Square.

**Court Approval Date** means the date when the Court grants its approval to the Scheme under section 411(4) of the Corporations Act.

**COVID-19** means SARS-CoV-2 or COVID-19, and any evolutions or mutations thereof (including any subsequent waves or outbreaks thereof).

**COVID-19 Measures** means any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, rules, regulations, directives, guidelines or recommendations promulgated by any Governmental Authority of competent jurisdiction, including the US Centres for Disease Control and Prevention, the Australian Government Department of Health and the World Health Organization in connection with or in response to COVID-19.

**CRM** means customer relationship management.

**Deed Poll** means the deed poll in the form of Attachment B to this Scheme Booklet, executed by Square and Square Acquirer in favour of Scheme Shareholders.

**Determination Date** means the trading day on NYSE determined in good faith by the parties such that the time period from the Determination Date to the Implementation Date is minimised to the extent reasonably practicable, provided that the Determination Date shall be no earlier than the fifteenth trading day and no later than the fourth trading day immediately preceding the Implementation Date.

**DGCL** means the Delaware General Corporation Law.

For personal use only

**132**

**Disclosed** means fully and fairly disclosed, with sufficient detail and context as to enable a sophisticated investor entering into a transaction of the nature contemplated by the Scheme Implementation Deed to understand the nature, scope and financial significance of the relevant matter, event or circumstance:

(a)  in the case of Afterpay:

   (i)  in the Afterpay Disclosure Materials; or

   (ii)  in any announcement made by Afterpay on ASX prior to the date of the Scheme Implementation Deed (other than any forward looking, projected or hypothetical information); and

(b)  in the case of Square:

   (i)  in the Square Disclosure Materials; or

   (ii)  in any statement, prospectus, report, schedule or another form filed with or furnished to the SEC by Square pursuant to the Securities Act or the Exchange Act prior to the date of the Scheme Implementation Deed (other than any forward looking, projected or hypothetical information).

**DRS** means the Direct Registration System, which allows registered securities to be held in electronic book-entry form without having a physical security certificate issued as evidence of ownership.

**Duty** means any stamp, transaction or registration duty or similar charge which is imposed by any Governmental Authority and includes any associated interest, penalty, charge or other amount which is imposed.

**Effective**, when used in relation to the Scheme, means the coming into effect, pursuant to section 411(10) of the Corporations Act, of the order of the Court made under section 411(4)(b) of the Corporations Act in relation to this Scheme, but in any event at no time before an office copy of the order of the Court is lodged with ASIC.

**Effective Date** means the date on which the Scheme becomes Effective.

**Election Date** means the 4th Business Day before the Record Date or such other date as agreed in writing by Afterpay and Square.

**Election Form** means the CDI Election Form or Share Election Form to be completed by a Scheme Shareholder (other than an Ineligible Foreign Shareholder) who wishes to make a CDI Election or Share Election (as applicable).

**Election Withdrawal Form** means the form to be completed by Scheme Shareholders (excluding Ineligible Foreign Shareholders) who have made a Share Election or CDI Election (as applicable) who wishes to withdraw that Share Election or CDI Election (as applicable).

**Employee Share Right** means a share, a right to acquire a share or a right, the value of which corresponds to a share, issued under an employee incentive plan operated by the Afterpay Group.

**EMV** means Europay, Mastercard and Visa.

**End Date** means the date that is 12 months after the date of the Scheme Implementation Deed (2 August 2021) or any other date agreed in writing by Square and Afterpay.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

**Ernst & Young Strategy and Transactions** means Ernst & Young Strategy and Transactions Limited.

**ERP** means enterprise relationship management.

**ESPP** means the Square 2015 Employee Stock Purchase Plan.

**ETF** means exchange-traded fund.

**Exchange Act** means the US Securities Exchange Act of 1934, as amended.

**Exclusivity Period** means the period from and including the date of the Scheme Implementation Deed to the termination of the Scheme Implementation Deed.

**FDIC** means Federal Deposit Insurance Corporation.

**FINRA** means Financial Industry Regulatory Authority.

**FIRB** means the Foreign Investment Review Board.

**Foreign Exempt Listing** means the admission of a company to the official list of ASX as an 'ASX Foreign Exempt Listing' pursuant to Listing Rule 1.11.

**FY19** means the 12 months ended 30 June 2019.

# 133

For personal use only

Section 11
Glossary

For personal use only

**FY20** means the 12 months ended 30 June 2020.

**FY21** means the 12 months ended 30 June 2021.

**GPV** means Gross Payment Volume.

**Governmental Authority** means:

(a)  any supranational, national, federal, state, county, municipal, local, provincial or foreign government or any entity exercising executive, legislative, judicial, arbitral, regulatory, taxing, or administrative functions of or pertaining to government;

(b)  any public international governmental organisation;

(c)  any agency, division, bureau, department, committee, or other political subdivision of any government, entity or organisation described in the foregoing clauses (a) or (b) of this definition (including patent and trademark offices); or (d) quasi-governmental, self-regulatory agency, commission or authority, including any national securities exchange or national quotation system,

and includes ASX, ACCC, ASIC, the Takeovers Panel, FIRB, OIO, the Australian Taxation Office, Bank of Spain, Spain FDI Authority, Department of Justice, US Federal Trade Commission and any state or territory revenue offices.

**GST** means a goods and services tax or similar value added tax levied or imposed under the GST Law.

**GST Law** has the meaning given to it in the *A New Tax System (Goods and Services Tax) Act 1999* (Cth).

**Headcount Test** has the meaning given to it in section 3.3(b) of this Scheme Booklet.

**HIN** means Holder Identification Number.

**HSR Act** means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

**IFRS** means International Financial Reporting Standards issued by the International Accounting Standards Board.

**Implementation Date** means the fifth Business Day after the Record Date or such other date as Afterpay and Square may agree in writing.

**Independent Expert** means the expert appointed by Afterpay, being Lonergan Edwards & Associates Limited.

**Independent Expert's Report** means the report prepared by the Independent Expert, a copy of which is set out in Attachment C to this Scheme Booklet.

**Independent Limited Assurance Report** means the report prepared by the Investigating Accountant, a copy of which is set out in Attachment D to this Scheme Booklet.

**Ineligible Foreign Shareholder** means an Afterpay Shareholder whose address shown in the Register is a place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States or who is acting on behalf of such a person, unless Square or Square Acquirer determines that:

(a)  it is lawful and not unduly onerous or unduly impracticable to issue that Afterpay Shareholder with the New Square Shares or New Square CDIs on implementation of the Scheme; and

(b)  it is lawful for that Afterpay Shareholder to participate in the Scheme by the law of the relevant place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States.

**Intervening Event** means an event, matter or circumstance that is material to the Square Group (taken as a whole) and that (a) was not known or reasonably foreseeable to the Square Board as of or prior to the date of the Scheme Implementation Deed and (b) does not relate to or involve (i) any Square Competing Transaction or any inquiry or communications relating thereto or any matter relating thereto or consequence thereof or (ii) any change in the price or trading volume of the Afterpay Shares, Square Shares or any other securities of Afterpay, Square or any of their respective Subsidiaries (provided that the underlying causes of such changes may constitute, or be taken into account in determining whether there has been, an Intervening Event).



**134**

A person is **Insolvent** if:

(a) it is (or states that it is) an insolvent under administration or insolvent (each as defined in the Corporations Act);

(b) it is in liquidation, in provisional liquidation, under administration or wound up or has had a Controller appointed to any part of its property;

(c) it is subject to any arrangement (including a deed of company arrangement or scheme of arrangement), assignment, moratorium, compromise or composition, protected from creditors under any statute or dissolved (in each case, other than to carry out a reconstruction or amalgamation while solvent on terms approved by the other parties to the Scheme Implementation Deed);

(d) an application or order has been made (and in the case of an application which is disputed by the person, it is not stayed, withdrawn or dismissed within 14 days), resolution passed, proposal put forward, or any other action taken, in each case in connection with that person, which is preparatory to or could result in any of the things described in any of the above paragraphs;

(e) it is taken (under section 459F(1) of the Corporations Act) to have failed to comply with a statutory demand;

(f) it is the subject of an event described in section 459C(2)(b) or section 585 of the Corporations Act (or it makes a statement from which another party to the Scheme Implementation Deed reasonably deduces it is so subject);

(g) it is otherwise unable to pay its debts when they fall due; or

(h) something having a substantially similar effect to any of the things described in the above paragraphs happens in connection with that person under the law of any jurisdiction.

**Instant Transfer** has the meaning given in section 5.4(a)(ii)(F).

**Investigating Accountant** means Ernst & Young Strategy and Transactions Limited.

**ISO** means incentive stock options.

**Listing Rules** means:

(a) in respect of Afterpay, the Listing Rules of ASX and any other applicable rules of ASX modified to the extent of any express written waiver by ASX; or

(a) in respect of Square, the applicable rules contained in the NYSE Listed Company Manual,

as the context requires.

**Matrix Convertible Notes** has the meaning given in section 4.13(a).

**NAB** means National Australia Bank.

**New Square CDI** means a CDI in respect of a New Square Share registered in the name of the CDI Nominee to be issued under the Scheme as Scheme Consideration.

**New Square Securities** means New Square Shares or New Square CDIs (as applicable) to be issued as Scheme Consideration.

**New Square Share** means a fully paid Square Class A Share to be issued under the terms of the Scheme as Scheme Consideration.

**NFC** means near-field communication.

**Notice of Scheme Meeting** means the notice set out in Attachment E to convene the Scheme Meeting.

**NSO** means non-statutory stock options.

**NZ** means New Zealand.

**NZ$** means New Zealand dollars.

**NZ OIO** means New Zealand Overseas Investment Office.

**NYSE** means the New York Stock Exchange.

**Officer** has the meaning given to that term in section 9 of the Corporations Act.

**Pagantis Convertible Note** has the meaning given in section 4.13(c).

**POS** means point of sale.

**PPP** means the Paycheck Protection Program.

**PPPLF** means Paycheck Protection Program Liquidity Facility.



**135**

Section 11
Glossary

**Proxy Form** means the proxy form which accompanies this Scheme Booklet.

**PS** means performance share.

**PSP** means payment service provider.

**PwC** means PricewaterhouseCoopers.

**Record Date** means 7.00pm (AEDT) on the 25th Business Day following the Effective Date or any other date as agreed by Afterpay and Square.

**Register** means the register of Afterpay Shareholders kept by Afterpay and **Registry** means the manager from time to time of the Register (currently Computershare Investor Services Pty Limited).

**Regulatory Approval** means any approval of or notification to a Governmental Authority to the Scheme or any aspect of it, or the expiration of any waiting period required by the HSR Act or another applicable law, which Square and Afterpay agree is necessary or desirable to implement the Scheme.

**Related Body Corporate** has the meaning it has in the Corporations Act.

**Relevant Interest** has the same meaning as given by sections 608 and 609 of the Corporations Act.

**Representatives** means, in relation to a party:

(a)  a Related Body Corporate;

(b)  a director, officer or employee of the party or any of the party's Related Bodies Corporate; or

(c)  an adviser or consultant to the party or any of the party's Related Bodies Corporate.

