# EXHIBIT H

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

_____

# FORM 10-Q

_____

**(Mark One)**

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2021**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number: 001-37622**

_____

# Square, Inc.

**(Exact name of registrant as specified in its charter)**

_____

| | |
|---|---|
| **Delaware** | **80-0429876** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification No.)** |

**1455 Market Street, Suite 600**
**San Francisco, CA 94103**
**(Address of principal executive offices, including zip code)**

**(415) 375-3176**
**(Registrant's telephone number, including area code)**

_____

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A common stock, $0.0000001 par value per share | S Q | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐ Smaller reporting company ☐    Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of October 29, 2021, the number of shares of the registrant's Class A common stock outstanding was 399,174,867 and the number of shares of the registrant's Class B common stock outstanding was 62,100,770.

**1**

**Item 1A. Risk Factors**

*Investing in our securities involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this Quarterly Report on Form 10-Q, including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our condensed consolidated financial statements and related notes, before making any investment decision with respect to our securities. The risks and uncertainties described below may not be the only ones we face. If any of the risks actually occur, our business could be materially and adversely affected. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

*The following description of risk factors includes any material changes to, and supersedes the description of, risk factors associated with the Company's business previously disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended December 31, 2020 under the heading "Risk Factors."*

**Risk Factors Summary**

Our business operations are subject to numerous risks and uncertainties, including those outside of our control, that could cause our actual results to be harmed, including risks regarding the following:

*Risks related to our business and our industry:*
•the ongoing COVID-19 pandemic and measures intended to prevent its spread;
•our participation in government relief programs set up in response to the COVID-19 pandemic;
•our ability to maintain, protect, and enhance our brand;
•our ability to retain existing sellers, attract new sellers, and increase sales to both new and existing sellers, as well as our ability to attract and retain Cash App customers and grow their use of Cash App services;
•our investments in our business and ability to maintain profitability;
•our efforts to expand our product portfolio and market reach;
•our ability to develop products and services to address the rapidly evolving market for payments and financial services;
•competition in our industry;
•expanding our business globally;
•any acquisitions, strategic investments, entries into new businesses, joint ventures, divestitures and other transactions that we may undertake, including our proposed acquisition of Afterpay;
•additional risks of Square Banking relating to the structure of bank partnerships, and FDIC and other regulatory obligations; and
•additional risks of Square Loans related to the availability of capital, seller payments, interest rate, deposit insurance premiums, and general macroeconomic conditions.

*Operational risks:*
•real or perceived improper or unauthorized use of, disclosure of, or access to sensitive data;
•real or perceived security breaches or incidents or human error in administering our software, hardware, and systems;
•systems failures, interruptions, delays in service, catastrophic events, and resulting interruptions in the availability of our products or services or those of our sellers;
•any inability to access our private keys required to access our bitcoins or any hack or other data loss relating to the bitcoins we hold;
•our risk management efforts;
•our dependence on payment card networks and acquiring processors;
•our reliance on third parties and their systems for a variety of services, including the processing of transaction data and settlement of funds;
•our dependence on key management and any failure to attract, motivate, and retain our employees;
•our operational, financial, and other internal controls and systems;
•the integration of our services with a variety of operating systems and the interoperation of our hardware that enables merchants to accept payment cards with third-party mobile devices utilizing such operating systems;
•any shortage, price increases, tariffs, changes, delay or discontinuation of our key components;
•our ability to accurately forecast demand for our products and adequately manage our product inventory;
•difficulties estimating the amount payable under TIDAL's license agreements; and
•manipulation of stream counts on TIDAL.

**2**

*Economic, financial, and tax risks:*
•a deterioration of general macroeconomic conditions;
•any greater-than-anticipated tax liabilities or significant valuation allowances on our deferred tax assets;
•any inability to secure financing on favorable terms, or at all, or covenants in our existing credit agreement, the indentures, or future agreements;
•our ability to service our convertible notes and our senior notes; and
•counterparty risk with respect to our convertible note hedge transactions.

*Legal, regulatory, and compliance risks:*
•extensive regulation and oversight in a variety of areas of our business;
•complex and evolving regulations and oversight related to privacy and data protection;
•obligations and restrictions as a licensed money transmitter;
•regulation and scrutiny of our subsidiary Square Financial Services, which is a Utah state-chartered industrial bank, including the requirement that we serve as a source of financial strength to it;
•supervision and regulation of Square Financial Services, including the Dodd-Frank Act and its related regulations;
•regulation and scrutiny of our subsidiary Cash App Investing, which is a broker-dealer registered with the SEC and a member of FINRA, including net capital and other regulatory capital requirements;
•changes to our business practices imposed by FINRA based on our ownership of Cash App Investing;
•litigation, including intellectual property claims, government investigations or inquiries, and regulatory matters or disputes;
•any inability to protect our intellectual property rights;
•assertions by third parties of infringement of intellectual property rights by TIDAL; and
•our bitcoin investments being subject to volatile market prices, impairment, and other risks of loss.

*Risks related to our proposed acquisition of Afterpay:*
• additional liabilities in connection with the proposed acquisition and integration of Afterpay;
• the failure to timely integrate Afterpay;
• disruption in our or Afterpay's business relationships due to the proposed acquisition;
• additional regulatory and competitive risks in the buy now, pay later space;
• risks of default in consumer repayments of borrowings in Afterpay's business; and
• increased foreign currency exchange rate risk following the completion of our proposed acquisition of Afterpay.

*Risks related to ownership of our common stock:*
•the dual class structure of our common stock;
•volatility of the market price of our Class A common stock;
•our convertible note hedge and warrant transactions;
•anti-takeover provisions contained in our amended and restated certificate of incorporation, our amended and restated bylaws, and provisions of Delaware law; and
•exclusive forum provisions in our bylaws.

