**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BLOCK, INC. SECURITIES LITIGATION | No. 1:22-cv-08636 (MMG) |
| | CLASS ACTION |
| | DEMAND FOR JURY TRIAL |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................... 1

SUMMARY OF RELEVANT FACTS .......................................................................................... 2

ARGUMENT .................................................................................................................................. 3

I.      Plaintiffs Adequately Allege That the Undisclosed Facts Relating to the
        Data Breach and Block's Related Inadequate Systems Designed to
        Safeguard PII Were Material .................................................................................. 3

II.     The Complaint Plausibly Alleges Falsity .............................................................. 5

        A.      Plaintiffs Have Not Engaged in Puzzle Pleading....................................... 6

        B.      Plaintiffs Properly Allege That Defendants' Pre-Data Breach
                Statements Were False or Misleading........................................................ 7

        C.      The Exchange Act Plaintiffs Also Properly Allege the Falsity of
                Defendants' Post-Data Breach Statements .............................................. 12

III.    The Exchange Act Plaintiffs Allege Facts Creating a Strong Inference of
        Scienter With Respect to Their Claims................................................................ 16

        A.      Defendants Were Motivated and Had the Opportunity to
                Misrepresent and Conceal Block's Cybersecurity Failures in Order
                to Complete the Merger ........................................................................... 17

        B.      Defendants Knew of or Recklessly Ignored Block's Cybersecurity
                Failures.................................................................................................... 21

IV.     OIP Properly States a Claim for a Violation of Section 12(a)(2) of the
        Securities Act ...................................................................................................... 26

        A.      OIP's Allegations Comply with Federal Rule of Civil Procedure
                8(a)'s Applicable Notice Pleading Requirement ...................................... 26

        B.      OIP's Acquisition of Block Securities is Subject to Section
                12(a)(2) of the Securities Act.................................................................. 28

                1.      OIP's Claims Do Not Involve the Extraterritorial
                        Application of the Securities Act................................................. 28

                2.      The Scheme Booklet Was a Prospectus within the Meaning
                        of the Securities Act................................................................... 31

3.      Defendants Also Are Liable Based Upon Having Assumed
        a Duty to Update the Scheme Booklet ......................................................... 33

V.      Plaintiffs' Control Person Claims Are Plausible .............................................................. 35

CONCLUSION ................................................................................................................................ 35

**TABLE OF AUTHORITIES**

**Page**

CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
677 F.3d 60 (2d Cir. 2012)......................................................................................31

*In re Alphabet, Inc. Sec. Litig.,*
1 F.4th 687 (9th Cir. 2021) ................................................................ *passim*

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.,*
19 F.4th 145 (2d Cir. 2021) .....................................................................................9

*In re Ambac Fin. Grp., Inc. Sec. Litig.,*
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................................................................27

*In re AmTrust Fin. Servs., Inc. Sec. Litig.,*
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019).........................................................27

*Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.,*
680 F. Supp. 2d 616 (S.D.N.Y. 2010)....................................................................33

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,*
28 F.4th 343 (2d Cir. 2022) .....................................................................................9

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................27

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.,*
849 F. App'x 289 (2d Cir. 2021) ............................................................................30

*In re Barclays Liquidity Cross & High Frequency Trading Litig.,*
390 F. Supp. 3d 432 (S.D.N.Y. 2019).....................................................................26

*Barilli v. Sky Solar Holdings, Ltd.,*
389 F. Supp. 3d 232 (S.D.N.Y. 2019).....................................................................10

*In re Beacon Assocs. Litig.,*
745 F. Supp. 2d 386 (S.D.N.Y. 2010).....................................................................14

*Billitier v. Merrimack Mut. Fire Ins. Co.,*
777 F. Supp. 2d 488 (W.D.N.Y. 2011)...................................................................12

*Born v. Quad/Graphics, Inc.,*
521 F. Supp. 3d 469 (S.D.N.Y. 2021).......................................................................7

*Burstyn v. Worldwide Xceed Grp., Inc.*,
    2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)........................................................................18

*Caiola v. Citibank, N.A., New York*,
    295 F.3d 312 (2d Cir. 2002)................................................................................................16

*Canoo Inc. v. DD Glob. Holdings Ltd.*,
    2023 WL 6162296 (S.D.N.Y. Sept. 21, 2023)....................................................................29

*In re Cap. One Consumer Data Sec. Breach Litig.*,
    488 F. Supp. 3d 374 (E.D. Va. 2020) ..................................................................................8

*In re CarLotz, Inc. Sec. Litig.*,
    2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ....................................................................24

*In re Citigroup Sec. Litig.*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ....................................................................10

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).....................................................................10

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ....................................................................14

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    2017 WL 2608243 (S.D. Tex. June 15, 2017).....................................................................30

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)..................................................................................6

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ................................................................................................9

*ECA, Local 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2nd Cir. 2009)........................................................................................10, 18

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015).................................................................................................22

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019).......................................................................7, 10, 12

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................................11

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ...............................................................................................12

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ....................................................................................23

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................12

*FTC v. Wyndham Worldwide Corp.*,
  799 F.3d 236 (3d Cir. 2015)...............................................................................8, 25

*Ganino v. Citizens Utils. Co.*,
  228 F.3d at 161 ...................................................................................................5, 16

*Garber v. Legg Mason*,
  537 F. Supp. 2d 597 (S.D.N.Y.2008)..........................................................................5

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2014 WL 2815571 (S.D.N.Y. June 23, 2014) ...........................................................9

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995).................................................................................................32

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) .....................................................................................26

*Hall v. Hall*,
  584 U.S. 59 (2018)...................................................................................................28

*In re Initial Public Offering Secs. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004).......................................................................17

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998)....................................................................................34

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020).......................................................................................17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).....................................................................................24

*Lozada v. TaskUs, Inc.*,
  2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) .................................................................35

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024).................................................................................................15

*Maher v. Glob. Factors LLC*,
  2024 WL 3356985 (S.D.N.Y. July 8, 2024) .............................................................15

*In re Marriott Int'l, Inc.*,
   31 F.4th 898 (4th Cir. 2022) ..................................................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).............................................................................................................21, 25

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...............................................................................................11, 13,

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016)....................................................................................23

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010)..........................................................................................................29, 30

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) ......................................................................................................11

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).....................................................................................................17

*Odeh v. Immunomedics, Inc.*,
   2020 WL 4381924 (D.N.J. July 31, 2020)...............................................................................14

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019)......................................................................................17

*In re Patriot Nat'l, Inc. Sec. Litig.*,
   2021 WL 3418615 (S.D.N.Y. Aug. 5, 2021)...........................................................................28

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
   11 F.4th 90 (2d Cir. 2021) .......................................................................................................10

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
   2020 WL 4937461 (S.D.N.Y. Aug. 24, 2020)............................................................................6

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................................................27, 33

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)......................................................................................................27

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)........................................................................................................17

*Salzman v. ImmunityBio, Inc.*,
   2024 WL 3100274 (S.D. Cal. June 20, 2024)..........................................................................15

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512 (S.D.N.Y. May 1, 2024) ........................................................21, 25

*SEC v. Compania Int'l Financiera SA*,
2011 WL 3251813 (S.D.N.Y. July 29, 2011) ...............................................................29

*SEC v. Ralston Purina Co.*,
346 U.S. 119 (1953)......................................................................................................33

*SEC v. StratoComm Corp.*,
2 F. Supp. 3d 240 (N.D.N.Y. 2014)................................................................................7

*Set Capital LLC v. Credit Suisse Group AG*,
996 F.3d 64 (2d Cir. 2021)...........................................................................................25

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020).....................................................................16, 17, 22, 25

*Sgarlata v. PayPal Holdings, Inc.*,
409 F. Supp. 3d 846 (N.D. Cal. 2019) ...........................................................................9

*In re Signet Jewelers Ltd. Sec. Litig.*,
389 F. Supp. 3d 221 (S.D.N.Y. 2019).........................................................................10

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)...........................................................................................10

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)..................................................................24

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008)..........................................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)......................................................................................................22

*Valentini v. Citigroup, Inc.*,
837 F. Supp. 2d 304 (S.D.N.Y. 2011)..........................................................................30

*Van Dongen v. CNinsure Inc.*,
951 F. Supp. 2d 457 (S.D.N.Y. 2013)..........................................................................17

*Veleron Holding, B.V. v. Morgan Stanley*,
117 F. Supp. 3d 404 (S.D.N.Y. 2015)............................................................................9

*Yung v. Lee*,
432 F.3d 142 (2d Cir. 2005)..........................................................................................33

## STATUTES

15 U.S.C. § 45........................................................................................................................10, 25

15 U.S.C. § 77b(a)(10)....................................................................................................................31

15 U.S.C. § 77z-1..............................................................................................................................8

15 U.S.C. § 78u-4(b)(1)....................................................................................................................8

38 U.S.C. § 5727(4)...........................................................................................................................4

## OTHER AUTHORITIES

17 C.F.R. § 229.106(a).......................................................................................................................4

17 C.F.R. § 230.144A(c)..................................................................................................................33

Fed. R. Evid. 404(b)(2)....................................................................................................................21

**INTRODUCTION**

On December 10, 2021, Block, Inc. ("Block" or the "Company") experienced a massive data breach (the "Data Breach") in which a former employee downloaded sensitive personally identifiable information ("PII") of 8.2 million customers, including brokerage portfolio value, brokerage portfolio holdings, and stock trading activity. The Data Breach occurred because Block engaged in an unreasonable violation of fundamental data security standards in failing to revoke a former employee's access to PII – one of the most basic elements of any internal control system.