**Requisite Majorities** means the threshold for approval of the Scheme Resolution set out in section 3.3(b) of this Scheme Booklet, being votes in favour of the resolution received from:

(a)  a majority in number (more than 50%) of Afterpay Shareholders present and voting at the Scheme Meeting (whether in person, by proxy, by attorney or, in the case of corporate Afterpay Shareholders, by a corporate representative); and

(b)  at least 75% of the total number of votes cast on the Scheme Resolution at the Scheme Meeting.

**Risk Manager** has the meaning given in section 5.4(b)(i)(C).

**RSA** means restricted stock awards.

**RSU** means restricted stock unit.

**Sale Agent** means an entity or person appointed by Square (after consultation with Afterpay and with Afterpay's approval, not to be unreasonably withheld) to sell New Square Shares under the Sale Facility that are attributable to Ineligible Foreign Shareholders.

**Sale Facility** means a facility established to sell New Square Shares that would otherwise be issued to Ineligible Foreign Shareholders, as described in section 3.5 of this Scheme Booklet.

**Sale Facility Proceeds** has the meaning given in section 3.5(a).

**Scheme** means a members' scheme of arrangement pursuant to Part 5.1 of the Corporations Act between Afterpay and Scheme Shareholders, on the terms described in Attachment A to this Scheme Booklet, subject to any alterations or conditions made or required by the Court under section 411(6) of the Corporations Act.

**Scheme Booklet** means this scheme booklet in relation to the Scheme.

**Scheme Consideration** means the consideration to be provided by Square Acquirer (or by Square on behalf of and at the direction of Square Acquirer) to Scheme Shareholders under the Scheme for the transfer of each Afterpay Share held by a Scheme Shareholder on the Record Date, as more fully described in section 3.1.

**Scheme Implementation Deed** means the Scheme Implementation Deed dated 2 August 2021 between Afterpay, Square and Square Acquirer, a copy of which was released in full to ASX on 2 August 2021.

**Scheme Meeting** means the meeting of Afterpay Shareholders ordered by the Court to be convened pursuant to section 411(1) of the Corporations Act at which Afterpay Shareholders will vote on this Scheme. The Scheme Meeting will be held virtually through an online platform, details of which are set out in the Notice of Scheme Meeting in Attachment E.

**Scheme Resolution** means a resolution of Afterpay Shareholders to approve the Scheme, the form of which is set out in the Notice of Scheme Meeting in Attachment E to this Scheme Booklet.

**Scheme Share** means an Afterpay Share held by a Scheme Shareholder as at the Record Date.

**136**

For personal use only

For personal use only

**Scheme Shareholder** means a holder of Afterpay Shares on the Record Date.

**SDK** means software development kit.

**SEC** means the United States Securities and Exchange Commission.

**Second Court Date** means the first day on which an application made to the Court for an order under section 411(4)(b) of the Corporations Act approving the Scheme is heard (or, if the application is adjourned or subject to appeal for any reason, the day on which the adjourned application is heard), with such hearing being the **Second Court Hearing**.

**Second Court Hearing** means the hearing of an application made to the Court for orders approving the Scheme pursuant to section 411(4)(b) of the Corporations Act.

**Securities Act** means US Securities Act of 1933, as amended.

**Seller** means each of:

(a)  Square's seller operating and reportable business segment; and

(b)  where applicable, the Seller ecosystem and related products and services provided by Square, as described in section 5.2.

(c)  **Senior Notes** means Square's 2026 Senior Notes and 2031 Senior Notes, which are described in section 5.10(g)(iii).

**SFS** means Square Financial Services, Inc.

**SGX Convertible Notes** has the meaning given in section 4.13(d).

**Share Election** means a valid election for New Square Shares made by a Scheme Shareholder whose registered address on the Register as at the Record Date is in Australia or New Zealand pursuant to the terms of the Scheme.

**Share Election Form** means an Election Form for a Share Election.

**SMB** means small and midsize business.

**Spain FDI Authority** means the Spanish Council of Ministers (Consejo de Ministros), or any other competent public authority.

**Square** means Square, Inc.

**Square Acquirer** means Lanai (AU) 2 Pty Ltd.

**Square Appointments** has the meaning given in section 5.4(b)(i)(A).

**Square Board** means the board of directors of Square.

**Square Class A Share** means a share of Class A common stock of Square.

**Square CDI** means a CDI in respect of a Square Class A Share.

**Square Capital** means Square Capital, LLC.

**Square Class B Share** means a share of Class B common stock of Square.

**Square Competing Acquisition** means any acquisition by any member of the Square Group of a business, entity or undertaking or assets comprising a business (whether by way of stock purchase, tender offer, exchange offer, merger, consolidation, share exchange, business combination, joint venture, reorganisation, recapitalisation or similar transaction) or joint venture or other transaction, or a series of any of the foregoing (other than the Scheme) where:

(a)  such target is material to the Combined Group (provided that, for this purpose, the Combined Group, taken as a whole, shall be deemed a consolidated group of entities the same size as the Afterpay Group) and derives a material portion of its revenues from BNPL products and/or services; or

(b)  the target operates in the BNPL space in North America, the United Kingdom, New Zealand, Europe or Australia and such acquisition or other transaction would likely materially delay or create substantial risk of any Regulatory Approval not being obtained.

**137**

Section 11
Glossary

**Square Competing Transaction** means an offer, proposal, transaction or arrangement (whether by way of stock purchase, tender offer, exchange offer, merger, consolidation, share exchange, business combination, joint venture, reorganisation, recapitalisation, takeover bid, scheme of arrangement, capital reduction, buy back, sale, lease or assignment of assets, sale or issue of securities, reverse takeover bid, dual listed company structure (or other synthetic merger), deed of company arrangement, debt for equity arrangement or otherwise), or a series of any of the foregoing (other than the Scheme) which, if completed, would mean:

(a)  the Square shareholders immediately prior to such transaction do not own more than 80% of the voting power of securities of the resulting entity or its ultimate parent; or

(b)  a person (other than Square, its Related Bodies Corporate, or holders of Square Class B Shares as of the date of the Scheme Implementation Deed), whether alone or together with its Associates, would:

(i)   directly or indirectly acquire a Relevant Interest in or become the holder of securities representing 20% or more of the total outstanding voting power of Square (other than as a custodian, nominee or bare trustee); or

(ii)  directly or indirectly acquire, obtain a right to acquire, or otherwise obtain an interest in (including through any license arrangement) 20% or more of the consolidated assets of the Square Group.

**Square Convertible Notes** means, collectively, the 2022 Convertible Notes, 2023 Convertible Notes, 2025 Convertible Notes, 2026 Convertible Notes and 2027 Convertible Notes, as each is defined in section 5.10(g).

**Square Director** means a director of Square as at the date of this Scheme Booklet.

**Square Disclosure Materials** means:

(a)  the information disclosed on behalf of the Square Group in written responses (including by email) to requests for information to Afterpay or any of its Representatives prior to the date of the Scheme Implementation Deed, except any information redacted; and

(b)  the Square Disclosure Letter.

**Square Group** means Square and each of its Subsidiaries, and **Square Member** means any of those entities comprising the Square Group.

**Square Historical Cash Flows** has the meaning given in section 5.10(a).

**Square Historical Financial Information** has the meaning given in section 5.10(a).

**Square Historical Income Statements** has the meaning given in section 5.10(a).

**Square Historical Statement of Financial Position** has the meaning given in section 5.10(a).

**Square Information** means the information provided by Square to Afterpay in writing for inclusion in this Scheme Booklet regarding:

(a)  the Square Group;

(b)  the Combined Group;

(c)  the Scheme Consideration; and

(d)  Square's intentions in relation to Afterpay's business, assets and employees,

which includes the information contained in the Letter from Square's CEO and Chairman, questions 3, 4, 19 – 22, 25, 30 – 32, 49 – 53 of the Frequently Asked Questions and sections 3.1(b), 3.2, 3.4 – 3.6, 3.8, 3.10, the acknowledgement from Square in 3.11(b), 5, 6, 7.1, 7.3(a), 7.3(d), 7.3(g), 7.3(h), 7.4 – 7.6 and 9 (as it relates to US laws and Square's Certificate of Incorporation and Bylaws), but excludes the Afterpay Information, information provided by Afterpay to Square (or otherwise obtained from Afterpay's public filings on ASX and ASIC) contained in, or used for the preparation of, the information regarding the Combined Group and the Independent Expert's Report or the Independent Limited Assurance Report.



**138**

For personal use only

**Square Material Adverse Effect** means any event, matter or circumstance which has, or would be reasonably likely to have, either individually or when aggregated with any other events, matters or circumstances, a material adverse effect on the assets and liabilities (taken as a whole), financial condition, business or results of operations of the Square Group (taken as a whole) but does not include events, matters or circumstances to the extent resulting from or arising out of:

(a) any matter Disclosed to Afterpay;

(b) changes in general economic, industry, regulatory or political conditions, the securities or other capital markets in general or law;

(c) any epidemic, pandemic (including COVID-19 or COVID-19 Measures), hurricane, earthquake, flood, weather conditions, calamity or other natural disaster, act of God or other force majeure event (or any worsening of or recovery from any of the foregoing);

(d) geopolitical conditions, hostilities, civil or political unrest, any acts of war, sabotage, cyberattack or terrorism (including any outbreak, escalation or worsening of any of the foregoing);

(e) any change in taxation rates, interest rates or exchange rates;

(f) any change in generally accepted accounting principles or the authoritative interpretation of them;

(g) the taking of any action required under the Scheme Implementation Deed, the Scheme or the transactions contemplated by them (other than, to the extent not excluded by another clause of this definition, Square's compliance with its obligations pursuant to clause 8 of the Scheme Implementation Deed);

(h) any change in the market price or trading volume of Square Shares (but this exception will not prevent the underlying cause or contributing factor of any such change, if not falling within any other exception in this definition, from being taken into account in determining whether there has been a Square Material Adverse Effect);

(i) any failure, in and of itself, by Square or a member of the Square Group to meet any internal or published projections, forecasts, estimates or predictions of revenues, earnings or other financial or operating metrics for any period (but this exception will not prevent the underlying cause or contributing factor of any such failure, if not falling within any other exception in this definition, from being taken into account in determining whether there has been a Square Material Adverse Effect);

(j) the execution, delivery or performance of the Scheme Implementation Deed, the announcement or pendency of the Scheme or the other transactions contemplated by the Scheme Implementation Deed (including in the impact of any of the foregoing on the relationship of Square or a member of the Square Group with their respective employees, customers, creditors, suppliers or contractual counterparties), provided that this clause (j) shall not apply with respect to any representation or warranty that addresses the consequences of the execution, delivery or performance of the Scheme Implementation Deed or the announcement or pendency of the Scheme or the other transactions contemplated by the Scheme Implementation Deed or with respect to the Conditions Precedent that relate to such representations or warranties;

(k) the identity of, or any facts or circumstances relating to, Afterpay or any member of the Afterpay Group;

(l) any actions, suits or claims arising from allegations of a breach of fiduciary duty or violation of securities laws, in each case relating to the Scheme Implementation Deed, the Scheme or the transactions contemplated by the Scheme Implementation Deed; or

(m) any action (or the failure to take any action) with the written consent or at the written request of Afterpay;

except, in the case of each of the foregoing clauses (b), (c), (d), (e) and (f), if the effects of such events, matters or circumstances are disproportionately adverse to the Square Group as compared to the effects on other companies in the industry in which the Square Group operates, and then solely to the extent of such disproportionate effect.