**Risks Related to Our Business and Our Industry**

***The ongoing COVID-19 pandemic and measures intended to prevent its spread may have a material and adverse effect on our business and results of operations.***

Global health concerns relating to the COVID-19 pandemic and related government actions taken to reduce the spread of the virus have been weighing on the macroeconomic environment, and the pandemic has significantly increased economic uncertainty and reduced economic activity. Small businesses, which constitute a large part of our sellers, have been impacted particularly hard. The pandemic has resulted in government authorities and businesses implementing numerous measures to try to contain the virus, such as travel bans and restrictions, quarantines, shelter in place or total lock-down orders, school closures, and business limitations and shutdowns. Such measures have contributed significantly to increased unemployment and negatively impacted consumer and business spending. Further, the pandemic has contributed to worldwide supply chain disruption, which has adversely affected, and is expected to continue to adversely affect businesses and the economy.

The pandemic has caused us to modify our business practices to help minimize the risk of the virus to our employees, our customers, and the communities in which we participate, which could negatively impact our business. We continue to permit employees to work remotely. As the availability of vaccines has increased and COVID-19 case rates have diminished, we have gradually begun a phased reopening of our offices. Where local health guidelines permit, vaccinated employees have

**3**

assessments, increases or required prepayments in FDIC insurance premiums could reduce our profitability and negatively impact our business.

We intend to continue to explore other products, models, and structures for Square Banking. Some of those models or structures may require, or be deemed to require, additional data, procedures, partnerships, licenses, regulatory approvals, or capabilities that we have not yet obtained or developed. The licenses required in connection with our lending program and other activities related to the Square Banking program subject us to reporting requirements, bonding requirements, and inspection by applicable state regulatory agencies. Should we fail to expand and evolve Square Banking in a successful manner, or should these new products, models or structures, or new regulations or interpretations of existing regulations, impose requirements on us that are cumbersome or that we cannot satisfy, our business may be materially and adversely affected.

***Square Loans are subject to additional risks related to availability of capital, seller payments, interest rate, deposit insurance premiums, and general macroeconomic conditions.***

Square Loans, previously known as Square Capital, is our commercial lending program. Square Financial Services, as the originator of the loans provided by Square Loans in the U.S., is subject to risks in addition to those described elsewhere in this Quarterly Report on Form 10-Q. Maintaining and growing our Square Loans business is dependent on institutional *t*hird-party investors purchasing the eligible business loans originated by us. If such third parties fail to continue to purchase such business loans or reduce the amount of future loans they purchase, then we may need to reduce originations, or we would need to fund the purchase of additional business loans from our own resources. We then may have to reduce the scale of Square Financial Services, which could have a direct impact on our ability to grow. Additionally, Square Financial Services has certain customary repurchase obligations in its loan purchase and servicing agreements with such institutional third-party investors for breaches of certain eligibility representations and warranties. If third parties reduce the price they are willing to pay for these business loans or reduce the servicing fees they pay us in exchange for servicing the business loans on their behalf, then the financial performance of Square Financial Services would be harmed.

The business loans provided by Square Loans are generally unsecured obligations of our Square sellers, and they are not guaranteed or insured in any way. Adverse changes in macroeconomic conditions or the credit quality of our Square sellers could cause some Square sellers who utilize Square Loans to cease operating or to experience a decline in their payment processing volume, thereby rendering them unable to make payment on the business loan and/or extend the repayment period beyond the contractual repayment terms on the business loan. To the extent a seller breaches a contractual obligation, such as the requirement to make minimum payments or other breach, the seller would be liable for an accelerated business loan repayment, where our recourse is to the business and not to any individual or other asset. In addition, because the servicing fees we receive from third-party investors depend on the collectability of the business loans, if there is an increase in Square sellers who utilize Square Loans who are unable to make repayment of business loans, we will be unable to collect our entire servicing fee for such loans. While our exposure to loans that we sell to third parties is more limited, if the Square sellers who utilize Square Loans are unable to repay their loans, the risk of loss in our owned loan portfolio will increase and our business may be adversely affected.

In addition, adverse changes in macroeconomic conditions may lead to a decrease in the number of sellers eligible for Square Loans and may strain our ability to correctly identify such sellers or manage the risk of non-payment or fraud as servicer of the business loans. If we fail to correctly predict the likelihood of timely repayment or correctly price such business loans, our business may be materially and adversely affected.

Square Financial Services' profitability depends, in part, on its net interest income. Net interest income is the difference between interest income earned on interest-bearing assets, such as loans and securities, and interest expense paid on interest-bearing liabilities, such as deposits and borrowed funds. Changes in interest rates and monetary policy can impact the demand for new loans, the credit profile of our borrowers, the yields earned on loans and securities, and the rates paid on deposits and borrowings. The impact of any sudden and substantial move in interest rates and/or increased competition may have an adverse effect on our business, financial condition and results of operations, as our net interest income may be adversely affected.

**Operational Risks**

***We, our sellers, our partners, and others who use our services obtain and process a large amount of sensitive data. Any real or perceived improper or unauthorized use of, disclosure of, or access to such data could harm our reputation as a trusted brand, as well as have a material and adverse effect on our business.***

**4**

We, our sellers, and our partners, including third-party vendors and data centers that we use, obtain and process large amounts of sensitive data, including data related to our customers, our sellers' customers, and their transactions. We face risks, including to our reputation as a trusted brand, in the handling and protection of this data. These risks will increase as our business continues to expand to include new products, subsidiaries, and technologies, and as we and our third-party vendors rely on an increasingly distributed workforce. Our operations involve the storage and transmission of sensitive information of individuals and businesses using our services, including their names, addresses, social security/tax ID numbers (or foreign equivalents), government IDs, payment card numbers and expiration dates, bank account information, loans they have applied for or obtained, and data regarding the performance of our sellers' businesses. Additionally, certain of our products and services are subject to the Health Insurance Portability and Accountability Act of 1996 (and the rules and regulations thereunder, as amended, including with respect to the HITECH Act) (HIPAA), and therefore we are required to take measures to safeguard protected health information of our health care entity-sellers' customers when using those products. Our services also provide third-party developers the opportunity to provide applications to our sellers in the Square and Weebly app marketplaces. Sellers who choose to use such applications can grant permission allowing the applications to access content created or held by sellers in their Square or Weebly account. Should our internal or third-party developers experience or cause a breach or a technological bug, that could lead to a compromise of the content of data held by such sellers, including personal data.