Defendants failed to timely disclose either the Data Breach or the underlying data security flaws enabling the Data Breach, instead waiting until April 4, 2022, at which time investors unsurprisingly reacted to the news by driving down the price of Block's common stock (the "Common Stock") by more than 15%. Block benefitted from delaying disclosure of the Data Breach and its lack of adequate internal control. In particular, its delay allowed it to obtain approval on December 14, 2021 from shareholders of Afterpay Limited ("Afterpay") for a merger (the "Merger" or "Transaction") with Block in which the Afterpay shareholders received Block securities, including CHESS Depository Interests ("CDIs"), which are equivalent to Common Stock, for their Afterpay stock. The delay also allowed Block to finalize the Merger in early 2022.

There are two distinct claims consolidated before the Court. Official Intelligence Pty. Ltd. ("OIP") asserts claims arising under the Securities Act of 1933 (the "Securities Act") that relate to its purchase of Block securities in connection with the Meger. Sotiropoulos and Sawyer (the "Exchange Act Plaintiffs") assert claims arising under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of Common Stock purchasers. All Plaintiffs plausibly allege that Defendants failed to properly disclose material facts relating to Block's data protection.

In addition, the Exchange Act Plaintiffs allege facts giving rise to a strong inference of scienter on Defendants' part, specifically, Defendants' failure to disclose Block's internal control

failures leading up to the Data Breach and the motive to complete the Merger. OIP does not allege – and consciously avoids incorporating by reference – any allegations of scienter for the Securities Act claims because scienter is not an element of those claims. OIP's claims are otherwise meritorious because it plausibly alleges that the Merger was a public offering with respect to which claims arising under Section 12(a)(2) of the Securities Act are properly pled. Therefore, and as discussed below in greater detail, Defendants' motion to dismiss should be denied in its entirety.

## SUMMARY OF RELEVANT FACTS

Block collects PII from its customers to conduct its business, particularly relating to its Cash App product, which enables customers to make peer-to-peer payments. Consolidated Amended Complaint ("Complaint"), ECF No. 87, ¶¶ 13-14. Since that information is obviously sensitive and of the sort that customers wish to keep confidential, Block reassures them through privacy policies and terms of service that the Company does "a lot to keep [their] data safe" and takes "reasonable measures, including … safeguards … to protect [their] information from … unauthorized access." ¶¶ 15-17. Block acknowledges in its public filings that "[a]ny perceived or actual breach of security or other type of security incident" could have a significant and deleterious impact on the Company. ¶¶ 19-25, 68, 98-103, 107-113.

On August 2, 2021, Block agreed to acquire Afterpay, executing a Scheme Implementation Deed (the "Deed") pursuant to which Afterpay shareholders were to receive either CDIs or Common Stock in exchange for their Afterpay stock. ¶ 41. The CDIs that Afterpay shareholders could elect to receive were the economic equivalent of the Common Stock, enjoying the same dividends and voting rights and having the contractual right to exchange either for the other. ECF No. 92-1 at 31-33, 48-49. On November 5, 2021, Afterpay disseminated the Scheme Booklet, seeking its shareholders' approval of the Merger, with Block determining the form and content of the information about Block contained in the Scheme Booklet. ¶¶ 49-51. The Scheme Booklet

included a letter from Defendant Jack Dorsey, who is Block's Chief Executive Officer ("CEO"), urging Afterpay shareholders to vote in favor of the Merger as well as information concerning Block's Privacy Policy, while also incorporating by reference portions of Block's SEC filings. ¶¶ 52-56. On December 7, 2021, Afterpay updated the Scheme Booklet with respect to the Transaction's fairness after the Common Stock had fallen in price. ¶¶ 61-62.

On December 10, 2021, the Data Breach occurred when a former employee (the "FE") accessed Block's network, downloading PII of 8.2 million Cash App users, consisting of usernames, Cash App brokerage account numbers, portfolio values, holdings, and certain trading activity. ¶ 63. The FE's ability to access Block's system to download that volume of PII evidenced, at a minimum, a lack of adequate security measures or controls over customers' PII provided to Block. ¶ 38. On December 14, 2021, Afterpay reopened its special meeting seeking shareholder approval of the Transaction without Block disclosing the Data Breach and Block's related lack of adequate security measures or controls. ¶¶ 64, 65. The Merger closed on January 31, 2022, with Afterpay shareholders receiving Block securities in the form of Common Stock or CDIs in exchange for their stock. ¶ 68. After the Merger, Block made more public statements about its security measures and the harm a data breach could cause, but still failed to disclose either the Data Breach or inadequacies in Block's systems designed to protection PII. *E.g.*, ¶¶ 104, 107-112.

On April 4, 2022, Block disclosed the Data Breach. ¶ 69. The disclosure caused the Common Stock's and CDI's prices to plummet about 15%. ¶ 70.

**ARGUMENT**

I.    **Plaintiffs Adequately Allege That the Undisclosed Facts Relating to the Data Breach and Block's Related Inadequate Systems Designed to Safeguard PII Were Material**

Defendants attempt to downplay the serious nature of the Data Breach and the materiality of the underlying related facts by contending that there was no "*breach*" of Block's systems but,

instead, an "*incident*" that "involved the unauthorized access of certain customer reports by a former employee who previously had authorization to access such reports." D. Mem. at 4.[1] However, in doing so, Defendants ignore that Block's own SEC filings describe a failure to protect PII from an authorized disclosure as a breach.[2] The term "breach" is also consistent with the U.S. Government's National Institute of Standards and Technology Computer Security Resource Center, which defines a "breach" to include instances when "a person other than an authorized user accesses or potentially accesses [PII]."[3] Similarly, the U.S. Cybersecurity and Infrastructure Security Agency ("CISA") and Federal Emergency Management Agency ("FEMA") define "*data breach*" as "[t]he unauthorized movement or disclosure of sensitive information to a party, usually outside the organization, that is not authorized to have or see the information,"[4] and Congress statutorily defined a data breach as "the loss, theft, or other unauthorized access, other than those incidental to the scope of employment, to data containing" PII. 38 U.S.C. §5727(4).

Here, Block admits, as it must, that the FE downloaded the PII of 8.2 million current and former customers "without permission after their employment ended," and Block "notified law

---

[1]  "D. Mem." means the Memorandum of Law in Support of Defendants' Motion to Dismiss Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF No. 93).

[2]  Block Annual Reports on Form 10-K filed with the SEC on February 26, 2020, and February 23, 2021 ("If our privacy and security measures ... are **breached**") (emphasis added).

[3]  https://csrc.nist.gov/glossary/term/breach.

[4]  *Planning Considerations for Cyber Incidents*, FEMA & CISA (Nov. 2023) at 49, available at https://www.cisa.gov/sites/default/files/2024-01/2023_fema_planning-considerations-cyber-incidents.pdf. By contrast, FEMA & CISA define a "*cyber incident*" as "[a]n event occurring on or conducted through a computer network that actually or imminently jeopardizes the confidentiality, integrity, or availability of computers, information or communications systems or networks, physical or virtual infrastructure controlled by computers or information systems, or information resident thereon," and they note that while an incident might include natural events and accidents, a data breach is a specific type of incident involving the unauthorized disclosure of sensitive information. *Id.* at 8, 34; *see also* 17 C.F.R. § 229.106(a) (defining "Cybersecurity incident"). Additionally, the Federal Trade Commission ("FTC") refers to an unauthorized disclosure of PII as a "data breach." *See* Federal Trade Commission, *Data Breach Response: A Guide for Business*, available at https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

enforcement" and "the applicable regulatory authorities." ¶ 33. Therefore, Block's effort to suggest that this case involves something less than a data breach is misleading, underscoring the weakness of Defendants' arguments in seeking to deny that their statements violated securities laws.