**Square Member** means each of Square and its Subsidiaries.

**Square Prescribed Event** means, except to the extent contemplated by the Scheme Implementation Deed of the Scheme, any of the following events:

(a) **(conversion)** Square converts all or any of its shares into a larger or smaller number of shares, other than a conversion of Square Class B Shares to Square Class A Shares pursuant to the terms of Square's Certificate of Incorporation;

(b) **(reduction of share capital)** Square or another member of the Square Group (other than a wholly owned Subsidiary of Square) resolves to reduce its share capital in any way or resolves to reclassify, combine or split directly or indirectly any of its shares, other than any actions under Square executive or employee share plans in the ordinary course of business;



Section 11
Glossary

(c) **(buy-back)** Square or another member of the Square Group (other than a wholly owned Subsidiary of Square) repurchases, redeems or otherwise acquires any shares of capital stock of Square, or agrees to do any of the foregoing, except (i) for acquisitions of Square A shares tendered by holders of equity awards under Square executive or employee share plans in the ordinary course of business as such awards are in effect on the date of the Scheme Implementation Deed in order to satisfy obligations to pay the exercise price or Tax withholding obligations with respect thereto or (ii) transactions solely between Square and a wholly owned Subsidiary of Square or wholly owned Subsidiaries of Square;

(d) **(issuing of securities)** any member of the Square Group issues or agrees to issue Square Class A Shares or other instruments convertible into Square Class A Shares to a person outside the Square Group other than (i) under Square executive or employee share plans in the ordinary course of business, (ii) under Square's convertible notes outstanding as of the date of the Scheme Implementation Deed or (iii) issuance of Square Class A Shares or other instruments convertible into Square Class A Shares in an amount of up to 15% of outstanding Square Shares as of the date of the Scheme Implementation Deed;

(e) **(distribution)** Square makes or declares, or announces an intention to make or declare, any distribution (whether by way of dividend, capital reduction or otherwise and whether in cash or in specie);

(f) **(charter)** Square adopts a new charter or modifies or repeals its charter or a provision of it, in each case in a manner that would materially and adversely impact the rights of the Afterpay Shareholders or would prevent, materially delay or materially impair the ability of the parties to perform their obligations under the Scheme Implementation Deed or to consummate the Scheme;

(g) **(encumbrances)** any member of the Square Group creates, or agrees to create, any Encumbrance over or declares itself the trustee of all or a material part of the Square Group's business or property;

(h) **(Square Competing Acquisition)** any member of the Square Group undertakes or agrees to undertake a Square Competing Acquisition;

(i) **(merger)** Square merges or consolidates with any other person, or restructures, reorganises or completely or partially liquidates or dissolves itself; or

(j) **(Insolvency)** Square or any of its material Related Bodies Corporate becomes Insolvent,

provided that a Square Prescribed Event will not include any matter:

(i) Disclosed to Afterpay;

(ii) required by law, regulation, changes in generally accepted accounting principles or by an order of a court or Governmental Authority;

(iii) made at the written request of Afterpay; or

(iv) the undertaking of which Afterpay has approved in writing (which approval must not be unreasonably withheld, delayed or conditioned).

**Square Shares** means Square Class A Shares and Square Class B Shares.

**Square Shareholder Approval** means the approval of Square shareholders referred to in clause 3.1(f) of the Scheme Implementation Deed which is required under the Listing Rules of NYSE to approve the issue of New Square Shares and Square Class A Shares underlying New Square CDIs.

**Square Shareholder Meeting** means a special meeting of the Square Shareholder to obtain the Square Shareholder Approval.

**Square Share Price** means the price of Square Class A Shares as quoted on NYSE in USD.

**Square Superior Proposal** means a genuine Square Competing Transaction which the Square Board, acting in good faith, and after taking advice from its outside legal adviser and financial adviser of nationally recognized reputation, determines is:

(a) reasonably likely of being completed on a reasonable timeline; and

(b) of a higher financial value and more favourable to Square shareholders than the Scheme,

in each case taking into account all aspects of the Square Competing Transaction, including the terms of the Square Competing Transaction, the price and/or value of the Square Competing Transaction, any conditions, timing considerations and any other matters affecting the probability of the Square Competing Transaction being completed in accordance with its terms, the identity, expertise, reputation and financial condition of the person making the proposal, and legal, regulatory and financial matters.

**SRN** means Securityholder Reference Number.

For personal use only

**140**

**Subsidiary** of an entity means another entity which:

(a) is a subsidiary of the first entity within the meaning of the Corporations Act; and

(b) is part of a consolidated entity constituted by the first entity and the entities it is required to include in the consolidated financial statements it prepares, or would be if the first entity was required to prepare consolidated financial statements.

**Superior Proposal** means a genuine Afterpay Competing Transaction (other than an Afterpay Competing Transaction which has resulted from a material breach of Afterpay's obligations under clause 9 of the Scheme Implementation Deed), which the Afterpay Board, acting in good faith, and after taking advice from its outside legal adviser and financial adviser of nationally recognised reputation, determines is:

(a) reasonably likely of being completed on a reasonable timeline; and

(b) of a higher financial value and more favourable to Afterpay Shareholders than the Scheme (as may be revised in accordance with clause 9.8 of the Scheme Implementation Deed, if applicable),

in each case taking into account all aspects of the Afterpay Competing Transaction, including the terms of the Afterpay Competing Transaction, the price and/or value of the Afterpay Competing Transaction, any conditions, timing considerations and any other matters affecting the probability of the Afterpay Competing Transaction being completed in accordance with its terms, the identity, expertise, reputation and financial condition of the person making the proposal, and legal, regulatory and financial matters.

**Takeovers Panel** means the Takeovers Panel constituted under the *Australian Securities and Investments Commission Act 2001* (Cth).

**Tax** means any tax, levy, charge, excise, GST, impost, rates, Duty, fee, deduction, compulsory loan or withholding, which is assessed, levied, imposed or collected by any fiscal Governmental Authority and includes any interest, fine, penalty, charge, fee, expenses or other statutory charges or any other such amount imposed by any fiscal Governmental Authority on or in respect of any of the above.

**TIDAL** has the meaning given in section 5.2(a)(iii).

**Transition Period** has the meaning given in section 5.8(d)(i).

**UK** means United Kingdom.

**Underlying Sales** means underlying value of customer orders processed through the Afterpay platform (otherwise referred to as gross merchant value).

**US** means United States of America.

**USD, US$** means US dollars.

**U.S. GAAP** means the generally accepted accounting principles in the United States of America.

**Voting Record Date** means 7.00pm on Saturday, 4 December 2021, being the time and date for determining eligibility to vote at the Scheme Meeting.

**VWAP** means the volume weighted average trading price of the relevant securities, calculated by dividing the total value by the total volume of securities traded for the relevant period.

**Warehouse Facilities** has the meaning given in section 7.2(f).

**141**

For personal use only

142


For personal use only

**Attachment A**

# Scheme of Arrangement made under Section 411 of the Corporations Act

**142**

228



# Scheme of Arrangement

Dated                    2021

Afterpay Limited ("**Afterpay**")

Scheme Participants

**King & Wood Mallesons**
Level 61
Governor Phillip Tower
1 Farrer Place
Sydney NSW 2000
Australia
**T** +61 2 9296 2000
**F** +61 2 9296 3999
DX 113 Sydney
www.kwm.com

For personal use only

**143**

For personal use only

# Scheme of Arrangement
## Contents

| | | |
|---|---|---|
| **Details** | | **1** |

| | | |
|---|---|---|
| **General terms** | | **2** |

| | | |
|---|---|---|
| **1** | **Definitions and interpretation** | **2** |
| 1.1 | Definitions | 2 |
| 1.2 | General interpretation | 6 |

| | | |
|---|---|---|
| **2** | **Preliminary** | **7** |
| 2.1 | Afterpay | 7 |
| 2.2 | Square | 7 |
| 2.3 | Square Acquirer | 7 |
| 2.4 | If Scheme becomes Effective | 8 |
| 2.5 | Scheme Implementation Deed | 8 |
| 2.6 | Deed Poll | 8 |

| | | |
|---|---|---|
| **3** | **Conditions precedent** | **8** |
| 3.1 | Conditions precedent to Scheme | 8 |
| 3.2 | Conditions precedent and operation of clause 5 | 8 |
| 3.3 | Certificate in relation to conditions precedent | 9 |

| | | |
|---|---|---|
| **4** | **Scheme** | **9** |
| 4.1 | Effective Date | 9 |
| 4.2 | End Date | 9 |

| | | |
|---|---|---|
| **5** | **Implementation of Scheme** | **9** |
| 5.1 | Elections | 9 |
| 5.2 | Lodgement of Court orders with ASIC | 10 |
| 5.3 | Transfer and registration of Afterpay Shares | 10 |
| 5.4 | Entitlement to Scheme Consideration | 11 |
| 5.5 | Title and rights in Afterpay Shares | 11 |
| 5.6 | Warranty by Scheme Participants | 11 |
| 5.7 | Transfer free of Encumbrances | 11 |
| 5.8 | Appointment of Square Acquirer as sole proxy | 11 |

| | | |
|---|---|---|
| **6** | **Scheme Consideration** | **12** |
| 6.1 | Consideration under this Scheme | 12 |
| 6.2 | Scheme Consideration | 12 |
| 6.3 | Provision of Scheme Consideration | 12 |
| 6.4 | Fractional entitlements | 13 |
| 6.5 | Scheme Participants' agreements | 14 |
| 6.6 | Ineligible Foreign Shareholder Sale Facility | 14 |
| 6.7 | Orders of a Court or Governmental Authority | 15 |
| 6.8 | Shares to rank equally | 16 |
| 6.9 | Joint holders | 17 |

**144**

230

| 7 | **Dealings in Scheme Shares** | **17** |
|---|---|---|
| 7.1 | Determination of Scheme Participants | 17 |
| 7.2 | Register | 17 |
| 7.3 | No disposals after Effective Date | 17 |
| 7.4 | Maintenance of Afterpay Register | 17 |
| 7.5 | Effect of certificates and holding statements | 17 |
| 7.6 | Details of Scheme Participants | 18 |
| 7.7 | Quotation of Afterpay Shares | 18 |
| 7.8 | Termination of quotation of Afterpay Shares | 18 |
| **8** | **Instructions and notification** | **18** |
| **9** | **Power of attorney** | **18** |
| **10** | **Notices** | **19** |
| 10.1 | No deemed receipt | 19 |
| 10.2 | Accidental omission | 19 |
| **11** | **General** | **19** |
| 11.1 | Variations, alterations and conditions | 19 |
| 11.2 | Further action by Afterpay | 19 |
| 11.3 | Authority and acknowledgement | 19 |
| 11.4 | No liability when acting in good faith | 20 |
| 11.5 | Enforcement of Deed Poll | 20 |
| 11.6 | Stamp duty | 20 |
| **12** | **Governing law** | **20** |
| 12.1 | Governing law and jurisdiction | 20 |
| 12.2 | Serving documents | 20 |

© King & Wood Mallesons    Scheme of Arrangement    ii

**145**

For personal use only

# Scheme of Arrangement

## Details

**Parties**

| | | |
|---|---|---|
| **Afterpay** | Name | **Afterpay Limited** |
| | ACN | 618 280 649 |
| | Formed in | Victoria |
| | Address | Level 23, 2 Freshwater Place Melbourne VIC 3006, Australia |
| | Email | legal@afterpay.com.au |
| | Attention | General Counsel |
| **Scheme Participants** | Each person who is an Afterpay Shareholder as at the Record Date. | |
| **Governing law** | Victoria | |

© King & Wood Mallesons          Scheme of Arrangement                                                          1

**146**

232

For personal use only

## General terms

## 1    Definitions and interpretation

### 1.1    Definitions

Unless the contrary intention appears, these meanings apply:

**ACCC** means the Australian Competition and Consumer Commission.

**Afterpay Share** means a fully paid ordinary share in the capital of Afterpay.

**Afterpay Shareholder** means each person who is registered in the Register of Afterpay as a holder of Afterpay Shares.

**ASIC** means the Australian Securities & Investments Commission.

**ASX** means ASX Limited ACN 008 624 691 or the market operated by it, as the context requires.

**ASX Official List** means the official list of the entities that ASX has admitted and not removed.

**ASX Settlement** means ASX Settlement Pty Limited (ABN 49 008 504 532) as the holder of a licence to operate a clearing and settlement facility.