Our products and services operate in conjunction with, and we are dependent upon, third-party products and components across a broad ecosystem. There have been and may continue to be significant attacks on certain third-party providers, and we cannot guarantee that our or our third-party developers or vendors' systems and networks have not been breached or that they do not contain exploitable defects or bugs that could result in a breach of or disruption to our systems and networks or the systems and networks of third parties that support us and our products and services. If there is a security vulnerability, error, or other bug in one of these third-party products or components and if there is a security exploit targeting them, we could face increased costs, claims and liability, proceedings and litigation, reduced revenue, or harm to our reputation or competitive position. The natural sunsetting of third-party products and operating systems that we use requires our personnel to reallocate time and attention to migration and updates, during which period potential security vulnerabilities could be exploited.

More generally, if our privacy, data protection, or data security measures or those of third party developers or vendors are inadequate or are breached or otherwise compromised, and, as a result, there is improper disclosure of or someone obtains unauthorized access to or exfiltrates funds, bitcoin, investment or other assets, or other sensitive information on our systems or our partners' systems, or if we, our third-party developers or vendors suffer a ransomware or advanced persistent threat attack, or if any of the foregoing is reported or perceived to have occurred, our reputation and business could be damaged. If the sensitive information or assets are lost or improperly accessed, misused, disclosed, destroyed, or altered or threatened to be improperly accessed, misused, disclosed, destroyed, or altered, we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to claims, litigation, regulatory scrutiny, and investigations.

Under payment card rules and our contracts with our card processors and other counterparties, if there is a breach of payment card information that we store or that is stored by our sellers or other third parties with which we do business, we could be liable to the payment card issuing banks for certain of their costs and expenses. Additionally, if our own confidential business information were improperly disclosed, our business could be materially and adversely affected. A core aspect of our business is the reliability and security of our payments platforms. Any perceived or actual breach of security or other type of security incident, regardless of how it occurs or the extent or nature of the breach or incident, could have a significant impact on our reputation as a trusted brand, cause us to lose existing sellers or other customers, prevent us from obtaining new sellers and other customers, require us to expend significant funds to remedy problems caused by breaches and incidents and to implement measures in an effort to prevent further breaches and incidents, and expose us to legal risk and potential liability including those resulting from governmental or regulatory investigations, class action litigation, and costs associated with remediation, such as fraud monitoring and forensics. Any actual or perceived security breach or incident at a company providing services to us or our customers could have similar effects. Further, any actual or perceived security breach or incident with respect to the bitcoin and blockchain ledger, regardless of whether such breach directly affects our products and services, could have negative reputational effects and harm customer trust in us and our products and services.

While we maintain cybersecurity insurance, our insurance may be insufficient to cover all liabilities incurred by such attacks. We cannot be certain that our insurance coverage will be adequate for data handling or data security liabilities actually incurred, that insurance will continue to be available to us on economically reasonable terms, or at all, or that any insurer will not deny coverage as to any future claim. The successful assertion of one or more large claims against us that exceed available insurance coverage, or the occurrence of changes in our insurance policies, premiums, or deductibles could have a material adverse effect on our business, including our financial condition, operating results, and reputation.

**5**

***Our products and services may not function as intended due to errors in our software, hardware, and systems, product defects, or due to security breaches or incidents or human error in administering these systems, which could materially and adversely affect our business.***

Our software, hardware, systems, and processes may contain undetected errors or vulnerabilities that could have a material adverse effect on our business, particularly to the extent such errors or vulnerabilities are not detected and remedied quickly. We have from time to time found defects in our customer-facing software and hardware, internal systems, and technical integrations with third-party systems, and new errors or vulnerabilities may be introduced in the future. If there are such errors or defects in our software, hardware, or systems, we may face negative publicity, government investigations, and litigation. Additionally, we rely on a limited number of component and product suppliers located outside of the U.S. to manufacture our products. As a result, our direct control over production and distribution is limited and it is uncertain what effect such diminished control will have on the quality of our products. If there are defects in the manufacture of our hardware products, we may face similar negative publicity, investigations, and litigation, and we may not be fully compensated by our suppliers for any financial or other liability that we suffer as a result. As our hardware and software services continue to increase in size and complexity, and as we integrate new, acquired subsidiaries with different technology stacks and practices, these risks may correspondingly increase as well.

In addition, we provide frequent incremental releases of product and service updates and functional enhancements, which increase the possibility of errors. The products and services we provide are designed to process complex transactions and deliver reports and other information related to those transactions, all at high volumes and processing speeds. Any errors, data leaks, security breaches or incidents, disruptions in services, or other performance problems with our products or services caused by external or internal actors could hurt our reputation and damage our customers' businesses. Software and system errors, or human error, could delay or inhibit settlement of payments, result in oversettlement, cause reporting errors, or prevent us from collecting transaction-based fees, or negatively impact our ability to serve our customers, all of which have occurred in the past. Similarly, security breaches or incidents such as cyber-attacks or identity theft could disrupt the proper functioning of our software products or services, cause errors, allow loss or unavailability of, unauthorized access to, or disclosure of, proprietary, confidential or otherwise sensitive information of ours or our customers, and other destructive outcomes. Moreover, security breaches or incidents or errors in our hardware or software design or manufacture could cause product safety issues typical of consumer electronics devices. Any of the foregoing issues could lead to product recalls and inventory shortages, result in costly and time-consuming efforts to redesign and redistribute our products, give rise to regulatory inquiries and investigations, and result in lawsuits and other liabilities and losses, which could have a material and adverse effect on our business.