Instead, Plaintiffs properly allege that Block failed to disclose both (1) its inadequate cybersecurity measures and (2) the Data Breach. The standard for assessing materiality is the same under § 10(b) and SEC Rule 10b–5 as it is under § 12(a)(2) of the Securities Act. *Garber v. Legg Mason*, 537 F. Supp. 2d 597, 615 (S.D.N.Y. 2008). "At the pleading stage, a plaintiff satisfies the materiality requirement of [securities laws] by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utilities* Co., 228 F.3d 154, 161-62 (2d Cir. 2000) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). There can be no dispute that these events were material to Block because its own pre-breach 10-K confirmed that if its "privacy and security measures were ... breached, ... [Block] could incur significant financial losses and costs and liability" (¶ 19), and its post-breach 10-K confirms that Block has "incurred costs related to our investigation and response to this incident, and we could incur other losses, costs, and liabilities in connection with [the Data Breach]." ¶ 128.

Here, materiality represents precisely such a mixed question of law and fact with respect to which a federal securities law complaint may not be dismissed unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. Because Block's Common Stock's price fell 15% in response to a Form 8-K solely related to the Data Breach (¶¶ 69-70), Plaintiffs have adequately alleged materiality.

## II.   The Complaint Plausibly Alleges Falsity

Plaintiffs' allegations regarding Defendants' statements having been materially false or misleading relates initially to those statements before the Merger, which apply to the claims

brought by all Plaintiffs. In addition, the Exchange Act Plaintiffs allege that Defendants' statements made between the Data Breach and Block's disclosure of the Data Breach are also materially false or misleading. Plaintiffs have properly alleged falsity of all those statements.

### A.    Plaintiffs Have Not Engaged in Puzzle Pleading

Defendants assert that the Complaint fails to comply with the basic pleading requirements by not specifying which statements are alleged to be false or misleading and that quotations from Block's own documents constitute "puzzle pleading." D. Mem. at 7. This is surprising since Defendants are able to identify the alleged misstatements and omissions at issue and, in any event, it fails because the Complaint sufficiently "identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading." *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (rejecting puzzle pleading argument).

This is particularly true because this case is based upon Block's material omissions of (1) its failure to implement reasonable data security measures and (2) its failure to disclose the Data Breach for nearly four months. The public record demonstrates the absence of meaningful disclosure. For example, ¶¶ 98-103 and 109-114 identify specific statements in SEC filings that misleadingly describe inadequate internal controls or omit necessary facts. Quotations from the Scheme Booklet and Block's privacy policies, *e.g.*, ¶¶ 46-48, 53-55, 87, are misleading for the same reasons and both help clarify the omissions at issue and provide the corporate context that investors considered in making investment decisions. These few quotes from Block's documents are nothing like the cases cited by Defendants involving "36 pages of quotations spanning 83 paragraphs" that were alleged to be false or misleading in *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 2020 WL 4937461, at \*3 (S.D.N.Y. Aug. 24, 2020), *aff'd*, 11 F.4th 90 (2d Cir. 2021), or the "69 paragraphs spanning over 30 pages" of block quotes alleged to be

misleading in *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 479 (S.D.N.Y. 2021). Plaintiffs pled the specific statements and reference specific documents where Block omitted critical information regarding its data security standards and the Data Breach. Plaintiffs' Complaint does not engage in puzzle pleading; it provides the particularly necessary to satisfy the PSLRA.

### B.    Plaintiffs Properly Allege That Defendants' Pre-Data Breach Statements Were False or Misleading

Block asserts in its SEC filings that its business is dependent on its "reputation as a trusted brand" and that a "core aspect of [its] business is the reliability and security of [its] payments platforms." ¶ 25 (quoting Nov. 4, 2021 10-Q). Block further stated in its privacy notice that it took "***reasonable measures***, including [] technical, and physical safeguards, *to protect [customer] information from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction.*" ¶ 17 (emphasis added). Similarly, Block told investors that it had "implemented technical and organizational measures designed to secure ... [PII] from ... unauthorized access, use, alteration, or disclosure." ¶ 47.[5] These statements are actionable and not meaningless puffery. As Block noted, "the information it acquires ... is subject to laws and regulations in the United States, the European Union, and elsewhere." ¶ 46.[6] These laws impose specific cybersecurity standards.

Defendants wrongly claim that "Plaintiffs do not specify *what* law or standard [Block purportedly] violated, and *how* the alleged violation occurred." D. Mem. 11 n.6 (cleaned up). That

---

[5]    A company's public statements can be actionable if made outside of SEC filings. *See SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 258 (N.D.N.Y. 2014) ("publicly-disseminated press releases, research reports, and website representations that contain materially false and misleading statements regarding an issuer of securities satisfies the 'in connection with' requirement"); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1227 (N.D. Ga. 2019) (finding actionable misstatements "on [Equifax's] website that it 'takes great care to ensure that we use and process personal data in ways that comply with applicable regulations and respects individual privacy.'").

[6]    The Scheme Booklet stated, "[Block] has provided and is responsible for the [Block] Information." ¶¶ 50(d), 51. Also, Block acquired Afterpay and is responsible for the information.

contention, which cites only 15 U.S.C. § 78u-4(b)(1) and Rule 9(b), does not apply to the Securities Act claims OIP brings. *See generally* 15 U.S.C. § 77z-1 (imposing no particularity requirement on Securities Act claims); Section IV.A, *infra* (notice pleading applies to OIP's claims). In any event, the Complaint alleges that the FTC imposed data security standards on companies and that a "failure to maintain reasonable and appropriate data security for consumer's sensitive [PII] is an 'unfair practice' that violates the FTC Act." ¶ 26. Plaintiffs even cited *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015), holding that lax cybersecurity practices violate the FTC Act. This holding was based on the FTC's cybersecurity guidelines and principles requiring industry standards and confirming that companies should "allow only trusted employees with a legitimate business need to access [a company's] network." *Id.* at 257.

The Complaint cites these same FTC cybersecurity guidelines, instructing businesses to limit access to customer PII "to employees with a legitimate business need." ¶ 26. Thus, Plaintiffs *did* specify the applicable *law* and *standards* that Block violated. *See In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (finding company's data breach and failure to protect consumer information violated the FTC Act and its standard of care and that plaintiffs had sufficiently alleged negligence *per se* claims).

Plaintiffs' cybersecurity expert, Monty Myers, also detailed *how* the alleged violations occurred and the applicable industry standards, concluding that Block lacked adequate information security protections "as it relates to former employee and system access controls." ¶ 30. He also concluded that the Data Breach was indicative of "material inadequacies in Block's access management, employee off-boarding, system monitoring, and data protection controls, particularly with respect to customer data." ¶ 124. These conclusions, based on a review of available evidence and decades of IT and cybersecurity industry knowledge and experience, bolster already plausible

allegations regarding Block's inadequate data security measures. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (vacating dismissal of a complaint where plaintiffs' adequately alleged falsity based on expert's opinion regarding industry norms); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 447 (S.D.N.Y. 2015) (finding expert's opinion supported claims because the "opinion regarding industry standards is based on his recollection of what was common in the industry over the course of two decades, that opinion is based on 'sufficient facts or data' for purposes of opining about what was in fact standard in the industry"); *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) ("it is permissible for a plaintiff to bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify").[7]

Moreover, Block's April 4, 2022 SEC disclosure confirmed that the FE downloaded 8.2 million customer records "without permission." ¶ 33. It is elementary that a reasonable company would revoke data access to all FEs. ¶ 32. Block's admission is *ipso facto* evidence that it failed to follow the FTC's standards and it lacked "reasonable measures ... to protect [customer] information from loss, theft, and misuse, and unauthorized access," despite assurances to its customers in its privacy notice. ¶ 17; *see In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (finding securities law violations plausible because "Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct"). Unsurprisingly, Block reached a multimillion-dollar settlement

---

[7]     *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 859-60 (N.D. Cal. 2019), *aff'd sub nom. Eckert v. PayPal Holdings, Inc.*, 831 F. App'x 366 (9th Cir. 2020), a non-precedential decision cited by Defendants, D. Mem. at 13, is incompatible with the precedential decision in *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 942 (9th Cir. 2023), *cert. granted sub nom. Nvidia Corp. v. Ohman J*, 2024 WL 3014476 (U.S. June 17, 2024) (denying motion to dismiss securities fraud complaint partially based on expert analysis because "the PSLRA nowhere requires experts to rely on internal data and witness statements to prove falsity").

with a consumer class alleging its failure to protect PII "was wrongful, reckless and grossly negligent." ¶¶ 37-39.