**ASX Settlement Operating Rules** means the operating rules of the clearing and settlement facility operated by ASX Settlement from time to time as modified by any express written waiver or exemption given by ASX or ASX Settlement.

**ATO** means the Australian Taxation Office.

**Australian Admission** means the admission of Square to the ASX Official List as an ASX foreign exempt listing and the official quotation of all New Square CDIs on ASX.

**Business Day** means a business day as defined in the Listing Rules, provided that such day is neither:

(a)    a day on which the banks in Sydney, New South Wales, Australia, are authorised or required to close, nor

(b)    a day on which the banks in San Francisco, California, United States of America, are authorised or required to close.

**CDI** means CHESS depository interest, being a unit of beneficial interest in shares of a foreign registered company, registered in the name of the CDN, or held in the form of beneficial ownership.

**CDI Elected Shareholder** means each of:

(a)    an Eligible AUSNZ Shareholder who has not made a Share Election; and

(b)    an Eligible Non-AUSNZ Shareholder who has made a CDI Election.

| © King & Wood Mallesons | Scheme of Arrangement | 2 |

**147**

Attachment A
Scheme of Arrangement made under Section 411 of the Corporations Act

**CDI Election** means a valid election for New Square CDIs made by an Eligible Non-AUSNZ Shareholder pursuant to the terms of this Scheme.

**CDI Election Form** means the form to be completed by an Eligible Non-AUSNZ Shareholder who wishes to make a CDI Election.

**CDN** means CHESS Depositary Nominees Pty Limited (ACN 071 346 506).

**CHESS** means Clearing House Electronic Subregister System or share transfers operated by ASX Settlement and Transfer Corporation Pty Ltd.

**Corporations Act** means the *Corporations Act 2001* (Cth), as amended from time to time.

**Court** means the Supreme Court of New South Wales, or another court of competent jurisdiction under the Corporations Act agreed in writing by Square and Afterpay.

**Deed Poll** means the deed poll executed by Square and Square Acquirer substantially in the form of Annexure C of the Scheme Implementation Deed or as otherwise agreed by Square, Square Acquirer and Afterpay under which Square and Square Acquirer covenant in favour of each Scheme Participant to perform the obligations attributed to Square and Square Acquirer under this Scheme.

**Details** means the section of this agreement headed "Details".

**Effective** means the coming into effect, pursuant to section 411(10) of the Corporations Act, of the order of the Court made under section 411(4)(b) of the Corporations Act in relation to this Scheme, but in any event at no time before an office copy of the order of the Court is lodged with ASIC.

**Effective Date** means the date on which this Scheme becomes Effective.

**Election Date** means the 4th Business Day before the Record Date or such other date as agreed in writing by Afterpay and Square.

**Election Withdrawal Form** means the form to be completed by Eligible AUSNZ Shareholders or Eligible Non-AUSNZ Shareholders who have made a Share Election or CDI Election (as applicable) who wishes to withdraw that Share Election or CDI Election (as applicable).

**Eligible AUSNZ Shareholder** means a Scheme Participant whose Registered Address as at the Record Date is in Australia or New Zealand.

**Eligible Non-AUSNZ Shareholder** means a Scheme Participant whose Registered Address as at the Record Date is not in Australia or New Zealand (other than an Ineligible Foreign Shareholder).

**Encumbrance** means any security for the payment of money or performance of obligations, including a mortgage, charge, lien, pledge, trust, power or title retention or flawed deposit arrangement and any "security interest" as defined in sections 12(1) or (2) of the PPSA, right of first refusal, preemptive right, any similar restriction, or any agreement to create any of them or allow them to exist.

**End Date** means the date that is 12 months after the date of the Scheme Implementation Deed or such other date as is agreed in writing by Square and Afterpay.

**FIRB** means the Australian Foreign Investment Review Board.

**148**

For personal use only

**Governmental Authority** means:

(a)    any supranational, national, federal, state, county, municipal, local, provincial or foreign government or any entity exercising executive, legislative, judicial, arbitral, regulatory, taxing, or administrative functions of or pertaining to government;

(b)    any public international governmental organisation;

(c)    any agency, division, bureau, department, committee, or other political subdivision of any government, entity or organisation described in the foregoing clauses (a) or (b) of this definition (including patent and trademark offices); or

(d)    quasi-governmental, self-regulatory agency, commission or authority, including any national securities exchange or national quotation system,

and includes ASX, ACCC, ASIC, the Takeovers Panel, FIRB, OIO, ATO, Bank of Spain, Spain FDI Authority, Department of Justice, US Federal Trade Commission and any state or territory revenue offices.

**Implementation Date** means the 5th Business Day following the Record Date or such other date after the Record Date as is agreed in writing by Square and Afterpay.

**Ineligible Foreign Shareholder** means an Afterpay Shareholder whose address shown in the Register is a place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States or who is acting on behalf of such a person, unless Square determines that:

(a)    it is lawful and not unduly onerous or unduly impracticable to issue that Afterpay Shareholder with the New Square Shares or New Square CDIs on implementation of this Scheme; and

(b)    it is lawful for that Afterpay Shareholder to participate in this Scheme by the law of the relevant place outside Australia and its external territories, Canada, Hong Kong, New Zealand, Singapore, Switzerland, United Kingdom and the United States.

**Ineligible Foreign Shareholder Sale Facility** means the facility to be conducted in accordance with clause 6.6.

**Listing Rules** means the Listing Rules of ASX.

**New Square CDIs** means the Square CDIs to be issued to Scheme Participants as Scheme Consideration under this Scheme.

**New Square Shares** means the fully paid Square Class A Shares to be issued to Scheme Participants as Scheme Consideration under this Scheme.

**Nominee Holder** has the meaning given in clause 5.1(f).

**NYSE** means the New York Stock Exchange.

**OIO** means the New Zealand Overseas Investment Office.

**PPSA** means the *Personal Property Securities Act 2009* (Cth).

**Record Date** means 7.00pm (AEDT) on Monday 10 January 2022 or any other date as agreed between Afterpay and Square.

© King & Wood Mallesons      Scheme of Arrangement                                    4

**149**

Attachment A

Scheme of Arrangement made under Section 411 of the Corporations Act

For personal use only

**Register** means the register of members of Afterpay maintained by or on behalf of Afterpay in accordance with section 168(1) of the Corporations Act.

**Registered Address** means, in relation to an Afterpay Shareholder, the address shown in the Register.

**Registry** means Computershare Investor Services or such other person nominated by Afterpay to maintain the Register.

**Sale Agent** means an entity or person appointed by Square (after consultation with Afterpay and with Afterpay's approval, not to be unreasonably withheld) to sell New Square Shares under the Sale Facility that are attributable to Ineligible Foreign Shareholders.

**Scheme** means this scheme of arrangement between Afterpay and Scheme Participants under which all of the Scheme Shares will be transferred to Square Acquirer under Part 5.1 of the Corporations Act as described in clause 6 of this Scheme, in consideration for the Scheme Consideration, subject to any amendments or conditions made or required by the Court pursuant to section 411(6) of the Corporations Act to the extent they are approved in writing by Afterpay and Square in accordance with clause 11 of this Scheme.

**Scheme Consideration** means the consideration payable by Square Acquirer (or by Square on behalf of and at the direction of Square Acquirer) for the transfer of Afterpay Shares held by a Scheme Participant to Square Acquirer, being, in respect of each Afterpay Share:

(a)    where the Scheme Participant is a Share Elected Shareholder, 0.375 New Square Shares; and

(b)    where the Scheme Participant is a CDI Elected Shareholder, 0.375 New Square CDIs.

**Scheme Implementation Deed** means the Scheme Implementation Deed dated 2 August 2021 between Afterpay, Square and Square Acquirer under which, amongst other things, Afterpay has agreed to propose this Scheme to Afterpay Shareholders, and each of Square, Square Acquirer and Afterpay have agreed to take certain steps to give effect to this Scheme, a copy of which was released in full to ASX on 2 August 2021.

**Scheme Meeting** means the meeting of Afterpay Shareholders ordered by the Court to be convened pursuant to section 411(1) of the Corporations Act at which Afterpay Shareholders will vote on this Scheme.

**Scheme Participant** means each person who is an Afterpay Shareholder as at the Record Date.

**Scheme Share** means an Afterpay Share held by a Scheme Participant as at the Record Date and, for the avoidance of doubt, includes any Afterpay Shares issued on or before the Record Date.

**Second Court Date** means the first day on which an application made to the Court under section 411(4)(b) of the Corporations Act approving the Scheme is heard or scheduled to be heard or, if the application is adjourned for any reason, the date on which the adjourned application is heard or scheduled to be heard.

**Share Elected Shareholder** means:

(a)    an Eligible AUSNZ Shareholder who has made a valid Share Election;

**150**

236

(b)    an Eligible Non-AUSNZ Shareholder who has not made a valid CDI Election.

**Share Election** means a valid election for New Square Shares made by an Eligible AUSNZ Shareholder pursuant to the terms of this Scheme.

**Share Election Form** means the form to be completed by an Eligible AUSNZ Shareholder who wishes to make a Share Election.

**Share Scheme Transfer** means, for each Scheme Participant, a duly completed and executed proper instrument of transfer of the Scheme Shares held by that Scheme Participant for the purposes of section 1071B of the Corporations Act, which may be a master transfer of all Scheme Shares.

**Spain FDI Authority** means the Spanish Council of Ministers (Consejo de Ministros), or any other competent public authority.

**Square** means Square, Inc.

**Square Acquirer** means Lanai (AU) 2 Pty Ltd (ACN 652 352 451).

**Square CDI** means a unit of beneficial ownership in a Square Class A Share (in the form of a CDI) that is registered in the name of CDN in accordance with the ASX Settlement Operating Rules, for the purpose of enabling the securities to be recorded and transferred in accordance with those operating rules.

**Square Class A Share** means a share of Class A common stock of Square.

**Square Class B Share** means a share of Class B common stock of Square.

**Square Register** means the register of shareholders maintained by Square or its agent.

**Square Share** means a Square Class A Share or Square Class B Share, as applicable.

**Subsidiary** of an entity means another entity which:

(a)    is a subsidiary of the first entity within the meaning of the Corporations Act; and

(b)    is part of a consolidated entity constituted by the first entity and the entities it is required to include in the consolidated financial statements it prepares, or would be if the first entity was required to prepare consolidated financial statement.