Additionally, electronic payment, hardware, and software products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers and other malicious actors. Because the techniques used to obtain unauthorized access to data, products, and services and to disable, degrade, or sabotage them change frequently and may be difficult to detect or remediate for long periods of time, we and our customers may be unable to anticipate these techniques or implement adequate preventative measures to stop them. If we or our sellers or other customers are unable to anticipate or prevent these attacks, our sellers' or other customers may be harmed, our reputation could be damaged, and we could incur significant liability.

***Systems failures, interruptions, delays in service, catastrophic events, and resulting interruptions in the availability of our products or services, or those of our sellers, could harm our business and our brand, and subject us to substantial liability.***

Our systems and those of our third-party vendors, including data center facilities, may experience service interruptions, outages, cyber-attacks and security breaches and incidents, human error, earthquakes, hurricanes, floods, pandemics, fires, other natural disasters, power losses, disruptions in telecommunications services, fraud, military or political conflicts, terrorist attacks and other geopolitical unrest, computer viruses, ransomware, and other malicious software, changes in social, political, or regulatory conditions or in laws and policies, or other changes or events. Our systems and facilities are also subject to break-ins, sabotage, and acts of vandalism. Some of our systems are not fully redundant, and our disaster-recovery planning is not sufficient for all eventualities. In addition, as a provider of payments solutions and other financial services, we are subject to increased scrutiny by regulators that may require specific business continuity and disaster recovery plans and more rigorous testing of such plans. This increased scrutiny may be costly and time-consuming and may divert our resources from other business priorities.

We have experienced and will likely continue to experience denial-of-service and other cyber-attacks, system failures, outages, security incidents, and other events or conditions that interrupt the availability, data integrity, or reduce the speed or functionality of our products and services. These events have resulted and likely will result in loss of revenue. In

**6**

addition, they could result in significant expense to repair or replace damaged equipment and remedy resultant data loss or corruption. The risk of cybersecurity incidents is increasing as we experience an increase in electronic payments, e-commerce, and other online activity, and we cannot provide assurances that our preventative efforts will be successful. A prolonged interruption in the availability or reduction in the speed or other functionality of our products or services could materially harm our reputation and business. Frequent or persistent interruptions in our products and services could cause customers to believe that our products and services are unreliable, leading them to switch to our competitors or to avoid our products and services, and could permanently harm our reputation and business. Moreover, to the extent that any system failure or similar event results in damages to customers or contractual counterparties, these customers and contractual counterparties could seek compensation from us for their losses, and those claims, even if unsuccessful, would likely be time-consuming and costly for us to address.

A significant natural or man-made disaster could have a material and adverse impact on our business. Our headquarters and certain of our data center facilities are located in the San Francisco Bay Area, a region known for seismic activity. Despite any precautions we may take, the occurrence of a natural disaster or other unanticipated problems at our headquarters or data centers could result in lengthy interruptions in our services or could result in related liabilities. We do not maintain insurance sufficient to compensate us for the potentially significant losses that could result from disruptions to our services.

Significant natural or other disasters, including pandemics, could also have a material and adverse impact on our sellers or other customers, which, in the aggregate, could in turn adversely affect our results of operations.

***The loss or destruction of a private key required to access our bitcoin may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to the bitcoins we hold on behalf of ourselves and our customers, we and our customers may be unable to access such bitcoins and it could harm customer trust in us and our products.***

Bitcoins are controllable only by the possessor of both the unique public key and private key relating to the local or online digital wallet in which the bitcoins are held. While the bitcoin and blockchain ledger require a public key relating to a digital wallet to be published when used in a transaction, private keys must be safeguarded and kept private in order to prevent a third party from accessing the bitcoins held in such digital wallet. To the extent any of our private keys are lost, destroyed, or otherwise compromised and no backup of such private key is accessible, we will be unable to access the bitcoins held in the related digital wallet. Additionally, we use a third party custodian to store a portion of our bitcoins in an offline and air-gapped cold storage. Any inappropriate access or theft of bitcoins held by our custodian, or the custodian's failure to maintain effective controls over the custody and other settlement services provided to us, could materially and adversely affect us. We cannot provide assurance that the digital wallets used to store our and our customers' bitcoins will not be hacked or compromised. The bitcoin and blockchain ledger, as well as other cryptocurrencies and blockchain technologies, have been, and may in the future be, subject to security breaches or incidents, hacking, or other malicious activities. Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' bitcoins could adversely affect our customers' ability to access or sell their bitcoins and could harm customer trust in us and our products, require us to expend significant funds for remediation, and expose us to litigation and other potential liability. Additionally, any loss of private keys relating to, or hack or other compromise of, digital wallets used by third parties to store bitcoins or other cryptocurrencies could have negative reputational effects on us and harm customer trust in us and our products. As the number of customers who use our bitcoin product has increased and the value of bitcoins we hold on behalf of such customers has grown significantly, the risks and consequences of such adverse events have increased and could materially and adversely affect our business.