Additionally, Block's Form 10-Ks, including from February 26, 2020, ¶ 98, were false and misleading because they discussed contingent risks ("If our privacy and security measures ... are inadequate or are breached") when those risks *already existed because of inadequate controls. See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that 'speak[ ] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[ ] the reader that some of these risks may already have come to fruition' can mislead reasonable investors").

Block's cybersecurity commitments to "*reasonable measures*" are not puffery like the "aspirational internal control mechanisms" in *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019). D. Mem. at 8. They are analogous to misleading statements that an issuer had "a comprehensive and well-documented set of internal controls that provides *reasonable assurance* that its financial transactions are recorded accurately and completely, and its assets are safeguarded." *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (emphasis added) (cleaned up). In *Avon*, the corporate statements were actionable because they were sufficient guarantees of "concrete steps" taken to comply with legal obligations. *Id.* Here, the FTC's cybersecurity standards give specific meaning to Block's commitment to "reasonable measures."[8] *See also In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d at 1225

---

[8]    Because Block's commitment to cybersecurity has legally imposed standards to comply with the FTC Act's prohibition against unfair practices, 15 U.S.C. § 45 (¶ 26), investors reasonably depended on Block's statements, making Block's citations to cases addressing vague aspirational puffery absent genuine requirements inapplicable. D. Mem. at 9-10 (citing *ECA, Local 134 IBEW Jt. Pension Tr. of Chicago*, 553 F.3d at 205-06; *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 11 F.4th 90, 103 (2d Cir. 2021); *Singh v. Cigna Corp.*, 918 F.3d 57, 60, 63-64 (2d Cir. 2019); *In re Citigroup Sec. Litig.*, 2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023); *In re Marriott Int'l, Inc.*, 31 F.4th 898, 902-03 (4th Cir. 2022). *See also In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (holding

("statements affirming a commitment to cybersecurity can be actionable because a reasonable investor might rely upon such statements in making investment decisions").

Block also cannot save itself by hiding behind cautionary language and generic warnings. D. Mem. at 11. Such warnings are insufficient to disclaim corporate responsibility and avoid liability for misleading statements and omissions under Section 10(b). *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."). As the Second Circuit noted, "[o]ne cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors." *Id.*; *see also In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized").

Moreover, Block's categorization of its cybersecurity measures as "reasonable" was false because it failed to meet the most basic standards of data security. Although Block did not need to describe itself in "a pejorative manner," D. Mem. at 12, its description failed to truthfully describe the status of its cybersecurity procedures. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022) ("'Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.'") (citation omitted); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d at 1229 ("Equifax assured the public that it made efforts to remain in compliance with data laws, regulation, and standards, even though in reality

---

"materiality turns on what a reasonable investor would consider 'important'" and rejecting "Defendants' position that code statements can *never* be material as a matter of law").

its cybersecurity was in a state of disrepair. Therefore, under the facts alleged, these assurances that Equifax made efforts to comply with data protection laws and best practices were false or misleading."); *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 951 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, 2024 WL 2883752 (U.S. June 10, 2024) ("broad pronouncements without meaningful acknowledgement of the known risks of improper data access and disclosure does not suffice to invoke the safe harbor provision").

In any event, whether Block implemented "reasonable measures," ¶ 17, and sufficiently disclosed the applicable risks are inherently factual issues that cannot be decided at this stage. "A complaint may not be dismissed 'on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 549 (S.D.N.Y. 2017) (citation omitted); *cf. Billitier v. Merrimack Mut. Fire Ins. Co.*, 777 F. Supp. 2d 488, 491 (W.D.N.Y. 2011) ("Assessing whether 'reasonable care' was taken necessarily includes a fact-intensive analysis.").

### C. The Exchange Act Plaintiffs Also Properly Allege the Falsity of Defendants' Post-Data Breach Statements

Block's statements after the December 10, 2021 Data Breach were also misleading. After the Data Breach, Block was obligated to disclose it in a timely and complete manner. Indeed, the SEC expressly stated in 2018 that "[c]ompanies are required to establish and maintain appropriate and effective disclosure controls and procedures that enable them *to make accurate and timely disclosures of material events, including those related to cybersecurity.*" *Commission Statement and Guidance on Public Company Cybersecurity Disclosures*, Release No. 33–10459 (Feb. 21, 2018), 83 Fed. Reg. 8166, 8167 (Feb. 26, 2018) (emphasis added). The current SEC cybersecurity rule requires that an 8-K disclosure report "be filed *within four business days* after the registrant

determines that it has experienced a material cybersecurity incident" (SEC Form 8-K Instructions B.1) (emphasis added). Although this four-day rule was only authorized after Block's Data Breach, Block's disclosure delay of nearly *four months* is strong evidence of false and misleading conduct.

As Plaintiffs' cybersecurity expert, Monty Myers, concluded, the breach was likely detected by Block's data protection protocols and mechanisms "within days or weeks" and prior to Block's January 12, 2022 press release regarding its ISO 270001 certification. ¶ 124. This conclusion is supported by numerous facts and inferences that are detailed in the Complaint, ¶ 122, and these facts coupled with the motive allegations in ¶¶ 125-127 create a strong inference of scienter with regard to the Exchange Act claims. Because Block boasted that its "certification validates the strength and effectiveness of [Block's] information security management system [] and signified [Block's] commitment to securing both company and customer data," ¶ 104, Block misled investors by failing to provide *any* indication of the Data Breach that occurred a month earlier. ¶ 63. The ISO certification announcement, ¶ 124, was also materially misleading because of Block's inadequate security measures. ¶¶ 31-32. The Second Circuit has held that, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250.

Not only did Block fail to disclose the Data Breach in its January 12, 2022 press release touting the "strength and effectiveness" of its cybersecurity, Block failed to mention it in its February 24, 2022 Annual Report on Form 10-K (the "2021 10-K"). ¶ 109. That 10-K was misleading on two counts: it failed to disclose that Block's privacy and security measures were inadequate and it failed to acknowledge the Data Breach. ¶¶ 109-114. Instead, it noted, "*if our privacy, data protection, or data security measures ... are inadequate or are breached ... our reputation and business could be damaged.*" ¶ 111 (emphasis added). Block again addressed

privacy through a partial and misleading disclosure without "tell[ing] the whole truth." *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*14 (S.D.N.Y. Mar. 25, 2013) ("the disclosures failed to warn investors that the risks were not hypothetical—which, of course, dramatically increased the possibility of adverse consequences. That is what makes the forward-looking disclosures misleading"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 703 ("the complaint plausibly alleges that Alphabet's warning in each Form 10-Q of risks that 'could' or 'may' occur is misleading to a reasonable investor when Alphabet knew that those risks had materialized"); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at \*6 (D.N.J. July 31, 2020) (holding statements were actionable because defendants' risk disclosure "framed a data breach as a potential risk when such a risk had already materialized").

The SEC's interpretive guidance regarding public cybersecurity disclosures bolsters Plaintiffs' argument because the SEC warned that "if a company previously experienced a material cybersecurity incident involving [for example] denial-of-service, it likely would not be sufficient for the company to disclose that there is a risk that a denial-of-service incident may occur." 83 Fed. Reg. at 8170. Rather, the SEC concluded, "the company may need to discuss the occurrence of that cybersecurity incident and its consequences as part of a broader discussion of the types of potential cybersecurity incidents that pose particular risks to the company's business and operations." *Id.* Block did nothing close to this in its 2021 10-K. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 700 ("In evaluating whether an omission relating to cybersecurity is materially misleading, we may consider the SEC's interpretive guidance regarding the adequacy of cybersecurity-related disclosures."). Regardless, Block had "a continuing duty to update or correct past statements when they became known to be misleading." *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010). This included the misleading statements/omissions in its 2021

- 14 -

10-K ("if our privacy, data protection, or data security measures ... are inadequate or are breached or otherwise comprised"), ¶ 111, and other post-breach statements failing to disclose the impact of the Data Breach and Block's lack of reasonable data security measures. ¶¶ 106-114.

Finally, Defendants argue that Block's omissions are not actionable because in some cases its public statements and filings "said *nothing at all* regarding data security." D. Mem. at 15. That is not exculpatory. "The test for whether a statement or omission is materially misleading ... is not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Maher v. Glob. Factors LLC*, 2024 WL 3356985, at *12 (S.D.N.Y. July 8, 2024) (cleaned up). Critically, "under the federal securities laws, 'literal accuracy is not enough. An issuer must also desist from misleading investors by saying one thing and holding back another.'" *Id.* Thus, "'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Id.*; *see Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (holding that Section 10(b) "covers half-truths"). In this regard, "[a] company that chooses to tout positive information to the market must do so without 'directly contradicting what the defendant knew at the time, or creating an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *5 (S.D. Cal. June 20, 2024) (citation omitted).