**Takeovers Panel** means the Australian Takeovers Panel.

### 1.2    General interpretation

Headings and labels used for definitions are for convenience only and do not affect interpretation.  Unless the contrary intention appears, in this document:

(a)    the singular includes the plural and vice versa;

(b)    the meaning of general words is not limited by specific examples introduced by "including", "for example", "such as" or similar expressions;

(c)    a reference to "**person**" includes an individual, a body corporate, a partnership, a joint venture, an unincorporated association and an authority or any other entity or organisation;

© King & Wood Mallesons    Scheme of Arrangement    6

**151**

For personal use only

(d)    a reference to a particular person includes the person's executors, administrators, successors, substitutes (including persons taking by novation) and assigns;

(e)    a reference to a time of day is a reference to the time in Melbourne, Australia;

(f)    a reference to dollars, $ or A$ is a reference to the currency of Australia;

(g)    a reference to any legislation includes regulations under it and any consolidations, amendments, re-enactments or replacements of any of them;

(h)    a reference to a group of persons is a reference to any 2 or more of them jointly and to each of them individually;

(i)    a period of time starting from a given day or the day of an act or event, is to be calculated exclusive of that day;

(j)    if a party must do something under this document on or by a given day and it is done after 5.00pm on that day, it is taken to be done on the next day; and

(k)    if the day on which a party must do something under this document is not a Business Day, the party must do it on the next Business Day.

## 2    Preliminary

### 2.1    Afterpay

Afterpay is:

(a)    a public company limited by shares;

(b)    incorporated in Australia and registered in Victoria; and

(c)    admitted to the official list of ASX and Afterpay Shares are officially quoted on the stock market conducted by ASX.

As at 2 August 2021, Afterpay had on issue 290,073,416 Afterpay Shares.

### 2.2    Square

Square is:

(a)    a corporation incorporated under the laws of the State of Delaware; and

(b)    Square Shares are officially listed on the NYSE.

### 2.3    Square Acquirer

Square Acquirer is:

(a)    a proprietary company limited by shares; and

(b)    incorporated in Australia and registered in Victoria.

**152**

For personal use only

**2.4    If Scheme becomes Effective**

If this Scheme becomes Effective:

(a)    in consideration of the transfer of each Scheme Share to Square Acquirer, Square Acquirer will provide or procure the provision of the Scheme Consideration to each Scheme Participant in accordance with the terms of this Scheme;

(b)    all Scheme Shares will be transferred to Square Acquirer on the Implementation Date; and

(c)    Afterpay will enter the name of Square Acquirer in the Register in respect of all Scheme Shares transferred to Square Acquirer in accordance with the terms of this Scheme.

**2.5    Scheme Implementation Deed**

Afterpay, Square and Square Acquirer have agreed by executing the Scheme Implementation Deed to implement the terms of this Scheme.

**2.6    Deed Poll**

Square and Square Acquirer have executed the Deed Poll for the purpose of covenanting in favour of the Scheme Participants to perform (or procure the performance of) the obligations attributable to Square and Square Acquirer as contemplated by this Scheme, including to provide the Scheme Consideration to the Scheme Participants.

# 3    Conditions precedent

**3.1    Conditions precedent to Scheme**

This Scheme is conditional on, and will have no force or effect until, the satisfaction of each of the following conditions precedent:

(a)    as at 8.00am on the Second Court Date, the Scheme Implementation Deed and Deed Poll not having been terminated;

(b)    all of the conditions precedent in clause 3.1 of the Scheme Implementation Deed having been satisfied or waived (other than the conditions precedent relating to Court approval set out in item 3.1(h) of the Scheme Implementation Deed) in accordance with the terms of the Scheme Implementation Deed;

(c)    the Court having approved this Scheme, with or without any modification or condition, pursuant to section 411(4)(b) of the Corporations Act, and if applicable, Afterpay and Square having accepted in writing any modification or condition made or required by the Court under section 411(6) of the Corporations Act; and

(d)    the coming into effect, pursuant to section 411(10) of the Corporations Act, of the orders of the Court made under section 411(4)(b) of the Corporations Act (and, if applicable, section 411(6) of the Corporations Act) in relation to this Scheme.

**3.2    Conditions precedent and operation of clause 5**

The satisfaction of each condition of clause 3.1 of this Scheme is a condition precedent to the operation of clause 5 of this Scheme.

**153**

**3.3     Certificate in relation to conditions precedent**

Afterpay and Square must provide to the Court on the Second Court Date a certificate, or such other evidence as the Court requests, confirming (in respect of matters within their knowledge) whether or not all of the conditions precedent set out in clause 3.1 of this Scheme (other than the conditions precedent in clauses 3.1(c) and 3.1(d) of this Scheme) have been satisfied or waived as at 8.00am on the Second Court Date.

The certificate referred to in this clause 3.3 will constitute conclusive evidence of whether the conditions precedent referred to in clause 3.1 of this Scheme (other than the condition precedent in clauses 3.1(c) and 3.1(d) of this Scheme) have been satisfied or waived as at 8.00am on the Second Court Date.

## 4     Scheme

**4.1     Effective Date**

Subject to clause 4.2, this Scheme will come into effect pursuant to section 411(10) of the Corporations Act on and from the Effective Date.

**4.2     End Date**

This Scheme will lapse and be of no further force or effect if:

(a)     the Effective Date does not occur on or before the End Date; or

(b)     the Scheme Implementation Deed or Deed Poll is terminated in accordance with its terms.

## 5     Implementation of Scheme

**5.1     Elections**

(a)     A Scheme Participant who is an Eligible AUSNZ Shareholder may make a Share Election to receive New Square Shares instead of New Square CDIs by completing a Share Election Form and returning it to the address specified in the Share Election Form so that it is received by the Registry (and not withdrawn) by no later than 5.00pm on the Election Date.

(b)     Subject to clause 5.1(c), a Scheme Participant who is an Eligible Non-AUSNZ Shareholder may make a CDI Election to receive New Square CDIs instead of New Square Shares by completing a CDI Election Form and returning it to the address specified in the CDI Election Form so that it is received by the Registry (and not withdrawn) by no later than 5.00pm on the Election Date.

(c)     In the event that ASX does not grant approval for Australian Admission on or before the Business Day after the Effective Date, and Square and Afterpay both provide written consent in accordance with clause 4.4 of the Scheme Implementation Deed, all CDI Elections will be disregarded and the entitlements of all Scheme Participants (including those who made a CDI Election) will be satisfied by the distribution of New Square Shares in the manner described in clause 6.2(a).

(d)     A Scheme Participant may withdraw their Share Election under clause 5.1(a) or their CDI Election under clause 5.1(b) by lodging an Election

**154**

For personal use only

Withdrawal Form provided that it is received by the Registry by no later than 5.00pm on the Election Date.

(e) Subject to clause 5.1(f), a Share Election under clause 5.1(a) or a CDI Election under clause 5.1(b) may only be made in respect of all and not part of the Afterpay Shares held by the relevant Scheme Participant.

(f) A Scheme Participant who holds one or more parcels of Afterpay Shares as trustee or nominee for, or otherwise on account of, another person ("**Nominee Holder**"):

(i) subject to clause 5.1(f)(ii), may make separate elections in accordance with clauses 5.1(a) or 5.1(b) in relation to each of those parcels of Afterpay Shares by lodging a separate election form for each separate holding in accordance with clauses 5.1(a) or 5.1(b), and in each case in accordance with clause 5.1(e); and

(ii) for the purposes of determining entitlements under this Scheme, will be treated as if they were a separate CDI Elected Shareholder or Share Elected Shareholder (as relevant) in respect of each parcel of Afterpay Shares in respect of which an election has been made.

(g) Square Acquirer will determine, in its sole discretion, all questions as to the correct completion of a CDI Election Form, Share Election Form or Election Withdrawal Form, and time of receipt of such form. Square Acquirer is not required to communicate with any Scheme Participant prior to making this determination. The determination of Square Acquirer will be final and binding on the Scheme Participant.

## 5.2 Lodgement of Court orders with ASIC

If the conditions precedent set out in clause 3.1 of this Scheme (other than the condition precedent in clause 3.1(d) of this Scheme) are satisfied, Afterpay must lodge with ASIC, in accordance with section 411(10) of the Corporations Act, an office copy of the Court order approving this Scheme as soon as possible, and in any event by no later than 4.00pm on the first Business Day after the day on which the Court approves this Scheme or such later time as Square and Afterpay agree in writing.

## 5.3 Transfer and registration of Afterpay Shares

On the Implementation Date, but subject to the provision of the Scheme Consideration for the Scheme Shares in accordance with clause 6 of this Scheme and Square Acquirer having provided Afterpay with written confirmation of the provision of the Scheme Consideration:

(a) the Scheme Shares, together with all rights and entitlements attaching to the Scheme Shares as at the Implementation Date, will be transferred to Square Acquirer, without the need for any further act by any Scheme Participant (other than acts performed by Afterpay as attorney and agent for Scheme Participants under clause 9 of this Scheme), by:

(i) Afterpay delivering to Square Acquirer a duly completed and executed Share Scheme Transfer executed on behalf of the Scheme Participants by Afterpay, for registration; and

(ii) Square Acquirer duly executing the Share Scheme Transfer and delivering it to Afterpay for registration; and

© King & Wood Mallesons     Scheme of Arrangement     10

**155**

For personal use only

(b)    as soon as practicable after receipt of the duly executed Share Scheme Transfer, Afterpay must enter, or procure the entry of, the name of Square Acquirer in the Register in respect of all Scheme Shares transferred to Square Acquirer in accordance with the terms of this Scheme.

### 5.4    Entitlement to Scheme Consideration

On the Implementation Date, in consideration for the transfer to Square Acquirer of the Scheme Shares, each Scheme Participant will be entitled to receive the Scheme Consideration in respect of each of their Scheme Shares in accordance with clause 6 of this Scheme.

### 5.5    Title and rights in Afterpay Shares

Subject to the provision of the Scheme Consideration for the Scheme Shares as contemplated by clause 6 of this Scheme, on and from the Implementation Date, Square Acquirer will be beneficially entitled to the Scheme Shares transferred to it under the Scheme, pending registration by Afterpay of Square Acquirer in the Register as the holder of the Scheme Shares.

### 5.6    Warranty by Scheme Participants

Each Scheme Participant warrants to and is deemed to have authorised Afterpay to warrant to Square Acquirer as agent and attorney for the Scheme Participant by virtue of this clause 5.6, that:

(a)    all their Scheme Shares (including any rights and entitlements attaching to those shares) transferred to Square Acquirer under the Scheme will, as at the date of the transfer, be fully paid and free from all Encumbrances; and

(b)    they have full power and capacity to sell and to transfer their Scheme Shares (including any rights and entitlements attaching to those shares) to Square Acquirer under this Scheme.

### 5.7    Transfer free of Encumbrances

To the extent permitted by law, all Afterpay Shares (including any rights and entitlements attaching to those shares) which are transferred to Square Acquirer under this Scheme will, at the date of the transfer of them to Square Acquirer, vest in Square Acquirer free from all Encumbrances and interests of third parties of any kind, whether legal or otherwise, and free from any restrictions on transfer of any kind not referred to in this Scheme.