***Our risk management efforts may not be effective, which could expose us to losses and liability and otherwise harm our business.***

We offer payments and other products and services to a large number of customers. We have programs to vet and monitor these customers and the transactions we process for them as part of our risk management efforts, but such programs require continuous improvement and may not be effective in detecting and preventing fraud and illegitimate transactions. When our payments services are used to process illegitimate transactions, and we settle those funds to customers and are unable to recover them, we suffer losses and liability. As a greater number of larger sellers use our services, our exposure to material risk losses from a single seller, or from a small number of sellers, will increase. Illegitimate transactions can also expose us to governmental and regulatory enforcement actions and potentially prevent us from satisfying our contractual obligations to our third-party partners, which may cause us to be in breach of our obligations. The highly automated nature of, and liquidity offered by, our payments and peer-to-peer services make us and our customers a target for illegal or improper uses, including scams and fraud directed at Cash App customers, fraudulent or illegal sales of goods or services, money

**7**

laundering, and terrorist financing. Identity thieves and those committing fraud using stolen or fabricated credit card, debit card, or bank account numbers, or other deceptive or malicious practices, potentially can steal significant amounts of money from businesses like ours or from our customers or third parties. Our risk management policies, procedures, techniques, and processes may not be sufficient to identify all of the risks to which we are exposed, to enable us to prevent or mitigate the risks we have identified, or to identify additional risks to which we may become subject in the future. Our current business, changes due to COVID-19 and the related economic impact, and anticipated domestic and international growth will continue to place significant demands on our risk management and compliance efforts, and we will need to continue developing and improving our existing risk management infrastructure, techniques, and processes. In addition, when we introduce new services, such as Square Banking, expand existing services, including online payment acceptance, focus on new business areas, including consumer financing and loans, or begin to operate in markets where we have a limited history of fraud loss, we may be less able to forecast and carry appropriate reserves on our books for those losses. Additionally, we recently launched Cash App Teens, making certain Cash App functions, such as Cash Card, limited peer-to-peer payments, and direct deposits available to teenagers between the ages of 13 through 17 with the authorization of a parent or guardian. The risks and the potential harm to our reputation are magnified in instances of fraud or unauthorized or inappropriate transactions involving minors.

While we maintain a program of insurance coverage for various types of liabilities, we may self-insure against certain business risks and expenses where we believe we can adequately self-insure against the anticipated exposure and risk or where insurance is either not deemed cost-effective or unavailable.

We are currently, and will continue to be, exposed to risks associated with chargebacks and refunds in connection with payment card fraud or relating to the goods or services provided by our sellers. In the event that a billing dispute between a cardholder and a seller is not resolved in favor of the seller, including in situations where the seller engaged in fraud, the transaction is typically "charged back" to the seller and the purchase price is credited or otherwise refunded to the cardholder. The risk of chargebacks is typically greater with our sellers that promise future delivery of goods and services. Moreover, chargebacks typically increase during economic downturns due to sellers becoming insolvent or bankrupt or otherwise unable to fulfill their commitments for goods or services. Additionally, the recent global supply chain disruptions and shortages related to the COVID-19 pandemic have negatively affected sellers' ability to deliver goods and services on time or at all, which increases the risk of chargebacks. If we are unable to collect chargebacks or refunds from the seller's account, or if the seller refuses to or is unable to reimburse us for chargebacks or refunds due to closure, bankruptcy, or other reasons, we, as the merchant of record, may bear the loss for the amounts paid to the cardholder. We collect and hold reserves for a limited number of sellers whose businesses are deemed higher risk in order to help cover potential losses from chargebacks and refunds, but this practice is limited and there can be no assurances that we will be successful in mitigating such losses. Our financial results would be adversely affected to the extent sellers do not fully reimburse us for the related chargebacks and refunds. Moreover, since October 2015, businesses that cannot process EMV chip cards are held financially responsible for certain fraudulent transactions conducted using chip-enabled cards. Not all of the readers we offer to merchants are EMV-compliant. If we are unable to maintain our losses from chargebacks at acceptable levels, the payment card networks could fine us, increase our transaction-based fees, or terminate our ability to process payment cards. Any increase in our transaction-based fees could damage our business, and if we were unable to accept payment cards, our business would be materially and adversely affected. If any of our risk management policies and processes, including self-insurance or holding seller reserves, are ineffective, we may suffer large financial losses, we may be subject to civil and criminal liability, and our business may be materially and adversely affected.

***We are dependent on payment card networks and acquiring processors, and any changes to their rules or practices could harm our business.***

Our business depends on our ability to accept credit and debit cards, and this ability is provided by the payment card networks, including Visa, MasterCard, American Express, and Discover. In a majority of these cases, we do not directly access the payment card networks that enable our acceptance of payment cards. As a result, we must rely on banks and acquiring processors to process transactions on our behalf. Our acquiring processor agreements have terms ranging from two to six years. Our three largest such agreements expire between the first quarter of 2022 and the fourth quarter of 2025. These banks and acquiring processors may fail or refuse to process transactions adequately, may breach their agreements with us, or may refuse to renegotiate or renew these agreements on terms that are favorable or commercially reasonable. They might also take actions that degrade the functionality of our services, impose additional costs or requirements on us, or give preferential treatment to competitive services, including their own services. If we are unsuccessful in establishing, renegotiating, or maintaining mutually beneficial relationships with these payment card networks, banks, and acquiring processors, our business may be harmed.

The payment card networks and our acquiring processors require us to comply with payment card network operating rules, including special operating rules that apply to us as a "payment facilitator" providing payment processing services to

**8**

**Legal, Regulatory, and Compliance Risks**

***Our business is subject to extensive regulation and oversight in a variety of areas, all of which are subject to change and uncertain interpretation.***

We are subject to a wide variety of local, state, federal, and international laws, regulations, licensing schemes, and industry standards in the United States and in other countries in which we operate. These laws, regulations, and standards govern numerous areas that are important to our business, and include, or may in the future include, those relating to banking, lending, deposit-taking, cross-border and domestic money transmission, foreign exchange, payments services (such as payment processing and settlement services), cryptocurrency, trading in shares and fractional shares, fraud detection, consumer protection, anti-money laundering, escheatment, sanctions regimes and export controls, data privacy, data protection and data security, and compliance with the Payment Card Industry Data Security Standard, a set of requirements designed to ensure that all companies that process, store, or transmit payment card information maintain a secure environment to protect cardholder data.