Here, Block's February 24, 2022 letter to its shareholders focused on rosy details, ignoring the thorns relating to the Data Breach. ¶ 108 (stating, "We delivered strong growth ..."). This was remarkable when Block's own SEC filings from a year before expressly warned that if there was a data breach, "we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to litigation,

- 15 -

regulatory scrutiny, and investigations." ¶ 21. Similarly, Block's January 31, 2002 press release and filing trumpeting "even better products and services for sellers and consumers," ¶¶ 106-107, failed to mention that millions of Block consumer customers had just had their PII disclosed and that, as it had previously warned, "Block's reputation and business could be damaged." ¶ 21. Ultimately, Plaintiffs easily meet the pleading standard regarding omissions that a reasonable investor would have considered significant. *See Ganino*, 228 F.3d at 161. This is especially so because the Exchange Act Class alleges Block's fraudulently inflated stock value was directly used to acquire Afterpay and Afterpay shareholders are now suing Block for exactly this misconduct. *See Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) ("the lack of an independent duty is not ... a defense to Rule 10b–5 liability because upon choosing to speak, one must speak truthfully about material issues").

## III.    The Exchange Act Plaintiffs Allege Facts Creating a Strong Inference of Scienter With Respect to Their Claims[9]

The Exchange Act Plaintiffs satisfy the scienter requirement of the Exchange Act by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). The Complaint satisfies both of these alternatives and Plaintiffs can successfully plead scienter even if there are insufficient scienter allegations with regard to any particular individual defendant. Indeed, Defendants are simply wrong when they argue that "there can be no finding of scienter as to Block unless Plaintiffs adequately plead scienter as to the Individual Defendants." D. Mem. at 18.

---

[9]    As explained below, OIP does not allege fraud or scienter, and for that reason it does not join this section of Argument. All references to Plaintiffs in this and any other sections explaining how Defendants committed fraud are made by and on behalf of the Exchange Act Plaintiffs only.

As the Second Circuit held, "it is possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *see also Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020) ("a shareholder need not always identify the individuals responsible for the fraudulent statement"). All that is required is that allegations "must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex Cap. Inc.*, 531 F.3d at 195. As noted below, there are sufficient allegations of scienter to impose liability without group pleading, and the Second Circuit has held that in 10b-5 cases, "[m]alice, intent, [and] knowledge ... may be alleged generally." *Setzer*, 968 F.3d at 212; *see also Novak v. Kasaks*, 216 F.3d 300, 307-09 (2d Cir. 2000) (discussing scienter pleading standards).

### A.     Defendants Were Motivated and Had the Opportunity to Misrepresent and Conceal Block's Cybersecurity Failures in Order to Complete the Merger

The Second Circuit has held that "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). This theory has been utilized multiple times within the Second Circuit to successfully allege motive when a company uses its stock as currency to acquire other assets.[10] *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 170 (D. Conn. 2019) ("the plaintiffs more than adequately pled that the defendants' price-hike strategy was implemented to increase revenue and inflate the price of their stocks to use as currency to acquire Actavis"); *In re Initial Public Offering Secs. Litig.*, 358 F. Supp. 2d 189, 215 (S.D.N.Y. 2004) (finding scienter alleged based on allegations that "Defendants may have been motivated to keep

---

[10]   "The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013).

the price of the ADSs high in order to use them in acquisitions" and "omitted material facts in earnings announcements and press releases"); *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) ("Plaintiffs allege that defendants' 'specific goal' was to acquire companies. This motive is sufficiently concrete to support a strong inference of scienter."); *ECA, Local 134 IBEW Jt. Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 n.6 (2d Cir. 2009) (noting this theory of liability generally requires "a unique connection between the fraud and the acquisition" and citing *In re Complete Mgmt. Inc. Secs. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (holding plaintiffs successfully alleged motive when "defendants sought to maintain the artificially high stock price so that [the company] might use that stock as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivables.")). Accordingly, "the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement," and this includes using inflated stock as currency to acquire another company. *Id.*

Here, the Exchange Act Plaintiffs allege Block executives were determined to use Block's stock to acquire Afterpay because "they could obtain corporate synergies by merging Block and Afterpay." ¶ 40. They believed "Afterpay could help Block's quest to become a financial technologies super app, which could expand access to consumers and drive additional revenue for sellers." *Id.* Block and Afterpay discussed a merger previously. ¶ 41. In August 2021, Block and Afterpay entered into the Deed for Block to acquire Afterpay at a fixed exchange ratio based on the then-value of Block shares in relation to Afterpay shares. ¶¶ 41, 62. On December 7, 2021, Afterpay shareholders received a letter with an expert report (the Lonergan Edwards report) that discussed the Transaction and the value of Block shares in relation to Afterpay shares that included a recommendation that based on the current share values the deal should be approved. ¶¶ 61-62.

Afterpay shareholders were solicited through a Scheme Booklet noting that Block "publishes its privacy policies and terms of service, which describe its practices concerning the use, transmission, and disclosure of information." ¶ 46. That policy represented that Block took "*reasonable measures*, including administrative, technical, and physical safeguards, *to protect* [PII] *from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction.*" ¶ 17 (emphasis added). The Scheme Booklet confirmed Block's data collection "is subject to laws and regulations in the United States, the European Union, and elsewhere." ¶ 46.

Block CEO Jack Dorsey was personally involved in soliciting Afterpay shareholders' approval of the Merger, and he wrote a letter to them that stated, "your vote is important in order to ensure the Scheme is implemented," and he lauded the merger as a chance to "unite two companies aligned in a shared mission of economic empowerment and financial inclusion." ¶¶ 10, 52. Dorsey and Jim McKelvey, ¶ 12, were critical to the control and management of Block's Afterpay acquisition strategy. ¶¶ 95-96. Block's CFO Amrita Ahuja was also directly involved in negotiating the Merger and signed the offering documents soliciting Afterpay shareholders, and through stock awards, bonuses, and incentives she stood to realize millions of dollars as a result of the completion of the merger. ¶ 11.

Based on the Scheme Booklet and valuations, Afterpay shareholders approved the Merger on December 14, 2021, in a special meeting, ¶ 65, and an Australian court approved the fairness of the transaction on December 17, 2021, using the independent expert report that determined that the merger scheme share value was "in the best interest of scheme shareholders." ¶¶ 62, 67. The Australian court stated in a December 29, 2021 decision approving the acquisition that the "amended scheme contemplates the issue of securities (being securities in Block (formerly Square) to be issued by Block) to Scheme Shareholders as consideration for their relevant Afterpay share."

¶ 67(a) (quoting *Re Afterpay Ltd*, [2021] NSWSC 1709 (Dec. 29, 2021), 2021 WL 6143789).

Afterwards, the deal was dependent on approval from the Bank of Spain, ¶ 59, which was not

obligated to make a decision until April 2022,[11] and this condition subsequent was eventually

resolved so that the merger closed on January 31, 2022. ¶ 107.

Unbeknownst to Afterpay's shareholders or the market, Block's inadequate cybersecurity

protections were breached on December 10, 2021, and 8.2 million customers' PII was

compromised. ¶ 33. Although Block was required by the Deed to inform Afterpay of any

significant new matters that arose during the merger process, ¶ 44, Block never did so and it

delayed disclosure until after it closed the Merger. ¶ 33. This Court may draw reasonable

inferences regarding Defendants' motivation to misrepresent and conceal material facts until after

April. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 707 (reversing dismissal because there were

strong inferences that the concealed cybersecurity failures were "calculated to 'buy time'"). Here,

Block, its CEO Jack Dorsey, and its CFO Amrita Ahuja had significant interests in completing the

merger and concealing Block's cybersecurity failures because, as Block's own SEC filings, signed

by Dorsey and Ahuja, admitted, "[a]ny errors, data leaks, security breaches ... or other performance

problems with our products or services caused by external or internal actors could hurt our

reputation and damage our customers' businesses." ¶ 23 (quoting August 2, 2021 Form 10-Q).

Indeed, Dorsey is particularly familiar with how a data breach could seriously impact Block

because, as Twitter's CEO, he was forced to hire a cybersecurity expert in 2020 in response to

well-publicized breaches at Twitter. ¶ 119. The expert eventually confirmed that Twitter, like

Block, suffered from "egregious deficiencies, negligence and willful ignorance," and Dorsey's

---

[11]   As noted in Block's filings, "the Scheme would remain subject to the Bank of Spain condition
being satisfied by 14 April 2022." Ex. B, ECF No. 92-2, at 5.

prior knowledge and involvement assists in "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). It is plausible to infer that Twitter's cybersecurity culture carried over to Block through Dorsey, and "[c]ourts in this district have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *10 (S.D.N.Y. May 1, 2024).