### 5.8    Appointment of Square Acquirer as sole proxy

Subject to the provision of the Scheme Consideration for the Scheme Shares as contemplated by clauses 5.3 and 6 of this Scheme, on and from the Implementation Date until Afterpay registers Square Acquirer as the holder of all of the Afterpay Shares in the Register, each Scheme Participant:

(a)    irrevocably appoints Afterpay as attorney and agent (and directs Afterpay in such capacity) to appoint Square Acquirer and each of its directors from time to time (jointly and each of them individually) as its sole proxy, and where applicable corporate representative, to attend shareholders' meetings, exercise the votes attaching to Afterpay Shares registered in its name and sign any shareholders resolution, and no Scheme Participant may itself attend or vote at any of those meetings or sign any resolutions, whether in person, by proxy or by corporate representative (other than pursuant to this clause 5.8(a));

**156**

(b)     must take all other actions in the capacity of the registered holder of Afterpay Shares as Square Acquirer directs; and

(c)     acknowledges and agrees that in exercising the powers referred to in clause 5.8(a), Square Acquirer and any director or corporate representative nominated by Square Acquirer under clause 5.8(a) may act in the best interests of Square Acquirer as the intended registered holder of the Scheme Shares.

Afterpay undertakes in favour of each Scheme Participant that it will appoint Square Acquirer and each of its directors from time to time (jointly and each of them individually) as that Scheme Participant's proxy or, where applicable, corporate representative in accordance with clause 5.8(a) of this Scheme.

## 6      Scheme Consideration

### 6.1      Consideration under this Scheme

On the Implementation Date, Square Acquirer:

(a)     must provide or procure as set forth in clause 6.1(b), in consideration for the transfer to Square Acquirer of the Afterpay Shares, the Scheme Consideration is issued to the Scheme Participants (or to the Sale Agent in accordance with clause 6.6) in accordance with this clause 6; and

(b)     agrees to cause Square to, and Square will at the direction of and on behalf of Square Acquirer (in satisfaction of Square Acquirer's obligation to provide such Scheme Consideration under clause 6.1(a)), issue the Scheme Consideration in accordance with this clause 6. If Square Acquirer fails to provide direction to Square as contemplated by this clause 6.1(b) (or to have otherwise procured the provision of the Scheme Consideration) within 1 Business Day following the Effective Date, Square Acquirer will be deemed to have provided such direction to Square and Square agrees that it will take the actions required by this clause 6.1(b).

### 6.2      Scheme Consideration

Subject to the terms and conditions of this Scheme (including clause 6.6 in relation to Ineligible Foreign Shareholders and clause 6.4 in relation to fractional elements), the Scheme Consideration to be provided to each Scheme Participant will be provided:

(a)     in respect of a Share Elected Shareholder, by the issue by Square (on behalf of and at the direction of Square Acquirer) of the Scheme Consideration comprising New Square Shares to that Scheme Participant on the Implementation Date; and

(b)     in respect of a CDI Elected Shareholder, by the issue by Square (on behalf of and at the direction of Square Acquirer) of Scheme Consideration comprising New Square CDIs to that Scheme Participant on the Implementation Date.

### 6.3      Provision of Scheme Consideration

Subject to the other provisions of this clause 6, the obligations of Square Acquirer to provide (or procure the provision of) the Scheme Consideration to the Scheme Participants will be satisfied:

**157**

Attachment A
Scheme of Arrangement made under Section 411 of the Corporations Act

(a) in the case of Scheme Consideration that is required to be provided to Scheme Participants in the form of New Square Shares, by Square procuring that:

   (i) the name and address of each such Scheme Participant is entered into the Square Register on the Implementation Date in respect of the New Square Shares to which it is entitled under this clause 6; and

   (ii) a share certificate or holding statement (or equivalent document) is sent to the Registered Address of each such Scheme Participant representing the number of New Square Shares issued to the Scheme Participant pursuant to this Scheme;

(b) in the case of Scheme Consideration that is required to be provided to Scheme Participants in the form of New Square CDIs, by Square:

   (i) issuing to CDN to be held on trust that number of New Square Shares that will enable CDN to issue New Square CDIs as envisaged by this clause 6 on the Implementation Date;

   (ii) procuring that the name and address of CDN is entered into the Square Register in respect of those New Square Shares on the Implementation Date and that a share certificate or holding statement (or equivalent document) in the name of CDN representing those New Square Shares is sent to CDN;

   (iii) procuring that on the Implementation Date, CDN issues to each such Scheme Participant the number of New Square CDIs to which it is entitled under this clause 6;

   (iv) procuring that on the Implementation Date, the name of each such Scheme Participant is entered in the records maintained by CDN as the holder of the New Square CDIs issued to that Scheme Participant on the Implementation Date;

   (v) in the case of each such Scheme Participant who held Scheme Shares on the CHESS subregister – procuring that the CDIs are held on the CHESS subregister on the Implementation Date and sending or procuring the sending of an allotment advice that sets out the number of New Square CDIs issued and procuring that ASX Settlement and Transfer Corporation Pty Ltd will provide at the end of the month of allotment a CDI holding statement confirming the number of New Square CDIs held on the CHESS subregister by that Scheme Participant; and

   (vi) in the case of each such Scheme Participant who held Scheme Shares on the issuer sponsored subregister – procuring that the New Square CDIs are held on the issuer sponsored subregister on the Implementation Date and sending or procuring the sending of a CDI holding statement to each such Scheme Participant which sets out the number of New Square CDIs held on the issuer sponsored subregister by that Scheme Participant.

**6.4    Fractional entitlements**

(a) If the number of Afterpay Shares held by a Scheme Participant at the Record Date is such that the aggregate entitlement of the Scheme Participant to Scheme Consideration comprising New Square Shares or New Square CDIs includes a fractional entitlement to a New Square Share or New Square CDI, the entitlement will be rounded as follows:

© King & Wood Mallesons    Scheme of Arrangement    13

**158**

244

For personal use only

       (i)       if the fractional entitlement is less than 0.5, it will be rounded down to zero New Square Shares or New Square CDIs; and

       (ii)      if the fractional entitlement is equal to or more than 0.5, it will be rounded up to one New Square Share or New Square CDI.

(b)     If a Nominee Holder makes separate elections in relation to parcels of Afterpay Shares it holds as trustee or nominee for, or otherwise on account of, another person, then for the purposes of this clause 6.4 the Scheme Consideration of the Nominee Holder will be calculated and rounded based on each nominated parcel of Afterpay Shares held by the Nominee Holder as trustee or nominee for, or otherwise on account of, another person.

(c)     If a Nominee Holder does not make separate elections in relation to parcels of Afterpay Shares it holds as trustee or nominee for, or otherwise on account of, another person, then for the purposes of this clause 6.4, the Scheme Consideration for the Nominee Holder will be calculated and rounded based on the aggregate number of Afterpay Shares held by the Nominee Holder in those parcels as trustee or nominee for, or otherwise on account of, other persons.

### 6.5 Scheme Participants' agreements

Under this Scheme, each Scheme Participant (and the Sale Agent) irrevocably:

(a)     agrees to the transfer of their Afterpay Shares together with all rights and entitlements attaching to those Afterpay Shares in accordance with this Scheme;

(b)     agrees to the variation, cancellation or modification of the rights attached to their Afterpay Shares constituted by or resulting from this Scheme;

(c)     agrees to, on the direction of Square Acquirer, destroy any holding statements or share certificates relating to their Afterpay Shares;

(d)     agrees to become a shareholder of Square, to have their name entered in the Square Register, accepts the New Square Shares or New Square CDIs (as relevant) issued to them and agrees to be bound by Square's Amended and Restated Certificate of Incorporation;

(e)     agrees and acknowledges that the issue of New Square Shares or New Square CDIs (as applicable) in accordance with clause 6.1 constitutes satisfaction of all that person's entitlements under this Scheme;

(f)     acknowledges that this Scheme binds Afterpay and all of the Scheme Participants from time to time (including those who do not attend the Scheme Meeting and those who do not vote, or vote against this Scheme, at the Scheme Meeting); and

(g)     consents to Afterpay, Square and Square Acquirer doing all things and executing all deeds, instruments, transfers or other documents as may be necessary or desirable to give full effect to this Scheme and the transactions contemplated by it.

### 6.6 Ineligible Foreign Shareholder Sale Facility

Where a Scheme Participant is an Ineligible Foreign Shareholder, each Ineligible Foreign Shareholder authorises Square Acquirer (or Square at the direction of

For personal use only

and on behalf of Square Acquirer) to:

(a)    issue to the Sale Agent any New Square Shares to which an Ineligible Foreign Shareholder would otherwise be entitled to (**Relevant Square Shares**);

(b)    procure, as soon as reasonably practicable after the Implementation Date, and in no event no more than 30 days after the Implementation Date, that the Sale Agent:

   (i)    sells or procures the sale of all of the Relevant Square Shares issued to the Sale Agent pursuant to clause 6.6(a) (including on an aggregated or partially aggregate basis), in the ordinary course of trading on NYSE at such price as the Sale Agent determines in good faith; and

   (ii)    remits to Square Acquirer (or Square at the direction of and on behalf of Square Acquirer) the proceeds of sale (net of any applicable brokerage, stamp duty and other selling costs, taxes and charges) (**Proceeds**); and

(c)    as soon as reasonably practicable after the last sale of the Relevant Square Shares in accordance with clause 6.6(b)(i), pay to each Ineligible Foreign Shareholder an amount equal to the proportion of the net proceeds of sale received by Square under clause 6.6(b)(ii) to which that Ineligible Foreign Shareholder is entitled, in full satisfaction of their entitlement to the Relevant Square Shares, in accordance with the following formula:

$$A = (B/C) \times D$$

Where

   **A** is the amount to be paid to the Ineligible Foreign Shareholder;

   **B** is the number of Relevant Square Shares attributable to, and that would otherwise have been issued to, that Ineligible Foreign Shareholder had it not been an Ineligible Foreign Shareholder and which are instead issued to the Sale Agent;

   **C** is the total number of Relevant Square Shares attributable to, and which would otherwise have been issued to, all Ineligible Foreign Shareholders collectively and which are instead issued to the Sale Agent; and

   **D** is the Proceeds (as defined in clause 6.6(b)(ii)).

(d)    None of Afterpay, Square or Square Acquirer make any representation as to the amount of proceeds of sale to be received by Ineligible Foreign Shareholders under the Ineligible Foreign Shareholder Sale Facility. Each of Afterpay, Square and Square Acquirer expressly disclaim any fiduciary duty to the Ineligible Foreign Shareholders which may arise in connection with the Ineligible Foreign Shareholder Sale Facility.

**6.7    Orders of a Court or Governmental Authority**

(a)    Afterpay may deduct and withhold from any consideration which would otherwise be provided to a Scheme Participant in accordance with this clause 6, any amount which Afterpay, Square and Square Acquirer determine is required to be deducted and withheld from that consideration under any applicable law, including any order, direction or

**160**

notice made or given by a court of competent jurisdiction or by another Governmental Authority.

(b) To the extent that amounts are so deducted or withheld, such deducted or withheld amounts will be treated for all purposes under this Scheme as having been paid to the person in respect of which such deduction and withholding was made, provided that such deducted or withheld amounts are actually remitted to the appropriate taxing agency.