These laws, rules, regulations, and standards are enforced by multiple authorities and governing bodies in the United States, including federal agencies, such as the FDIC, the SEC, the Consumer Financial Protection Bureau, and Office of Foreign Assets Control, self-regulatory organizations, and numerous state and local agencies, such as the Utah Department of Financial Institutions. Outside of the United States, we are subject to additional regulators. As we expand into new jurisdictions, or expand our product offerings in existing jurisdictions, the number of foreign regulations and regulators governing our business will expand as well. For example, in connection with our proposed acquisition of Afterpay we expect to establish a secondary listing on the Australian Securities Exchange ("ASX") to allow Afterpay shareholders to trade shares of our Class A common stock via CHESS Depositary Interests on the ASX, which may subject us to additional listing requirements. As our business and products continue to develop and expand, we may become subject to additional rules, regulations, and industry standards. We may not always be able to accurately predict the scope or applicability of certain regulations to our business, particularly as we expand into new areas of operations, which could have a significant negative effect on our existing business and our ability to pursue future plans.

Laws, regulations, and standards are subject to changes and evolving interpretations and application, including by means of legislative changes and/or executive orders, and it can be difficult to predict how they may be applied to our business and the way we conduct our operations, particularly as we introduce new products and services and expand into new jurisdictions.

For example, Cash App includes a feature that permits our customers to buy and sell bitcoin. Bitcoin is not widely accepted as legal tender or backed by governments around the world, and it has experienced price volatility, technological glitches, security compromises, and various law enforcement and regulatory interventions. Certain existing laws also prohibit transactions with certain persons and entities, and we have a risk based program in place to prevent such transactions. Despite this, due to the nature of bitcoin technology and blockchain, it may be technically infeasible to prevent all such transactions, and there can be no guarantee that our measures will be viewed as sufficient. The regulation of cryptocurrency and crypto platforms is still an evolving area, and it is possible that we could become subject to additional regulations. If we fail to comply with regulations or prohibitions applicable to us, we could face regulatory or other enforcement actions and potential fines and other consequences. Further, we might not be able to continue operating the feature, at least in current form, which could cause the price of our Class A common stock to decrease.

We are subject to audits, inspections, inquiries, and investigations from regulators on an ongoing basis. Although we have a compliance program focused on the laws, rules, and regulations applicable to our business, we have been and may still be subject to inquiries, investigations, fines, or other penalties in one or more jurisdictions levied by regulators, including federal agencies, state Attorneys General and private plaintiffs who may be acting as private attorneys general pursuant to various applicable laws, as well as those levied by foreign regulators. In addition to fines, penalties for failing to comply with applicable rules and regulations could include significant criminal and civil lawsuits, forfeiture of significant assets, increased licensure requirements, or other enforcement actions. We could also be required to make changes to our business practices or compliance programs as a result of regulatory scrutiny. In addition, any perceived or actual breach of compliance by us with respect to applicable laws, rules, and regulations could have a significant impact on our reputation as a trusted brand and could cause us to lose existing customers, prevent us from obtaining new customers, require us to expend significant funds to remedy problems caused by breaches and to avert further breaches, and expose us to legal risk and potential liability.

Further, from time to time, we may leverage third parties to help conduct our businesses in the U.S. or abroad. We and our third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities and may be held liable for any corrupt or other illegal activities of these third-party business partners and intermediaries, our employees, partners, and agents, even if we do not explicitly authorize such activities. While we have policies and procedures to address compliance with such laws, we cannot assure you that our

**9**

employees and agents will not take actions in violation of our policies and applicable law, for which we may be ultimately held responsible.

***Our business is subject to complex and evolving regulations and oversight related to privacy and data protection.***

We are subject to laws and regulations relating to the collection, use, retention, privacy, protection, security, and transfer of information, including personal information of our employees and customers. As with the other laws and regulations noted above, these laws and regulations may change or be interpreted and applied differently over time and from jurisdiction to jurisdiction, and it is possible they will be interpreted and applied in ways that will materially and adversely affect our business. For example, the European Union's General Data Protection Regulation ("GDPR") and similar legislation in the United Kingdom ("U.K.") impose stringent data privacy and data protection requirements and provide for greater penalties for noncompliance of up to the greater of 4% of worldwide annual revenue or €20 million or £17.5 million, as applicable. GDPR restricts international data transfers from the EU to other jurisdictions unless the rights of the individual data subjects in respect of their personal data is protected by an approved transfer mechanism, or one of a limited number of exceptions applies. The U.K.'s data protection regime contains similar requirements. When transferring personal data from the EU to other jurisdictions, we utilize standard contractual clauses published by the EU Commission (the "SCCs"). On July 16, 2020, the Court of Justice of the European Union ("CJEU") issued a decision that may impose additional obligations on companies when relying on those SCCs, in addition to invalidating another method that some companies previously relied on for transferring personal data from the European Economic Area ("EEA") to the United States, the EU-U.S. Privacy Shield. This CJEU decision may result in different EEA data protection regulators applying differing standards for the transfer of personal data from the EEA to the United States, and even require ad hoc verification of measures taken with respect to data flows. On June 4, 2021, the European Commission issued new SCCs that account for the CJEU's decision and other developments, which need to be put in place for new contracts involving the transfer of personal data from the EEA to a third country as of September 27, 2021, and, by December 27, 2022, replace previous SCCs included in existing contracts concluded before September 27, 2021. As a result of this CJEU decision or other developments with respect to the legal and regulatory regime affecting cross-border data transfers, we may be required to take additional steps to legitimize impacted personal data transfers. This could result in increased costs of compliance and limitations on our customers and us. More generally, we may find it necessary or desirable to modify our data handling practices and to engage in additional contractual obligations, and this CJEU decision or other legal or regulatory challenges or developments relating to cross-border data transfer may serve as a basis for our personal data handling practices, or those of our customers and vendors, to be challenged and may otherwise adversely impact our business, financial condition and operating results. In the U.K., although the Data Protection Act and legislation referred to as the UK GDPR substantially enacts the EU GDPR into U.K. law, the U.K.'s exit from the EU has created uncertainty with regard to the regulation of data protection in the U.K. and data transfers between the U.K., the EU, and other jurisdictions and could require us to make additional changes to the way we conduct our business and transmit data between the U.S., the U.K., the EU, and the rest of the world. On June 28, 2021, the European Commission announced a decision of "adequacy" concluding that the U.K. ensures an equivalent level of data protection to the GDPR, which provides some relief regarding the legality of continued personal data flows from the EEA to the U.K. Some uncertainty remains, however, as this adequacy determination must be renewed after four years and may be modified or revoked in the interim. Further, in addition to the GDPR, the European Commission has a draft regulation in the approval process that focuses on a person's right to conduct a private life. The proposed legislation, known as the Regulation of Privacy and Electronic Communications ("ePrivacy Regulation"), would replace the current ePrivacy Directive. Originally planned to be adopted and implemented at the same time as the GDPR, the ePrivacy Regulation is still being negotiated. Most recently, on February 10, 2021, the Council of the EU agreed on its version of the draft ePrivacy Regulation. If adopted, the earliest date for entry into force is in 2023, with broad potential impacts on the use of internet-based services and tracking technologies, such as cookies. Aspects of the ePrivacy Regulation remain for negotiation between the European Commission and the Council. We expect to incur additional costs to comply with the requirements of the ePrivacy Regulation as it is finalized for implementation. In addition, some countries are considering or have enacted legislation addressing matters such as requiring local storage and processing of data that could impact our compliance obligations, expose us to liability, and increase the cost and complexity of delivering our services.