More importantly, if Block's inadequate cybersecurity and breaches were disclosed before the completion of the Merger, it would directly impact whether the stock exchange between Afterpay shareholders was considered fair and reasonable by the independent valuation expert. ¶ 62. This expert valuation report was incorporated into the December 29, 2021 Australian court decision that approved the merger and found that the expert report confirmed "that the amended scheme is in the best interest of scheme shareholders." ¶ 67(c). Therefore, if any information about Block's cybersecurity deficiencies leaked before the Merger was complete, the conclusions of the expert report valuation would have significantly changed, and Block would have been unable to use the same amount of its own stock to acquire Afterpay. This would have put the entire merger and the benefits the Defendants expected to derive in jeopardy. ¶¶ 65-68, 125-127.

**B.    Defendants Knew of or Recklessly Ignored Block's Cybersecurity Failures**

Even if Plaintiffs were unable to provide a motive for Block's misrepresentations and omissions, it is not necessary to provide a specific motive to the defendants because "[t]he absence of a motive allegation ... is not dispositive." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (citation omitted) (holding district court erred by dismissing securities fraud complaint that alleged defendants intentionally or recklessly failed to disclose information that might harm the corporate defendant). Notably, "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally

- 21 -

or recklessly." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 n.3 (2007). Thus, in the Second Circuit, scienter can be successfully pled without regard to individual motives based solely on defendants' conscious misbehavior or recklessness. *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

When pleading this alternative option, "[c]ircumstantial evidence can support an inference of scienter in a variety of ways." *Id.* This includes "where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Id.* (citation omitted). The Complaint easily meets the Second Circuit's conscious misbehavior or recklessness pleading standard.[12]

Starting in reverse order, Block failed to check information it had a duty to monitor. The Scheme Implementation Deed required Block to "promptly provide to Afterpay any further or new Information" that materially related to the Afterpay merger. ¶¶ 44-45. Block publicly committed itself to implementing "technical and organizational measures designed to secure ... [PII] from ... unauthorized access, use, alteration, or disclosure." ¶ 47. But it was asleep at the wheel and provided no update on the Data Beach or its inadequate cybersecurity for nearly four months.

Second, Block knew facts or had access to information that suggest Defendants were aware of or recklessly ignored the Data Breach and Block's related cybersecurity failures. *See Setzer*, 968 F.3d at 215 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to

---

[12]   The Second Circuit has noted that the applicable pleading standard at this stage "does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Emps.' Ret. Sys. of Gov't of the V.I.*, 794 F.3d at 306 (citation omitted).

information contradicting their public statements"). In particular, Block acknowledged that the company obtained ISO 27001 certification by January 12, 2022, ¶ 104, but public records indicate that this certification was actually obtained in November 2021. ¶ 123. Significantly, ISO 27001 certification means that Block would have implemented "*comprehensive requirements for active executive leadership involvement* across areas such as policy, process, records, ownership, risk management, resourcing, and communication." ¶ 104 (emphasis added). The certification would have required ISO 27001 mandated management reports before the Data Breach "of security incidents and breaches." ¶ 121.

According to Plaintiffs' cybersecurity expert, Monty Meyers, that fact coupled with Block's status as a broker-dealer that was subject to SEC, FINRA, and Sarbanes-Oxley rules meant that it was "more likely than not the breach was detected by the established data protection protocols/mechanisms at Block/CashApp within days or weeks of the breach, prior to Block's January 12, 2022 press release regarding its ISO 270001 certification." ¶ 124.[13] Meyers' opinion supports the inference that Block likely discovered the breach shortly after it occurred, which supports the plausibility of Defendants' knowledge prior to the April 2022 public disclosure. ¶ 33.

---

[13]   Although Defendants argue and cite case law that it is "well established that an expert may not opine on the state of mind or knowledge of a party," D. Mem. at 22, Plaintiffs' expert bolsters the scienter allegations that Defendants "*knew facts or had access to information*" from the ISO 27001 mandated management reports that would have been available as early as November 2021. Case law supports using expert analysis to support allegations regarding a defendant's access to information. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479 (S.D.N.Y. 2016) ("Dr. Parisian may opine on what documents in Bayer's possession said—in other words, on what Bayer 'knew' in the sense of what information was in its possession—or on the FDA's or Bayer's intent to the extent it is 'clearly indicated in public documents.'"). Furthermore, at the motion to dismiss stage, Plaintiffs' expert analysis and scienter allegations should be given the benefit of the doubt. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("[N]either the district court, nor we, can conduct a battle of experts on a motion to dismiss. Rather, we must assume the truth of the allegations pleaded with particularity in the complaint. The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.").

Moreover, as the Ninth Circuit noted with regard to Alphabet's cybersecurity failures, "given the importance of the information, 'it would be 'absurd' to suggest that management was without knowledge of the matter.'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 706 (cleaned up). *See also Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024) (finding inference of scienter based on information available to executives and supported by the core-operations doctrine, which "simply reflects the commonsense assumption that executives are likely to know more about things central to their business"); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024) ("The 'core operations' doctrine also bolsters the inference of scienter here.").

It is just as absurd to find now that Block's management remained unaware of Block's cybersecurity failures, especially because Block's senior management would have received mandated ISO 27001 management reports, had signed SEC filings regarding the impact "security breaches" could have on Block's reputation, ¶ 23, and were directly involved in the Afterpay acquisition that was not completed until January 31, 2022. Indeed, Block's core business is directly impacted by consumer data privacy issues. ¶¶ 13-15. Accordingly, the specific facts alleged in the Complaint support an inference that Block and its management, including Defendants Dorsey and Ahuja, were aware of or recklessly ignored the Data Breach and the prior red flags about vulnerabilities in Block's security, which included prior hacks and customer complaints.[14] ¶¶ 115-20. "These allegations, 'taken collectively,' give rise to a 'cogent and compelling' inference that [Block] elected not to disclose the reports of adverse events not because it believed they were

---

[14]   *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) ("[I]t is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading.").

meaningless but because it understood their likely effect on the market." *Matrixx Initiatives*, 563 U.S. at 49 (quoting *Tellabs, Inc.*, 551 U.S. at 314). *See also Setzer*, 968 F.3d at 216; *San Antonio Fire & Police Pension Fund*, 2024 WL 1898512, at *9 (citing *Tellabs, Inc.*, 551 U.S. at 324) ("But here, Defendants' own statements suggest that they had access to—and reviewed—such information. Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to.").

Third, Block engaged in illegal behavior by failing to comply with the FTC Act, 15 U.S.C. § 45. ¶ 26. A company acts unlawfully and inequitably when it "publishes a privacy policy to attract customers who are concerned about data privacy, fails to make good on that promise by investing inadequate resources in cybersecurity, exposes its unsuspecting customers to substantial financial injury, and retains the profits of their business." *Wyndham*, 799 F.3d at 245 (discussing FTC Act and inadequate cybersecurity measures). In this case, Block duped its customers and Afterpay shareholders by asserting it had reasonable privacy and security measures when Block was aware of or recklessly ignored information that this was not accurate. Furthermore, Block's admission that there is an ongoing government investigation regarding its failures to protect its customers, ¶ 132, coupled with a recent FOIA request denial concerning information related to the Data Breach because the request relates "to an ongoing enforcement proceeding," ¶ 72, are additional evidence of Block's scienter and lack of innocent explanation. *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 n.58 (2d Cir. 2021) (noting ongoing investigation strengthens scienter allegations because "courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view") (citation omitted).[15]

---

[15] Block argues that its "launch[ing] an investigation of the Data [Breach]" is evidence of its innocence, D. Mem. at 24, but it fails to mention this investigation occurred months after the

Fourth, there is circumstantial evidence of Block's scienter because, as noted above, Block benefitted in a concrete and individual way by using its stock as currency to acquire Afterpay, a company Block was interested in acquiring since at least 2020. ¶ 41. Once alleged, "the competing inference of a mere profit motive is not enough to *defeat* the inference of scienter." *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 452 (S.D.N.Y. 2019). At bottom, "[t]he inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 451 (quoting *Tellabs, Inc.*, 551 U.S. at 322-23). In fact, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," it is sufficient if it is "strong in light of other explanations." *Id.* (cleaned up). Here, the Complaint pleads violations of the Exchange Act using either of the Second Circuit's scienter pleading theories, or both holistically, to create an inference at least as compelling as any opposing inference. ¶¶ 115-132 (scienter allegations). *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021) (court must "assess the total weight of the circumstantial allegations together with the allegations of motive and opportunity").