(c) If written notice is given to Afterpay of an order, direction or notice made or given by a court of competent jurisdiction or by another Governmental Authority that:

(i) requires consideration which would otherwise be provided to a Scheme Participant in accordance with this clause 6 to instead be paid or provided to a Governmental Authority or other third party (either through payment of a sum or the issuance of a security), then Afterpay shall be entitled to procure that provision of that consideration is made in accordance with that order, direction or notice (and payment or provision of that consideration in accordance with that order, direction or notice will be treated for all purposes under this Scheme as having been paid or provided to that Scheme Participant); or

(ii) prevents consideration being provided to any particular Scheme Participant in accordance with this clause 6, or the payment or provision of such consideration is otherwise prohibited by applicable law, Afterpay shall be entitled to (as applicable) direct Square not to issue (or procure the issue of), or to issue or provide to a trustee or nominee, such number of New Square Shares or New Square CDIs as that Scheme Participant would otherwise be entitled to under this clause 6, until such time as payment or provision of the consideration in accordance with this clause 6 is permitted by that order or direction or otherwise by law.

### 6.8 Shares to rank equally

Square covenants in favour of Afterpay (in its own right and on behalf of the Scheme Participants) that:

(a) the New Square Shares and Square Class A Shares underlying New Square CDIs will rank equally in all respects with all existing Square Class A Shares (but not Square Class B Shares);

(b) it will do everything reasonably necessary to ensure that trading in the New Square Shares and the New Square CDIs commences by the first Business Day after the Implementation Date;

(c) the New Square Shares and New Square CDIs will be duly and validly issued in accordance with applicable laws and Square's certificate of incorporation and bylaws; and

(d) on issue, each New Square Share and New Square CDI will be fully paid and free from any Encumbrance.

© King & Wood Mallesons    Scheme of Arrangement    16

**161**

**6.9     Joint holders**

In the case of Afterpay Shares held in joint names:

(a)      any New Square Shares or New Square CDIs (as applicable) to be issued under this Scheme must be issued and registered in the names of the joint holders and entry in the Square Register must take place in the same order as the holders' names appear in the Register; and

(b)      any document required to be sent under this Scheme, will be forwarded to either, at the sole discretion of Afterpay, the holder whose name appears first in the Register as at the Record Date or to the joint holders.

## 7      Dealings in Scheme Shares

**7.1     Determination of Scheme Participants**

To establish the identity of the Scheme Participants, dealings in Scheme Shares or other alterations to the Register will only be recognised by Afterpay if:

(a)      in the case of dealings of the type to be effected using CHESS, the transferee is registered in the Register as the holder of the relevant Scheme Shares on or before the Record Date; and

(b)      in all other cases, registrable transmission applications or transfers in registrable form in respect of those dealings are received on or before the Record Date at the place where the Register is kept.

**7.2     Register**

Afterpay must register any registrable transmission applications or transfers of the Scheme Shares received in accordance with clause 7.1(b) of this Scheme on or before the Record Date.

**7.3     No disposals after Effective Date**

If this Scheme becomes Effective, a holder of Scheme Shares (and any person claiming through that holder) must not dispose of or purport or agree to dispose of any Scheme Shares or any interest in them after the Record Date in any way except as set out in this Scheme and any such disposal will be void and of no legal effect whatsoever.

Afterpay will not accept for registration or recognise for any purpose any transmission, application or transfer in respect of Scheme Shares received after the Record Date (except a transfer to Square Acquirer pursuant to this Scheme and any subsequent transfer by Square Acquirer or its successors in title).

**7.4     Maintenance of Afterpay Register**

For the purpose of determining entitlements to the Scheme Consideration, Afterpay will maintain the Register in accordance with the provisions of this clause 7.4 until the Scheme Consideration has been issued to the Scheme Participants and Square Acquirer has been entered in the Register as the holder of all the Scheme Shares.  The Register in this form will solely determine entitlements to the Scheme Consideration.

**7.5     Effect of certificates and holding statements**

Subject to provision of the Scheme Consideration and registration of the transfer to Square Acquirer contemplated in clauses 5.3 and 7.4 of this Scheme, any

For personal use only

**162**

248

statements of holding in respect of Scheme Shares will cease to have effect after the Record Date as documents of title in respect of those shares (other than statements of holding in favour of Square Acquirer and its successors in title). After the Record Date, each entry current on the Register as at the Record Date (other than entries in respect of Square Acquirer or its successors in title) will cease to have effect except as evidence of entitlement to the Scheme Consideration.

### 7.6 Details of Scheme Participants

Within 3 Business Days after the Record Date, Afterpay will ensure that details of the names, Registered Addresses and holdings of Scheme Shares for each Scheme Participant, as shown in the Register at the Record Date are available to Square Acquirer in such form as Square Acquirer reasonably requires.

### 7.7 Quotation of Afterpay Shares

Suspension of trading on ASX in Afterpay Shares will occur from the close of trading on ASX on the 2nd Business Day prior to the Record Date.

### 7.8 Termination of quotation of Afterpay Shares

After this Scheme has been fully implemented (including after the Register and the Square Register have been updated in accordance with clauses 5.3(b) and 6.3(a)(i)), Afterpay will apply:

(a)    for termination of the official quotation of Afterpay Shares on ASX; and

(b)    to have itself removed from the official list of ASX.

## 8    Instructions and notification

If not prohibited by law (and including where permitted or facilitated by relief granted by a Governmental Authority), all instructions, notifications or elections by a Scheme Participant to Afterpay that are binding or deemed binding between the Scheme Participant and Afterpay relating to Afterpay or Afterpay Shares, including instructions, notifications or elections relating to:

(a)    whether dividends are to be paid by cheque or into a specific bank account;

(b)    payments of dividends on Afterpay Shares; and

(c)    notices or other communications from Afterpay (including by email),

will be deemed from the Implementation Date (except to the extent determined otherwise by Square Acquirer in its sole discretion), by reason of this Scheme, to be made by the Scheme Participant to Square Acquirer and to be a binding instruction, notification or election to, and accepted by, Square Acquirer until that instruction, notification or election is revoked or amended in writing addressed to Square Acquirer at its registry.

## 9    Power of attorney

Each Scheme Participant, without the need for any further act by any Scheme Participant, irrevocably appoints Afterpay and each of its directors and

For personal use only

**163**

For personal use only

secretaries (jointly and each of them individually) as its attorney and agent for the purpose of:

(a)    executing any document necessary or expedient to give effect to this Scheme including the Share Scheme Transfer;

(b)    enforcing the Deed Poll against Square and Square Acquirer,

and Afterpay accepts such appointment.

## 10    Notices

### 10.1    No deemed receipt

If a notice, transfer, transmission application, direction or other communication referred to in this Scheme is sent by post to Afterpay, it will not be taken to be received in the ordinary course of post or on a date and time other than the date and time (if any) on which it is actually received at Afterpay's registered office or at the office of the registrar of Afterpay Shares.

### 10.2    Accidental omission

The accidental omission to give notice of the Scheme Meeting or the non-receipt of such a notice by any Afterpay Shareholder will not, unless so ordered by the Court, invalidate the Scheme Meeting or the proceedings of the Scheme Meeting.

## 11    General

### 11.1    Variations, alterations and conditions

(a)    Afterpay may, with the consent of Square, by its counsel or solicitor consent on behalf of all persons concerned to any variations, alterations or conditions to this Scheme which the Court thinks fit to impose.

(b)    Each Scheme Participant agrees to any such alterations or conditions which Afterpay has consented to pursuant to clause 11.1(a).

### 11.2    Further action by Afterpay

Afterpay will execute all documents and do all things (on its own behalf and on behalf of each Scheme Participant) necessary or expedient to implement, and perform its obligations under, this Scheme.

### 11.3    Authority and acknowledgement

Each of the Scheme Participants:

(a)    irrevocably consents to Afterpay, Square and Square Acquirer doing all things necessary or expedient for or incidental to the implementation of this Scheme; and

(b)    acknowledges that this Scheme binds Afterpay and all Scheme Participants (including those who do not attend the Scheme Meeting or do not vote at that meeting or vote against the Scheme at that Scheme Meeting) and, to the extent of any inconsistency and to the extent permitted by law, overrides the constitution of Afterpay.

**164**

For personal use only

**11.4    No liability when acting in good faith**

Without prejudice to the parties' rights under the Scheme Implementation Deed, neither Afterpay nor Square nor Square Acquirer, nor any of their respective officers, will be liable for anything done or omitted to be done in the performance of this Scheme in good faith.

**11.5    Enforcement of Deed Poll**

Afterpay undertakes in favour of each Scheme Participant to enforce the Deed Poll against Square and Square Acquirer on behalf of and as agent and attorney for the Scheme Participants.

**11.6    Stamp duty**

Square or Square Acquirer will pay all stamp duty (including any fines, penalties and interest) payable in connection with this Scheme.

## 12    Governing law

**12.1    Governing law and jurisdiction**

The law in force in the place specified in the Details governs this document.  The parties submit to the non-exclusive jurisdiction of the courts of that place.

**12.2    Serving documents**

Without preventing any other method of service, any document in an action in connection with this document may be served on a party by being delivered or left at that party's address set out in the Details.

166

**Attachment B**

# Deed Poll

For personal use only

252

**166**

**Attachment C**

# Independent Expert's Report

For personal use only

**167**

168

**Attachment D**

# Independent Limited Assurance Report

For personal use only

**168**

For personal use only

Attachment E

# Notice of Scheme Meeting

**169**



For personal use only

Friday, 5 November 2021

## Afterpay Limited

NOTICE OF MEETING OF REGISTERED HOLDERS OF FULLY PAID ORDINARY SHARES IN AFTERPAY.

NOTICE IS HEREBY GIVEN, by an order of the Supreme Court of New South Wales made on Thursday, 4 November 2021, pursuant to subsection 411(1) of the Corporations Act, a Scheme Meeting of Afterpay Shareholders will be held virtually at 10.00am (AEDT) on Monday, 6 December 2021.

As a result of the potential health risks associated with large gatherings and the ongoing COVID-19 pandemic, the Scheme Meeting will be a virtual (online only) meeting. The health of Afterpay Shareholders, employees and other meeting attendees is of paramount importance and, therefore, there will not be a physical meeting where Afterpay Shareholders or their proxies, attorneys or corporate representatives can attend in person.

Instead, Afterpay Shareholders are invited to participate in the Scheme Meeting using an online platform. This online platform will enable participants to view the Scheme Meeting live, ask questions online and vote on the Scheme Resolution in real time.

## Business

The purpose of the Scheme Meeting is to consider, and if thought fit, to agree (with or without amendment or any alterations or conditions required by the Court to which Afterpay and Square agree) to a scheme of arrangement proposed to be made between Afterpay and Afterpay Shareholders.

## Scheme Resolution

To consider and, if thought fit pass (with or without amendment) the following resolution:

*"That, pursuant to and in accordance with section 411 of the Corporations Act 2001 (Cth), the scheme of arrangement proposed between Afterpay Limited ("Afterpay") and the holders of its fully paid ordinary shares, the terms of which are contained in and more particularly described in the Scheme Booklet of which the notice convening the Scheme Meeting forms part, is approved (with or without alteration or conditions as approved by the Supreme Court of New South Wales and agreed to by Afterpay and Square) and, subject to approval of the Scheme by the Court, the Afterpay Board is authorised to implement the Scheme with any such alterations or conditions."*

## Voting Exclusion Statement

Square and its associates (as defined in section 12 of the Corporations Act) are excluded from voting on the Scheme Resolution, unless:

- the vote is cast by the associate as proxy for a person who is not excluded from voting, in accordance with that person's directions on the Proxy Form; or
- the associate is acting solely as an investment manager, custodian, nominee, trustee, responsible entity or other fiduciary on behalf of a third party beneficiary or third party investor, who is not an associate of Square.