Likewise, the California Consumer Privacy Act of 2018 ("CCPA") became effective on January 1, 2020 and will be modified by the California Privacy Rights Act ("CPRA"), which was passed in November 2020 and becomes fully effective on January 1, 2023. The CCPA and CPRA impose stringent data privacy and data protection requirements for the data of California residents, and provide for penalties for noncompliance of up to $7,500 per violation. It remains unclear how various provisions of the CCPA and CPRA will be interpreted and enforced. More generally, data privacy and security continues to be a rapidly evolving area, and further legislative activity has arisen and will likely continue to arise in the U.S., the EU, and other jurisdictions. Various states in the U.S. have proposed or enacted laws regarding privacy and data protection that contain obligations similar to the CCPA. For example, on March 2, 2021, Virginia enacted the Virginia Consumer Data Protection Act ("CDPA"), and on July 7, 2021, Colorado enacted the Colorado Privacy Act. Both of these are comprehensive privacy statutes

**10**

that will become effective in 2023 and share similarities with the CCPA, the CPRA, and legislation proposed in other states. The U.S. federal government also is contemplating federal privacy legislation. In addition, laws and regulations directed at privacy, data protection, and data security, and those that have been applied in those areas, may be subject to evolving interpretations or applications. The effects of recently proposed or enacted legislation potentially are far-reaching and may require us to modify our data processing practices and policies and to incur substantial costs and expenses in an effort to comply.

We have incurred, and may continue to incur, significant expenses to comply with evolving privacy and security standards and protocols imposed by law, regulation, industry standards, shifting consumer expectations, or contractual obligations. In particular, with laws and regulations such as the GDPR in the EU and the CCPA, CPRA, and CDPA in the U.S. imposing new and relatively burdensome obligations, and with substantial uncertainty over the interpretation and application of these and other laws and regulations, we may face challenges in addressing their requirements and making necessary changes to our policies and practices, and we may incur significant costs and expenses in an effort to do so. Any failure, real or perceived, by us to comply with our privacy, data protection, or information security policies, changing consumer expectations, or with any evolving regulatory requirements, industry standards, or contractual obligations could cause our customers to reduce their use of our products and services, disrupt our supply chain or third-party vendor or developer partnerships, and materially and adversely affect our business.

***As a licensed money transmitter, we are subject to important obligations and restrictions.***

We have obtained licenses to operate as a money transmitter (or as other financial services institutions) in the United States and in the states where this is required, as well as in some non-U.S. jurisdictions, including the European Union, the United Kingdom, and Australia. As a licensed money transmitter, we are subject to obligations and restrictions with respect to the investment of customer funds, reporting requirements, bonding requirements, and inspection by state regulatory agencies concerning those aspects of our business considered money transmission. Evaluation of our compliance efforts, as well as the questions of whether and to what extent our products and services are considered money transmission, are matters of regulatory interpretation and could change over time. In the past, we have been subject to fines and other penalties by regulatory authorities due to their interpretations and applications to our business of their respective state money transmission laws. In the future, as a result of the regulations applicable to our business, we could be subject to investigations and resulting liability, including governmental fines, restrictions on our business, or other sanctions, and we could be forced to cease conducting business in certain jurisdictions, be forced to otherwise change our business practices in certain jurisdictions, or be required to obtain additional licenses or regulatory approvals. There can be no assurance that we will be able to obtain any such licenses, and, even if we were able to do so, there could be substantial costs and potential product changes involved in maintaining such licenses, which could have a material and adverse effect on our business.