## IV.   OIP Properly States a Claim for a Violation of Section 12(a)(2) of the Securities Act

### A.   OIP's Allegations Comply with Federal Rule of Civil Procedure 8(a)'s Applicable Notice Pleading Requirement

Defendants are mistaken in asserting that Rule 9(b) applies to OIP's claims arising under Section 12(a)(2) of the Securities Act. Indeed, even in cases where "it is clear that plaintiffs believe [defendants] were engaged in a massive fraud[,] [t]his fact … does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *In re*

---

Data Breach and after it closed the Merger. In any event, Block receives no favorable inferences now.

*Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 263 (S.D.N.Y. 2010). Thus, "when the same course of conduct supports both a claim of fraud under the Exchange Act and a claim under … the Securities Act, the latter claim must satisfy the requirements of Rule 9(b) *unless the complaint identifies clearly an alternate basis, i.e., negligence, for the claim.*" *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *11 (S.D.N.Y. Sept. 9, 2019) (emphasis added). OIP has clearly identified an alternate basis for doing so here since the charging allegations for its Section 12(a)(2) claim explicitly contain strict liability language in referencing the claim against Block (¶ 84) and no suggestion of fraud as it relates to the Sections 12(a)(2) and 15 claims asserted against Dorsey and McKelvey. ¶¶ 84, 92-96. Indeed, no allegation of fraud or knowledge, except in Section I, which merely describes the later Exchange Act claims, appears until after the Securities Act claims, which end at ¶ 96 of the Complaint.

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), upon which Defendants rely, is not on point because there the plaintiffs' "effort to disavow allegations of fraud in other parts of the complaint" would have "required [the court] 'to sift through allegations of fraud in search of' a claim for strict liability or negligence." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004) (citing *Rombach*, 355 F.3d at 176). Instead, "the court's conclusion … should be read in the context of the pleadings at issue in that case, in which [unlike here] the plaintiffs did not assert any claim of negligence on the part of the Individual Defendants, nor did they specify any basis for such a claim." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (citing *Rombach v. Chang*, 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002)) (cleaned up).

It is particularly inappropriate for Defendants to assert that OIP's Securities Act claims sound in fraud because Defendants have not pointed to any specific allegations made by OIP which

incorporates fraud by reference. Instead, Defendants' fraud-by-incorporation argument is effectively based upon OIP's Securities Act claims appearing in the same consolidated complaint as Plaintiffs Sotiropoulos and Sawyer's Exchange Act claims. However, the existence of a single consolidated complaint is entirely the result of Defendants' prior procedural machinations in successfully opposing OIP's prior effort to file a separate complaint. ECF Nos. 82, 84. That procedural step does not alter the separate nature of OIP's Securities Act claims because "consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Hall v. Hall*, 584 U.S. 59, 70 (2018). Instead, "consolidation 'preserv[es] the distinct identities of the cases and the rights of the separate parties in them.'" *In re Patriot Nat'l, Inc. Sec. Litig.*, 2021 WL 3418615, at *8 (S.D.N.Y. Aug. 5, 2021) (citing *Hall*, 584 U.S at 76). Here, one of the distinct elements of OIP's Securities Act claims is that they do not make any allegations sounding in fraud.

**B.    OIP's Acquisition of Block Securities is Subject to Section 12(a)(2) of the Securities Act**

Defendants contend that Section 12(a)(2) does not apply to the sale of Block securities to OIP because: (i) the offering was impermissibly extraterritorial; and (2) did not involve the use of a prospectus. Defendants are in error with respect to both arguments.

**1.    OIP's Claims Do Not Involve the Extraterritorial Application of the Securities Act**

Defendants contend that this Court does not have jurisdiction over OIP's Securities Act claims because they involve the extraterritorial application of the Securities Act to Block CDIs which "only trade on the *Australian* Stock Exchange." D. Mem. at 25. However, the precise location where the Block CDIs trade does not properly address the issue of whether the Block

CDIs were issued "in connection with the purchase or sale of a security listed on an American stock exchange." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 273 (2010).

Here, Defendants ignore that Block CDIs are, in fact, securities issued in connection with Block Common Stock, which is traded on the NYSE. Thus, Afterpay shareholders, including OIP, had the option to receive *either* CDIs *or* Common Stock. ¶ 41. More fundamentally, the CDIs each represent a beneficial interest in one share of Common Stock, as the two are economically equivalent, have the same voting rights and right to receive dividends, and each can be converted into the other. ECF No. 92-1 at 31-33, 48-49. The CDIs are thus equivalent to the Common Stock traded on the NYSE and satisfy *Morrison*'s test. *See SEC v. Compania Int'l Financiera SA*, 2011 WL 3251813, at *6 (S.D.N.Y. July 29, 2011) (U.K. investor's purchase of "contracts for difference," the value of which was dependent on securities traded on the NYSE, was sufficient to satisfy *Morrison* test). More recently, in *Canoo Inc. v. DD Glob. Holdings Ltd.*, 2023 WL 6162296, at *1, 4-6 (S.D.N.Y. Sept. 21, 2023), private purchases of non-U.S. "participation notes" were held to constitute transactions in connection with a security listed on a U.S. exchange under *Morrison* because they were deliberately undertaken to change the defendant's official ownership of shares that were exclusively listed on a U.S. exchange from being direct to being indirect for purposes of compliance with national security concerns about foreign investment in the U.S. Here, the CDIs trade in Australia for purposes of convenience rather than national security (ECF No. 92-1 at 19), but that is not a meaningful distinction.

Thus, as in *Canoo*, the shares in question are "inextricably linked to the purchase or sale" of "common stock on the NYSE," and qualify under *Morrison*. *Compania Int'l Financiera SA*, 2011 WL 3251813, at *5. That inextricable link is inseverable, as not only do CDI holders have a

contractual right to convert their CDIs to Common Stock at any time, Common Stock holders have contractual right to convert their Common Stock to CDIs at any time. ECF No. 92-1 at 33.

Courts confronted with similar facts in which the value of a foreign security was linked to a U.S. traded security have uniformly held that the link was sufficient to support application of U.S. securities laws. *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304 (S.D.N.Y. 2011), illustrates this point. The *Valentini* court held that structured notes linked to the value of, or convertible into shares of, stock traded on the NYSE supported jurisdiction under *Morrison* even if purchased by a Brazilian resident. *Id.* at 323-24; *see also In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *6 (S.D. Tex. June 15, 2017) (following *Valentini* and finding that foreign notes convertible upon maturity into common stock traded on a domestic exchange likely "would qualify as a transaction involving securities listed on a domestic exchange for purposes of *Morrison*").

Here, the facts supporting jurisdiction under *Morrison* are substantially stronger since Block CDI holders have the contractual right to convert or redeem those securities into shares of Block common stock. *See* ¶ 68 (referencing "Common Stock underlying 95,377,954 New Block CDIs."); ECF No. 92-1 at 48 (explaining how CDI holders may at any time after merger request to convert CDIs into Common Stock). Indeed, it is harder to imagine a stronger link in value than the right to exchange the Block CDIs for Block common stock.[16]

An alternative basis for U.S. jurisdiction and application of U.S. securities laws exists where "the purchase or sale is made in the United States." *Morrison*, 561 U.S. at 269-70. The Second Circuit has explained that "to adequately allege the existence of a domestic transaction, it

---

[16] *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289 (2d Cir. 2021) (SUMMARY ORDER), the only case Defendants cite, is a non-precedential decision which is not on point because there the transaction involved foreign securities whose only connection to the U.S. was the location of plaintiff's counterparties.

is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States," including where "the seller incurred irrevocable liability within the United States to deliver a security." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012).

Defendants, in contending that the transaction did not take place in the United States, focus on Block's indirect wholly owned Australian subsidiary acquiring those shares. D. Mem. at 25-26. However, that argument ignores that Block was a party to the contract through which Afterpay was acquired. *See* ECF No. 92-1 at 46 ("On the Implementation Date, ***Square must***, at the direction of and on behalf of Square Acquirer, ***issue New Square Securities*** to each Scheme Shareholder entitled to them as the Scheme Consideration and cause their names and addresses to be entered in the Square register." (emphasis added)). Block, as a party to the Transaction, had an obligation to deliver the Block common stock eventually provided to Afterpay shareholders. *See* ¶ 68 ("In connection with the closing of the Transaction, Block issued 113,387,895 New Common Stock, including Common Stock underlying 95,377,954 New Block CDIs."). That legal obligation and the related irrevocable liability which Block incurred was in the U.S. where it is incorporated under Delaware law and headquartered in California. *See* ¶ 9; ECF No. 92-1 at 152.