# 170

## Afterpay Board Comment and Recommendations

For the reasons set out in the Scheme Booklet, the Afterpay Board unanimously recommends that eligible Afterpay Shareholders vote in favour of the Scheme Resolution in the absence of a Superior Proposal and subject to the Independent Expert continuing to conclude that the Scheme is in the best interests of Afterpay Shareholders and each Afterpay Director intends to vote all of the Afterpay Shares held or controlled by them in favour of the Scheme.[1]

Amanda Street
Company Secretary
Afterpay Limited

## Explanatory Notes

These explanatory notes relate to the Scheme and should be read in conjunction with the Notice of Scheme Meeting and the information in the Scheme Booklet dated 5 November 2021 of which that notice forms part. Unless the context requires otherwise, terms used in the Notice of Scheme Meeting and in these notes have the same meaning as set out in section 11 (Glossary) of the Scheme Booklet.

### Chair

The Court has directed that Elana Rubin, or failing her, Pat O'Sullivan act as chair of the meeting and has directed the chair to report the result of the meeting to the Court.

### Requisite Majorities

For the proposed Scheme to be binding in accordance with section 411(4)(a)(ii) of the Corporations Act, the Scheme Resolution must be passed by:

- more than 50% in number (unless the Court orders otherwise) of eligible Afterpay Shareholders who are present and voting, either in person or by proxy, by attorney or, in the case of a corporation, by its duly appointed corporate representative at the Scheme Meeting; and
- at least 75% of the total number of votes cast on the Scheme Resolution by eligible Afterpay Shareholders.

### Court approval

Under paragraph 411(4)(b) of the Corporations Act, the Scheme (with or without amendment or any alteration or condition required by the Court) is subject to the approval of the Court. If the Scheme Resolution is passed by the Requisite Majorities and the other conditions to the Scheme (other than approval by the Court) are satisfied or waived (if capable of waiver) by the time required under the Scheme, Afterpay intends to apply to the Court for the necessary orders to give effect to the Scheme.

In order for the Scheme to become Effective, it must be approved by the Court and an office copy of the orders of the Court approving the Scheme must be lodged with ASIC.

### Entitlement to vote

The time for the purposes of determining voting entitlements pursuant to regulation 7.11.37 of the Corporations Regulations will be 7.00pm (AEDT) on Saturday, 4 December 2021 (being the Voting Record Date). Only those Afterpay Shareholders entered on the Afterpay Share Register at that time will be entitled to participate in and vote at the meeting, either online, by proxy or attorney, or in the case of a corporate Afterpay Shareholder, by a body corporate representative.

Accordingly, share transfers registered after that time will be disregarded in determining entitlements to attend and vote at the Scheme Meeting.

---

1. You should note that when considering this recommendation that two of the Afterpay Directors (being Co-CEOs and Managing Directors, Anthony Eisen and Nick Molnar) have previously been issued options under the Afterpay equity incentive plan. As contemplated by the terms of the Scheme Implementation Deed, Mr Eisen and Mr Molnar will each be receiving a benefit if the Scheme proceeds. A pro rata portion of the unvested options they hold will be accelerated and the balance will be forfeited and converted into a Square award as contemplated in section 4.11 of the Scheme Booklet. These arrangements are described in more detail in sections 4.10, 4.11 and 10.1. The benefit to each of Anthony Eisen and Nick Molnar in respect of their Co-CEO Options is estimated to be approximately $9,612,242. See footnote 1 in section 10.1 for further information.

   Despite this interest in the outcome of the Scheme, each of Anthony Eisen and Nick Molnar, considers that, given the importance of the Scheme, and their role as directors of Afterpay, it is important and appropriate for them to provide a recommendation to shareholders in relation to voting on the Scheme. The Afterpay Board (excluding Anthony Eisen and Nick Molnar) also considers that it is appropriate for them to make a recommendation on the Scheme given their role in the management and operation of Afterpay.

**171**

Attachment E
Notice of Scheme Meeting

**Voting at the Scheme Meeting**

You can vote in either of the following ways:

- virtually by attending the Scheme Meeting scheduled to be held at 10.00am (AEDT) on Monday, 6 December 2021 through an online platform (details of which are set out below); or
- by appointing a proxy, attorney or, if you are a body corporate, a duly appointed corporate representative to virtually attend and vote at the Scheme Meeting on your behalf.

Voting will be conducted by poll.

**Voting yourself**

You will be able to attend and vote at the Scheme Meeting through an online platform by using a web browser at http://web.lumiagm.com/354553219 on your smartphone, tablet or computer. You will need the latest versions of Chrome, Safari, Edge or Firefox. Please ensure your browser is compatible.

The **meeting ID** for the online Scheme Meeting is: 354553219

Your **username** is your SRN/HIN.

Your **password** is the postcode of your registered address for your holding if you are an Australian shareholder. If you are an overseas shareholder, your password is your three-character country code.

Please refer to the online meeting user guide at www.computershare.com.au/virtualmeetingguide for further details. It is recommended that Afterpay Shareholders login to the online platform at least 15 minutes prior to the scheduled start time for the Scheme Meeting.

If you attend the online Scheme Meeting and vote in your capacity as an Afterpay Shareholder, any votes cast by your proxy or attorney (if any) will not be counted.

**Proxies**

If you are unable to attend the online Scheme Meeting, you are encouraged to appoint a proxy to attend online and vote on your behalf. If you wish to appoint a proxy, please complete the enclosed Proxy Form.

Afterpay Shareholders are notified that:

- a member who is entitled to attend and cast a vote at the meeting may appoint a proxy to attend and vote for the member;
- the appointment may specify the proportion or number of votes that the proxy may exercise;
- a member who is entitled to cast two or more votes at the meeting may appoint two proxies and may specify the proportion or number of votes each proxy is entitled to exercise. If you appoint two proxies and the appointment does not specify the proportion or number of votes each proxy may exercise, each proxy may exercise half of the votes; and
- a proxy may be an individual or a body corporate and need not be a member of Afterpay. If an eligible Afterpay Shareholder appoints a body corporate as a proxy, the body corporate will need to ensure that it appoints an individual as the corporate representative and provides satisfactory evidence of that appointment.

**Voting by Proxy**

You can direct your proxy to vote by following the instructions on the Proxy Form.

If the Chair of the meeting is appointed as your proxy (or is appointed your proxy by default), the Chair can be directed how to vote by ticking the relevant box next to the Scheme Resolution on the Proxy Form (i.e. 'for', 'against' or 'abstain'). The Chair of the Scheme Meeting is required to cast all votes as directed. TheChair of the Scheme Meeting intends to vote all undirected and available proxies in favour of the Scheme Resolution.

Any directed proxies that are not voted on a poll at the online Scheme Meeting by a Afterpay Shareholder's appointed proxy will automatically default to the Chair of the meeting, who is required to vote proxies as directed on a poll.

**Lodging proxies**

The Proxy Form must be received by Afterpay's Share Registry, Computershare, by 10.00am(AEDT on Saturday, 4 December 2021. The completed Proxy Form may be submitted:

- online to Afterpay's Share Registry by visiting the website, www.investorvote.com.au. You will need your Holder Identifier (Securityholder Reference Number (SRN) or Holder Identification Number (HIN) and control number as shown on your Proxy Form). You will be taken to have signed the Proxy Form if you lodge in accordance with the instructions on the website;

**172**

- by mail (using the reply paid envelope included with the Scheme Booklet) to Afterpay Limited, C-Computershare Investor Services Pty Limited, GPO Box 242, Melbourne, Vic 3001;
- by fax to Computershare Investor Services Pty Limited on 1800 783 447 (within Australia) or +61 3 9473 2555 (outside Australia); or
- by hand delivering them to Computershare Investor Services Pty Limited at Yarra Falls, 452 Johnston Street, Abbotsford, VIC, 3067 during business hours (Monday – Friday, 9.00am – 5.00pm (AEDT))

Afterpay Shareholders should contact the Afterpay Shareholder Information Line on 1300 229 418 (within Australia) or +61 2 9066 4051 (outside Australia) Monday to Friday (excluding public holidays in Australia) between 9.00am and 5.00pm (AEDT), with any queries regarding the number of Afterpay Shares they hold, how to vote at the online Scheme Meeting, how to lodge the Proxy Form or to request a replacement Proxy Form.

Further details in respect of the Scheme Resolution to be put to the online Scheme Meeting are set out in the accompanying Scheme Booklet.

### Voting by corporate representative

If you are a body corporate, you can appoint a corporate representative to attend and vote at the online Scheme Meeting on your behalf. The appointment must comply with section 250D and 253B of the Corporations Act.

To vote by corporate representative, a corporate representative must provide written evidence of their appointment by obtaining and completing an 'Appointment of Corporate Representative' form from Computershare or online at www.investorcentre.com/au and select 'Printable Forms'. Corporate representative forms must be provided to the Afterpay Share Registry by no later than 10.00am (AEDT) on Saturday, 4 December 2021. A corporate representative form may be submitted in the same manner as a completed Proxy Form, as described above.

A validly appointed corporate representative wishing to attend and vote at the online Scheme Meeting will require the name, SRN and postcode of the body corporate that appointed it in order to access the online platform.

### Voting by attorney

Certified copies of powers of attorney must be received by the Afterpay Share Registry by no later than 10.00am (AEDT) on Saturday, 4 December 2021. A certified copy of a power of attorney may be submitted in the same manner as a completed Proxy Form, as described above.

### Questions

Afterpay Shareholders will have a reasonable opportunity to ask questions during the Scheme Meeting via the online platform.

Afterpay Shareholders who prefer to register questions in advance of the Scheme Meeting are also invited to do so by submitting questions online at company.secretary@afterpay.com. Questions must be submitted by 5pm (AEDT) on Monday, 29 November 2021.

The chair of the Scheme Meeting will endeavour to address as many of the more frequently raised relevant questions as possible during the course of the Scheme Meeting. However, there may not be sufficient time available during the Scheme Meeting to address all of the questions raised. Please note that individual responses will not be sent to Afterpay Shareholders.

### Technical difficulties

Technical difficulties may arise during the course of the Scheme Meeting. The chair has discretion as to whether and how the Scheme Meeting should proceed in the event that a technical difficulty arises. In exercising this discretion, the chair will have regard to the number of Afterpay Shareholders impacted and the extent to which participation in the business of the meeting is affected. Where the chair considers it appropriate, the chair may continue to hold the Scheme Meeting and transact business, including conducting a poll and voting in accordance with valid proxy instructions.

### Changes to the current arrangement

Due to the constantly evolving response to the COVID-19 pandemic and potentially unforeseen circumstances, Afterpay may be required to make changes to the arrangements for the Scheme Meeting. If there are any updates, Afterpay will ensure that Afterpay Shareholders are given as much notice as possible. Further information will also be made available at https://corporate.afterpay.com/investors.

# 173

For personal use only

174

**Attachment F**

# Sample Proxy Form

174

For personal use only

**175**

afterpay

**175**