***Our subsidiary Square Financial Services is a Utah state-chartered industrial bank, which requires that we serve as a source of financial strength to it and subjects us to potential regulatory sanctions.***

On March 1, 2021, Square Financial Services received its deposit insurance from the FDIC and charter approval from the Utah Department of Financial Institutions and became operational. The Federal Deposit Insurance Act requires that we serve as a source of financial strength to Square Financial Services. This means that we are required by law to provide financial assistance to Square Financial Services in the event that it experiences financial distress. In this regard, the FDIC's approval requires that Square Financial Services have initial paid in capital of not less than approximately $56 million, and at all times meet or exceed the regulatory capital levels required for Square Financial Services to be considered "well capitalized" under the FDIC's prompt corrective action rules. The regulatory total capital and leverage ratios of Square Financial Services during the first three years of operation may not be less than the levels provided in Square Financial Services' business plan approved by the FDIC. Thereafter, the regulatory capital ratios must be annually approved by the FDIC, and in no event may Square Financial Services' leverage ratio be less than twenty percent, as calculated in accordance with FDIC regulations. If Square Financial Services' total capital or leverage ratios fall below the levels required by the FDIC, we will need to provide sufficient capital to Square Financial Services so as to enable it to maintain its required regulatory capital ratios. If the FDIC were to increase Square Financial Services' capital requirements, it could have adverse effects on us and Square Financial Services.

The FDIC's approval is also contingent on us maintaining a Capital and Liquidity Maintenance Agreement as well as a Parent Company Agreement. The Capital and Liquidity Maintenance Agreement requires, among other things, that we maintain the leverage ratio of Square Financial Services at a minimum of 20 percent following the first three years of Square Financial Services' operations; maintain a third-party line of credit for the benefit of Square Financial Services acceptable to the FDIC; purchase any loan from Square Financial Services at the greater of the cost basis or fair market value, if deemed necessary by the FDIC or Square Financial Services; and establish and maintain a reserve deposit of $50 million at an

**11**

unaffiliated third-party bank that Square Financial Services could draw upon in the event that we fail to provide sufficient funds to maintain Square Financial Services' capital ratios at the required levels. The Parent Company Agreement requires, among other things, that we consent to the FDIC's examination of us and our subsidiaries; limit our representation on Square Financial Services' board of directors to no more than 25 percent; submit a contingency plan to the FDIC that describes likely scenarios of significant financial or operational stress and, if we were unable to serve as a source of financial strength, options for the orderly wind down or sale of Square Financial Services; and engage a third party to review and provide periodic reports concerning the effectiveness of our complaint response system. Jack Dorsey, who is considered our controlling shareholder in this context, also agreed to cause us to perform under these agreements. Should we fail to comply with these obligations, we could be subject to regulatory sanctions. In addition, any failure by Square Financial Services to comply with applicable laws, rules, and regulations could also subject us and Square Financial Services to regulatory sanctions. These sanctions could adversely impact our reputation and our business, require us to expend significant funds for remediation, and expose us to litigation and other potential liability.

***Square Financial Services is subject to extensive supervision and regulation, including the Dodd-Frank Act and its related regulations, which are subject to change and could involve material costs or affect operations.***

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Dodd-Frank Act, effected significant changes to U.S. financial regulations and required rulemaking by U.S. financial regulators including adding a new Section 13 to the Bank Holding Company Act known as the Volcker Rule. The Volcker Rule generally restricts certain banking entities (such as Square Financial Services) from engaging in proprietary trading activities and from having an ownership interest in or sponsoring any private equity funds or hedge funds (or certain other private issuing entities). The current activities of Square Financial Services have not been and are not expected to be materially affected by the Volcker Rule. Nevertheless, we cannot predict whether, or in what form, any other proposed regulations or statutes or changes to implementing regulations will be adopted or the extent to which the business operations of Square Financial Services may be affected by any new regulation or statute. Such changes could subject our business to additional compliance burden, costs, and possibly limit the types of financial services and products we may offer.

Square Financial Services is also subject to the requirements in Sections 23A and 23B of the Federal Reserve Act and the Federal Reserve Board's implementing Regulation W, which regulate loans, extensions of credit, purchases of assets, and certain other transactions between an insured depository institution (such as Square Financial Services) and its affiliates. The statute and regulation require Square Financial Services to impose certain quantitative limits, collateral requirements and other restrictions on "covered transactions" between Square Financial Services and its affiliates and requires all transactions be on "market terms" and conditions consistent with safe and sound banking practices.

***Our subsidiary Cash App Investing is a broker-dealer registered with the SEC and a member of FINRA, and therefore is subject to extensive regulation and scrutiny.***

Our subsidiary Cash App Investing facilitates transactions in shares and fractionalized shares of publicly-traded stock and exchange-traded funds by users of our Cash App through a third-party clearing and carrying broker, DriveWealth LLC ("DriveWealth"). Cash App Investing is registered with the SEC as a broker-dealer under the Exchange Act and is a member of FINRA. Therefore Cash App Investing is subject to regulation, examination, and supervision by the SEC, FINRA, and state securities regulators. The regulations applicable to broker-dealers cover all aspects of the securities business, including sales practices, use and safekeeping of clients' funds and securities, capital adequacy, record-keeping, and the conduct and qualification of officers, employees, and independent contractors. As part of the regulatory process, broker-dealers are subject to periodic examinations by their regulators, the purpose of which is to determine compliance with securities laws and regulations, and from time to time may be subject to additional routine and for-cause examinations. It is not uncommon for regulators to assert, upon completion of an examination, that the broker-dealer being examined has violated certain of these rules and regulations. Depending on the nature and extent of the violations, the broker-dealer may be required to pay a fine and/or be subject to other forms of disciplinary and corrective action. Additionally, the adverse publicity arising from the imposition of sanctions could harm our reputation and cause us to lose existing customers or fail to gain new customers.

The SEC, FINRA, and state regulators have the authority to bring administrative or judicial proceedings against broker-dealers, whether arising out of examinations or otherwise, for violations of state and federal securities laws. Administrative sanctions can include cease-and-desist orders, censure, fines, and disgorgement and may even result in the suspension or expulsion of the firm from the securities industry. Similar sanctions may be imposed upon officers, directors, representatives, and employees.

Cash App Investing has adopted, and regularly reviews and updates, various policies, controls, and procedures designed for compliance with Cash App Investing's regulatory obligations. However, appropriately addressing Cash App

**12**