### 2. The Scheme Booklet Was a Prospectus within the Meaning of the Securities Act

The Securities Act defines a Prospectus as "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security" with certain inapplicable exceptions. 15 U.S.C. § 77b(a)(10). Defendants do not, nor could they reasonably, dispute that the Scheme Booklet was a written communication offering Block's securities for sale and that Dorsey's letter was either part of that offer or confirmed that offer. Instead, Defendants contend that the Scheme Booklet is "neither an

offer to sell nor a solicitation of an offer to buy securities as such terms are defined under the Securities Act." ECF No. 92-1 at 53.

In making that argument, Defendants ignore that the Scheme Booklet was soliciting Afterpay shareholders to vote in favor of the Merger through which they would receive Block securities for their Afterpay stock. *See, e.g.*, ECF No. 92-1 at 4. This can clearly be seen through Dorsey's letter, included as part of the Scheme Booklet, asking all Afterpay shareholders to "vote … in order to ensure the Scheme is implemented and [ensure their] opportunity to participate in the future growth and performance of [Block]." ECF No. 92-1 at 14. That participation in Block's future growth and performance was through the Block CDIs or Block common stock, which Afterpay shareholders were set to acquire in connection with the Merger.

Defendants nonetheless contend that the Scheme Booklet (and Dorsey's Letter) was not a "prospectus" because the Supreme Court limited the definition of a "prospectus," as used in the Securities Act, to a prospectus which is required to be filed as part of a registration statement with the SEC. *See* D. Mem. at 27-29 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)). That is not correct as *Gustafson* held that "securities exempted by § 3 of the [Securities] Act do not require registration, although they are covered by § 12." 513 U.S. at 579. Thus, offerings made pursuant to a Section 3(a)(10) exemption, such as the case at bar, are "typically public offerings by an issuer" subject to Section 12 liability. Harold S. Bloomenthal and Samuel Wolff, 10A *Int'l Capital Markets and Securities Regulation*, §14:20: Action for fraud in the sale of securities generally— Section 12(2) and the trading market—Applying the new construct.

Here, Block relied on the Section 3(a)(10) exemption in issuing Block securities to former Afterpay shareholders (*see* ECF No. 92-1 at 53) but pointedly did *not* rely on the exemption afforded to private offerings by Section 4(a)(2) of the Securities Act, 15 U.S.C. §77d(a)(2). Nor

would it have made sense for Block to do so, because, notwithstanding Defendants' arguments to the contrary (D. Mem. at 27-29), the sale of Block securities to former Afterpay shareholders was *not* a private offering since the Supreme Court long ago held that an offering made to all the shareholders of a publicly traded company such as Afterpay is *not* private offering. Instead, "*an offering of securities to all redheaded men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less 'public', in every realistic sense of the word, than an unrestricted offering to the world at large*." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953) (emphasis added).

Section 4 of the Securities Act only exempts "transactions by an issuer not involving any public offering" from registration. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 627. *In re Refco, Inc. Sec. Litig.*, *Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.*, 680 F. Supp. 2d 616, 624 (S.D.N.Y. 2010), and *Yung v. Lee*, 432 F.3d 142, 145, 149 (2d Cir. 2005), upon which Defendants rely, are not on point because they involve a Section 4(a)(2), 15 U.S.C. § 77d(a)(2), exemption from the Securities Act's registration requirements for private securities offerings rather than the Section 3(a)(10) exemption at issue in this case. Specifically, those cases implicated SEC Rule 144A, which expressly provides that securities sold in compliance with its provisions "shall be deemed not to have been offered to the public." 17 C.F.R. § 230.144A(c).

### 3. Defendants Also Are Liable Based Upon Having Assumed a Duty to Update the Scheme Booklet

Block's statements were false or misleading when made, as explained in Section I.A.1, *supra*. Specifically, the Scheme Booklet represented that Block's privacy policies and terms of service "describe its practices concerning the use, transmission, and disclosure of information" and otherwise incorporated Block's misleading SEC risk factor disclosures. ¶¶ 46-48, 54-55.

Defendants argue that they were under no duty to disclose the Data Breach, which happened after the Scheme Booklet was supplemented on December 7, 2021. D. Mem. at 29-30. *In re Int'l Bus. Machs. Corp. Sec. Litig.* ("*IBM*"), the sole case cited by Defendants for this proposition, held that a solicitation was "not sufficiently concrete, specific or material to impose a duty to update," 163 F.3d 102, 110 (2d Cir. 1998). *IBM* is inapposite because even assuming *arguendo* the risk factors were reasonable when made and that the federal securities laws did not impose a duty to update on Block, the Deed and Scheme Booklet did. The merger agreement required Block to "promptly provide to Afterpay any further or new Information as may arise after the Scheme Booklet has been sent to Afterpay Shareholders and until the date of the [Special] Meeting as may be necessary to ensure that the Information contained in the Scheme Booklet is not, having regard to applicable disclosure requirements, false, misleading or deceptive in any material respect (including because of any material omission)." ¶¶ 43-44. The duty to update was triggered when "a significant new matter [arose] and it would have been required to be included in this Scheme Booklet if known about at the date of lodgement with ASIC." ¶ 45; ECF No. 92-1 at 126. If such information were timely disclosed to Afterpay, the Scheme Booklet would have been updated and the Securities Act Class could have made an informed vote. ¶ 45. However, Block failed to advise Afterpay of the Data Breach, as it was required to do. ¶ 44. As a result, the Securities Act Class has claims under the Securities Act.

Defendants also assert that Plaintiffs fail to allege that Defendants knew of the Data Breach before the Scheme Meeting on December 17, 2021. D. Mem. at 30. However, *scienter* is not an element of a Section 12(a)(2) claim. Plaintiffs allege, and Defendants ignore, that "[s]ome experts believe that the breach came from an orphaned account still active on a third-party software as a service ('SaaS') application like a cloud storage solution or from a lack of proper communication

protocols between Block's Human Resources and IT departments." ¶ 35. In either event, Block plausibly would have known that it was paying for an orphaned account on a SaaS or that network credentials were in use for an ex-employee. Block's ability to figure out the who, what, where, and when of the Data Breach (¶ 33) confirms it possessed the data required to do so. Defendants do not attempt to explain why it matters whether they knew about the Data Breach considering they may be "held liable for mere negligence" with no need for OIP to allege "scienter, reliance, or loss causation." *Lozada v. TaskUs, Inc.*, 2024 WL 68571, at *9 (S.D.N.Y. Jan. 5, 2024) (citation omitted). Indeed, it is reasonable to infer Block allowing an ex-employee to maintain credentials to download the PII of 8.2 million current and former customers suggests the same gross negligence present at Twitter when Dorsey was its Chief Executive Officer. ¶¶ 38, 119.

## V.    Plaintiffs' Control Person Claims Are Plausible

Defendants' argument for dismissal of control person claims is limited to the lack of a plausible primary claim. D. Mem. at 30. However, as detailed above, Plaintiffs sufficiently allege primary violations of the securities laws. Consequently, their claims for control liability survive.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request the Court deny the Motion in its entirety. In the event the Court finds the Complaint insufficient, Plaintiffs request leave to amend to address any deficiencies the Court might identify.

DATED: August 14, 2024

Respectfully Submitted,

By: */s/ Jeffrey S. Abraham*
Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 Seventh Avenue, 38th Floor
New York, NY 10123
Telephone: (212) 279-5050
Facsimile:  (212) 279-3655
jabraham@aftlaw.com
mklein@aftlaw.com

*Co-Lead Counsel for Securities Act Claim Plaintiff*

Peretz Bronstein
Yitzchak E. Soloveichik
Eitan Kimelman
**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile:  (212) 697-7296
peretz@bgandg.com
soloveichik@bgandg.com
eitank@bgandg.com

*Co-Lead Counsel for Securities Act Claim Plaintiff*

By: */s/ Reed R. Kathrein*
Reed R. Kathrein (*pro hac vice*)
Lucas E. Gilmore (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Nathaniel A. Tarnor
**HAGENS BERMAN SOBOL SHAPIRO LLP**
68 Third Street, Suite 249
Brooklyn, NY 11231
Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
nathant@hbsslaw.com

*Lead Counsel for Exchange Act Claims Plaintiffs*

Brian J. Schall (*pro hac vice* forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile:  (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Exchange Act Claims Plaintiffs*